### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| TECHNOLOGY TRAINING ASSOCIATES, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 8:16-cv-01622-AEP |
| v. | ) ) ) | |
| BUCCANEERS LIMITED PARTNERSHIP, | ) ) ) | |
| Defendant, | ) ) | |
| ————————————————— | ) ) ) | |
| CIN-Q AUTOMOBILES, INC., and MEDICAL & CHIROPRACTIC CLINIC, INC., | ) ) ) | |
| Intervenors. | ) ) | |

### INTERVENORS' *RENEWED* MOTION TO DECERTIFY SETTLEMENT CLASS, VACATE PRELIMINARY APPROVAL ORDER, AND STRIKE CLASS ALLEGATIONS

# EXHIBIT 3 through 25

## Filing Under Seal Pursuant to Order Doc. 130

Ryan M. Kelly (Fla. Bar No: 90110)
Ross M. Good (Fla. Bar No: 116405)
Glenn L. Hara (admitted *pro hac vice*)
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500

Michael C. Addison (Fla. Bar. No. 0145579)
ADDISON LAW OFFICE, P.A.
1304 Alicia Avenue
Tampa, Florida 33604
Telephone: (813) 223-2000
m@mcalaw.net

# EXHIBIT 3
(under seal)

# CinQ+MC000001-
# CinQ+MC000278

Date : 8/25/2015 5:13:18 PM
From : "Tina Natali"
To : "wral991@aol.com" , "bbuczkowski@jamsadr.com"
Cc : "David Oppenheim" , "Ross Good" , "m@mcalaw.net" , "mark.mester@lw.com"
Subject : Cin-Q Automobiles v. Buccaneers – JAMS Reference No. 1340012173
Attachment : pltfs' pre-mediation stmt.pdf;#Exhibit Index.pdf;Ex. A - Biggerstaff report w-exhibits 1-6.pdf;Ex. B - Kaiser dep.pdf;

Email 1 of 3
Attached is Plaintiffs' Pre-Mediation Statement, Exhibit Index, and Exhibits A and B.

*Tina Natali*
*Assistant to David M. Oppenheim*
*Anderson + Wanca*
*3701 Algonquin Road, Suite 500*
*Rolling Meadows, IL 60008*
*Telephone: 847-368-1500*
*Fax: 847-368-1501*

CONFIDENTIAL

CinQ+MC000001

## ANDERSON + WANCA
### ATTORNEYS AT LAW

3701 ALGONQUIN ROAD, SUITE 760, ROLLING MEADOWS, IL 60008
TEL: (847) 368-1500 • FAX: (847) 368-1501
EMAIL: BUSLIT@ANDERSONWANCA.COM

August 25, 2015

Via Electronic Mail

Hon. Wayne R. Anderson (Ret.)
JAMS
71 S. Wacker Drive, Suite 3090
Chicago, IL 60606

Re:   **PLAINTIFFS' PRE-MEDIATION POSITION STATEMENT**
Cin-Q Automobiles, et al. v. Buccaneers Limited Partnership
Reference No. 1340012173
Date of Mediation: August 31, 2015

Dear Judge Andersen:

This action involves a total of 633,483 advertising facsimiles sent on behalf of Defendant between July 14, 2009 and June 9, 2010. *See* Biggerstaff Report, attached as Exhibit A. 357,888 of these were successfully sent. *Id.* "Sent" is all that is required by the statute. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252-53 (11th Cir. 2014), citing *A Fast Sign Co. v. Am. Home Servs., Inc.*, 734 S.E.2d 31, 33 (Ga. 2012). *See also Critchfield Physical Therapy v. Taranto Group, Inc.*, 263 P.3d 767, 778-79 (Kan. 2011).

As we are sure that you know, the Telephone Consumer Protection Act ("TCPA") imposes statutory liquidated damages of $500 per fax and that figure is increased to $1,500 per fax if the court finds that defendant's violations were committed "willfully or knowingly." 47 U.S.C. § 227 (b) (3). A plaintiff need not prove that the defendant had knowledge of the TCPA's provisions in order to establish that the defendant willfully or knowingly violated the TCPA. *See Sengenberger v. Credit Control Services, Inc.*, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010) (Zagel, J.) (trebling the statutory damages to $1,500 per violation because defendants "intentionally made the contested phone calls to Plaintiff"). Thus, the liability is at least $173,944,000.00 and could be as much as $950,224,500.00.

### DISCUSSION

## I.   HISTORY OF DEFENDANT'S FAXING PROGRAM

The financial crisis that struck the United States began in earnest in the fall of 2009. Its effect on the American economy was felt in all sectors, and the impact on the business of professional football began to be noticed in the Tampa Bay area as well. It became apparent that a significant number of season ticket holders for the Tampa Bay Buccaneers were going to be

Hon. Wayne R. Andersen (Ret.)
Page 2
August 25, 2015

reluctant to renew their season tickets for 2009 because of the costs associated with that renewal. In order to find new people to occupy the seats that would be vacated as a result of the non-renewal of the season tickets, in early 2009, Buccaneers Director of New Business Development, Matthew Kaiser, pitched an idea to his superiors to "generate some ticket sales" by sending advertisements to fax numbers in and around Tampa Bay. (See Kaiser Dep. Tr., attached as Exhibit B, at p. 68.) Kaiser had access to the team's "existing contacts," but needed to drum up "new business" by targeting new potential customers because the former customers for the football game tickets were no longer interested. (Id.) Kaiser was then authorized by Defendant to hire a fax broadcaster to execute the advertising campaign. (BLP Resp. First Req. Admissions, Group Exhibit C, at No. 117.)

Kaiser knew prior to hiring FaxQom there was a federal statute called the TCPA that imposed "liability associated with the unsolicited sending of faxes." (Kaiser Dep., Ex. B, at 72, 121.) Armed with that knowledge, Kaiser conducted internet research on fax broadcasters and settled on a company called FaxQom. (Id. at 66.)

Kaiser thought consumers could "opt-in" under the TCPA if they "[a]greed to receive faxes" from the fax broadcaster. (Id. at 72, 84.) So he testified that he wanted to send advertisements for the purchase of single game tickets to the Buccaneers games to people who "had agreed to receive from FaxQom." (Id. at 97.) On June 24, 2009, Kaiser informed FaxQom in an email that "[a]fter reading some literature" about the TCPA, he was "concerned" and asked, "[c]an you please tell me if 100% of the numbers you gather have opted in, to receive your faxes?" (See E-Mail Bates No. BLP000011, attached as Exhibit D.) Kaiser asked if FaxQom would "indemnify us from any complaints or potential financial recourse as it relates to the fines imposed for spam mail?" (Id.) FaxQom stated it had millions of fax numbers, that "100% of our data is 'opt-in,'" and that it was "no problem" to indemnify BLP. (See BLP000013, attached as Exhibit E.) Kaiser "trusted" FaxQom. (Kaiser Dep., Ex. B, at 96.) Kaiser does not remember if FaxQom explained how it supposedly obtained permission from millions of people who must have indicated in writing to FaxQom that they wished to receive any facsimile advertisement that FaxQom was hired to send out on behalf of any person or firm—not just an advertisement for tickets to the Buccaneers football games. (Id. at 91.)

On June 26, 2009, Kaiser sent FaxQom a draft advertisement created by BLP, listing "group ticket" prices. (See BLP000022, attached as Exhibit F.) On July 9, 2009, BLP and FaxQom executed a "Fax Indemnity Agreement" along with the Fax Broadcast Order Form submitted by Defendant (See BLP000067-69, attached as Exhibit G.) Kaiser proceeded to place orders for thousands of fax advertisements. (Kaiser Dep., Ex. B, at 107–08.) Kaiser did not feel it was "necessary" to do anything else to verify the legality of the fax campaign. (Id. at 131.) Kaiser never asked FaxQom for a list of the fax numbers or contact information for any of the intended recipients to verify they had "opted in" and specifically agreed to voluntarily accept and print out advertisements for anyone at any time, with the only control being that the advertiser had paid FaxQom to send the advertisement. (Id. at 132.) BLP directed FaxQom to send advertisements for Buccaneers tickets to fax numbers in selected area codes on the following schedule: area code 727 – July 14, 2009; area code 813 – July 15, 2009; area codes 352 and 941 – July 16, 2009. (Ex. G.) BLP paid FaxQom $15,336.80 by a check that had to be sent by

Hon. Wayne R. Andersen (Ret.)
Page 3
August 25, 2015

overnight delivery to an address in Conroe, Texas for these first three broadcasts. (*See* BLP000038, attached as Exhibit H.) Had Kaiser checked the address specified for the overnight delivery in Google, he would have learned that it was a private mailbox service—not the business address for FaxQom.

On July 13, 2009, BLP sent FaxQom the final version of its first fax advertisement as an email attachment. (*See* BLP000040–42, attached as Exhibit I.) The proposed fax advertisement was two pages in length, including a cover page stating, "attached is the information on group seating." (*Id.*)

On July 15, 2009, BLP received a phone call from 813 area code resident Mike Paschke, complaining that he "received numerous faxes," that he had filed "law suits" against marketing companies before, that he was "going to contact [the] State Attorney office," and that he "would like a call back with the name of the marketing company [BLP] used." (*See* BLP000053, attached as Exhibit J.) Ben Milsom, BLP's Director of Sales, asked Kaiser, "[a]ny response to this?" (*Id.*)

Kaiser forwarded Milsom's email to Ed Glazer, the chairman and one of the owners of BLP (Kaiser Dep., Ex. B at 22), asking, "[w]ould you like me to call this guy back and give him the information?" (Ex. J at BLP000052). Glazer told Kaiser, "email me our signed indemnification" and do not "worry about" calling Paschke. (*Id.*) Kaiser told Milsom for future complaints about unsolicited faxes, "just tell them that the opt out info is located" on page two. (*Id.*) Kaiser told Glazer that Paschke's fax number would not be "on our next go around," and that "[a]ll is well." (*See* BLP000058, attached as Exhibit K.)

On July 22, 2009, Nick Coblio, an 813 area code resident, called BLP to complain about the unsolicited Buccaneers fax and a text advertisement received on his cell phone. (*See* BLP00677, attached as Exhibit L.) Milsom spoke to Coblio and reported to Kaiser that he threatened to "file a complaint with the FCC." (*Id.*) Kaiser responded, "just add both his fax and mobile to the list, so I can send this to the companies if we decide to go for round 2 (which we will likely do)." (*Id.*) Kaiser also referred to a "hospital" that "received all the faxes" and asked Milsom to add the Hospital's number to the "remove" list as well. (*Id.*)

Kaiser brushed off the complaints about the fax and text campaigns, stating, "[i]f these people didn't sign up for every free offer they see, then their names probably wouldn't end up in 2 separately complied [sic] marketing databases of 'opted-in' recipients. I wish there was a nice way to explain that to them." (*Id.*) In BLP's view, it was the consumers' own fault they were receiving the faxes, not BLP's. (*Id.*)

On August 13, 2009, BLP directed FaxQom to send an advertisement for "individual game tickets" to area codes on the following schedule: area code 727 – August 17, 2009; area code 813 – August 18, 2009; area code 352 – August 19, 2009; area code 941 – August 20, 2009. (*See* BLP000087, attached as Exhibit M.)

Hon. Wayne R. Andersen (Ret.)
Page 4
August 25, 2015

On August 20, 2009, attorney Phyllis J. Towzey sent a letter to BLP's registered agent complaining about the fax advertisements she received at her office on July 14, 2009, and August 17, 2009. (*See* Towzey Aff., attached as Exhibit N, at ¶¶ 1, 5, 6.) Towzey had no business relationship with BLP and did not give BLP permission to send fax advertisements. (*Id.* ¶¶ 7, 8.) Towzey warned BLP the TCPA prohibits fax advertisements without "prior express invitation or permission" and imposes $500 damages per violation, which can be increased to $1,500 for "willfully or knowingly" violating the statute, setting forth verbatim portions of the statute. (*Id.* ¶ 11; *id.*, Ex. A.) Towzey offered to settle for $1,000. (*Id.*, Ex. A at 1, 2.) Towzey warned she planned to sue BLP in this Court. (*Id.*)

Shortly thereafter, Towzey received a phone call from Manny Alvare, BLP's General Counsel, who stated he received the August 20 letter. (Towzey Aff., Ex. N, at ¶ 15; Alvare Dep., attached as Exhibit O, at 44.) Alvare told Towzey the faxes had been sent by FaxQom and that FaxQom was liable for any damages because it "sent" the fax, not BLP. (Towzey Aff., N, at ¶¶ 16, 17; Alvare Dep., Ex. O, at 44–46.)

On August 28, 2009, Craig Cinque filed a class-action lawsuit against BLP under the TCPA in Florida state court. (Exhibit P.) Cinque served the Complaint on BLP's registered agent September 7, 2009. (*Id.*) BLP hired outside counsel to defend the case. Counsel appeared in the case October 5, 2009, and filed a Motion to Dismiss.

On September 16, 2009, Towzey wrote a second letter to Alvare, stating it was irrelevant whether a "vendor actually sent the fax," since "the fax was clearly sent on behalf of the Tampa Bay Buccaneers, and expressly solicits the purchase of tickets for Bucs games." (Towzey Aff., Ex. N, at Ex. C thereto.) Alvare called Towzey again, asking her not to file a lawsuit and assuring her he would make sure she did not receive any more unsolicited faxes from BLP and "see what he could do" to make FaxQom pay her damages. (Towzey Aff. at ¶ 22.) Towzey has not received any compensation to date. (*Id.* at ¶ 23.)

On May 18, 2010, BLP directed FaxQom to send a third round of faxes to area code 813 – May 24, 2014; area code 727 – May 25, 2014; and area codes 352 and 941 – May 26, 2014. (*See* BLP000107, attached as Exhibit Q). With this request, Kaiser added handwritten language stating FaxQom will "indemnify and hold harmless Tampa Bay Buccaneers and any of its affiliates, agents, or employees harmless from any claims, complaints, or FCC violations as a result of this campaign and hereby confirms that all numbers have been collected lawfully and with cause." (*Id.*)

On June 3, 2010, the Florida Attorney General sent BLP a letter stating it received complaints that BLP had sent unsolicited fax advertisements and that it is "unlawful to transmit an unsolicited facsimile" under Florida law and "47 U.S. C. § 227(b)(1)(C) and the Junk Fax Protection Act of 2005 set forth a similar prohibition under federal law." (*See* BLP00758, attached as Exhibit R.) The Attorney General concluded that, "[b]ased upon the information received by this office, your company is in violation of either the state or federal laws (or both)," that violations "carry civil penalties of $500.00 per transmission," and that BLP was advised to

Hon. Wayne R. Andersen (Ret.)
Page 5
August 25, 2015

stop immediately. (*Id.*) Nonetheless, BLP sent three more transmissions, on June 7, 8, and 9, 2010. (Biggerstaff Report, Ex. A, Ex. 3 thereto.)

## II.   TOTAL FAXES BY DATE AND DEFENDANT'S KNOWLEDGE OF WRONGDOING

In sum, the following is a relevant time line of the faxing and events increasing BLP's knowledge of the wrongfulness of the campaign:

- July 14, 2009: 81,765 (26,044 successful)
- July 15, 2009: 78,595 (46,064 successful)
- July 16, 2009: 129,245 (45,180 successful)

   **\*\*\* Paschke and Coblio complaints \*\*\***

- August 17, 2009: 34,202 (20,032 successful)
- August 18, 2009: 52,373 (37,718 successful)
- August 19, 2009: 37,185 (26,936 successful)
- August 20, 2009: 32,425 (23,159 successful)

   **\*\*\* First lawsuit filed and served (and Defendant appeared); Towzey correspondence with Alvare \*\*\***

- May 24, 2010: 36,685 (31,879 successful)
- May 25, 2010: 47,516 (10,796 successful)
- May 26, 2010: 24,447 (21,665 successful)
- May 27, 2010: 21,400 (18,629 successful)
- May 28, 2010: 11,764 (10,039 successful)
- June 1, 2010: 9,670 (8,356 successful)

   **\*\*\* Florida Attorney General Cease and Desist Letter \*\*\***

- June 7, 2010: 17,647 (15,095 successful)
- June 8, 2010: 6,800 (5,878 successful)
- June 9, 2010: 11,764 (10,014 successful)

*See* Biggerstaff Report at Exs. 3 and 6 thereto.

## III.   THE FAXES LACKED COMPLIANT OPT OUT NOTICE

Various fax templates were used in the 16 broadcasts detailed above. (Biggerstaff Report at Exs. 2 and 5b.) Many of the faxes had no opt out notice at all. Others stated: "To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com." The remainder stated: "If your office has decided to

CONFIDENTIAL

Hon. Wayne R. Andersen (Ret.)
Page 6
August 25, 2015

opt-out of further faxes please call 866-247-0920. Thank you." (*Id.*) As discussed below, none of these opt out notices are valid under the TCPA and accompanying regulations.

## IV.   LEGAL AND FACTUAL ISSUES

Large awards are common in TCPA blast faxing cases like this one. *See, e.g., A Fast Sign Co., Inc. v. Am. Home Servs.*, Case No. 2003-CV-77276, 2010 WL 4496651 (Ga. Super. Sept. 15, 2010) (summary judgment entered in amount of $459,000,000.00, calculated at $1,500 per fax for 306,000 faxes), *aff'd by* 734 S.E.2d 31 (Ga. 2012); *Ira Holtzman, C.P.A v. Turza*, 728 F.3d 682 (7th Cir. 2013) (affirming award of $4,215,000, calculated at $500 per fax for 8,430 faxes); *G.M. Sign, Inc. v. Group C Communications, Inc.*, Case No. 1:08-cv-04521 (N.D. Ill. Jan. 10, 2011) (Darrah, J.) (summary judgment for $18,966,000, representing $500 per fax for 37,932 faxes); *National Union Fire Ins. Co. of Pittsburgh v. ESI Ergonomics Solutions, LLC*, 342 F. Supp. 2d 853 (D. Ariz. 2004) (summary judgment entered in amount of $40,446,580.00, representing $500.00 per fax plus statutory interest); *Hooters of Augusta, Inc. v. American Global Ins. Co.*, 272 F. Supp. 2d 1365 (S.D. Ga. 2003), *aff'd*, 157 Fed. Appx. 201 (11th Cir. 2005) (insurer owed duty to indemnify $11,889,000.00 judgment, representing $1,500.00 per fax).

The TCPA is a strict liability statute. *See Alea London Limited v. American Home Services, Inc.*, 638 F.3d 768, 776 (11th Cir. 2011); *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir.2008); *A Fast Sign Co., Inc. v. American Home Servs., Inc.*, 734 S.E.2d 31, 32 (Ga. 2012); *Erie Ins. Exchange v. Lake City Indus. Prods., Inc.*, 2012 WL 1758706, *3 (Mich. App. May 17, 2012); *Breslow v. Wells Fargo Bank, N.A.*, 857 F.Supp.2d 1316, 1318 (S.D. Fla. 2012); *Harris v. World Fin. Network Nat. Bank*, 867 F.Supp.2d 888, 892 (E.D. Mich. 2012); *Park University Enterprises, Inc. v. American Cas. Co. of Reading, PA*, 314 F.Supp.2d 1094, 1103 (D. Kan. 2004), *aff'd*, 442 F.2d 1239 (10th Cir. 2006). A party can be found liable under the TCPA for sending an unauthorized fax, even if that party believed, reasonably and in good faith, that the recipient wanted and had authorized receipt of the fax. *Park Univ.*, 314 F.Supp.2d at 1103.

As the Court discussed in its recent order on summary judgment, the question of whether BLP is liable for the faxes sent at its request is governed by the Eleventh Circuit's decision in *Sarris*. The Court held that the question of whether BLP is liable for the faxes promoting Buccaneers tickets is governed by a "totality test" based on "the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA." *Cin-Q Auto., Inc. v. Buccaneers Ltd. Partnership*, 2014 WL 7224943 at *7-9. (M.D. Fla. Dec. 17, 2014.)

The Court discussed the evidence and ultimately concluded that "evidence in the record could also support the proposition that BLP ratified what it knew to be offending conduct—

Hon. Wayne R. Andersen (Ret.)
Page 7
August 25, 2015

deciding to turn a blind eye and accept the collateral damage created by its agent's actions, all while hiding behind a promise of indemnity. Ample evidence before the Court suggests this may be the case, but it is not so undeniable as to compel this court to grant summary judgment." *Id.* at *9. The Court relied on the fact that the *Sarris* court ultimately decided that the question of whether the defendant in that case was a sender was a question of fact and on cases standing for a Court's discretion to deny summary judgment even where the facts are not in dispute. *Id.*

Plaintiffs have filed a motion for reconsideration of the denial of its motion for summary judgment. If that motion is unsuccessful, plaintiffs believes that a jury will ultimately conclude that faxes promoting Buccaneers tickets, ordered and paid for by the Buccaneers' Director of New Business Development, were sent by or on behalf of the BLP. That the broadcaster made assurances to BLP and agreed to indemnify it is a matter between BLP and the broadcaster.

Beyond the question of BLP's responsibility for the faxes, there do not appear to be any other viable defenses. Significantly, BLP's faxes either contained no opt-out notice at all, or else purported notices that do not satisfy the requirements of the TCPA and of 47 C.F.R. § 64.1200 in order to be effective. Two defenses commonly raised in TCPA cases, both in opposition to class certification and on the merits, are the potential that plaintiff or class members either (1) has a prior business relationship with the defendant; or (2) consented to receive faxes. Neither defense, however, is viable when the fax sent fails to contain an opt-out notice that complies with the statute and the regulations. *See, e.g., Turza*, 728 F.3d at 684 ("Because Top of Mind omitted opt-out notices, it does not matter which recipients consented or had an established business relation with Turza."); *Walburg*, 715 F.3d at 685 ("the regulation as written requires the senders of fax advertisements to employ the above-described opt-out language even if the sender received prior express permission to send the fax."); *C-Mart*, 2014 WL 457580; *Med Waste*, 2013 WL 3463489.

The statute is clear that a valid "established business relationship" defense requires three things: (1) the sender has an "established business relationship" with the recipient; (2) the sender obtained the recipient's fax number either through a voluntary communication between the two or through a public source on which the recipient voluntarily made the number available; and (3) the fax has an opt-out notice meeting the requirements of the statute. Thus, without a compliant opt-out notice, there can be no established business relationship defense.

Likewise, with respect to a consent defense, the FCC has been clear that opt-out notice requirements apply even to "facsimile advertisements to consumers from whom [the sender] obtained permission." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Protection Act of 2005*, 2006 WL 1151584 at *25972. The federal Hobbs Act requires courts to enforce this regulation in the context of private TCPA litigation. *See Nack*, 715 F.3d at 685-86, *citing CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. 2010) and *City of Peoria v. Gen. Elec. Cablevision Corp. (GECCO)*, 690 F.2d 116, 120 (7th Cir.1982). *See A Aventura Chiropractic Center, Inc. v. Med Waste Management LLC*, 2013 WL 3463489 at *3-4 (S.D. Fla. July 3, 2013); *C-Mart, Inc. v. Metropolitan Life Ins. Co.*, 299 F.R.D. 679, 688-89 (S.D. Fla. 2014); *Brodsky v. HumanaDental Ins. Co.*, 2014 WL 2780089 at *9-10 (N.D. Ill. Sept. 29, 2014); *Whiteamire Clinic, P.A., Inc. v. Quill Corp.*, 2013 WL 5348377, *7

CONFIDENTIAL                   CinQ+MC000008

Hon. Wayne R. Andersen (Ret.)
Page 8
August 25, 2015

(N.D. Ill. Sept. 24, 2013); *In re Sandusky Wellness Center, LLC*, 570 Fed.Appx. 437, 437 (6th Cir. 2014); *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, *3 (Dec. 24, 2014); *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 2014 WL 7109630, *12 (W.D. Mich. Dec. 12, 2014).

Specifically, 47 C.F.R. § 64.1200(a)(4)(iv) requires every fax to have an opt out notice that:

(1) Is clear and conspicuous and on the first page of the advertisement;

(2) States that the recipient may make a request to the sender not to send any future unsolicited advertisements and that failure to comply within 30 days is unlawful;

(3) Sets forth the requirements for a request under 47 U.S.C. § 227(b)(2)(E)[1];

(4) Includes a domestic contact telephone and facsimile number for the recipient; and a cost-free mechanism for a recipient to transmit a request; and

(5) Permits the recipient to make such a request at any time on any day of the week.

47 C.F.R. § 64.1200(a)(3)(iii).[2] Here, the notices fail to comply with requirements 2 and 3 on their face. In addition, the notices fail to comply with Requirement 4 because they do not include a fax number to which to send opt out requests.

Notably, the FCC just issued a new order confirming both that consented-to faxes must contain a compliant opt out notice and that a notice must comply with *all* requirements; "substantial compliance" is not enough. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 61 Communications Reg. (P&F)

---

[1] 47 U.S.C. § 227(b)(2)(E) states that a request not to send future unsolicited advertisements will be binding only if: (1) identifies the telephone number or numbers of the telephone facsimile machine to which the request relates; (2) the request is made to the telephone or facsimile number of the sender; and (3) the person making the request has not "subsequent to such request" provided express invitation or permission to the sender.

[2] 47 C.F.R. § 64.1200(a)(3)(iv) provides "A facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(3)(iii) of this section."

CONFIDENTIAL

CinQ+MC000009

Hon. Wayne R. Andersen (Ret.)
Page 9
August 25, 2015

671 at ¶¶ 16-21, 33, 2014 WL 5493425 (Oct. 30, 2014).[3] There is no evidence of actual consent with any recipient here. And even if there was, the deficiencies in the opt out notice defeat the potential defense. Thus, neither established business relationship nor consent is available to BLP as a defense.

Further, "Class certification is normal in litigation under [the TCPA], because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Turza*, 728 F.3d at 684, *citing Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005). Indeed, the United States Supreme Court recently acknowledged that the bulk of TCPA litigation in the federal courts are class actions. *See Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740, 753 (2012). None of the issues that cause problems for class certification (individualized consent/established business relationship issues, lack of records of fax broadcasts) are present here.

Numerous federal courts have certified unsolicited fax classes. *See Turza*; *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540 (6th Cir. 2014); *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014); *C-Mart, Inc. v. Metropolitan Life Ins. Co.*, 2014 WL 457580 (S.D. Fla. Feb. 4, 2014); *A Aventura Chiropractic Center, Inc. v. Med Waste Management LLC*, 2013 WL 3463489 (S.D. Fla. July 3, 2013); *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, Case No. 11-cv-1074, 2012 WL 262556 (N.D. Ohio Jan. 30, 2012); *Silbaugh v. Viking Magazine Services*, No. 1:11 CV 1299, 2012 WL 76889, *1, 5-6 (N.D. Ohio Jan. 10, 2012); *Sparkle Hill, Inc. v. Interstate Mat Corp.*, Case No. 11-10271, 2012 WL 6589258 (D. Mass. Dec. 18, 2012); *Exclusively Cats Veterinary Hosp. v. Anesthetic Vaporizer Servs., Inc.*, No. 10-10620, 2010 WL 5439737 (E.D. Mich. Dec. 27, 2010); *CE Design, Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009), *app. denied* (7th Cir. September 9, 2009); *Hinman v. M and M Rental Center, Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008) (Bucklo, J.), *app. denied* (08-8012) (7th Cir. Jun 13, 2008); *Kavu, Inc. v. Omnipak Corp.*, No. 06 C 109, 2007 WL 201093 (W.D. Wash. Jan. 23, 2007).

---

[3] The FCC Order does provide a process by which a company can seek a "retroactive waiver" of the rule. However, the first federal court to consider such a "waiver" concluded that it would not affect private litigation, but rather would only impact a possible enforcement action by the FCC itself. *See Stryker*, 2014 WL 7109630 at * 14 ("the waiver issue does not impact the Court's decision, for three reasons. First, as noted above, this Court's ruling rests not merely on the FCC's regulation, but on the statutory term itself. Second, the Court finds that nothing in the waiver—even assuming the FCC ultimately grants it—invalidates the regulation itself. The regulation remains in effect just as it was originally promulgated. Third, the FCC cannot use an administrative waiver to eliminate statutory liability in a private cause of action; at most, the FCC can choose not to exercise its own enforcement power"), *citing Turza*, 728 F.3d at 688. *See also Doctor Diabetic*, 2014 WL 7366255 at *5. Here, of course, Defendant has neither received an FCC waiver nor established consent with anyone. *Id.*

                CinQ+MC000010

Hon. Wayne R. Andersen (Ret.)
Page 10
August 25, 2015

The majority of state courts have held likewise, including the Supreme Court of Kansas, *Critchfield*, 263 P.3d 767, and the appellate courts of Illinois, North Carolina, Louisiana, Georgia, Oklahoma, California, Indiana, and Arizona. *See JT's Frames, Inc. v. Sunhill NIC Co., Inc.*, 2012 IL App (2d) 110676-U (Ill. App. 2012) (affirming class certification of TCPA claim); *Jemiola v. XYZ Corp.*, 802 N.E.2d 745, 749 (Ohio C.P. 2003) (same); *Display Funding Group, Inc. v. Graphic House Sports Promotions, Inc.*, 992 So.2d 510 (La. App. 2007) (same); *Display South, Inc. v. Express Computer Supply, Inc.*, 961 So.2d 451 (La. App. 2007) (same); *Hypertouch, Inc. v. Superior Court ex rel. Perry Johnson, Inc.*, 27 Cal. Rptr. 3d (Cal. App. 2005) (same); *American Home Servs., Inc. v. A Fast Sign Co., Inc.*, 651 S.E.2d 119 (Ga. App. 2004) (same); *Core Funding Group, LLC v. Young*, 792 N.E.2d 547 (Ind. App. 2003) (same); *Hooter's of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468 (Ga. App. 2000) (same); *Blitz v. Agean, Inc.*, 677 S.E.2d 1 (N.C. App. 2009) (reversing denial of class certification); *Lampkin v. GGH, Inc.*, 146 P.3d 847 (Okla. App. 2006) (same); *Kaufman v. ACS Sys., Inc.*, 2 Cal. Rptr. 3d 296 (Cal. App. 2003) (same); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 50 P.3d 844 (Ariz. App. 2002) (same). This list does not include the countless trial courts that have certified such classes.

Assuming that the class is certified and Plaintiffs ultimately prevail on the question of whether BLP is liable for the faxes under *Sarris* and the authority upon which it relies, the liability faced by BLP is massive. The base damages of $500 per fax for each of the 628,259 faxes is $314,124,500.00. And it is likely given the series of events discussed above that some if not all of the faxes subject BLP to treble damages.

The Eleventh Circuit has held that "the intent for treble damages [under the TCPA] does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing' conduct." *Alea London*, 638 F.3d at 776. Mr. Kaiser knew about the requirements of the TCPA at the time the first faxes were sent. As the various howls from the recipients built to a cacophony culminating in the first lawsuit and the cease and desist letter, any claim that the faxes were sent in ignorance of the fact that they violated the statute become much less believable (assuming it was believable at all). As noted above, there were four groups of fax broadcasts: (1) the three July 2009 broadcasts (289,605 total); (2) the four August 2009 broadcasts after the first two recipient complaints (156,185 total); (3) the May 24-June 1, 2010 broadcasts after the first lawsuit and the Towzey correspondence (151,482 total); and (4) the June 7-9, 2010 broadcasts after the Attorney General cease and desist letter (36,211 total).

If all of the faxes are assessed at $1,500 per, the liability is $800,224,500.00. If all of the faxes sent after the initial complaints are assessed at $1,500 with those sent before at $500, the liability is $670,619,500.00. If only those faxes sent after BLP was sued are assessed at $1,500, the liability is $504,434,500.00. And if only those faxes sent after the attorney general letter are assessed at $1,500, the liability is still $350,335,500.

## V.  SETTLEMENT PROPOSAL

In the interest of settlement, Plaintiffs are willing to resolve all claims under the attached terms. (*See* Term Sheet, attached as Exhibit S) In broad strokes, BLP will agree to provide a

Hon. Wayne R. Andersen (Ret.)
Page 11
August 25, 2015

$99,000,000.00 virtual fund. Out of that fund, BLP will pay: (1) $500 per fax to class members who submit claims; (2) if total claims are less than 20% of the fund ($19,800,000.00), the difference between that sum and actual total claims to charity as *cy pres*; (3) an incentive award of $15,000.00 to each class representative; (4) attorney's fees in the amount of 25% of the fund ($24,750,000.00); (5) out of pocket litigation expenses; and (6) the cost of administering the settlement. BLP would then retain the balance of the virtual fund. If claims are below the *cy pres* floor, BLP would pay approximately $45 million.

Respectfully submitted,

CIN-Q AUTOMOBILES, INC. and MEDICAL & CHIROPRACTIC CLINIC, INC.

By: _____
David M. Oppenheim
One of their Attorneys

DMO/tn
Enclosures
cc: Record Counsel

CONFIDENTIAL                                CinQ+MC000012

## INDEX TO EXHIBITS TO PLAINTIFFS' MEDIATION STATEMENT

| *DESCRIPTION* | *EXHIBIT LETTER* |
|---|---|
| Robert Biggerstaff Report (with Exhibits 1 through 6) | A |
| Transcript of Kaiser 3/25/14 Deposition | B |
| Defendant's Response to First Requests for Admission | C |
| Email, Kaiser to FaxQom dated 6/24/09 | D |
| Email, FaxQom to Kaiser dated 6/24/09 | E |
| Draft Advertisement | F |
| Fax Indemnity Agreement and Fax Broadcast Order Form | G |
| Copy of Check | H |
| Email, Kaiser to FaxQom dated 7/13/09 | I |
| Emails regarding Mike Paschke | J |
| Email, Kaiser to Glazer dated 7/15/09 | K |
| Emails regarding Nick Coblio | L |
| Emails, between Kaiser and FaxQom dated 8/10/09 and 8/13/09 | M |
| Phyllis J. Towzey Affidavit | N |
| Transcript of 5/2/14 Manual Alvare Deposition | O |
| Cinque Complaint | P |
| Fax Broadcast Order Form | Q |
| Letter from Florida Attorney General dated 6/3/10 | R |
| Term Sheet | S |

CONFIDENTIAL

CinQ+MC000013

PROPRIETARY AND CONFIDENTIAL

# EXPERT REPORT OF ROBERT BIGGERSTAFF

Prepared in the matter of:

### *Cin-Q Autos., Inc. v Buccaneers Ltd. Partnership.*

### No. 13-CV-01592-17

Pending in the United States District Court
for the Middle District of Florida.

March 20, 2014

**Notice**
This report is proprietary and confidential. If you are not the intended recipient of this document, any use, dissemination, distribution, or duplication of this document or any portion of its contents is expressly prohibited. The information contained in this document may also be privileged and/or subject to nondisclosure under applicable court rules.

Copyright© 2014 Robert Biggerstaff. All Rights Reserved. No portion of this document or any exhibits, appendices, attachments, or any other parts hereof, in whole or in part, may be duplicated or used for any purposes without the express written permission of the author.

PROPRIETARY AND CONFIDENTIAL

**Disclaimer**

This document many contain or describe software, algorithms, methodologies, processes, texts, businesses methods, patents, or other items that are the property of other entities and used under license or other permitted use. Any implementation, distribution, storage, copying, or other use of such property may be subject to restrictions.

Any registered marks used within this document are the property of their respective owners. They are used herein only for the purposes of identification and do not indicate any endorsement or approval by those owners.

Linux® is a trademark of Linus Torvalds.
Windows® is a trademark of Microsoft Corporation.
Visual FoxPro® is a trademark of Microsoft Corporation.
HylaFAX® is a trademark of Silicon Graphics, Inc.
Slackware® is a trademark of Patrick Volkerding.
ReiserFS® is a trademark of Hans Reiser and the Naming System.
FaxFacts® is a registered trademark of Copia International, Ltd.
GNU® is a trademark of the Free Software Foundation.
CAAS® and ISETTLE® are trademarks of A.B. Data, LTD.
MySQL® is a trademark of Oracle Corporation.
MariaDB® is a trademark of Monty Program Ab.
FTK® is a trademark of Access Data, Inc.
Zetafax® is a trademark of Equisys.
RightFax® is a trademark of Captaris, Inc.
WinHex® and X-Ways Forensics® are trademarks of X-Ways Software Technology AG.
ActFax® is a registered trademark of ActFax Communication
Encase® and EnScript® are trademarks of Guidance Software, Inc.
DB2® and RACF® are trademarks of IBM Corp.
WinFax® is a trademark of Symantec Corp.
eFax® is a registered trademark of j2 Global.
Reference Legal®, SalesGenie® and InfoUSA® are trademarks of Infogroup, Inc.
ACT!® is a trademark of Sage Software, Inc.
Goldmine® is a trademark of FrontRange Solutions USA Inc.

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 2 OF 17

CONFIDENTIAL          CinQ+MC000015

PROPRIETARY AND CONFIDENTIAL

## <u>Table of Contents</u>

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Retention and Scope of Work** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Background and Qualifications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**Materials Reviewed** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
    Rocket Messanging Data Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Hard Drive Data Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Combined Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Facsimile Technology Standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Description of the phases of a fax transmission . . . . . . . . . . . . . . . . . . . . . . 8
    All Group III faxes use a positive acknowledgment protocol . . . . . . . . . . . 10
    Confirmation of receipt and subsequent events . . . . . . . . . . . . . . . . . . . . . 13

**Conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**Table of Exhibits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

CONFIDENTIAL                    CinQ+MC000016

PROPRIETARY AND CONFIDENTIAL

## Executive Summary

1.   I was asked to examine materials provided by counsel in order to identify and report on facsimile transmissions documented by those materials.  The materials included fax broadcasting records of Rocket Messaging and 127 High Street regarding a total of 25 fax broadcasts related to Tampa Bay Buccaneers tickets.  The examination identified 131,011 unique fax numbers that received a combined 343,122 successful error-free fax transmissions.

## Retention and Scope of Work

2.   On December 4, 2013 Ryan Kelly, who I am informed is Plaintiff's counsel, requested that I review materials in this matter and to report my findings and conclusions regarding their contents related to facsimile transmissions related to Tampa Bay Buccaneers tickets.

## Background and Qualifications

3.   I obtained a Bachelors of Science in Engineering from Clemson University in 1987. I am retired from the position of Senior Support Systems Engineer, overseeing computer operations at a large production facility. I have continuously worked in the computer field for 30 years, including work involving VLDB (Very Large DataBase) projects for the Department of Defense and large corporations. My particular expertise for most of this time has been design and implementation of large database projects, network design, and network/computer security. This includes forensic examinations, intrusion detection, incident response, evidence preservation, integration and analysis of disparate data sources, and complex data recovery and analysis across a wide array of media, operating systems, and platforms from 1984 to present.

4.   I am a certified computer forensic examiner and a member of the International Society of Forensic Computer Examiners ("ISFCE").  I have 30 years of experience in forensic computer examinations and data recovery.  I have been retained as a forensic computer expert in over 200 court cases and have performed hundreds of data

PROPRIETARY AND CONFIDENTIAL

recovery and ESI preservation assignments across many diverse platforms and filesystems.

5.    I have direct experience in the role that computer records play in claims under the Telephone Consumer Protection Act ("TCPA"), specifically with regard to analyzing those records for the purposes of identifying persons to whom facsimile advertisements were sent for purposes of class certification and class notice.

6.    As part of my work in network and database design, and as a consultant, I have had direct experience with many facets of facsimile technology, including computer-based facsimile systems, as well as technical specifications and details of facsimile transmissions. This includes both evaluation and testing of many different systems, service and maintenance of such systems on a day to day basis, installation and configuration of such systems, as well as writing drivers and other software for facsimile-enabled software applications.

7.    I have extensive knowledge of how fax transmissions are processed, the standards involved, how the various types of devices that send and receive faxes operate, and how various fax forwarding and delivery technologies function over both packet-switched and circuit-switched networks.

8.    I have worked with records from many different fax broadcasters, as well as reviewing testimony, forensic examinations of computers used in fax broadcasting, user guides, and many other documents from those companies. In doing so, I have acquired an extensive base of knowledge regarding their records and business practices.

## Materials Reviewed

9.    In addition to any materials cited elsewhere herein, I reviewed the following material in the process of producing this report:

   a.   Optical disc labeled "Cin Q v. Tampa Bay", indicating it contained Bates RMI00001 through RMI02821.

    b.   Contents of a Seagate hard drive MODEL ST3500620AS, SN: 9QM73KR6, MD5 hash: 8c99c0a3acc740e00283c254fe685fe4.

10.   I have also relied generally on applicable facsimile standards including *Procedures for document facsimile transmission in the general switched telephone network, ITU-T T.30* and *Standardization of Group 3 facsimile terminals for document transmission, ITU-T T.4.*

11.   I have also relied generally on orders, notices, and other promulgations of the Federal Communications Commission ("the Commission") regarding the agency's administration of the TCPA.

12.   In preparing this report, I have also relied on knowledge and skills I acquired through my education, training, career, and experience.

## Analysis

### *Rocket Messanging Data*

13.   I received the optical disc identified in paragraph 9 above from Mr. Kelly on December 31, 2013. Mr. Kelly represented that the disc contained data produced by Rocket Messaging, Inc. A copy of the cover of that disc is attached as Exhibit 1 hereto.

14.   My examination of these data found documentation of 22 fax broadcasts that contained a fax image regarding tickets for the Tampa Bay Buccaneers. The 22 image files I identified are collected as Exhibit 2 hereto.

15.   I have produced a table of the files associated with these 22 images, attached as Exhibit 3 hereto.

16.   I imported and analyzed the logs associated with those 22 image files using Microsoft Visual Foxpro 9 SP2. This analysis found 120,232 unique fax numbers received 240,596 successful error-free fax transmissions, indicated by STATUS "0" in the logs, ranging in dates from August 17, 2009 to June 9, 2010 (inclusive).

### *Hard Drive Data*

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 6 OF 17

PROPRIETARY AND CONFIDENTIAL

17. I received the Seagate hard drive identified in paragraph 9 above from Gerald Nelson on February 10, 2014. A copy of the cover of that drive is attached as Exhibit 4 hereto. My forensic examination of the contents of the drive was conducted principally with Forensic Toolkit version 4.1.0.165 ("FTK").

18. The hard drive contained two (2) partitions and an installation of Microsoft Windows.

19. Among other things on the hard drive, I found a number of e-mails and directories containing files and instructions for fax broadcasting jobs, as well as "Fax Service Exception" reports documenting the results of fax broadcasts. Within these records, I found documentation of three (3) fax broadcasting jobs regarding tickets for the Tampa Bay Buccaneers. These consisted of:

    a. E-mails from "do-not-reply@127highstreet.com" to "jforbes@usadatalink.com" confirming fax job submissions and identifying the filename of the list of target fax numbers and the fax content document. (These e-mails are attached as Exhibit 5a hereto.)

    b. E-mails from "FaxService@faxdeliveryservice.com" to "jforbes@usadatalink.com" containing "exception" reports which identify individual failed fax transmissions for the corresponding broadcast.

20. I found the folder "/Users/The Nelsons/Links/DMI Marketing/FAX Customers" contained a number of subdirectories with documents that appeared to be related to fax broadcasting. Most were organized by what appeared to be names of persons or businesses. One of these was named "Steve Sims" which itself contained a sub directory named "Tampa Bay Bucs."

21. The "Tampa Bay Bucs" directory[1] contained only three subdirectories, "July 14-09", "July 15-09", and "July 16-09." Each of these three subdirectories contained 2 files—a list file containing fax numbers and a document which contained a 2-page flyer for Tampa Bay Buccaneers tickets, with a stadium diagram on the second page. These files are consistent with the file names contained in the three fax submission e-mails attached as Exhibit 5a. I have attached the three image files as Exhibit 5b hereto. I

---

    1. The full path is "//partition_1/[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/"

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 7 OF 17

CONFIDENTIAL        CinQ+MC000020

have also included a table of metadata for these files/directories in the "Tampa Bay Bucs" directory as Exhibit 5c thereto.

22. I collected these data and produced a table of information for each of the three broadcasts as Exhibit 6 hereto. My analysis of these data found that they document 102,526 successful error-free fax transmissions, received by 102,524 unique fax numbers.

### *Combined Records*

23. I combined the results of my analysis of the 22 broadcasts found in the Rocket Messaging data with the data regarding the three (3) broadcasts in the hard drive data. This produced a list of 131,011 unique fax numbers which received a combined 343,122 successful error-free fax transmissions. I have attached as Exhibit 7 hereto, a list of each of those 131,011 unique fax numbers and the number of successful error-free fax transmissions each one received.

### *Fax received at 352-377-9774*

24. Mr. Kelly also provided a document, attached as Exhibit 8a hereto, he identified as a fax received at 352-377-9774, and asked if there was any documentation related to this fax transmission in the records I examined.

25. I found one record of a successfully received error-free fax transmission to this fax number in the Rocket Messaging log file "231446-CDR.CSV" and that transmission was dated 08/19/2009 11:23:49 AM. This corresponds to the header on the fax Mr. Kelly provided. The content of the fax provided by Mr. Kelly also matches the fax content document for the Rocket Messaging broadcast, "231446-DOC.TIF" (Bates No. RMI00049).

### *Fax received at 813-237-3792*

26. Mr. Kelly also provided a document, attached as Exhibit 8b hereto, he identified as a fax received at 813-237-3792, and asked if there was any documentation related to this fax transmission in the records I examined.

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 8 OF 17

CONFIDENTIAL

CinQ+MC000021

PROPRIETARY AND CONFIDENTIAL

27. I found that the fax number 813-237-3792 was present in the file "SteveSims813-79K[239862].txt" that was submitted to 127 High Street on July 15, 2009 as part of fax submission ID: 125650 along with fax image document "7-15_buc_doc.pdf." I found no exception report indicating that a fax to 813-237-3792 failed for any reason, meaning that a fax was sent to this number and was a successfully received error-free transmission of the document "7-15_buc_doc.pdf."

28. I compared the document "7-15_buc_doc.pdf" to the specimen fax from Mr. Kelly, and found the content identical. In addition, the header on the fax is consistent with the date of transmission for the fax submission ID 125650.

## Facsimile Technology Standards

### *Background*

29. There are four basic facsimile transmission standards established by the International Telecommunication Union (see http://www.itu.int/home/) known as Group 1, Group 2, Group 3, and Group 4. Group 1 and Group 2 are obsolete. Group 3 is the current standard used by most fax machines bought today. Group 3 employs the T.30 standard which defines the procedures necessary for an analog document transmission between two facsimile devices on the public switched telephone network or PSTN. A T.30 standard facsimile machine can generally send a fax transmission at speeds up to 33.6 Kbps in about 25 seconds per page under good conditions. See ITU-T T.30. Group 4 is a more advanced standard that is used for fax transmissions over digital phone lines such as ISDN, with speeds up to 64Kbps, sending a page in as little as 2 seconds per page. By using these standards, facsimile machines that comply with them can communicate with facsimile machines from other manufacturers that follow the same standards, much like light bulb manufacturers can make light bulbs that will fit into other manufacturer's light fixtures as long as both are using the same standards for that size light bulb socket. The T.30 standard employs a positive confirmation protocol, whereby a fax transmission is positively confirmed by the receiving machine before the sending machine will record the transmission as successful.

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 9 OF 17

CONFIDENTIAL                    CinQ+MC000022

PROPRIETARY AND CONFIDENTIAL

### *Description of the phases of a fax transmission*

30. The T.30 standard identifies five distinct phases of a fax transmission:

    a. Phase A - Call establishment

    b. Phase B - Pre-message procedure

    c. Phase C - In-message procedure and message transmission

    d. Phase D - Post-message procedure

    e. Phase E - Call release

31. Prior to beginning a T.30 standard fax transmission, the content of the document to be transmitted, called the "message," is converted into binary data in the correct format, as specified by the T.4 standard of which the most common resolutions are approximately (in scan lines per inch) 200x100 (standard), 200x200 (fine), or 200x400 (superfine). This may be done by scanning a printed document or by converting a digital file or data stream to binary data in the correct format and compressing it using algorithms such as modified Huffman or modified read compression (also specified by T.4).

32. Unlike a typical human telephone conversation, with faxes, it is the calling machine that usually "speaks" first.[2] Phase A of a fax transmission begins when the sending machine acquires a dial tone and dials the phone, and then starts beaconing over the open telephone connection, that is it begins sending out data in the form of a calling tone, or CNG. If a device with a fax-modem on the other end of the phone line has answered the telephone call and receives the CNG, it can identify that a sending device is attempting to begin a T.30 fax transmission. This is what some people call "fax tones."

---

2. In some cases, particularly with multifunction devices that handle both voice and fax calls or manually assisted receipt, the receiving machine may wait a prescribed period of time and then begin beaconing its own fax tones to signal the sending device that a fax-modem has answered.

CONFIDENTIAL          CinQ+MC000023

PROPRIETARY AND CONFIDENTIAL

33. If a response to the "fax tones" is sent by the receiving machine, the two devices begin Phase B or the pre-message procedure. This is often referred to as "handshaking" and during this phase, the devices exchange information about themselves, their capabilities, and they "negotiate" with respect to certain options to employ for the transmission of the message, such as resolution of the message. Training tones are also sent during this phase to test the quality of the phone line and the agreed upon settings.

34. Phase C then begins, and the data constituting the message is transmitted. Error detection, in-message synchronization, and line supervision are also performed while packets of data making up the message are exchanged. The largest portion of the time of a fax transmission is generally spent in Phase C.

35. Phase D is reached when an end-of-page, end-of-message, or other terminating instruction is sent. An end-of-page or end-of-message instruction will cause the receiving device to sent a confirmation message to the sender, after which both devices will return to a prior phase for transmission of additional pages. The positive confirmation of a facsimile transmissions occurs in this phase. An end-of-fax instruction which indicates no more messages are left to be sent will cause the receiving device confirm that message back to the sending device, and then to proceed to Phase E.

36. In Phase E, the sending device may transmit a disconnect signal, disconnect, or the timeout period may expire for Phase E with the sending machine. The T.30 standard specifies that a fax transmission ends with the conclusion of Phase E.

*All Group III faxes use a positive acknowledgment protocol*

37. Certain aspects of the postal mail can be used as an analogy for T.30 fax transmissions. When you send a first-class letter, there is always the possibility that it may not be delivered. This is a known possibility with the postal service method of delivering letters.[3] Knowing it is a possibility, a protocol was developed to solve the

---

3.   The U.S. Postal Service reported in 2006, that 4.7 million parcels and 93.1 million letters were undelivered. *2006 Comprehensive Statement*, USPS. 2006.

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 11 OF 17

CONFIDENTIAL

CinQ+MC000024

problem of possible non-delivery, which is to send the letter "return receipt requested." The sender then has proof of the date of delivery, as well as a signature. If the return receipt does not come back (for whatever reason) then the sender has no confirmation of receipt, so the transmission is unsuccessful. This is known as a "positive acknowledgment" protocol.

38. A T.30 fax transmission is a 2-way conversation between two fax machines. Not only is the content of the document image (the "payload") sent from one fax machine to the other, but the two fax machines exchange many pieces of information about the capabilities each has, and about the document image itself. In addition to individual commands and messages, the fax image itself is broken up into individual, self-contained pieces of information, sent to the receiving fax machine, and then the image is "reassembled" at the other end. Continuing the postal service analogy, it is like playing chess by mail, and sending each move with a return receipt card. If you don't get a return receipt back for one move, you can resend it (retransmit), and if you do get the return receipt back, you proceed to the next move. This assures each person is looking at the same chessboard.

39. The T.30 protocol is robust and reliable. The protocol fully expects that commands, messages, and pieces of the fax image sent between fax machines may be lost or corrupted. T.30 solves that problem with special coding such as High-Level Data Link Control ("HDLC") frames. Messages between the two fax machines are packaged into HDLC frames, which include a 16-bit CRC code (the Frame Check Sequence or "FCS") that protects against any errors or corruption.

40. For each command in the T.30 protocol, there are permitted responses, further ensuring that the fax transmission is protected against any errors such as dropped connections, programming errors, hardware failures, or poor quality phone lines.

41. The T.30 protocol also has error correction ("ECM") which provides 100% accurate image transmissions. A fax image is divided into 64-byte or 256-byte ECM frames and each ECM frame is protected against corruption with a 16-bit CRC. The frames are numbered and any missing or corrupted frames are detected by the receiving machine. Both fax machines know exactly how many frames, blocks, and pages are in

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. v BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 12 OF 17

CONFIDENTIAL                CinQ+MC000025

PROPRIETARY AND CONFIDENTIAL

the document. For example, at the end of a typical fax transmission, the sending machine sends a PPS message as illustrated below. (Illustration follows).



The PPS message format.

42. This procedure guarantees the receiving machine knows **exactly** what was sent (number of pages, blocks, and frames) and it is protected against corruption by a 16-bit CRC. Any errors in the data or in the messages such as the PPS, are immediately detectable. Each frame has its own CRC, so each individual frame is protected against corruption. For a single-page fax image that contained 170 frames of 256-bytes each of data (a typical single-page consisting of 43K of image data), the sending machine says with the PPS:

*I sent page 1, block 1, that was 170 frames of image data.*

43. The receiving machine **must** respond. If it does not, the fax transmission is recorded as unsuccessful. This is the "positive acknowledgment" aspect of T.30.

44. The receiving fax machine may respond with either a *negative* confirmation message or a *positive* confirmation message. Each confirmation message is also HDLC encoded to protect against any corruption. A typical positive confirmation is an MCF or

PROPRIETARY AND CONFIDENTIAL

"message confirmation" message. This means the fax data was checked for any corruption or missing frames, and it was successfully received. A typical *negative* confirmation is a PPR or "partial page request" message, where the receiving machine requests some of the frames be retransmitted, because they contained errors. Lack of a response message, or anything other than a positive confirmation message as the final message from the receiving machine, is logged as a failed transmission by the sending machine.

45.  Noisy phone lines and other issues can impact the success rate of faxes. However, those issues have no effect on the *accuracy* of the results that record which faxes are received since a positive confirmation is received evincing error-free receipt. Even on a telephone line of very poor quality where 99% of the faxes fail to go through, the receipt of the positive confirmation of successful receipt for the 1% that did go through means exactly that—positive confirmation of successful transmission for those individual faxes. Whether 99% of the faxes fail or 99% of them succeed, those that succeeded can be 100% accurately determined by the T.30 protocol. Put another way, while line quality can affect the success rate of T.30 fax transmissions on that line, it has no effect on the accuracy of the results reporting the fax transmissions on that line as a successful error-free transmission. Whatever the success rate, the T.30 protocol will successfully determine it.

### *Confirmation of receipt and subsequent events*

46.  In my experience, a record of a "successful" transmission by computer based facsimile transmission systems reflects the successful completion of all the necessary phases of the T.30 fax transmission to a device with a fax-modem and appropriate software. This is true regardless of the type of fax machine (i.e., a "stand-alone" fax machine or a computer with a fax-modem) which received the T.30 fax transmission. This is demonstrated by the receipt from the receiving machine of the positive confirmation of receipt of the transmission (e.g. the message confirmation or "MCF").

47.  I have reviewed testimony, documentation, and other documents regarding many facsimile transmission systems, and in particular, systems used for computer-based fax broadcasting. In my experience, the positive confirmation of receipt of the transmission (e.g. the message confirmation or "MCF") is always used as the

CONFIDENTIAL                          CinQ+MC000027

PROPRIETARY AND CONFIDENTIAL

determining factor when recording a transmission as successfully received versus unsuccessful.

48. Many things can happen to the contents of a fax message after the end of the T.30 fax transmission.

49. I can categorically state that without exception, every device of which I am aware that can receive a T.30 fax transmission, has the capacity to use a regular telephone line for the receipt of a T.30 fax transmission and to print the contents of the T.30 fax transmission.

50. Because a record of a successful transmission by a facsimile transmission system capable of sending standard T.30 fax transmissions, reflects the successful completion of all necessary phases of the T.30 fax transmission to a device with a fax-modem, and every device with a fax-modem capable of receiving a T.30 fax transmission has the capacity to receive that transmission over a regular telephone line and to print the contents of that transmission, a record of a successful transmission by a computer based facsimile transmission system is a record that such a transmission was sent to and received by equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

## Conclusions

51. The records I examined are consistent with contemporaneously recorded data from computer-based fax broadcasting systems.

52. The records I examined are the type and format of data I regularly examine from computer-based fax broadcasting systems.

53. In my experience, such materials from computer-based fax broadcasting systems. are generally highly reliable and accurate, particularly when identifying particular fax transmissions as fully received error-free transmissions.

54. The records I examined identified 131,011 unique fax numbers that received a combined 343,122 successful error-free fax transmissions containing advertisements for Tampa Bay Buccaneers tickets.

PROPRIETARY AND CONFIDENTIAL

55. The facts, conclusions, and opinions stated herein are made to a reasonable degree of scientific certainly based upon examination of the available information. The principles and methods I have used are reliable, repeatable, and generally accepted. To the extent any portion of this report is based on limited information or where further analysis, testimony, opinions, or information are provided, the contents of this report are subject to revision and supplementation.

Robert Biggerstaff, CCE

March 20, 2014

CONFIDENTIAL                                     CinQ+MC000029

PROPRIETARY AND CONFIDENTIAL

## Table of Exhibits

1. Disc cover image (provided separately).
2. Rocket Messaging Image files (22) (provided separately).
3. Table of files used.
4. Hard drive cover image (provided separately).
5a. E-mails (provided separately).
5b. Image files (3) (provided separately).
5c. File list and metadata
6. Analysis results.
7. List of unique fax numbers and number of faxes received (provided separately).
8a. Specimen fax (provided separately).
8b. Specimen fax (provided separately).

EXPERT REPORT OF ROBERT BIGGERSTAFF
CIN-Q AUTOS., INC. V BUCCANEERS LTD. P'SHIP.

MARCH 20, 2014
PAGE 17 OF 17

CONFIDENTIAL                CinQ+MC000030

# EXHIBIT 1

CONFIDENTIAL

CinQ+MC000031

DOCUMENTS PRODUCED BY
MITTS LAW, LLC ON 12.27.13
[RMI00001 through RMI02821]

*Cin Q  v. Tampa Bay*

EVIDENCE

CONFIDENTIAL

**EXHIBIT 2**

CONFIDENTIAL

CinQ+MC000033



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000 OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000034   RMI00033



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000035

RML00035



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| MIAMI | August 27 | 8:00pm |
| HOUSTON | September 4 | 7:00pm |
| DALLAS | September 13 | 1:00pm |
| N.Y. GIANTS | September 27 | 1:00pm |
| CAROLINA | October 18 | 1:00pm |
| GREEN BAY | November 8 | 1:00pm |
| NEW ORLEANS | November 22 | 1:00pm |
| N.Y. JETS | December 13 | 1:00pm |
| ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000036

RMI00037



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| MIAMI | August 27 | 8:00pm |
| HOUSTON | September 4 | 7:00pm |
| DALLAS | September 13 | 1:00pm |
| N.Y. GIANTS | September 27 | 1:00pm |
| CAROLINA | October 18 | 1:00pm |
| GREEN BAY | November 8 | 1:00pm |
| NEW ORLEANS | November 22 | 1:00pm |
| N.Y. JETS | December 13 | 1:00pm |
| ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000 OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL          CinQ+MC000037     RMU00039



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL                    CinQ+MC000039

RMI00043



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000040

RMU00045



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
|  | **MIAMI** | **August 27** | **8:00pm** |
|  | **HOUSTON** | **September 4** | **7:00pm** |
|  | **DALLAS** | **September 13** | **1:00pm** |
|  | **N.Y. GIANTS** | **September 27** | **1:00pm** |
|  | **CAROLINA** | **October 18** | **1:00pm** |
|  | **GREEN BAY** | **November 8** | **1:00pm** |
|  | **NEW ORLEANS** | **November 22** | **1:00pm** |
|  | **N.Y. JETS** | **December 13** | **1:00pm** |
| | **ATLANTA** | **January 3** | **1:00pm** |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000041   RMI00047



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
|  | **MIAMI** | **August 27** | **8:00pm** |
|  | **HOUSTON** | **September 4** | **7:00pm** |
|  | **DALLAS** | **September 13** | **1:00pm** |
|  | **N.Y. GIANTS** | **September 27** | **1:00pm** |
|  | **CAROLINA** | **October 18** | **1:00pm** |
|  | **GREEN BAY** | **November 8** | **1:00pm** |
|  | **NEW ORLEANS** | **November 22** | **1:00pm** |
|  | **N.Y. JETS** | **December 13** | **1:00pm** |
| | **ATLANTA** | **January 3** | **1:00pm** |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL                    CinQ+MC000042    RMI00049



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |
| | N.Y. JETS | December 13 | 1:00pm |
| | ATLANTA | January 3 | 1:00pm |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database,
please call 888-703-9205. Removaltech@FaxQom.com

CONFIDENTIAL

CinQ+MC000043   RMI00051



# FAX COVER

ONE BUCCANEER PLACE, TAMPA, FL 33607    TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/24/10 | # OF PAGES (INCLUDING COVER): | | 2 |
|---|---|---|---|---|
| TO: | Human Resources | | | |
| FROM: | Group Sales Department | | | |
| SUBJECT: | Your Group Ticket Order | | | |

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

## 2010 HOME SCHEDULE

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decide to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000044      RMI00221





## 2010 GROUP TICKET ORDER FORM

- •Group tickets starting at $32 per seat per game
- •Minimum group of 10 or more
- •Savings up to $16 per ticket
- •Fully catered tailgating packages available

| OPPONENT | DATE | | TIME* | # OF TICKETS | PRICE | TOTAL COST PER ORDER |
|---|---|---|---|---|---|---|
| Kansas City | Sat. | Aug. 21 | 7:30PM | | | |
| Jacksonville | Sat. | Aug. 28 | 7:30PM | | | |
| Cleveland | Sun. | Sept. 12 | 1:00PM | | | |
| Pittsburgh | Sun. | Sept. 26 | 1:00PM | | | |
| New Orleans | Sun. | Oct. 17 | 1:00PM | | | |
| St. Louis | Sun. | Oct. 24 | 1:00PM | | | |
| Carolina | Sun. | Nov. 14 | 1:00AM | | | |
| Atlanta | Sun. | Dec. 5 | 1:00PM | | | |
| Detroit | Sun. | Dec. 19 | 1:00PM | | | |
| Seattle | Sun. | Dec. 26 | 1:00PM | | | |

*Time Subject to change due to NFL Flex Scheduling

**FOR MORE INFORMATION
CALL 877-649-2827 EXT.2512
OR VISIT BUCCANEERS.COM**

| | |
|---|---|
| SUB TOTAL | |
| SHIPPING & HANDLING | $5.00 |
| GRAND TOTAL | |

Name/Company _____

Attn. _____

Address _____

City _____ State _____ Zip _____

Work Phone _____ Home _____

Fax _____ Email _____

**SEATING IS SELECTED FROM BEST AVAILABLE GROUP SECTIONS**
Those requesting special accommodations must contact the Buccaneers Ticket Office at 877-649-2827. All persons, regardless of age, must have a ticket for admittance.

Mail to: Tampa Bay Buccaneers, Attn: Group Sales Dept.
One Buccaneer Place, Tampa Florida 33607 • FAX 813-354-1320
**NO REFUNDS/NO EXCHANGES** • Dates and times subject to change
Please contact the Group Sales Department for all terms and conditions.

**METHOD OF PAYMENT**

Check or Money Order - Make checks payable to Tampa Bay Buccaneers

Amount of Check Enclosed: $ _____ Check # _____

Charge to:   VISA   MasterCard   American Express   Discover

Account # _____ Exp. Date _____

Name on Card _____

Card Member Signature _____

I agree to the ticket policies set forth on Buccaneers.com and authorize the above charge

X _____

| ACCTJ | AUTH. CODE |
|---|---|
| | |



CONFIDENTIAL

CinQ+MC000045

RML00222



# FAX COVER

ONE BUCCANEER PLACE TAMPA, Fl. 33607    TEL: (877) 649-2827  WWW.BUCCANEERS.COM

| DATE | 5/24/10 | # OF PAGES (INCLUDING COVER): | 2 |
|------|---------|-------------------------------|---|

**2010 HOME SCHEDULE**

| | |
|---|---|
| **TO:** | Human Resources |
| **FROM:** | Group Sales Department |
| **SUBJECT:** | Your Group Ticket Order |

**ADDITIONAL COMMENTS**

Enclosed is the information you requested.

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decide to opt-out of further faxes please call 866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000046

RMI00224



# GROUP TICKETS ON SALE NOW!

- •Group tickets starting at **$32** per seat for groups of 10 or more
- •Savings up to $16 per ticket
- •Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | |
|---|---|---|---|
| Kansas City | Sat. | Aug. 21 | 7:30 PM |
| Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| Cleveland | Sun. | Sept. 12 | 1:00 PM |
| Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| New Orleans | Sun. | Oct. 17 | 1:00 PM |
| St. Louis | Sun. | Oct. 24 | 1:00 PM |
| Carolina | Sun. | Nov. 14 | 1:00 PM |
| Atlanta | Sun. | Dec. 5 | 1:00 PM |
| Detroit | Sun. | Dec. 19 | 1:00 PM |
| Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



UNITE & CONQUER



# FAX COVER

ONE BUCCANEER PLACE, TAMPA, FL 33607    TEL: (877) 649-2827    WWW.BUCCANEERS.COM

| DATE: | 5/25/10 | # OF PAGES (INCLUDING COVER): | 2 |
| --- | --- | --- | --- |

**2010 HOME SCHEDULE**

| TO: | Human Resources |
| --- | --- |
| FROM: | Group Sales Department |
| SUBJECT: | Your Group Ticket Order |

ADDITIONAL COMMENTS:

Enclosed is the information you requested.

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decided to opt-out of further faxes please call 866-247-0920
Thank you

CONFIDENTIAL



# GROUP TICKETS ON SALE NOW!

- **Group tickets starting at $32 per seat for groups of 10 or more**
- **Savings up to $16 per ticket**
- **Fully catered tailgating packages also available**

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



CinQ+MC000049

RMI00236



# FAX COVER

ONE BUCCANEER PLACE, TAMPA, FL 33607     TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/25/10 | # OF PAGES (INCLUDING COVER): | | 2 |
|---|---|---|---|---|

**2010 HOME SCHEDULE**

| TO: | Human Resources |
|---|---|

| FROM: | Group Sales Department |
|---|---|

| SUBJECT: | Your Group Ticket Order |
|---|---|

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decided to opt-out of further faxes please call 866-247-0920
Thank you

CONFIDENTIAL



# GROUP TICKETS
## ON SALE NOW!

- Group tickets starting at **$32** per seat for groups of 10 or more

- Savings up to $16 per ticket

- Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



UNITE & CONQUER



# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607   TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/25/10 | # OF PAGES (INCLUDING COVER): | 2 |
| --- | --- | --- | --- |

| | |
| --- | --- |
| TO: | **Human Resources** |
| FROM: | **Group Sales Department** |
| SUBJECT: | **Your Group Ticket Order** |

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

**2010 HOME SCHEDULE**

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decided to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000052   RMI00241



# GROUP TICKETS
## ON SALE NOW!

- Group tickets starting at **$32** per seat for groups of 10 or more

- Savings up to $16 per ticket

- Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*





# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607     TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/26/10 | # OF PAGES (INCLUDING COVER): | | 2010 HOME SCHEDULE |
|---|---|---|---|---|
| | | | 2 | |

| TO: | Human Resources |
|---|---|

| FROM: | Group Sales Department |
|---|---|

| SUBJECT: | Your Group Ticket Order |
|---|---|

**ADDITIONAL COMMENTS**

**Enclosed is the information you requested.**

**2010 HOME SCHEDULE**

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

**If your office has decided to opt-out of further faxes please call  866-247-0920**
**Thank you**

CONFIDENTIAL



# GROUP TICKETS ON SALE NOW!

- **Group tickets starting at $32 per seat for groups of 10 or more**

- **Savings up to $16 per ticket**

- **Fully catered tailgating packages also available**

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | |
|---|---|---|---|
| Kansas City | Sat. | Aug. 21 | 7:30 PM |
| Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| Cleveland | Sun. | Sept. 12 | 1:00 PM |
| Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| New Orleans | Sun. | Oct. 17 | 1:00 PM |
| St. Louis | Sun. | Oct. 24 | 1:00 PM |
| Carolina | Sun. | Nov. 14 | 1:00 PM |
| Atlanta | Sun. | Dec. 5 | 1:00 PM |
| Detroit | Sun. | Dec. 19 | 1:00 PM |
| Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Plex Scheduling*



CONFIDENTIAL        CinQ+MC000055        RMI00249



# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607      TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/27/10 | # OF PAGES (INCLUDING COVER): | 2 |
| --- | --- | --- | --- |
| TO: | Human Resources | | |
| FROM: | Group Sales Department | | |
| SUBJECT: | Your Group Ticket Order | | |

**ADDITIONAL COMMENTS**

**Enclosed is the information you requested.**

### 2010 HOME SCHEDULE

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decided to opt-out of further faxes please call 866-247-0920
Thank you

CONFIDENTIAL                    CinQ+MC000056          RMI00255



# GROUP TICKETS ON SALE NOW!

- **Group tickets starting at $32 per seat for groups of 10 or more**
- **Savings up to $16 per ticket**
- **Fully catered tailgating packages also available**

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*





# FAX COVER

ONE BUCCANEER PLACE, TAMPA, FL 33607     TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: 5/28/10 | # OF PAGES (INCLUDING COVER): | 2 |
|---|---|---|

| | | 2010 HOME SCHEDULE |
|---|---|---|
| **TO:** Human Resources | | **KANSAS CITY** August 21 \| 7:30pm |
| **FROM:** Group Sales Department | | **JACKSONVILLE** August 28 \| 7:30pm |
| **SUBJECT:** Your Group Ticket Order | | **CLEVELAND** September 12 \| 1:00pm |
| **ADDITIONAL COMMENTS** | | **PITTSBURGH** September 26 \| 1:00pm |
| Enclosed is the information you requested. | | **NEW ORLEANS** October 17 \| 1:00pm |
| | | **ST. LOUIS** October 24 \| 1:00pm |
| | | **CAROLINA** November 14 \| 1:00pm |
| | | **ATLANTA** December 5 \| 1:00pm |
| | | **DETROIT** December 19 \| 1:00pm |
| | | **SEATTLE** December 26 \| 1:00pm |

If your office has decide to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000058

RMI00262



# GROUP TICKETS
## ON SALE NOW!

- Group tickets starting at **$32** per seat for groups of 10 or more

- Savings up to $16 per ticket

- Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



RMI00263
CinQ+MC000059



# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607     TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: 6/01/10 | # OF PAGES (INCLUDING COVER): 2 | 2010 HOME SCHEDULE |
|---|---|---|

**TO:** Human Resources

**KANSAS CITY**
August 21 | 7:30pm

**FROM:** Group Sales Department

**JACKSONVILLE**
August 28 | 7:30pm

**SUBJECT:** Your Group Ticket Order

**CLEVELAND**
September 12 | 1:00pm

ADDITIONAL COMMENTS

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**Enclosed is the information you requested.**

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decide to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000060 RMI00265



# GROUP TICKETS ON SALE NOW!

- **Group tickets starting at $32 per seat** for groups of 10 or more
- **Savings up to $16 per ticket**
- **Fully catered tailgating packages also available**

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*





# FAX COVER

ONE BUCCANEER PLACE TAMPA, Fl.33607     TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE | 6/07/10 | # OF PAGES (INCLUDING COVER): | 2 |
|------|---------|-------------------------------|---|

**2010 HOME SCHEDULE**

| TO: | Human Resources |
|-----|-----------------|

**KANSAS CITY**
August 21 | 7:30pm

| FROM: | Group Sales Department |
|-------|------------------------|

**JACKSONVILLE**
August 28 | 7:30pm

| SUBJECT: | Your Group Ticket Order |
|----------|-------------------------|

**CLEVELAND**
September 12 | 1:00pm

ADDITIONAL COMMENTS

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

Enclosed is the information you requested.

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decided to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000062

RMI00276



# GROUP TICKETS
## ON SALE NOW!

• **Group tickets starting at $32 per seat for groups of 10 or more**

• **Savings up to $16 per ticket**

• **Fully catered tailgating packages also available**

## GROUP TICKETS IDEAL TO:

• Reward employees

• Entertain clients

• Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



RMI00277
CinQ+MC000063



# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607    TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 6/08/10 | # OF PAGES (INCLUDING COVER): | 2 | 2010 HOME SCHEDULE |
|---|---|---|---|---|

| TO: | **Human Resources** | **KANSAS CITY**<br>August 21 \| 7:30pm |
|---|---|---|

| FROM: | **Group Sales Department** | **JACKSONVILLE**<br>August 28 \| 7:30pm |
|---|---|---|

| SUBJECT: | **Your Group Ticket Order** | **CLEVELAND**<br>September 12 \| 1:00pm |
|---|---|---|

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decide to opt-out of further faxes please call 866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000064

RMI00283



# GROUP TICKETS
## ON SALE NOW!

- •Group tickets starting at **$32** per seat for groups of 10 or more

- •Savings up to $16 per ticket

- •Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at **877-649-2827 (2827)** or purchase online at www.buccaneers.com

| | | | | |
|---|---|---|---|---|
| | Kansas City | Sat. | Aug. 21 | 7:30 PM |
| | Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| | Cleveland | Sun. | Sept. 12 | 1:00 PM |
| | Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| | New Orleans | Sun. | Oct. 17 | 1:00 PM |
| | St. Louis | Sun. | Oct. 24 | 1:00 PM |
| | Carolina | Sun. | Nov. 14 | 1:00 PM |
| | Atlanta | Sun. | Dec. 5 | 1:00 PM |
| | Detroit | Sun. | Dec. 19 | 1:00 PM |
| | Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



RMI00284
CinQ+MC000065



# FAX COVER

ONE BUCCANEER PLACE TAMPA, FL 33607    TEL: (877) 649–2827   WWW.BUCCANEERS.COM

| DATE | 6/09/10 | # OF PAGES (INCLUDING COVER): | 2 |
|------|---------|-------------------------------|---|

| | |
|---|---|
| TO: | **Human Resources** |
| FROM: | **Group Sales Department** |
| SUBJECT: | **Your Group Ticket Order** |

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

**2010 HOME SCHEDULE**

**KANSAS CITY**
August 21 | 7:30pm

**JACKSONVILLE**
August 28 | 7:30pm

**CLEVELAND**
September 12 | 1:00pm

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm

If your office has decide to opt-out of further faxes please call  866-247-0920
Thank you

CONFIDENTIAL

CinQ+MC000066

RMI00290



# GROUP TICKETS
## ON SALE NOW!

- Group tickets starting at **$32** per seat for groups of 10 or more
- Savings up to $16 per ticket
- Fully catered tailgating packages also available

## GROUP TICKETS IDEAL TO:

- Reward employees
- Entertain clients
- Celebrate a birthday or special occasion

For more information, call the Buccaneers sales department at 877-649-2827 (2827) or purchase online at www.buccaneers.com

| | | | |
|---|---|---|---|
| Kansas City | Sat. | Aug. 21 | 7:30 PM |
| Jacksonville | Sat. | Aug. 28 | 7:30 PM |
| Cleveland | Sun. | Sept. 12 | 1:00 PM |
| Pittsburgh | Sun. | Sept. 26 | 1:00 PM |
| New Orleans | Sun. | Oct. 17 | 1:00 PM |
| St. Louis | Sun. | Oct. 24 | 1:00 PM |
| Carolina | Sun. | Nov. 14 | 1:00 PM |
| Atlanta | Sun. | Dec. 5 | 1:00 PM |
| Detroit | Sun. | Dec. 19 | 1:00 PM |
| Seattle | Sun. | Dec. 26 | 1:00 PM |

*Time Subject to change due to NFL Flex Scheduling*



CONFIDENTIAL

**EXHIBIT 3**

CONFIDENTIAL                    CinQ+MC000068

## EXHIBIT 3

| Log File | Bates ID Page | Fax Image File | First Fax | Last Fax | Received | Attempted |
|---|---|---|---|---|---|---|
| 231328-CDR.csv | 231328-CDR.tif | 231328-DOC.tif | 17-Aug-09 09:49:49 | 17-Aug-09 10:14:49 | 13,575 | 23,528 |
| 231329-CDR.csv | 231329-CDR.tif | 231329-DOC.tif | 17-Aug-09 10:20:04 | 17-Aug-09 10:43:52 | 4,410 | 7,861 |
| 231336-CDR.csv | 231336-CDR.tif | 231336-DOC.tif | 17-Aug-09 12:16:09 | 17-Aug-09 12:26:44 | 1,747 | 2,400 |
| 231337-CDR.csv | 231337-CDR.tif | 231337-DOC.tif | 17-Aug-09 12:37:13 | 17-Aug-09 12:45:03 | 298 | 410 |
| 231340-CDR.csv | 231340-CDR.tif | 231340-DOC.tif | 17-Aug-09 15:05:39 | 17-Aug-09 15:06:21 | 2 | 3 |
| 231384-CDR.csv | 231384-CDR.tif | 231384-DOC.tif | 18-Aug-09 09:39:35 | 18-Aug-09 11:01:16 | 32,958 | 47,056 |
| 231402-CDR.csv | 231402-CDR.tif | 231402-DOC.tif | 18-Aug-09 11:31:09 | 18-Aug-09 11:49:56 | 4,760 | 5,317 |
| 231445-CDR.csv | 231445-CDR.tif | 231445-DOC.tif | 19-Aug-09 09:49:24 | 19-Aug-09 10:20:10 | 6,026 | 6,573 |
| 231446-CDR.csv | 231446-CDR.tif | 231446-DOC.tif | 19-Aug-09 09:52:15 | 19-Aug-09 11:47:00 | 20,910 | 30,612 |
| 231460-CDR.csv | 231460-CDR.tif | 231460-DOC.tif | 20-Aug-09 09:29:12 | 20-Aug-09 09:59:32 | 23,159 | 32,425 |
| 243300-CDR.csv | 243300-CDR.tif | 243300-DOC.tif | 24-May-10 09:59:35 | 24-May-10 10:46:26 | 15,348 | 18,300 |
| 243301-CDR.csv | 243301-CDR.tif | 243301-DOC.tif | 24-May-10 10:06:15 | 24-May-10 10:59:02 | 16,531 | 18,385 |
| 243372-CDR.csv | 243372-CDR.tif | 243372-DOC.tif | 25-May-10 10:40:53 | 25-May-10 12:27:00 | 9,490 | 11,764 |
| 243373-CDR.csv | 243373-CDR.tif | 243373-DOC.tif | 25-May-10 10:42:40 | 25-May-10 11:57:15 | 1,199 | 35,118 |
| 243377-CDR.csv | 243377-CDR.tif | 243377-DOC.tif | 25-May-10 11:13:44 | 25-May-10 11:24:35 | 507 | 634 |
| 243443-CDR.csv | 243443-CDR.tif | 243443-DOC.tif | 26-May-10 11:08:52 | 26-May-10 11:57:40 | 21,665 | 24,447 |
| 243501-CDR.csv | 243501-CDR.tif | 243501-DOC.tif | 27-May-10 10:30:28 | 27-May-10 11:24:12 | 18,629 | 21,400 |
| 243534-CDR.csv | 243534-CDR.tif | 243534-DOC.tif | 28-May-10 11:30:22 | 28-May-10 11:58:31 | 10,039 | 11,764 |
| 243580-CDR.csv | 243580-CDR.tif | 243580-DOC.tif | 01-Jun-10 10:30:16 | 01-Jun-10 11:11:37 | 8,356 | 9,670 |
| 243796-CDR.csv | 243796-CDR.tif | 243796-DOC.tif | 07-Jun-10 11:00:35 | 07-Jun-10 11:33:35 | 15,095 | 17,647 |
| 243877-CDR.csv | 243877-CDR.tif | 243877-DOC.tif | 08-Jun-10 10:45:20 | 08-Jun-10 11:11:28 | 5,878 | 6,800 |
| 243921-CDR.csv | 243921-CDR.tif | 243921-DOC.tif | 09-Jun-10 09:07:49 | 09-Jun-10 09:27:35 | 10,014 | 11,764 |
| | | | | TOTALS: | 240,596 | 343,878 |

CONFIDENTIAL

# EXHIBIT 4

CONFIDENTIAL

CinQ+MC000070



CinQ+MC000071

**EXHIBIT 5a**

CONFIDENTIAL

CinQ+MC000072

# Fax Submission - SubmissionId# 125536

**From:**  "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com>

**To:**  "jforbes@usadatalink.com" <jforbes@usadatalink.com>

**BCC:**  "submit@127highstreet.com" <submit@127highstreet.com>

**Subject:** Fax Submission - SubmissionId# 125536

**Sent:**  Mon, 13 Jul 2009 19:18:42 -0700

This is a multi-part message in MIME format. ------=_NextPart_000_00CE_01C79EE6.1D38D900 Content-Type: text/plain; charset="iso-8859-1" Content-Transfer-Encoding: quoted-printable If you can see this, then your email client does not support HTML messages. ------=_NextPart_000_00CE_01C79EE6.1D38D900 Content-Type: text/html; charset="iso-8859-1" Content-Transfer-Encoding: quoted-printable

**HighStreet Fax Submission Summary**
= Please print this form = out for your records

=
=
=
=
=

| | |
|---|---|
| **SubmissionId:** | = 125536 |
| **Contact = Name:** | John |
| = **Contact Number:** = | 888-325-2182 = |
| **Email Address:** | = jforbes@usadatalink.com |
| **UserId:** | F0004504 |
| **CSID:** | Group Tickets |
| **USID:** | Steve S |
| **DateToSend:** | Tuesday, Jul 14, 2009 09:00 ET |
| **Number Of Pages:** | 2 |

| Merge = Job: | NO |
|---|---|
| = Test Fax Required: = | NO |
| Special Instructions: | Please release at 9:15 am EST |
| File Uploaded: = | tampabay1.pdf |
| File Uploaded: | = SteveSlms727-66K.txt |

**Questions?**
If you have any questions regarding = this submission request, please click Customer = Portal and submit a support ticket.

| DateTime: | = Monday, Jul 13, 2009 7:18:42 PM = |
|---|---|
| Remote Address: = | 99.241.186.6 |

------=_NextPart_000_00CE_01C79EE6.1D38D900--

| | |
|---|---|
| **X-Account-Key:** | account2 |
| **X-UIDL:** | UID3377-1234386509 |
| **X-Mozilla-Status:** | 0001 |
| **X-Mozilla-Status2:** | 00000000 |
| **Return-path:** | <do-not-reply@127highstreet.com> |
| **Envelope-to:** | jforbes@usadatalink.com |
| **Delivery-date:** | Mon, 13 Jul 2009 22:18:46 -0400 |
| **Received:** | from impinc02.yourhostingaccount.com ([10.1.13.102] helo=impinc02.yourhostingaccount.com) by mailscan10.yourhostingaccount.com with esmtp (Exim) id 1MQXbS-0004XC-6a for jforbes@usadatalink.com; Mon, 13 Jul 2009 22:18:46 -0400 |
| **Received:** | from fsf-svr-web1.5STARFAX.LOCAL ([69.90.29.163]) by impinc02.yourhostingaccount.com with NO UCE id FeJl1c02q3X9VQM02eJlrT; Mon, 13 Jul 2009 22:18:46 -0400 |
| **X-EN-OrigIP:** | 69.90.29.163 |
| **X-EN-IMPSID:** | FeJl1c02q3X9VQM02eJlrT |
| **Received:** | from 127highstreet.com ([127.0.0.1]) by fsf-svr-web1.5STARFAX.LOCAL with Microsoft SMTPSVC(5.0.2195.6713); Mon, 13 Jul 2009 19:18:42 -0700 |
| **Content-Type:** | text/html; charset="us-ascii" |
| **Reply-To:** | "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com> |
| **Message-Id:** | <6021735813182009.071842@127highstreet.com> |
| **MIME-Version:** | 1.0 |
| **Content-Type:** | multipart/alternative; boundary="----=_NextPart_000_00CE_01C79EE6.1D38D900" |
| **X-OriginalArrivalTime:** | 14 Jul 2009 02:18:42.0848 (UTC) FILETIME=[68989200:01CA0429] |

# Fax Submission - SubmissionId# 125650

**From:**     "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com>
**To:**       "jforbes@usadatalink.com" <jforbes@usadatalink.com>
**BCC:**      "submit@127highstreet.com" <submit@127highstreet.com>
**Subject:** Fax Submission - SubmissionId# 125650
**Sent:**     Wed, 15 Jul 2009 06:03:12 -0700

This is a multi-part message in MIME format. ------=_NextPart_000_00CE_01C79EE6.1D38D900
Content-Type: text/plain; charset="iso-8859-1" Content-Transfer-Encoding: quoted-printable If
you can see this, then your email client does not support HTML messages. ------
=_NextPart_000_00CE_01C79EE6.1D38D900 Content-Type: text/html; charset="iso-8859-1"
Content-Transfer-Encoding: quoted-printable

## HighStreet Fax Submission Summary
= Please print this form = out for your records

=
=
=
=

| | |
|---|---|
| **SubmissionId:** | = 125650 |
| **Contact = Name:** | John |
| = **Contact Number:** = | 888-325-2182 = |
| **Email Address:** | = jforbes@usadatalink.com |
| **UserId:** | F0004504 |
| **CSID:** | Group Tickets |
| **USID:** | Steve |
| **DateToSend:** = | ASAP |
| **Number Of Pages:** | 2 |
| **Merge** | NO |

| = Job: | |
|---|---|
| = Test Fax Required: = | NO |
| Special Instructions: | |
| File Uploaded: | = 7-15_buc_doc.pdf |
| File Uploaded: | SteveSims813-79K.txt = |

**Questions?**
If you have any questions regarding this submission = request, please click Customer = Portal and submit a support ticket.

| **DateTime:** | = Wednesday, Jul 15, 2009 6:03:12 AM = |
|---|---|
| **Remote Address:** = | 99.241.186.6 |

------=_NextPart_000_00CE_01C79EE6.1D38D900--

| | |
|---|---|
| **X-Account-Key:** | account2 |
| **X-UIDL:** | UID3417-1234386509 |
| **X-Mozilla-Status:** | 0001 |
| **X-Mozilla-Status2:** | 00000000 |
| **Return-path:** | <do-not-reply@127highstreet.com> |
| **Envelope-to:** | jforbes@usadatalink.com |
| **Delivery-date:** | Wed, 15 Jul 2009 09:03:16 -0400 |
| **Received:** | from impinc02.yourhostingaccount.com ([10.1.13.102] helo=impinc02.yourhostingaccount.com) by mailscan13.yourhostingaccount.com with esmtp (Exim) id 1MR48I-0003CR-BI for jforbes@usadatalink.com; Wed, 15 Jul 2009 09:03:16 -0400 |
| **Received:** | from fsf-svr-web1.5STARFAX.LOCAL ([69.90.29.163]) by impinc02.yourhostingaccount.com with NO UCE id GD3D1c0733X9VQM02D3EEA; Wed, 15 Jul 2009 09:03:16 -0400 |
| **X-EN-OrigIP:** | 69.90.29.163 |
| **X-EN-IMPSID:** | GD3D1c0733X9VQM02D3EEA |
| **Received:** | from 127highstreet.com ([127.0.0.1]) by fsf-svr-web1.5STARFAX.LOCAL with Microsoft SMTPSVC(5.0.2195.6713); Wed, 15 Jul 2009 06:03:12 -0700 |
| **Content-Type:** | text/html; charset="us-ascii" |
| **Reply-To:** | "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com> |
| **Message-Id:** | <6936083015032009.060312@127highstreet.com> |
| **MIME-Version:** | 1.0 |
| **Content-Type:** | multipart/alternative; boundary="----=_NextPart_000_00CE_01C79EE6.1D38D900" |
| **X-OriginalArrivalTime:** | 15 Jul 2009 13:03:12.0858 (UTC) FILETIME=[9C2193A0:01CA054C] |

# Fax Submission - SubmissionId# 125699

**From:** "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com>

**To:** "jforbes@usadatalink.com" <jforbes@usadatalink.com>

**BCC:** "submit@127highstreet.com" <submit@127highstreet.com>

**Subject:** Fax Submission - SubmissionId# 125699

**Sent:** Thu, 16 Jul 2009 06:08:23 -0700

This is a multi-part message in MIME format. ------=_NextPart_000_00CE_01C79EE6.1D38D900 Content-Type: text/plain; charset="iso-8859-1" Content-Transfer-Encoding: quoted-printable If you can see this, then your email client does not support HTML messages. ------=_NextPart_000_00CE_01C79EE6.1D38D900 Content-Type: text/html; charset="iso-8859-1" Content-Transfer-Encoding: quoted-printable

**HighStreet Fax Submission Summary**
= Please print this form = out for your records

=
=
=
=

| | |
|---|---|
| **SubmissionId:** | = 125699 |
| **Contact = Name:** | John |
| = **Contact Number:** = | 888-325-2182 = |
| **Email Address:** | = jforbes@usadatalink.com |
| **UserId:** | F0004504 |
| **CSID:** | Group Tickets |
| **USID:** | Steve |
| **DateToSend:** = | ASAP |
| **Number Of Pages:** | 2 |
| **Merge** | NO |

| = Job: | |
|---|---|
| = Test Fax Required: = | NO |
| Special Instructions: | |
| File Uploaded: | = tampabay_thurs.pdf |
| File Uploaded: | = SteveSims352-941-116KK.txt |

**Questions?**
If you have any questions regarding = this submission request, please click Customer = Portal and submit a support ticket.

**DateTime:**   = Thursday, Jul 16, 2009 6:08:23 AM =

**Remote Address:**   99.241.186.6

=

------=_NextPart_000_00CE_01C79EE6.1D38D900--

Fax Submission - Submission Id# 125699                                              Page 3 of 3

| | |
|---|---|
| **X-Account-Key:** | account2 |
| **X-UIDL:** | UID3494-1234386509 |
| **X-Mozilla-Status:** | 0001 |
| **X-Mozilla-Status2:** | 00000000 |
| **Return-path:** | <do-not-reply@127highstreet.com> |
| **Envelope-to:** | jforbes@usadatalink.com |
| **Delivery-date:** | Thu, 16 Jul 2009 11:52:52 -0400 |
| **Received:** | from impinc02.yourhostingaccount.com ([10.1.13.102] helo=impinc02.yourhostingaccount.com) by mailscan07.yourhostingaccount.com with esmtp (Exim) id 1MRQhF-0008DS-Nm for jforbes@usadatalink.com; Thu, 16 Jul 2009 09:08:25 -0400 |
| **Received:** | from fsf-svr-web1.5STARFAX.LOCAL ([69.90.29.163]) by impinc02.yourhostingaccount.com with NO UCE id Gd8R1c01h3X9VQM02d8RBq; Thu, 16 Jul 2009 09:08:25 -0400 |
| **X-EN-OrigIP:** | 69.90.29.163 |
| **X-EN-IMPSID:** | Gd8R1c01h3X9VQM02d8RBq |
| **Received:** | from 127highstreet.com ([127.0.0.1]) by fsf-svr-web1.5STARFAX.LOCAL with Microsoft SMTPSVC(5.0.2195.6713); Thu, 16 Jul 2009 06:08:23 -0700 |
| **Content-Type:** | text/html; charset="us-ascii" |
| **Reply-To:** | "do-not-reply@127highstreet.com" <do-not-reply@127highstreet.com> |
| **Message-Id:** | <5105379516082009.060823@127highstreet.com> |
| **MIME-Version:** | 1.0 |
| **Content-Type:** | multipart/alternative; boundary="----=_NextPart_000_00CE_01C79EE6.1D38D900" |

**X-OriginalArrivalTime:** 16 Jul 2009 13:08:23.0078 (UTC) FILETIME=[7F732460:01CA0616]

# EXHIBIT 5b

CONFIDENTIAL

CinQ+MC000082

# TAMPA BAY
# BUCCANEERS | FAX COVER

**FACSIMILE**



ONE BUCCANEER PLACE   TAMPA, FL 33607          TEL: (813) 870-2700          BUCCANEERS.COM

DATE: 7/15/09      # of Pages (including cover): 2

TO: Human Resources

FROM: Group Seating Department

SUBJECT: Buccaneers Group Tickets

ADDITIONAL COMMENTS:

Attached is the information on group seating. Tickets are available for groups of 20 or more people. When buying group seating, you save up to $16 per ticket versus the individual game ticket cost.  Group seating also gives you access to large blocks of seating that are not available any other way.

Many companies use group seating as a retreat and/or reward to build team unity.

If you have any questions, please don't hesitate to call us at (877) 649-BUCS (2827).

## 2009 SCHEDULE

**DALLAS**
September 13 | 1:00pm

**AT BUFFALO**
September 20 | 4:05pm

**N.Y. GIANTS**
September 27 | 1:00pm

**AT WASHINGTON**
October 4 | 1:00pm

**AT PHILADELPHIA**
October 11 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**NEW ENGLAND**
October 25 | 1:00pm | LONDON

**GREEN BAY**
November 8 | 1:00pm

**AT MIAMI**
November 15 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**AT ATLANTA**
November 29 | 1:00pm

**AT CAROLINA**
December 6 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**AT SEATTLE**
December 20 | 4:15pm

**AT NEW ORLEANS**
December 27 | 1:00pm

**ATLANTA**
January 3 | 1:00pm

*ALL TIMES EASTERN / SUBJECT TO CHANGE

## 2002 WORLD CHAMPIONS

CONFIDENTIAL

CinQ+MC000083



# GROUP TICKETS ON SALE NOW!
## 877-649-BUCS (2827)

| SECTION | A | B | C | D | E |
|---|---|---|---|---|---|
| GROUP PER GAME PRICE | $99.00 | $89.00 | $85.00 | $75.00 | $65.00 |

Group tickets are available in packages of 20 or more and reflect a discount of up to $16 per ticket

### 2009 SEASON

**DALLAS**
September 13 | 1:00pm

**N.Y. GIANTS**
September 27 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**GREEN BAY**
November 8 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**ATLANTA**
January 3 | 1:00pm



## Call 877-649-BUCS (2827) or visit www.buccaneers.com today for seat locations

To immediately and permanently remove your fax number from our opt-in compiled database, please call 877-272-7614.  Removaltech@FaxQom.com

CONFIDENTIAL                    CinQ+MC000084

# TAMPA BAY
# BUCCANEERS

# FAX COVER

FACSIMILE



ONE BUCCANEER PLACE  TAMPA, FL 33607      TEL: (813) 870-2700      BUCCANEERS.COM

DATE: **7/16/09**      # of Pages (including cover):   **2**

TO:  **Human Resources**

FROM:  **Group Seating Department**

SUBJECT:  **Buccaneers Group Tickets**

ADDITIONAL COMMENTS:

Attached is the information on group seating. Tickets are available for groups of 20 or more people. When buying group seating, you save up to $16 per ticket versus the individual game ticket cost.  Group seating also gives you access to large blocks of seating that are not available any other way.

Many companies use group seating as a retreat and/or reward to build team unity.

If you have any questions, please don't hesitate to call us at (877) 649-BUCS (2827).

## 2009 SCHEDULE

**DALLAS**
September 13 | 1:00pm

**AT BUFFALO**
September 20 | 4:05pm

**N.Y. GIANTS**
September 27 | 1:00pm

**AT WASHINGTON**
October 4 | 1:00pm

**AT PHILADELPHIA**
October 11 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**NEW ENGLAND**
October 25 | 1:00pm | LONDON

**GREEN BAY**
November 8 | 1:00pm

**AT MIAMI**
November 15 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**AT ATLANTA**
November 29 | 1:00pm

**AT CAROLINA**
December 6 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**AT SEATTLE**
December 20 | 4:15pm

**AT NEW ORLEANS**
December 27 | 1:00pm

**ATLANTA**
January 3 | 1:00pm

*ALL TIMES EASTERN / SUBJECT TO CHANGE

# 2002 WORLD CHAMPIONS

CONFIDENTIAL

CinQ+MC000085



# GROUP TICKETS ON SALE NOW!
## 877-649-BUCS (2827)

| SECTION | A | B | C | D | E |
|---|---|---|---|---|---|
| GROUP PER GAME PRICE | $99.00 | $89.00 | $85.00 | $75.00 | $65.00 |

Group tickets are available in packages of 20 or more and reflect a discount of up to $16 per ticket

### 2009 SEASON

| | | | |
|---|---|---|---|
| **DALLAS** September 13 I 1:00pm | **N.Y. GIANTS** September 27 I 1:00pm | **CAROLINA** October 18 I 1:00pm | **GREEN BAY** November 8 I 1:00pm |
| **NEW ORLEANS** November 22 I 1:00pm | **N.Y. JETS** December 13 I 1:00pm | **ATLANTA** January 3 I 1:00pm | |



## Call 877-649-BUCS (2827) or visit www.buccaneers.com today for seat locations

To immediately and permanently remove your fax number from our opt-in compiled database, please call 877-272-7614. Removaltech@FaxQom.com

CONFIDENTIAL                    CinQ+MC000086

# TAMPA BAY BUCCANEERS | FAX COVER

**F A C S I M I L E**

ONE BUCCANEER PLACE   TAMPA, FL 33607          TEL: (813) 870-2700     BUCCANEERS.COM



DATE: **7/14/09**     # of Pages (including cover): **2**

TO: **Human Resources**

FROM: **Group Seating Department**

SUBJECT: **Buccaneers Group Tickets**

ADDITIONAL COMMENTS:

**Attached is the information on group seating. Tickets are available for groups of 20 or more people. When buying group seating, you save up to $16 per ticket versus the individual game ticket cost.  Group seating also gives you access to large blocks of seating that are not available any other way.**

**Many companies use group seating as a retreat and/or reward to build team unity.**

**If you have any questions, please don't hesitate to call us at (877) 649-BUCS (2827).**

## 2009 SCHEDULE

**DALLAS**
September 13 | 1:00pm

**AT BUFFALO**
September 20 | 4:05pm

**N.Y. GIANTS**
September 27 | 1:00pm

**AT WASHINGTON**
October 4 | 1:00pm

**AT PHILADELPHIA**
October 11 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**NEW ENGLAND**
October 25 | 1:00pm | LONDON

**GREEN BAY**
November 8 | 1:00pm

**AT MIAMI**
November 15 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**AT ATLANTA**
November 29 | 1:00pm

**AT CAROLINA**
December 6 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**AT SEATTLE**
December 20 | 4:15pm

**AT NEW ORLEANS**
December 27 | 1:00pm

**ATLANTA**
January 3 | 1:00pm

*ALL TIMES EASTERN / SUBJECT TO CHANGE

## 2002 WORLD CHAMPIONS

CONFIDENTIAL

CinQ+MC000087



# GROUP TICKETS ON SALE NOW!
## 877-649-BUCS (2827)

| SECTION | A | B | C | D | E |
|---|---|---|---|---|---|
| GROUP PER GAME PRICE | $99.00 | $89.00 | $85.00 | $75.00 | $65.00 |

Group tickets are available in packages of 20 or more and reflect a discount of up to $16 per ticket

### 2009 SEASON

**DALLAS**
September 13 | 1:00pm

**N.Y. GIANTS**
September 27 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**GREEN BAY**
November 8 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**ATLANTA**
January 3 | 1:00pm



## Call 877-649-BUCS (2827) or visit www.buccaneers.com today for seat locations

To immediately and permanently remove your fax number from our opt-in compiled database, please call 877-272-7614. Removaltech@FaxQom.com

CONFIDENTIAL                    CinQ+MC000088

**EXHIBIT 5c**

CONFIDENTIAL

CinQ+MC000089

**EXHIBIT 5C**

| File/Dir Name | Item # | Path | Type | L-Size | MD5 | Created | Accessed | Modified |
|---|---|---|---|---|---|---|---|---|
| July 14-09 | 239857 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 14-09 | Folder | 512 | | 7/13/2009 8:02:03 PM (2009-07-14 00:02:03 UTC) | 7/13/2009 9:54:07 PM (2009-07-14 01:54:07 UTC) | 7/13/2009 9:54:07 PM (2009-07-14 01:54:07 UTC) |
| SteveSims727-66K.txt | 239858 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 14-09/SteveSims727-66K.txt | Text | 765,145 | DFE664A3C4FFB4E597E0A1D2390931ED | 7/13/2009 8:01:00 PM (2009-07-14 00:01:00 UTC) | 7/13/2009 8:02:13 PM (2009-07-14 00:02:13 UTC) | 7/13/2009 9:50:46 PM (2009-07-14 01:50:46 UTC) |
| tampabay1.pdf | 23 9859 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 14-09/tampabay1.pdf | Adobe Acrobat | 302,765 | C599B652B2E2EC1A0F669E8936E896C1 | 7/13/2009 6:53:37 PM (2009-07-13 21:53:37 UTC) | 7/13/2009 9:54:07 PM (2009-07-14 01:54:07 UTC) | 7/13/2009 6:53:37 PM (2009-07-13 21:53:37 UTC) |
| July 15-09 | 239860 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 15-09 | Folder | 520 | | 7/15/2009 9:00:26 AM (2009-07-15 13:00:26 UTC) | 7/15/2009 9:01:04 AM (2009-07-15 13:01:04 UTC) | 7/15/2009 9:01:04 AM (2009-07-15 13:01:04 UTC) |
| 7-15 buc doc.pdf | 23 9861 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 15-09/7-15 buc doc.pdf | Adobe Acrobat | 467,985 | 3842F5251FF07FDB195D653DD093AE1D | 7/14/2009 11:30:06 AM (2009-07-14 15:30:06 UTC) | 7/15/2009 9:00:32 AM (2009-07-15 13:00:32 UTC) | 7/14/2009 11:30:08 AM (2009-07-14 15:30:06 UTC) |
| SteveSims813-79K.txt | 239862 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 15-09/SteveSims813-79K.txt | Text | 943,182 | D6506FEF89FEA540C63131F4EFDFC46D | 7/15/2009 6:59:00 AM (2009-07-15 12:59:00 UTC) | 7/15/2009 9:01:04 AM (2009-07-15 13:01:04 UTC) | 7/15/2009 8:59:00 AM (2009-07-15 12:59:00 UTC) |
| July 16-09 | 239863 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 16-09 | Folder | 626 | | 7/16/2009 8:57:32 AM (2009-07-16 12:57:32 UTC) | 7/16/2009 9:05:36 AM (2009-07-16 13:05:36 UTC) | 7/16/2009 9:05:36 AM (2009-07-16 13:05:36 UTC) |
| SteveSims352-841-116KK.txt | 239864 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 16-09/SteveSims352-841-116KK.txt | Text | 1,366,795 | F2D5D7734CB2767AC70307D2EFF3E92C | 7/16/2009 9:05:00 AM (2009-07-16 13:05:00 UTC) | 7/16/2009 9:05:36 AM (2009-07-16 13:05:36 UTC) | 7/16/2009 9:05:00 AM (2009-07-16 13:05:00 UTC) |
| tampabay thurs.pdf | 23 9865 | /[root]/Users/The Nelsons/Links/DMI Marketing/FAX Customers/Steve Sims/Tampa Bay Bucs/July 16-09/tampabay thurs.pdf | Adobe Acrobat | 467,872 | B9081DE4B8619E3BB5E14B36EBFE1AD4 | 7/14/2009 11:11:50 AM (2009-07-14 15:11:50 UTC) | 7/16/2009 8:57:39 AM (2009-07-16 12:57:39 UTC) | 7/14/2009 11:11:50 AM (2009-07-14 15:11:50 UTC) |

CinQ+MC000090

**EXHIBIT 6**

CONFIDENTIAL                    CinQ+MC000091

**EXHIBIT 6**

CONFIDENTIAL

CinQ+MC000092

# EXHIBIT 6

| File Name of Target List | File name of Fax Image | Submission Date | Total Rows of Fax Numbers | Unique Normalized 10-digit Fax Numbers | Billing Code | Number of Exception Reports | Total Attempts | Total Failed Attempts | Unique Fax Numbers with Failed Transmissions | Unique Fax Numbers with No Errors |
|---|---|---|---|---|---|---|---|---|---|---|
| SteveSims727-66K[239858].txt | tampabay1.pdf | 7/14/2009 | 86,429 | 86,424 | 125636 | 13 | 81,765 | 55,721 | 40,488 | 24,938 |
| SteveSims813-79K[239862].txt | 7-15_buc_doc.pdf | 7/15/2009 | 78,599 | 78,594 | 125650 | 28 | 78,595 | 46,068 | 46,067 | 32,527 |
| SteveSims352-941-116KK[239864].txt | tampabay_thurs.pdf | 7/16/2009 | 115,568 | 115,554 | 125899 | 18 | 129,246 | 84,065 | 70,494 | 45,061 |
| | | COMBINED TOTALS | 259,596 | 259,570[a] | | 59 | 289,605 | 185,854 | | 102,524[a] |

[a]There were 2 fax numbers that appeared in 2 lists: 8138720046 and 8135541351 so the overall total unique fax numbers with error-free transmissions is 102,524 and the overall total unique 10-digit fax numbers is 259,570. A separate e-mail identified 5 extra fax numbers to be added to the last list. At the request of Mr. Kelly, those 5 fax numbers are excluded from this analysis.

CONFIDENTIAL

CinQ I MC000093

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| CIN-Q AUTOMOBILES, INC. and MEDICAL & CHIROPRACTIC CLINIC, INC., Florida corporations, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) ) ) ) | Case No. 8:13-cv-1592-17AEP |
| Paintiffs, | ) ) | |
| vs. | ) ) | |
| BUCCANEERS LIMITED PARTNERSHIP and JOHN DOES 1-10, | ) ) ) | |
| Defendants. | ) ) ) | |

VIDEOTAPED DEPOSITION OF MATTHEW KAISER

LOS ANGELES, CALIFORNIA

TUESDAY, MARCH 25, 2014

REPORTED BY:
SYLVIA POLLICK
CSR #1826, RMR, CRR

CONFIDENTIAL                    CinQ+MC000094

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 2**

1   VIDEOTAPED DEPOSITION OF MATTHEW KAISER, taken on
2   behalf of the Plaintiffs, at 5757 West Century
3   Boulevard, Seventh Floor, Los Angeles,
4   California, on Tuesday, March 25, 2014, at
5   9:19 a.m., before Sylvia Pollick, CSR #1826,
6   RMR, CRR, pursuant to Notice.
7
8
9   APPEARANCES OF COUNSEL:
10
11      FOR THE PLAINTIFFS:
12          Anderson & Wanca
            BY:  Ryan M. Kelly, Esq.
13               Ross M. Good, Esq.
            3701 Algonquin Road
14          Suite 760
            Rolling Meadows, Illinois  60008
15          Telephone:  (847) 368-1500
16          Addison & Howard, P.A.
            BY:  Michael C. Addison, Esq.
17          400 North Tampa Street
            Suite 100
18          Tampa, Florida 33602
            (813) 223-2000
19          [Present telephonically]
20
21      FOR THE WITNESS AND THE DEFENDANTS:
22          Law Offices of
            Cole, Scott & Kissane, P.A.
23          BY:  Barry A. Postman, Esq.
            1645 Palm Beach Lakes Boulevard
24          2nd Floor
            West Palm Beach, Florida  33401
25          (561) 366-4700

**Page 3**

1   APPEARANCES OF COUNSEL CONTINUED:
2
3   ALSO PRESENT:
4          Tampa Bay Buccaneers
           BY:  David S. Cohen, Esq.
5               General Counsel
           One Buccaneer Place
6          Tampa, Florida  33607
           Telephone:  (813) 870-2700
7
8   THE VIDEOGRAPHER:
           BY:  Spencer Benveniste
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                    I N D E X
2
3
4   WITNESS            EXAMINATION          PAGE
5   Matthew Kaiser     By Mr. Kelly           11
6   Afternoon Session                        204
7
8              E X H I B I T S
9   PLAINTIFFS':                             PAGE
10  1    E-mail from Sales at FaxQom.com       64
11       dated January 23, 2009
12       BLP 000001
13  2    E-mail from Sales at FaxQom.com       98
14       dated June 16, 2009
15       BLP 000010
16  3    E-mail dated June 24, 2009 from      132
17       Matt Kaiser to sales@faxqom.com
18       BLP 000011
19  4    E-mail dated June 10, 2010 from      144
20       sales@faxqom.com to Matt Kaiser
21  5    E-mail dated August 3, 2009 from     151
22       Matt Kaiser to Manny Alvare, etc.
23       BLP 000066
24  6    Two checks, CinQ001914               161
25  ///

**Page 5**

1                    I N D E X
2                   (Continued)
3
4              E X H I B I T S
5   PLAINTIFFS':                             PAGE
6   7    E-mail from Matt Kaiser              164
7        to sales@faxqom.com, dated
8        August 13, 2009, etc.
9        BLP 000086 - BLP 000091
10  8    2010 Group Ticket Order Form, etc.   171
11  9    E-mail dated August 11, 2009         212
12       to FaxQom from Matt Kaiser
13       BLP 000082
14  10   E-mail dated September 1, 2009 to    246
15       FaxQom from Matt Kaiser to FaxQom
16  11   Letter dated August 20, 2009,        249
17       from the Law Offices of Phyllis J.
18       Towzey to Brian Ford
19  12   Letter dated December 16, 2009       259
20       to Manny Alvare from person
21       complaining of receiving faxes
22  13   Letter from Ms. Towzey to Steve      263
23       Simms, dated September 11, 2009
24  ///
25  ///

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 6

|   |   | I N D E X | |
|   |   | (Continued) | |
|   |   |   |   |
|   |   | E X H I B I T S | |
| 5 | DEFENDANTS': |   | PAGE |
| 6 | A | Full set of all of the documents | 274 |
| 7 |   | sent to Plaintiffs last night, |   |
| 8 |   | March 24, 2014 |   |
|   |   |   |   |
| 10 |   | INFORMATION REQUESTED | |
| 11 |   | (None) | |
|   |   |   |   |
| 13 |   | QUESTIONS INSTRUCTED NOT TO ANSWER | |
| 14 |   | Page | Line |
| 15 |   | 112 | 16 |
| 16 |   | 120 | 2 |
| 17 |   | 210 | 3 |
| 18 |   | 211 | 15 |
| 19 |   | 214 | 1 |
| 20 |   | 215 | 7 |
| 21 |   | 215 | 15 |
| 22 |   | 216 | 4 |
| 23 |   | 217 | 11 |
| 24 |   | 219 | 18 |
| 25 |   | 223 | 25 |

Page 7

|   |   | I N D E X | |
|   |   | (Continued) | |
|   |   |   |   |
| 4 |   | QUESTIONS INSTRUCTED NOT TO ANSWER | |
| 5 |   | Page | Line |
| 6 |   | 232 | 14 |

Page 8

1       LOS ANGELES, CALIFORNIA
2       TUESDAY, MARCH 25, 2014
3            9:19 A.M.
4       MR. POSTMAN:  We're here today for
5  Mr. Kaiser's deposition.  He's being produced as the
6  30(B)(6) witness.  We had received a Notice with 52
7  different subject matters that the Plaintiff has
8  asked us to produce a witness to testify on behalf
9  of.  He is that person.
10      I object generally, as I've said to
11 Counsel, to the concept of there being a 30(B)(6)
12 with 52 different subject matters, but in the effort
13 of cooperation, in an effort to try to resolve
14 differences without having court intervention,
15 Mr. Kaiser is being produced as that person.
16      We are not waiving our right to object to
17 the effort of having 52 different subject matters
18 being a part of a 30(B)(6).  But having said that,
19 he's here to testify.
20      Second thing I wanted to comment on the
21 record is I sent Counsel an e-mail last night.  In
22 my meeting with Mr. Kaiser I was a little concerned
23 that perhaps not all of the e-mails were produced.
24 So I wanted to give them a copy of a complete set of
25 the documents.  I e-mailed it last night.  I have an

Page 9

1  e-mail record of the time it was sent.
2       But I also indicated in an e-mail that I
3  would bring a hard copy of the documents and attach
4  it as an exhibit.  If either of you want the hard
5  copy -- Ross, you indicated you printed it out -- I
6  have a copy here for you, and I will attach it as an
7  exhibit when I question the witness.  If you need to
8  see this copy, I'm offering it to you.  I wanted to
9  give you as much notice as I had prior to the depo
10 so you could have those documents.
11      Having said that, we're ready to proceed.
12      MR. KELLY: Okay.  Just in response, we
13 did receive the e-mails or the documents that were
14 attached to the e-mail.  There are new e-mails that
15 were not previously produced that should have been
16 produced.  You know, I'm just going to keep the
17 deposition open for us to review those e-mails and
18 attachments and to ask any questions that we may
19 have regarding the new production.
20      MR. POSTMAN: So just so you understand, we
21 don't believe you have the right to keep it open.  I
22 understand that you're saying that, and I'm letting
23 you know that our position is you can't.  But I
24 wanted you to have them, and you have had them in
25 advance.  If you feel you need to take a break to

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 10**

1 review them, we're happy to let you take a break.
2     MR. KELLY: Okay. And we do have Mike on
3 the phone. You know that.
4     THE VIDEOGRAPHER: We're on the record.
5 The time is 9:22 a.m. The date is March 25, 2014.
6 This is the video deposition of Matthew Kaiser,
7 Volume I, in the matter of CIN-Q Automobiles, Inc.,
8 et al., versus Buccaneers Limited Partnership,
9 et al., in the United States District Court, Middle
10 District of Florida, Tampa Division, Case No.
11 8:13-cv-1592-17AEP. This deposition is being held
12 at the offices of L.A. Reporters.
13     My name is Spencer Benveniste from L.A.
14 Reporters, with offices located at 5757 Century
15 Boulevard, Seventh Floor, Los Angeles, California.
16 This is the start of Volume I, Tape No. 1.
17     Counsel, if would you introduce yourselves
18 and state your affiliations, please.
19     MR. KELLY: Ryan Kelly and Ross Good from
20 Anderson & Wanca representing the plaintiffs.
21     MR. POSTMAN: Mike, do you want to
22 introduce yourself?
23     MR. ADDISON: Michael Addison of the firm
24 of Addison & Howard, P.A., in Tampa, representing
25 CIN-Q Automobiles.

**Page 11**

1     MR. POSTMAN: Barry Postman from Cole,
2 Scott & Kissane, as attorney for the witness, as
3 well as the Buccaneers Limited Partnership.
4     And joining with me is my client, David
5 Cohen, general counsel for the Tampa Bay Buccaneers.
6     THE VIDEOGRAPHER: Will the court reporter
7 please swear in the witness.
8     THE REPORTER: Mr. Kaiser, would you raise
9 your right hand, please.
10     Do you solemnly state the testimony you are
11 about to give in your deposition will be the truth,
12 the whole truth, and nothing but the truth?
13     THE WITNESS: I do.
14     THE REPORTER: Thank you.
15
16     MATTHEW KAISER,
17 having been duly administered an oath
18 in accordance with CCP 2094, was
19 examined and testified as follows:
20
21     EXAMINATION
22 BY MR. KELLY:
23 Q Can you state your name, please.
24 A Matthew Kaiser.
25 Q Mr. Kaiser, there's a court reporter here.

**Page 12**

1 She is going to take down what people say in the
2 room here today. She'll also take down anything
3 that Mr. Addison says over the telephone.
4     Keep your answers out loud. Don't
5 shrug your shoulders, nod your head to any of my
6 questions, because the court reporter only takes
7 down what people say.
8     Do you understand that?
9 A Understood.
10 Q Allow me to finish asking a question before
11 you start giving an answer to it. That way we're
12 not talking over each other, and the court reporter
13 can take down my full question and your full answer.
14 Okay?
15 A Sounds good.
16 Q If you don't understand a question of mine,
17 let me know. I'll be happy to rephrase or restate
18 any question. But if you do give an answer to a
19 question that I did ask, I'm going to assume that
20 you understood the question. Is that fair?
21 A That's fair.
22 Q If you need to take a break at any time,
23 just answer any question that's currently pending.
24 Okay?
25 A Understood.

**Page 13**

1 Q All right. You're here as the Tampa Bay
2 Buccaneers' Rule 30(B)(6) witness?
3 A Correct.
4 Q And you understand as the Rule 30(B)(6)
5 witness for the Tampa Bay Buccaneers any testimony
6 you're giving would bind the corporation.
7     Do you understand that?
8 A Understood.
9 Q And the corporation is called Buccaneers
10 Limited Partnership. That's your understanding?
11 A Yes.
12 Q And you're here as the Rule 30(B)(6) for
13 the Buccaneers Limited Partnership; correct?
14 A Correct.
15 Q Are you currently employed?
16 A I am.
17 Q By whom?
18 A The Tampa Bay Buccaneers, Buccaneers
19 Limited Partnership.
20 Q And if I refer to "Tampa Bay" or the
21 "Buccaneers," you'll understand that I'm actually
22 referring to the Buccaneers Limited Partnership?
23 A Okay.
24 Q And how long have you worked for the
25 Buccaneers?

CONFIDENTIAL

CinQ+MC000097

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 14**

1    A   13 years.
2    Q   So you first started in 2001?
3    A   2001, correct, May.
4    Q   Now you live in California?
5    A   I do.
6    Q   And how long have you lived in California?
7    A   Since August 2002. So coming up on 12
8 years.
9    Q   So where did you live in 2001?
10   A   In Tampa.
11   Q   Are you originally from Tampa?
12   A   I'm not, no.
13   Q   Where did you grow up?
14   A   I grew up in Dallas.
15   Q   And when did you move to Tampa?
16   A   1996, I believe.
17   Q   Where did you go to high school?
18   A   Central High School in Brooksville,
19 Florida. That was for my junior and senior year.
20   Q   Did you go to college?
21   A   I did.
22   Q   Where did you go to college?
23   A   University of South Florida.
24   Q   And that's in Tampa; right?
25   A   In Tampa; correct.

**Page 15**

1    Q   And what did you study there?
2    A   Economics and international studies.
3    Q   And you got a degree; correct?
4    A   Correct.
5    Q   And where did you work coming out of
6 college?
7    A   Immediately I took a position with the
8 SunTrust Bank.
9    Q   Where was that?
10   A   It was in Downtown Tampa.
11   Q   And what did you do for SunTrust?
12   A   I forget the exact title. Kind of a
13 Tele-Banker, an account representative in the lobby.
14   Q   And then where did you work after that?
15   A   The Tampa Bay Buccaneers.
16   Q   And that was in 2001; correct?
17   A   Correct.
18   Q   All right. And you worked -- did you work
19 at the Tampa Bay location for the Buccaneers in
20 2001?
21   A   I did.
22   Q   And did they have a corporate office there?
23   A   Correct.
24   Q   And where is the corporate office?
25   A   The former one or the --

**Page 16**

1    Q   Let's talk about 2001.
2    A   It was also referred to as "One Buccaneer
3 Place." It was the old headquarters, which has
4 since moved.
5    Q   And where was that located? Was that by
6 the stadium?
7    A   It was by the airport, off of West Shore
8 Boulevard, I believe. It was the original.
9    Q   All right. And then where did the
10 Buccaneers move after that?
11   A   I want to say the physical address is 3101
12 Martin Luther King, which is on -- close to the
13 stadium.
14   Q   And that's where it is right now?
15   A   Correct.
16   Q   And do you know when that office moved?
17   A   I believe it was 2004.
18   Q   All right. So in 2001 you were hired.
19 What was your job title?
20   A   Acquisitions manager.
21   Q   And who was your immediate supervisor?
22   A   Ed Glazer.
23   Q   What did you do as acquisitions manager?
24   A   We would source commercial real estate,
25 shopping centers, to purchase on behalf of First

**Page 17**

1 Allied Corporation.
2    Q   What is First Allied Corporation?
3    A   It's a company owned -- a corporation owned
4 by the Glazer family.
5    Q   Okay. Were you being paid by the
6 Buccaneers in 2001?
7    A   I was.
8    Q   Have you always been paid by the
9 Buccaneers?
10   A   I have.
11   Q   Have you ever worked for First Allied
12 Corporation?
13   A   I do work with First Allied Corporation.
14   Q   You're just not paid by them?
15   A   Correct.
16   Q   How long were you the acquisitions manager?
17   A   Three or four years.
18   Q   So about 2005?
19   A   Yes, maybe 2005, when I was promoted at
20 that point.
21   Q   All right. Well, you moved to California
22 in August of 2002; is that right?
23   A   Correct.
24   Q   And you still did work as acquisitions
25 manager?

L.A. Reporters
(800) 675-9700   www.LAReporters.com

CONFIDENTIAL

CinQ+MC000098

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 18**

1  A   Correct.
2  Q   Did you work in an office in California
3  when you moved?
4  A   I did.
5  Q   What was the office or where was the
6  office?
7  A   It was 9601 Wilshire Boulevard.  That was
8  in Beverly Hills.
9  Q   And is that a First L.A. Corporation
10  office?
11  A   No.  It was an Ed Glazer office.
12  Q   How did you come to know Ed Glazer?
13  A   I think the first time I met him was
14  through an interview that I had with him, which
15  was —
16  Q   Back in 2001?
17  A   Back in — 2000, I believe.  Maybe it was
18  early 2001.
19  Q   Do you still work at the Wilshire Boulevard
20  location?
21  A   I don't.  We've moved offices.
22  Q   And where is the new office?
23  A   It's in Century City.  The address is
24  10250 Constellation Boulevard, and that's L.A.
25  Q   And when did you move to that office

**Page 19**

1  location?
2  A   2010.
3  Q   All right.  So you worked at the Wilshire
4  location from 2002 till about 2011?
5  A   Correct.
6  Q   All right.  What's at the Century City
7  location?  Is it just another Ed Glazer office?
8  A   Yes.  Just a primary office for Mr. Glazer
9  and employees of — his employees.
10  Q   Have you ever worked for any other
11  companies or been paid by any companies other than
12  Tampa Bay Buccaneers from 2001 through the present?
13  A   No.
14  Q   What was your next job title after
15  acquisitions manager?
16  A   I was promoted to the vice president of
17  acquisitions.
18  Q   And who was your immediate supervisor at
19  that time?
20  A   Still Ed Glazer.  And that was either on or
21  before the time that I also acquired the title of
22  director of New Business Development with the Tampa
23  Bay Buccaneers.
24  Q   When you held that job title, your
25  immediate supervisor was also Ed Glazer?

**Page 20**

1  A   Correct.
2  Q   How long did you hold the job title of
3  vice president of acquisitions?
4  A   I still currently hold it.
5  Q   And how about director of New Business
6  Development?
7  A   I still currently hold it.
8  Q   And currently your immediate supervisor is
9  Ed Glazer?
10  A   Correct.
11  Q   Where does Ed Glazer live?
12      MR. POSTMAN:  Well, are you asking for his
13  address or a general location?
14      MR. KELLY:  Just general location.
15  Q   Is he in Tampa or California?
16  A   He's here in California.
17  Q   Has he always maintained a residence in
18  California?
19  A   Yes.
20  Q   Ed Glazer has worked for the Tampa Bay Bucs
21  since 2001?
22  A   Correct.
23  Q   Has he always worked at the California
24  locations?
25  A   No.  I believe he had a residence in Tampa

**Page 21**

1  when I was first hired and moved to California.
2  Q   When did he move to California?
3      MR. POSTMAN:  I think it's appropriate to
4  get some general background information.
5      MR. KELLY:  That's what I'm doing.
6      MR. POSTMAN:  Okay.  But you're
7  borderlining on — where he lives is completely
8  irrelevant to this case.
9      MR. KELLY:  It's not.  Since he's the
10  immediate supervisor of the witness, I need to find
11  out where he's working and at what location.
12      MR. POSTMAN:  So you asked him where he
13  lived.
14      MR. KELLY:  Yes.  Where does he live?  I'm
15  not asking for a specific address.
16      MR. POSTMAN:  I'm going to let him answer
17  this question but —
18      MR. KELLY:  Is it California or Tampa?
19  That's what I'm asking.
20      MR. POSTMAN:  So I'll let him answer this
21  question, but to the extent you're getting into the
22  personal life of Mr. Glazer, we're going to have a
23  problem.
24      But this question I'll allow.
25      THE WITNESS:  He resides in California.

L.A. Reporters
(800) 675-9700    www.LAReporters.com
CONFIDENTIAL
CinQ+MC000099

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 22**

1  I don't recall specifically when he moved to
2  California. I was only working in Tampa a
3  very short period before I, myself, moved to
4  California --
5  BY MR. KELLY:
6  Q   All right. And --
7  A   -- which is where he was.
8  Q   And he works for the Tampa Bay Buccaneers;
9  correct?
10  A   Correct. I'm not sure exactly what --
11  chairman, owner.
12  Q   Does he work full time for the Buccaneers
13  from 2001 through the present?
14  A   Yes.
15  Q   All right. And where does he work when
16  he's in California? Did he work at the Wilshire
17  Boulevard location and the Constellation location?
18  A   Correct.
19  Q   Any other locations that he worked in
20  in California?
21  A   Not that I'm aware of.
22  Q   So is he in California working at the
23  offices full time?
24  A   Yes. Yes, I'd say that's accurate.
25  Q   So in 2009-2010, he was working in

**Page 23**

1  California?
2  A   Correct.
3  Q   And if you had a question about an issue
4  relating to the Tampa Bay Buccaneers, you can call
5  him up and ask him questions or see him; correct?
6  A   Correct. We were in the same office. Or
7  else I had people in Tampa that I could discuss or
8  talk to.
9  Q   All right. How many other people worked at
10  the Wilshire Boulevard location that also worked for
11  the Tampa Bay Buccaneers?
12  A   Well, Mr. Glazer always had an assistant
13  so I would consider that a -- you know, an employee
14  of the Buccaneers. We had a couple of other
15  acquisition managers from time to time that dealt
16  really more specifically with First Allied.
17  Q   What was Mr. Glazer's secretary's name?
18  A   Actually, I don't remember. She's had a
19  couple of different ones so -- there was one, Ryan
20  Abelman. There was an Allen V. Goss. There was a
21  Dennis Tanquito I think was his last name. I don't
22  remember the prounnciation or...
23  Q   All right. And how about the other
24  acquisition managers?
25  A   There were a few from Tampa and then also

**Page 24**

1  in California.
2  Q   Well, let me ask you about the California
3  location, 2009-2010 time frame.
4  A   I'm going to say Chris Orpia was an
5  acquisitions manager. Ryan Abelman was also an
6  acquisitions manager, in addition to one of the
7  executive assistants for Mr. Glazer. You said 2010
8  time frame?
9  Q   2009-2010.
10  A   Yes, I think it was just the two of them.
11  Q   Did you have a secretary?
12  A   I did not, no.
13  Q   Did you have an office?
14  A   I do.
15  Q   All right. What were the names of some of
16  the other acquisition managers in Tampa?
17  A   Back in 2001, there was Sean Ward, Scott
18  Henard, which is H-e-n-a-r-d, and Josh Granger.
19  Q   Why did you move to California?
20  A   I believe at that time Mr. Glazer decided
21  that California was going to be his primary
22  residence and made me an offer to move out.
23      (Whereupon, a discussion was held off
24      the record.)
25  ///

**Page 25**

1  BY MR. KELLY:
2  Q   All right. I'm going to just give you some
3  names and ask you what their job titles are and what
4  they do for the Buccaneers.
5  A   Okay.
6  Q   Jason Layton.
7  A   He's no longer with the Buccaneers.
8  Q   When did he work for the Buccaneers?
9  A   I believe he was hired before I was. I'm
10  going to say he left -- I don't recall specifically.
11  In the ballpark of a couple of years ago.
12  Q   Was he the senior director of Sales and
13  Advertising?
14  A   That sounds correct.
15  Q   Did he work at the Tampa Bay location?
16  A   He did.
17  Q   Are there any other locations where the
18  front office worked or people that worked with Ed
19  Glazer other than California and Tampa?
20  A   Not that I'm aware of, no.
21  Q   Do you know what Jason Layton specifically
22  did in the 2009-2010 time frame?
23  A   I think he was in charge of our sales as
24  his title suggests, kind of overseeing sales.
25  Q   And who was his immediate supervisor in

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 26**

1  2009 and 2010?
2  A  I believe it was Brian Ford.
3  Q  Does Brian Ford still work at the
4  Buccaneers?
5  A  He does.
6  Q  Is he the vice president of Business
7  Administration?
8  A  I believe he's been promoted to the C.O.O.
9  Q  And what is C.O.O.?
10  A  Chief operating officer.
11  Q  What did Brian Ford do in 2009-2010?
12  A  He may have been the vice president of --
13  Q  Business Administration?
14  A  -- Business Administration. I don't recall
15  specifically what else.
16  Q  What did he specifically do in the
17  2009-2010 time frame?
18  A  I think he was in charge of just overseeing
19  the administration side of the organization. So
20  nothing specific to football operations. More
21  overseeing the different departments within the
22  organization.
23  Q  Jeffrey Ajluni, A-j-l-u-n-i. Do you
24  recognize that name?
25  A  I do.

**Page 27**

1  Q  Does he still work for the Buccaneers?
2  A  He does not.
3  Q  When did he leave?
4  A  I don't recall. I want to say it was prior
5  to Jason Layton, not by much time. So let's kind of
6  put it in maybe the two- to three-year time frame.
7  Q  All right. And was he the director of
8  Marketing and Business Development?
9  A  That sounds correct.
10  Q  Specifically, what did he do in 2009-2010?
11  A  I believe that was his title, to go out
12  and source partnership opportunities with corporate
13  sponsors.
14  Q  All right. Manny Alvare?
15  A  I think it's Alvare (pronunciation).
16  Q  Alvare (pronunciation). He was general
17  counsel for the Buccaneers?
18  A  That's correct.
19  Q  And he no longer works for the Buccaneers?
20  A  That's correct.
21  Q  And when did he leave?
22  A  You know, I want to put it in that same
23  time frame. Perhaps prior to Jeff Ajluni.
24  Q  Okay.
25  A  Maybe put him in the three- to four-year

**Page 28**

1  time frame, if I recall.
2  Q  So sometime in 2010?
3  A  Yes.
4  Q  Was he terminated?
5  A  I don't recall.
6  Q  Do you know one way or the other?
7  A  I don't.
8  Q  2009-2010, specifically, what did
9  Mr. Alvare do for the Buccaneers?
10  A  He was the general counsel. You know, I
11  can't say for certain how much involvement he had
12  on the football side of the business; but on the
13  administrative side, I know, in general, he would --
14  you know, he would review certain documents and, you
15  know, contracts and, you know, agreements that we
16  had, just the general responsibilities of whatever
17  general counsel would be.
18  Q  Do you recognize the name Ben Milsom?
19  A  I do.
20  Q  And does he still work for the Buccaneers?
21  A  He does.
22  Q  Is his job title the director of Ticket
23  Sales?
24  A  Yes. And he's been promoted since to the
25  chief ticketing officer, I believe.

**Page 29**

1  Q  Was his job title in 2009-2010 director of
2  Ticket Sales?
3  A  I can't confirm. I'm confident it probably
4  was.
5  Q  Specifically, what did Mr. Milsom do in
6  2009-2010?
7  A  He was -- I would say he would be in charge
8  of kind of overseeing ticket operations, specific
9  to ticket sales, as opposed to all general sales,
10  for suites or club tickets or, you know, general
11  tickets that we would sell.
12  Q  All right. Darren Morgan -- do you
13  recognize that name?
14  A  I do.
15  Q  And does he still work for the Tampa Bay
16  Bucs?
17  A  He does not.
18  Q  Do you know when he last left?
19  MR. POSTMAN: When he was last employed I
20  think is what he's asking.
21  BY MR. KELLY:
22  Q  Yes, when he was last employed.
23  A  I want to put him in the 2010-2011
24  time frame. Maybe 2011.
25  Q  And, specifically, in 2009-2010, I have

CONFIDENTIAL

CinQ+MC000101

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 30**

1  here his job title is director of Creative Services;
2  is that right?
3  A  It sounds correct.
4  Q  What did he do in 2009-2010?
5  A  As a director of Creative Services I think
6  he would be responsible for a lot of the graphic
7  artwork that would go on Websites or different print
8  materials perhaps that we would use.
9  Q  And he worked at the Tampa Bay location?
10  A  He did.
11  Q  Okay. Who were the people at the Tampa Bay
12  location that you worked more closely with in
13  2009-2010?
14  A  I would say the names that we just
15  discussed. Brian Ford, one of those. There was a
16  handful of just different people, kind of, you know,
17  depending on whatever the projects or, you know,
18  whatever I was working on, you know, at the time.
19  MR. POSTMAN: Don't cross your arms.
20  THE WITNESS: Oh, sorry. A little more
21  comfortable?
22  MR. POSTMAN: Well, I want you to feel
23  comfortable, but it looks better that way.
24  BY MR. KELLY:
25  Q  For ticket sales did the Buccaneers have a

**Page 31**

1  call center or people answering the phones?
2  A  I believe we did, yes.
3  Q  Is that in a department that the Buccaneers
4  had?
5  A  I believe it was a department under Ben
6  Milsom.
7  Q  Was the call center at the corporate
8  location?
9  A  Yes.
10  Q  Was there somebody in charge of the call
11  center other than Ben Milsom?
12  A  I don't know exactly how the hierarchy of
13  the call center was. The call center would have
14  been overseen by either Ben Milsom or Jason Layton.
15  There could have been a couple of other directors
16  involved, overseeing different parts of the call
17  center.
18  Q  Have you ever heard of the name Alyssa
19  Chinous (phonetic)?
20  A  I have not.
21  Q  Do you know of any of the people that
22  worked at the call center?
23  A  By name?
24  Q  By name.
25  A  I really can't — I can't recall.

**Page 32**

1  MR. POSTMAN: Feel comfortable. That's the
2  most important thing.
3  THE WITNESS: Oh, I'm fine.
4  MR. POSTMAN: Okay.
5  THE WITNESS: I'm fine.
6  MR. POSTMAN: If you need to cross your
7  arms, you can, but --
8  THE WITNESS: I switched my legs. That
9  helps a little bit.
10  BY MR. KELLY:
11  Q  All right. So if somebody would call
12  877-649-BUCS, do you know who would answer that
13  phone call?
14  A  I don't know who would answer.
15  Q  Would that go to the call center?
16  A  I'm not sure.
17  Q  Is the call center staffed all year round?
18  A  I believe so. That would really be a
19  question for Ben Milsom.
20  Q  But I assume they added a few employees
21  right before the season; is that your understanding?
22  A  Not necessarily. I don't know if we hire
23  people more seasonally, you know, than year round.
24  Again, probably a better question for Ben Milsom.
25  You know, the sales is really kind of a year-around

**Page 33**

1  project.
2  Q  The telephone number (813) 870-2700, do you
3  recognize that phone number?
4  A  I do.
5  Q  And if someone called that number, who
6  would answer or what department?
7  A  I think that's just the general phone line
8  for the Tampa Bay Buccaneers. So whoever was
9  working, you know, at the general reception would
10  answer that call.
11  Q  Anyone else that we haven't mentioned that
12  you worked with in 2009-2010?
13  MR. POSTMAN: Object to the form.
14  You can answer.
15  THE WITNESS: There's just probably
16  hundreds of people, to be honest, over the course of
17  those two years that I've worked with. Specifically
18  departments or within the Buccaneers organization or
19  in my office or --
20  BY MR. KELLY:
21  Q  Well, let me ask you this. In 2009-2010,
22  you were an employee of the Buccaneers; correct?
23  A  Correct.
24  Q  And your immediate supervisor was Ed
25  Glazer; correct?

Min-U-Script®
L.A. Reporters
(800) 675-9700    www.LAReporters.com
CONFIDENTIAL
(8) Pages 30 - 33
CinQ+MC000102

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 34**

1    A   Correct.
2    Q   Now, I know you were the director of New
3  Business Development in 2009-2010; correct?
4    A   Correct.
5    Q   Were you also the vice president of
6  acquisitions at that time?
7    A   I believe so. I don't remember
8  specifically when that promotion came, but I believe
9  it was in or around that time or prior to.
10    Q   Is there an evaluation that is done by the
11  Tampa Bay Buccaneers regarding your work?
12    A   Not specific to mine that I'm aware of.
13    Q   Are there any annual reviews or audits of
14  your work?
15    A   Not that I'm aware of.
16    Q   Is there an employment file that relates to
17  your work?
18    A   I couldn't say if something's kept in
19  Tampa. I'm confident there's a file with a drawer
20  of everyone's name and, you know, information and
21  stuff in it but --
22    Q   Do the Buccaneers have a Human Resource
23  Department?
24    A   We do.
25    Q   Who is in charge of the Human Resource

**Page 35**

1  Department?
2    A   We just hired a gal. I don't remember --
3  I believe her last name -- Christine Houston, I
4  believe, is currently there. I believe that's
5  correct. David could confirm.
6    Q   And that person's in Tampa?
7    A   Yes.
8    Q   Have you ever been suspended from the
9  Buccaneers?
10    A   No.
11    Q   Reprimanded from the Buccaneers?
12    A   No.
13    Q   And you've always worked full time?
14    A   I have.
15    Q   Is there a way to determine the hours that
16  you worked for the Buccaneers in 2009-2010?
17    A   I've always been a full-time employee.
18    Q   Let me ask you this. Do you time in and
19  time out?
20    A   No, no. But I'm -- you know, I'm pretty
21  punctual and, you know, adamant about being in the
22  office at a certain time and not leaving, you know,
23  before a certain time.
24    Q   All right. So there's never been a problem
25  with attendance at work at all?

**Page 36**

1    A   No.
2    Q   Have you ever done any work in Tampa at
3  that office?
4    A   I have.
5    Q   How much time did you spend in California
6  as opposed to Tampa in 2009-2010?
7    A   I would say the majority of the time is
8  spent in California. Vast majority of the time; you
9  know, 95 percent of the time.
10    Q   On what different occasions would there be
11  for you to travel to Tampa to do work?
12    A   You know, it would really depend on really
13  what we were working on at the time. It could be
14  different events that are going on. It could be
15  kind of in and around the season or games, perhaps,
16  that I would fly into. I still have a lot of family
17  in Tampa, so sometimes on vacations I would make
18  it a point to go into the office for a day
19  or two, you know.
20    Q   In 2009-2010, did you have an office at the
21  corporate headquarters at Tampa?
22    A   I did not, no.
23    Q   So where would you work?
24    A   Just different offices or, you know, vacant
25  cubicles or conference rooms I would sit in.

**Page 37**

1    Q   Did you have a computer?
2    A   I would usually bring my laptop.
3    Q   In California, did you have a desktop
4  computer?
5    A   I do.
6    Q   And did you send e-mails while you worked
7  at the Tampa Bay Buccaneers?
8    A   From that computer?
9    Q   Yes, from that computer.
10    A   Yes.
11    Q   And what was your e-mail address?
12    A   It was MKaiser. So first initial, last
13  name, @BuccaneersNFL.com.
14    Q   Do the e-mails have a different address?
15  Were you also using the First Allied e-mail address?
16    A   I do. I use that. That's actually my
17  default e-mail address when I send e-mails out.
18    Q   All right. And what's that e-mail address?
19    A   It's the same. First initial, last name.
20  So MKaiser@FirstAllied -- A-l-l-i-e-d -- corp --
21  which is c-o-r-p -- .com.
22    Q   So the First Allied e-mail address is your
23  primary e-mail address?
24    A   Primary, default. You know, when you go
25  in to start an e-mail address, that's the one that

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 38**

1 pulls out.
2 Q And do you use any other e-mail addresses
3 for work done for the Buccaneers?
4 A I don't currently, no.
5 Q What e-mail system do you use?
6 MR. POSTMAN: For the Buccaneers?
7 MR. KELLY: Well, no, him, personally in
8 California.
9 MR. POSTMAN: If you're asking him his
10 personal e-mail address, I'm not --
11 MR. KELLY: I'm not asking his personal
12 e-mail. I said is it Outlook --
13 THE WITNESS: The e-mail that I currently
14 use?
15 BY MR. KELLY:
16 Q Well, let's say 2009-2010.
17 A I don't recall if it was Outlook or exactly
18 what it was then. I use MCmail now.
19 Q When did you first start using MCmail?
20 A I don't recall specifically. We actually
21 kind of moved over from a PC to MC. So I don't
22 recall specifically when that was, or if I continued
23 to use Outlook on a Macintosh for awhile. But I use
24 MCmail now, and I have, I'd say, for the last three
25 or four years, at least, if not longer.

**Page 39**

1 Q All right. Do you have your e-mails dating
2 back to 2008?
3 A All of my e-mails?
4 Q Yes.
5 A I can't confirm that I have every e-mail
6 back to 2008 but --
7 Q Do you have access to your e-mails going
8 back to 2008?
9 A Yes, I have some that date back to 2008 or
10 some that probably date back a little longer.
11 Q Do you archive your e-mails?
12 A I do.
13 Q And how do you archive your e-mails?
14 A I have folders under each of the e-mail
15 addresses. So in MCmail you can just create a
16 folder. So I would title it, you know, whatever I'm
17 working on or -- you know, really, I guess kind of
18 depending on the role or the responsibility. So
19 there's folders called "Buccaneers" or folders
20 called "First Allied" or -- you know.
21 Q Okay. So you wouldn't archive by year;
22 you'd be archiving by different projects?
23 A Really different projects, or I'd say the
24 subject of the project. So, you know, having been
25 employed for 13 years, there's just a number of

**Page 40**

1 things or projects that I've worked on. So some
2 folders I'd say are active and still get things
3 filed into, and some are probably just a little bit
4 older, just easy reference.
5 But the great thing about MCmail is you
6 can -- you know, you can search different things
7 or -- you know, by key words so you don't really
8 have to archive a specific way.
9 Q Well, this case involves the allegation of
10 sending unsolicited advertisements by fax. You
11 understand that; right?
12 A I do.
13 Q And was there a specific name of the
14 project that dealt with that work that was done?
15 A There's not a specific folder that I kept
16 or have created.
17 Q Were you able to retrieve e-mails that
18 related to the Buccaneers contracting to send
19 advertisements by fax?
20 A The Buccaneers never -- well, I guess --
21 yes. Yes, I'm going back, just doing the search for
22 FaxQom or Steve Simms would -- you know, would
23 provide certain -- you know, the e-mails or the
24 correspondence, you know, that I had.
25 Q All right. And you did that search?

**Page 41**

1 A I have several times, yes.
2 Q All right. And you were able to find some
3 e-mails -- correct? -- or at least you were able to
4 find e-mails that you believe were responsive to
5 your search terms; right?
6 A I would -- you know, I would take that a
7 step further and I would say that I have probably
8 located every piece of correspondence that -- you
9 know, that I had with FaxQom and the majority of it
10 so...
11 Q Well, did you use search terms, or did
12 eyeball all of the e-mails back in 2009-2010?
13 A I don't remember specifically how I
14 searched. I likely would have used the word
15 "FaxQom," which would have resulted in certain
16 things or "Steve Simms" or even an e-mail address,
17 you know, at FaxQom to kind of see what -- you know,
18 what would have come up.
19 Q Now, there were additional documents that
20 were produced in this case just yesterday. I think
21 most of them were from 2000- -- the new ones were
22 from 2010. Is there a reason why you didn't
23 retrieve those e-mails prior to the last few days?
24 MR. POSTMAN: Well, I'll answer that,
25 in all fairness to the witness, not that it's

L.A. Reporters
(800) 675-9700 www.LAReporters.com

CONFIDENTIAL

CinQ+MC000104

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 42**

1 particularly relevant for him, but it may have
2 been a switch when it went from one firm to the
3 law firm handling the case. In all fairness to him,
4 he produced them.
5     As I was going through them with him, I
6 wasn't confident that you had seen everything and,
7 as a courtesy, to make sure that you had seen
8 everything, since they weren't Bates stamped --
9 apparently, you hadn't seen them; I wanted you to
10 have them.
11     But it had nothing to do with the witness
12 not doing his job of properly producing them, I
13 think, to the prior counsel. So it is what it is.
14 But, in all fairness to this witness, it wasn't him
15 that didn't properly produce it.
16     MR. KELLY: No, no. I'm not suggesting he
17 did anything wrong. I just --
18     MR. POSTMAN: I just wanted you to know
19 what happened.
20     MR. KELLY: Okay.
21     MR. POSTMAN: And I wanted the record to be
22 clear that it's not his responsibility or it wasn't
23 his fault.
24 BY MR. KELLY:
25   Q  All right. There was a mention of a

**Page 43**

1 previous counsel. Do you recognize the name of the
2 previous counsel?
3   A  Which name?
4   Q  Well, Tim Hunt from Hill Ward?
5   A  I don't recall working with Tim.
6   Q  All right. The attorney for the Buccaneers
7 is Barry Postman; is that right?
8   A  Correct.
9   Q  But there was a prior counsel that also
10 represented the Buccaneers; correct?
11   A  I'm not sure to what extent, to be honest.
12 If I could refer to them if -- by memory, I believe
13 it was Hill, Ward, Henderson had some involvement,
14 but to what extent I'm not sure, and individually
15 who was working on it I couldn't tell you.
16   Q  You don't recognize any of the names
17 from --
18   A  No.
19   Q  Okay. What's the phone number that you use
20 at the California location?
21   A  For --
22   Q  Well, you have an office --
23   A  My primary telephone number?
24   Q  Yes.
25   A  (310) 275-8944.

**Page 44**

1     MR. POSTMAN: To the extent that -- I know
2 you're not going to do this, but to the extent you
3 need to contact him, it obviously has got to come
4 through me.
5     MR. KELLY: That's not the reason why I'm
6 asking the question.
7     MR. POSTMAN: I just want to make sure that
8 the record is clear.
9 BY MR. KELLY:
10   Q  And is that a direct line?
11   A  It's a direct line to my office.
12   Q  Has that been your direct line since 2008?
13   A  Yes.
14   Q  Does your office have a fax machine?
15   A  We do. I believe our number -- our fax now
16 goes into our e-mail, so I don't --
17   Q  I'll ask you about that next, but I guess
18 my question is does the office have a stand-alone
19 fax machine?
20   A  Yes. It's kind of an all-in-one machine.
21   Q  Is there a designated fax number to that
22 machine?
23   A  For someone to send to?
24   Q  Or to receive.
25   A  Are you asking what my fax number is?

**Page 45**

1   Q  Well, I'm asking about --
2   A  I'll give it to you. I just -- I don't --
3 and I think there's also an 800 number that goes
4 directly into my e-mail.
5   Q  I'm going to ask you about that --
6   A  Okay.
7   Q  -- but I'm just asking you about the
8 stand-alone fax machine at this point.
9   A  Well, it's not a stand-alone. It's kind of
10 an all-in-one copier. So I can send faxes out. We
11 get faxes on it.
12   Q  Okay. What's that number?
13   A  I believe (310) 275-8995. And the truth is
14 I don't really use faxes very often anymore.
15   Q  I think I have that number as your MyFax
16 account.
17   A  And that's the point I was making. The
18 MyFax, I think, goes into your e-mail. So I don't
19 know --
20   Q  Well, I'm asking you about the all-in-one
21 machine that may receive faxes. Do you know the
22 number for that machine?
23   A  Then I don't know. It would be that or --
24   Q  All right.
25   A  -- an 800 number, perhaps, that we set up

CONFIDENTIAL      CinQ+MC000105

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 46**

1 at some point. I'm really not sure.
2   Q   Okay. So you do receive faxes via e-mail;
3 correct?
4   A   I do.
5   Q   And have you received faxes via e-mail
6 since 2008?
7   A   I believe, yes. I still do.
8   Q   And has the software program been -- or
9 strike that. Is the software program MyFax?
10   A   I don't know currently what we use. I
11 think one of Mr. Glazer's assistants set it up at
12 some point.
13   Q   Has it been the same software program since
14 2008?
15   A   I don't know when it was set up. I think
16 at one point the 310 was a hard fax line; so we
17 would actually receive, you know, a piece of paper
18 on a machine. I don't know when it was transferred
19 over to the MyFax or whatever numbers at that point
20 were added or even consolidated. I think we add a
21 couple of different numbers, perhaps. We're such
22 a -- you know, a small office. I don't -- you know,
23 I don't -- they may have all been consolidated to a
24 machine. I don't know.
25   Q   Do you still have access to any faxes that

**Page 47**

1 you received in 2009-2010?
2   A   No, I don't believe so.
3   Q   Well, they would go to your e-mail;
4 correct?
5   A   Well, I don't know when the switch-over
6 happened. So any faxes that I have received, like
7 in the last year, perhaps -- I really don't receive
8 a lot of faxes so, to be honest, most of it's spam.
9 So I would just delete it, as opposed to, you know,
10 archive any fax that I would get today, unless it
11 was legitimate, in which case I would, you know,
12 forward to whatever folder or print out, perhaps.
13   Q   How can you tell a fax came to your e-mail?
14 What would be the subject line?
15   A   I don't know specifically what it says. I
16 think it may say "fax" or something in the "Subject"
17 or whatever it does.
18   Q   Did you look for any faxes that you may
19 have received in 2009-2010 relating to any of the
20 issues in this case?
21   A   I did. And, again, I think at that
22 point -- I believe at that point our telephone
23 number or MyFax number, I should say, was still kind
24 of a physical fax number. I don't know that we had
25 converted it at that point to the digital e-mail

**Page 48**

1 so --
2   Q   Okay. Because I read through the e-mails,
3 and you gave the number (310) 275-8995 to Mr. Simms,
4 and I think the reason why you did that is because
5 you wanted to receive one of the faxes that were
6 being sent.
7   A   Correct.
8   Q   So, in knowing that, does that jog your
9 memory in receiving those faxes via a computer or a
10 stand-alone fax machine?
11   A   I honestly don't recall.
12   Q   Do you know what company took out the
13 (310) 275-8995 number? Would it be First Allied, or
14 would it be the Buccaneers?
15   A   What do you mean? Took out as far as --
16   Q   Well, I guess somebody has to subscribe
17 to that number. You had said it was Mr. Glazer's
18 secretary or assistant. Do you know if, in
19 contacting MyFax, the company that would be paying
20 for the line would either be First Allied or the
21 Buccaneers?
22   A   I couldn't tell you with certainty, but
23 the numbers used on my business -- or both of my
24 business cards -- or was at one point is a fax. So
25 it's been used interchangeably with the Buccaneers

**Page 49**

1 and First Allied.
2   Q   So you can't tell me who the subscriber to
3 that number is?
4   A   Subscriber as far as who's paying the bill?
5   Q   Yes. Who's paying the bill or what name
6 was given to MyFax to set up the account?
7   A   I don't know if they needed a company -- I
8 don't recall because I didn't set it up. As far as
9 who's paying for it, I couldn't tell you with
10 certainty. Likely, the Buccaneers, but I couldn't
11 tell you.
12   MR. POSTMAN: Don't guess. If you don't
13 know, don't guess.
14 BY MR. KELLY:
15   Q   Do you maintain any paper files in your
16 office relating to any of the issues in this case?
17   A   Not paper files, no.
18   Q   It's all electronic files?
19   A   It is.
20   Q   When you send an e-mail, do you print it
21 out?
22   A   No, typically not.
23   Q   When you receive an e-mail, do you
24 typically print it out?
25   A   Depends on the circumstance or, you know,

MATTHEW KAISER
March 25, 2014

Page 50

1  if it's something -- I follow up with them, kind of
2  a creature of habit. So to print it out to me is
3  kind of more of an action item. So it's something
4  that has to be addressed, usually, when I print an
5  e-mail out.
6      Q   Are there any documents that were printed
7  out that relate to any of the issues in this case?
8      A   Documents such as?
9      Q   Well, any documents that may have been put
10 in a paper file, like the indemnity agreement or
11 anything like that?
12     A   I don't believe so. I think it was all
13 electronic, and once having an electronic record of
14 something -- I don't say it's always the case but,
15 you know, by having an electronic copy of something,
16 sometimes having a physical copy -- unless there's a
17 physical signature, you know, by both parties,
18 that's different. That would usually be something I
19 would hold onto. But --
20     Q   Do you ever save any of the documents that
21 were attachments to e-mails to the hard drive of
22 your computer?
23     A   I don't believe specifically saving it in
24 a different area if it's already included in an
25 e-mail.

Page 51

1      Q   All right. So all of the documents that
2  you retrieved in this case came from your e-mails;
3  correct?
4      A   Yes.
5      Q.  All right. And you retrieved those from
6  the Firstalliedcorp.com e-mail address?
7      A   I believe it was all through them. I don't
8  believe I had any e-mails through the Buccaneers
9  directly to FaxQom, Steve Simms.
10     Q   Did you look?
11     A   I did, yes. The search on MCmail will
12 actually search all of your different accounts. So,
13 as I went through, I didn't see any through the
14 Buccaneers.
15     Q   All right. I read through the e-mails that
16 Mr. Simms was to provide you with a report following
17 a broadcast. Do you know what I'm referring to?
18     A   It's something we had requested from him.
19     Q   Yes. Did he ever provide you with those
20 reports?
21     A   Which? Do you have a copy of which
22 reports?
23     Q   Yes, I guess --
24     A   I can think I have one look here
25 (indicating).

Page 52

1      Q   Well, that's all right. I just wanted to
2  ask generally. I think the e-mails said that the
3  reports were going to be faxed to you.
4          Do you ever recall receiving any reports
5  that were faxed to you?
6      A   I do recall receiving a fax summary report.
7  I can't remember exactly when it was, but I do --
8  yes, I do remember receiving one -- requesting and
9  receiving one from him.
10     Q   And was that received by you by fax or by
11 e-mail?
12     A   I couldn't tell you. I don't recall.
13     Q   All right. How many employees are at the
14 California location? Actually, let me just make
15 sure I have the California location correct, because
16 you had moved to the Century City location, and I
17 think you had said 2010?
18     A   You know, it was actually -- probably more
19 like 2012, I think.
20     Q   Oh, okay. So I guess the issues involved
21 in this case involve, like, 2009-2010. Do you agree
22 with that?
23     A   Yes.
24     Q   So during that time frame you were at the
25 Wilshire Boulevard location; correct?

Page 53

1      A   That's correct.
2      Q   How many employees were also at the
3  location?
4      A   Sorry. I had moved to the Century City
5  offices -- I had moved -- I was thinking. I'm
6  sorry. What was your question?
7      Q   So 2009-2010, how many employees were
8  working at the Wilshire Boulevard location?
9      A   I'd say three to five.
10     Q   Okay.
11     A   You know, depending on when during the
12 time.
13     Q   And if there was a computer problem at the
14 office, who would generally handle that issue?
15     A   It depends on the problem. You know, if it
16 was more of an IT-network-related issue on a
17 computer, we have people in Tampa, you know, that we
18 can contact.
19         If it was specific, you know, to the
20 computer itself or software, I think we're all
21 pretty -- we're very resourceful. So I can't recall
22 any specific issues or situations where we had to
23 call or, you know, bring a third company or a third
24 party or a different company in.
25     Q   So you're not aware of any third-party

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP
MATTHEW KAISER
March 25, 2014

**Page 54**

1  vendors that managed the e-mails or anything like
2  that?
3      A  For our e-mails?
4      Q  Yes.
5      A  No. Not during that time, no.
6      Q  You had said that the Buccaneers had a IT
7  Department in Tampa; is that right?
8      A  We do, correct.
9      Q  Who is responsible for the IT Department
10  currently?
11     A  We have a director of IT. I don't know if
12  he's responsible for the entire department. His
13  name is Ed Johnston.
14     Q  In 2009-2010, if you had a problem
15  receiving or sending e-mails, who would you call?
16     A  It would probably be Ed Johnston.
17     Q  And does he still work for the Buccaneers?
18     A  He does.
19     Q  Do you know if the e-mails that you receive
20  in the First Allied e-mail address are backed up by
21  the server in Tampa?
22     A  I couldn't tell you.
23     Q  Did you ask Mr. Johnston or anybody at the
24  Tampa location to retrieve any of your e-mails from
25  2009-2010?

**Page 55**

1      A  I don't recall doing so.
2      Q  Was there ever a time that you needed to
3  call Tampa to retrieve e-mails from years ago?
4      A  Not that I recall.
5      Q  Do you have an understanding that the IT
6  Department in Tampa has access to your e-mails in
7  2009-2010?
8      A  I don't recall. I don't know if they do or
9  what -- if they have access to only the Buccaneers
10  or First Allied or if both. I don't know what
11  server the different accounts are sitting on and,
12  honestly, who manages the First Allied account. I'm
13  not sure if it's managed in Tampa or managed by Ed
14  Johnston.
15     Q  Would the best person to ask would be Ed
16  Johnston relating to the backing up of your e-mails?
17         MR. POSTMAN: Object to the form.
18         You can answer.
19         THE WITNESS: I believe that's one of his
20  responsibilities is to provide backup, you know, for
21  the entire company. To what extent that includes
22  e-mails and to what extent -- how long he keeps
23  them, I don't know. You'd have to ask him.
24  BY MR. KELLY:
25     Q  Does the California location have an e-mail

**Page 56**

1  server?
2      A  I believe our server is through Tampa.
3  I want to call it a kind of a virtual server. The
4  acronym is escaping me, but I believe we're on their
5  network.
6      Q  When you say, "their network," you're
7  referring to the Buccaneers?
8      A  The same network; correct.
9      Q  All right. And is that e-mail server
10  housed within the Buccaneers' location, or does a
11  third party manage it?
12     A  It's within One Buc Place.
13     Q  And Ed Johnston would have the best
14  knowledge regarding that e-mail server?
15         MR. POSTMAN: Object to the form.
16         THE WITNESS: He would, yes. I believe
17  he'd likely be the person who would know the most
18  about it.
19  BY MR. KELLY:
20     Q  Okay. Did you look anywhere else in order
21  to retrieve any relevant documents for this case?
22     A  I don't recall. You know, I can say with
23  certainty the majority of the dialogue or the
24  conversation was via e-mail and just being adamant
25  and organized, you know, as I am and going through

**Page 57**

1  and looking at the different documents, you know,
2  since this case came up, it's consistently been the
3  same documents. And I think the documents that are
4  there really encompass -- gee, I'd say most of --
5  you know, most of the dialogue between myself and
6  Steve Simms.
7      Q  Well, you say, "most." The other e-mails
8  regarding the dialogue between you and Steve Simms,
9  would they have been lost in some way?
10         MR. POSTMAN: Object to the form.
11         You can answer.
12         THE WITNESS: I don't think anything was
13  lost. You know, we're talking about e-mails from
14  five years ago. So, I mean, the reality is if --
15  you know if there was an e-mail or something that,
16  you know, was not included, I don't have any
17  knowledge of it. There's no other place that I
18  would store them.
19         And, again, having gone through the
20  exercise of printing the e-mails out and reviewing
21  the e-mails, I consistently came up with -- you
22  know, with really the same -- the exact same
23  documents and e-mails and correspondence.
24  BY MR. KELLY:
25     Q  Well, in order to access the e-mails that

CONFIDENTIAL
CinQ+MC000108

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 58

1 were produced in this case, did they need to be
2 archived?
3    A   I don't believe so. Again, a computer
4 expert with MCmail, I believe you could just search
5 and no matter where the e-mail is, as long as it
6 hasn't been deleted from a server, it comes up, and
7 it pops up, and it's a very quick and easy process.
8    Q   Okay.
9    A   You know, as opposed to the old way that
10 Outlook was. You'd have to go through all your
11 "sents" and I don't know — sent e-mails. I don't
12 know if there's a way to sort or -- I don't know how
13 it was before but --
14    Q   All right. Well, is there a possibility
15 that the Tampa IT Department has e-mails that you
16 weren't able to find?
17       MR. POSTMAN: Form.
18       THE WITNESS: I would doubt it. Again, I'm
19 not sure exactly what the policy is as far as the
20 e-mails that they hold onto or that they have.
21 BY MR. KELLY:
22    Q   Well, assume they have all of the e-mails.
23    A   And I think -- I believe the Buccaneers'
24 Web mail could be managed by the NFL directly. That
25 was a transition that happened.

Page 59

1       So, to go back to your other question, I
2 think Ed Johnston oversees it, handles it, manages
3 the servers, but to what extent the archive and
4 everything is owned, I don't know if it's through
5 the League or --
6    Q   Okay. Well, you've read through the
7 e-mails before the deposition; correct?
8    A   I have.
9    Q   Anything in reading through the e-mails
10 that jogs your memory that other e-mails -- you've
11 written other e-mails or received other e-mails that
12 weren't contained in the production?
13    A   Not that I'm aware of. And, again, I've
14 produced these documents on a couple of different
15 occasions, and, you know, everything has been very
16 consistent with them.
17       So there's no other rocks where documents
18 are -- you know, are hiding or other places I would
19 think to check or think to consider, you know, for
20 these.
21       So I had all the correspondence with them
22 and, again, just being very organized and detailed
23 like I am, I'm confident that this is everything
24 that we have.
25    Q   Now, did you ever do any faxing to

Page 60

1 Mr. Simms?
2    A   I don't recall.
3    Q   Did Mr. Simms ever fax anything to you?
4    A   I don't recall. You had asked about the
5 report, how it was sent.
6    Q   Yes. You said --
7    A   I don't recall if he sent anything. I
8 don't see any reason that I had to fax him.
9    Q   Do you recall ever retrieving any documents
10 coming from your MyFax account?
11    A   You know, I really don't recall.
12    Q   If somebody would call your direct line and
13 leave a voice mail, does that voice mail go to your
14 e-mail?
15    A   No, it's not set up that way.
16    Q   All right. So you'd have to call in and
17 retrieve the voice mail?
18    A   Retrieve it physically, yes.
19    Q   Do you ever save any of the voicemails?
20    A   I'm sorry.
21       MR. POSTMAN: No, you're doing perfect. I
22 want the jury to see your handsome face.
23       THE WITNESS: Oh, thanks.
24       No, I can't say that I have. I don't know
25 that there is a way for me -- if there's a way to

Page 61

1 save, other than archive -- but, you know, to kind
2 of save or anything with a voice mail. If there's
3 a new voice mail, I check it and, really, I address
4 it.
5 BY MR. KELLY:
6    Q   There's only so many voicemails that you
7 can maintain; correct?
8    A   Yes. I don't know if there's a limitation
9 on the voice mail system, but I'm just...
10    Q   Okay. Do you use any software that you
11 record communications between you and other people?
12    A   Not that I'm aware of. I'm not aware of
13 any that I use or the company uses.
14    Q   I believe you have spoken to Mr. Simms,
15 you know, during 2009-2010 -- correct? -- over the
16 phone?
17    A   I can't recall how many conversations we
18 had. I think there were a handful. Say, maybe less
19 than five oral conversations, I think, initially.
20    Q   All right. Well, I guess my question is,
21 after talking to Mr. Simms, did you record anything
22 that you said to him or what he said to you?
23    A   No.
24    Q   So it would be based strictly on memory?
25    A   And, you know, the e-mails, which, again,

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 62**

1 is really how we communicated, I would say.
2     MR. KELLY: Okay. Let's take a short
3 break.
4     THE VIDEOGRAPHER: The time is 10:20 a.m.
5 We are off the record.
6     (Whereupon, a recess was taken from
7     10:20 a.m. to 10:29 a.m.)
8     THE VIDEOGRAPHER: Back on the record. The
9 time is 10:29 a.m.
10 BY MR. KELLY:
11   Q  In using your MyFax account in receiving
12 a fax via e-mail, the image that was faxed is an
13 attachment to the e-mail; correct?
14   A  I believe it's a separate attachment. With
15 MCmail, though, sometimes they'll show you the
16 attachment, depending on how many pages, so it looks
17 like it's kind of embedded in the e-mail.
18   Q  You don't have to go to a separate place to
19 retrieve the image that was sent to you; correct?
20   A  Outside of the e-mail itself?
21   Q  Yes, outside of the e-mail.
22   A  No. If there was an attachment in the
23 e-mail, I guess that would be all that...
24   Q  Okay. Do you ever back up your computer at
25 work?

**Page 63**

1   A  May have at some point. I don't -- I don't
2 recall. I don't actively do it. Again, it sounds
3 like I'm trying to sell MC computers here. They
4 have an automatic backup.
5     MR. POSTMAN: My office may go to MC when
6 this depo's over.
7 BY MR. KELLY:
8   Q  Well, was there anything that you saved
9 that relates to this case to your computers at all?
10   A  Not that I'm aware of. There may be the
11 attachment of the word "Document" for Exhibit A, the
12 original. There may be a signed quote and a PDF,
13 which I think, we've -- you know, we produced.
14     Oh, I'm sorry. But back to the question,
15 you know, I've been keeping electronic files of
16 the e-mails that I printed out, scanning those,
17 you know, as PDF files. You know, any other
18 correspondence I get from my attorneys, you know,
19 I've been holding onto, that kind of stuff. I
20 created a folder for that, yes.
21   Q  All right. Now, we mentioned a person by
22 the name of Steve Simms.
23   A  Yes.
24   Q  You understand that he worked for a company
25 called FaxQom; is that right?

**Page 64**

1   A  I understood he owned FaxQom.
2   Q  FaxQom is spelled F-a-x-Q-o-m.
3   A  Q-o-m, yes.
4   Q  And he had a Website, FaxQom.com?
5   A  I believe so, yes.
6   Q  Now, the earliest correspondence I have
7 between you and him is January 23, 2009. Is that
8 consistent with your understanding of when you first
9 had e-mail contact with him, or could it have been
10 before?
11   A  Do you mind if I see this?
12   Q  Yes. Let's mark it as Exhibit 1 to the
13 deposition first.
14     MR. POSTMAN: So here's what happens. She
15 marks it --
16     MR. KELLY: This is off the record.
17     (Whereupon, a discussion was held off
18     the record.)
19     * * *
20     (Whereupon, the document referred
21     to was marked for identification
22     as Plaintiffs' Exhibit No. 1.)
23     * * *
24 BY MR. KELLY:
25   Q  All right. I'm showing you what's

**Page 65**

1 been marked as Exhibit 1. It's an e-mail from
2 sales@faxqom.com to you. Do you see that?
3   A  I do.
4   Q  In sales@faxqom.com did you understand that
5 to be the e-mail address for Steve Simms?
6   A  Correct.
7   Q  Now, this is dated January 23, 2009. So
8 is this consistent with your understanding of your
9 first contact with this company?
10   A  I believe so, yes.
11   Q  Is there a way --
12   A  I'm sorry. Let me retract for a second.
13     First contact. There may have been some
14 oral conversations. Clearly, there's many ways that
15 we have spoken before. This being the first e-mail,
16 I would -- you know, the earlier conversations must
17 have been on the phone.
18   Q  All right. So you're not aware of any
19 e-mail correspondence between yourself and FaxQom in
20 2008?
21   A  Not that I'm aware of, no.
22   Q  Now, how did you first come into contact
23 with Steve Simms?
24   A  Well, specifically, Steve Simms, I think
25 I was looking for some companies that did fax

CONFIDENTIAL

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 66**

1  marketing. I don't remember, it being five years
2  ago, honestly, how that came about. There were
3  likely searches, you know, on the Internet, you
4  know, looking at, you know, different companies that
5  would specialize, you know, in this.
6      Q   Was there a project that was created for
7  the Buccaneers to do fax marketing?
8      A   It was discussed to look into some
9  different sales initiatives I think for the upcoming
10 2009 season. So --
11     Q   Was this --
12         MR. POSTMAN: Wait. You've got to let him
13 finish. Maybe he is -- I don't know -- but you've
14 got to let him finish.
15         THE WITNESS: I could be finished.
16         MR. POSTMAN: Well, if you're done, that's
17 fine.
18 BY MR. KELLY:
19     Q   And if I do start a question where you're
20 not done answering, you can actually tell me "I'm
21 not done answering the question," if you need to
22 finish the answer. You have that right.
23     A   Okay.
24     Q   So I guess my question is: there was a
25 discussion between people at the Buccaneers

**Page 67**

1  regarding some promotional activities for the
2  upcoming 2009 season?
3      A   Correct.
4      Q   Can you tell me when those discussions
5  first took place. Were they in January 2009?
6      A   I don't remember specifically when they
7  were. Just the nature of the business we're in,
8  there's a lot of work that kind of begins during
9  the off season so it makes sense that, you know, in
10 January we're kind of already thinking ahead to the
11 next year.
12     Q   Tampa Bay was not in the Superbowl in 2008.
13     A   No. Unfortunately not.
14     Q   So I guess on January 23, 2009, the
15 Buccaneers didn't have any more games to play;
16 correct?
17     A   I believe so. I believe that was Jon
18 Gruden's last year, and we didn't make the playoffs,
19 I guess.
20     Q   All right. And you had said that there
21 were discussions between you and other people
22 regarding next year's marketing projects. Who
23 specifically did you speak to?
24     A   I recall presenting some ideas to
25 Mr. Glazer. Jason Layton, I believe, was on a call.

**Page 68**

1  It may have been a videoconference call, where I had
2  presented some different marketing ideas. I joke.
3  I like to think of myself as an idea guy. So I was
4  excited, I think, at the time to show some different
5  things that I was thinking that could possibly
6  generate some ticket sales.
7      Q   Were you the person that worked at the
8  Buccaneers that came up with the idea of fax
9  marketing?
10         MR. POSTMAN: Object to the form.
11         THE WITNESS: I believe it was my idea,
12 yes.
13 BY MR. KELLY:
14     Q   Did you also consider e-mail marketing?
15     A   Yes. I believe it was something, yes,
16 we also had talked about at the time. E-mail
17 marketing?
18     Q   And text messaging?
19     A   I'm not sure on e-mail marketing. Text
20 messaging was also something we were discussing at
21 the time.
22     Q   Did the Buccaneers ever do text messaging?
23     A   Yes, we had a text campaign. I don't know
24 exactly when it was.
25     Q   Was the company that did the text messaging

**Page 69**

1  a 1 Touch?
2      A   That sounds correct.
3      Q   Were you the contact at the Buccaneers that
4  dealt with the text messaging with 1 Touch?
5      A   Yes.
6      Q   Did 1 Touch provide any fax marketing?
7      A   Not that I believe.
8      Q   Who was your contact at 1 Touch?
9      A   I don't recall, to be honest.
10     Q   Is there e-mail correspondence between
11 yourself and 1 Touch for the text messaging?
12     A   I'm sure there is.
13     Q   Any other companies that the Buccaneers
14 contracted with to send text messaging?
15     A   Not that I'm aware of, no.
16     Q   All right. Had the Buccaneers ever done
17 any fax marketing prior to 2009?
18     A   I couldn't answer that. To be honest, I,
19 you know, began my employment in 2001. So to what
20 extent they did something, you know, prior to that,
21 I don't know.
22     Q   How about from 2001 up until --
23         MR. POSTMAN: Again, just make sure you're
24 done. If you're not done, let me know.
25         THE WITNESS: Well, I would say that I --

Min-U-Script®
L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL
(17) Pages 66 - 69
CinQ+MC000111

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 70**

1  if there was additional fax marketing done, I wasn't
2  directly involved until -- you know, until the -- I
3  think the 2009 campaign. I wasn't aware of any.
4  BY MR. KELLY:
5      Q   Okay. So you're not aware of any fax
6  marketing from 2001 through 2008; correct?
7      A   Correct.
8      Q   In coming up with the idea of fax
9  marketing, did you provide any documents to Jason
10 Layton or Ed Glazer regarding your research?
11     A   I don't remember specifically what I
12 provided them. You know, thinking off memory, we
13 may have had a big -- you know, one of the wet
14 chalkboards where maybe I, you know, had put a few
15 things down. Again, going off memory, I believe
16 there was a videoconference that we had where --
17 because we were in California, and Jason and Ben
18 were in Tampa, because I wanted to kind of show that
19 in the background and some different ideas that I
20 had. So...
21     Q   Are the videoconferences taped?
22     A   No.
23     Q   There's no audiotape or video of any of the
24 conferences?
25     A   Not that I'm aware of.

**Page 71**

1      Q   Is there any way to determine what was
2  discussed at any of the conferences that used the
3  videoconferences?
4      A   Just based on my memory.
5      Q   When conducting the videoconference with
6  respect to the fax marketing program had you already
7  done some research?
8      A   On?
9      Q   On fax marketing.
10     A   Fax marketing? You know, I had looked
11 into -- I can't remember specific. I remember
12 looking into the DMA, the Direct Marketing
13 Association, you know, for general guidelines.
14 I can't say specifically, but normally I wouldn't
15 present different ideas without -- you know, without
16 having done some due diligence or, you know, some
17 work on them or maybe getting some quotes on them or
18 that kind of stuff. So...
19     Q   All right. And this was a project that you
20 were working on in early 2009; correct?
21     A   I don't remember specifically when the
22 project was or when the videoconference was or even
23 if -- remembering a videoconference, but I couldn't
24 tell you exactly -- exactly when it was.
25     Q   Well, in researching fax marketing, were

**Page 72**

1  you aware that there was a Federal statute that
2  prohibits the sending of unsolicited advertisements
3  by fax?
4      MR. POSTMAN: Object to the form.
5      THE WITNESS: I was aware of the TCPA,
6  which I believe I reviewed at the time, not being
7  an attorney, you know, looked at some general
8  guidelines, you know, just to understand the
9  limitations or the type of company, really, that I
10 should, you know, begin to look for or the type of
11 questions I should be asking the company before
12 hiring somebody. It was my understanding that
13 people needed to opt-in to receive faxes.
14 BY MR. KELLY:
15     Q   In gathering this knowledge regarding the
16 TCPA, were you doing that in preparation to approach
17 Ed Glazer and Jason Layton regarding your ideas?
18     MR. POSTMAN: Form.
19     You can answer.
20     THE WITNESS: I don't remember when the
21 research was done, if it was prior to presenting an
22 idea. Just, generally, it's kind of my nature.
23 I like to do a little homework prior to, you know,
24 throwing something on the table for -- you know, for
25 anyone to consider.

**Page 73**

1      Mr. Glazer's a busy person. Jason Layton
2  is a busy person. I'm a very busy person. So to
3  save everyone the time, rather than go on a wild
4  goose chase but -- so I don't remember specifically
5  if the research was prior to or after or exactly
6  when it was. But I don't remember.
7  BY MR. KELLY:
8      Q   Well, you had said that you reviewed the
9  TCPA. Did you actually review the statute of the
10 TCPA?
11     A   I don't recall if there was a Website or
12 what exactly there was. It's possible they could
13 have had, you know, a drop-down, you know, general
14 information. I'm not an attorney so I likely would
15 not have gone through, you know, whatever statute
16 was out there in very technical language of exactly
17 what it was.
18     What I took away from that was, again, kind
19 of more of the general rules and regulations. And
20 even further, in doing research in the DMA, took a
21 lot of it -- you know, the best practices, you know,
22 as I kind of understood them to be, I think, in
23 preparation for calling -- sourcing a fax company
24 so that I would have questions to ask them and be
25 able to confirm, really, their legitimacy.

---

L.A. Reporters
(800) 675-9700    www.LAReporters.com
CONFIDENTIAL
CinQ+MC000112

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 74

1   Q   All right. So I guess to summarize your
2   understanding of the fax laws in early 2009 is that
3   you did a preliminary research, and that was it?
4        MR. POSTMAN: I'm sorry. Object to the
5   form of the question.
6        THE WITNESS: Well, again, I'm not an
7   attorney. You know, I wanted to hire a company that
8   understood the law and that used the best practices.
9   And in FaxQom, I thought I had found one that had,
10  you know, been doing this legitimately for -- you
11  know, for 18 years, had a solid reputation.
12       So, you know, I really kind of relied
13  on them and their knowledge, their expertise to
14  understand, you know, that law and exactly how --
15  you know, how it was -- you know, how it may or may
16  not affect us or how they could conduct, you know,
17  their faxes.
18  BY MR. KELLY:
19  Q   How much time did you spend researching the
20  different fax marketing companies?
21  A   I couldn't recall. I mean, it was five
22  years ago. So, generally, any company that we come
23  across for any type of business, we're going to look
24  at a couple different companies to make sure that,
25  you know, we're getting competitive quotes and, you

Page 75

1   know, some consistency kind of in what we're looking
2   for.
3   Q   In finding the fax marketing companies, did
4   you Google the company, or did you Google to gather
5   that information?
6   A   Again, I don't recall. I'm confident there
7   was, you know, some sort of Internet search or
8   something, but I don't recall who contacted who
9   first. FaxQom could have reached out to me. You
10  know, there are a lot of people that reach out to
11  us, you know, trying to -- you know, trying to
12  promote their sales or different business
13  opportunities and things constantly all -- the next
14  time we take a break, I'll have ten more e-mails
15  from people. So...
16  Q   Well, can you identify another fax
17  marketing company that you spoke to, you know, in
18  2009?
19  A   I wouldn't be able to. I don't recall.
20  Q   Was it your typical practice to call up the
21  fax marketing companies to get some information from
22  them or e-mail them?
23  A   Generally to get on the phone I think,
24  at least to start. A policy, you know, I have is to
25  tell people -- people have told me, you know, "pick

Page 76

1   up the phone." It's easier than, you know,
2   e-mailing back and forth, kind of get to the point
3   quicker, and, you know, get what you're looking for,
4   I think, a little bit quicker.
5   Q   Are you aware of any fax marketing
6   companies that you e-mailed in early 2009 to gather
7   information?
8   A   Not that I'm aware of. Again, my practice
9   would generally be for new business or, you know,
10  for introducing my company as being interested in a
11  service is to pick up the phone and talk to someone.
12  Q   Did you look at your e-mails from early
13  2009 or possibly late 2008 regarding any contact
14  that you had with any other fax marketing companies?
15  A   I did when I went through the MCmail and
16  searched FaxQom and sales of FaxQom and Steve Simms
17  and -- you know, to be sure that -- again, being
18  five years ago, I wanted to kind of jog my memory
19  and, you know, I was asked to provide all the
20  correspondence that I had. Fax marketing, I think,
21  was also a search that I had or that I did.
22  Q   You weren't able to find any e-mails from
23  you to any other fax marketing company?
24  A   I was not, no.
25  Q   Can you recall any specific instance where

Page 77

1   you talked to another fax marketing company in late
2   2008, early 2009?
3        MR. POSTMAN: Object to the form.
4        You can answer.
5        THE WITNESS: Not specifically. I'm
6   confident there was. It's just I would do business
7   today with any new person or look into any type of
8   new business. It's just kind of my policy or, you
9   know, policy procedure to talk to a couple of
10  different companies to get several quotes on
11  anything we're looking to do. So recalling any
12  specific names of other companies five years later,
13  I couldn't tell you.
14  BY MR. KELLY:
15  Q   Can you recall any specific conversations
16  that you had with any other fax marketing company in
17  late 2008, early 2009?
18  A   I don't recall.
19  Q   When you say you're confident that there
20  were other companies, would you have obtained that
21  information through Internet searches?
22  A   Likely. Likely. Do Internet searches or
23  referrals or -- yes, I think that's kind of -- or if
24  people had contacted us, you know, prior, you know,
25  maybe, you know, it would have saved an e-mail or

CONFIDENTIAL                        CinQ+MC000113

**Page 78**

1 something and would have had that to kind of go back
2 to and hold onto if I wanted to reach out or contact
3 them in the future.
4    Q   All right. In contacting fax marketing
5 companies there's some things that you'd probably
6 want to know. Number one, the price; correct?
7       MR. POSTMAN: Object to the form.
8       You can answer.
9       THE WITNESS: It would be one of the
10 things. I think our initial concern — and I can
11 say this with some confidence because I believe the
12 e-mail I have here — and if you want to use that as
13 an exhibit, you can; it was one of the earliest
14 e-mails I had to FaxQom — I wanted to be confident
15 that whoever we were using was aware of all the
16 legislation regarding "spam marketing," as I put it.
17 I wanted to know that a hundred percent of the
18 numbers that FaxQom or anyone I was working with had
19 opted in to receive the faxes. That was really kind
20 of the initial concern. I wouldn't use the word
21 "concern." The initial, I guess, due diligence
22 that, you know, that we had, you know, wanting to
23 make sure that we had someone that was aware of you
24 know, the regulations, aware of the best practices,
25 and was practicing, you know, using those.

**Page 79**

1    Q   Did the Buccaneers have any lists of fax
2 numbers that it had available?
3    A   Not that I'm aware of. To the extent
4 customers of ours — what information's on file. If
5 collecting faxes was — you know, was part of what
6 we retained in — you know, in a contact or in a
7 database, I'm not sure. I didn't handle that so —
8    Q   Did the Buccaneers ever use those fax
9 numbers from prior — or from existing customers to
10 send them an advertisement by fax?
11    A   Nothing I was involved with.
12    Q   So in reaching out to the —
13    A   I'm not aware of any.
14    Q   So, in reaching out to the fax marketing
15 companies, one of your concerns was the fax lists;
16 correct?
17    A   Well, yes. After doing the research with
18 the TCPA and the DMA, I wanted to make sure that we
19 were using someone who could validate everything
20 that I kind of, you know, learned, you know, from
21 those sites, who was aware, who had some knowledge
22 of it.
23       And, in talking to FaxQom, they, you know,
24 represented that they were very aware and, you know,
25 they knew all of that and they used best practices.

**Page 80**

1       And I think there was a quote from Steve
2 Simms in one of the e-mails. He said that's the
3 reason they've been in business for 18 years. So I
4 took a good level of comfort in that.
5    Q   All right. Can you recall a specific
6 instance where you called another fax marketing
7 company where they told you there's no such thing as
8 an opt-in fax list?
9       MR. POSTMAN: Object to the form.
10      THE WITNESS: No, I don't recall. I
11 don't know where that situation would, I guess,
12 be applicable if I was looking for someone who
13 promoted fax marketing for them to say that "we
14 don't" — you know, "we don't do fax marketing."
15 I don't know. So I don't recall.
16 BY MR. KELLY:
17    Q   Well, there are situations where a fax
18 marketing company would use a list from the actual
19 customer, as opposed to the fax marketing company's
20 fax list. You understand that that's a —
21    A   I don't understand the difference.
22    Q   You know, there's ways in which you can
23 send faxes. One can be from a purchased list; or,
24 No. 2, it can be from a list that was compiled by
25 the client.

**Page 81**

1       MR. POSTMAN: Is that a question you're
2 asking him —
3       MR. KELLY: Yes.
4       MR. POSTMAN: — or a statement?
5       I object to the form.
6       THE WITNESS: I now understand the
7 difference.
8 BY MR. KELLY:
9    Q   All right. But, in reaching out to the fax
10 marketing companies, the Buccaneers didn't have a
11 fax list that it wanted to use; correct?
12    A   I wouldn't say that's accurate, that we
13 didn't want to use a fax list. I don't know if,
14 perhaps — I believe — I don't want to speculate,
15 but any fax numbers that we would have I would
16 assume would already have been existing contacts;
17 thus we wouldn't necessarily feel the need to
18 remarket to existing customers so...
19    Q   You wanted to reach out to other people and
20 not your existing customers; correct?
21       MR. POSTMAN: Object to the form.
22       THE WITNESS: Yes, I believe the intent was
23 to generate some new business.
24 BY MR. KELLY:
25    Q   Were you aware that the Buccaneers can

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 82

1  purchase fax numbers from third-party vendors?
2      A   I believe -- and I could be mistaken, but I
3  believe in part of the research I did with the TCPA
4  indicated that that wasn't a best practice -- or it
5  could have been the DMA; I don't recall -- which is
6  why it was important that we found a company that
7  had contacts of people that had agreed to receive
8  faxes and who had opted in to receive those faxes.
9      Q   Did you ever contact any third-party
10 vendors that sold lists?
11     A   "Sold" -- when you say "sold" --
12     Q   Sold fax lists.
13     A   Like, sold their telephone number or their
14 fax numbers?
15     Q   Right.  Did you ever reach out to them
16 to --
17     A   I don't -- I don't recall.  It's possible
18 that I, you know, may have come across a company or
19 two that did that.  However, had I, it wouldn't have
20 been of interest to us because we don't have -- we
21 didn't have, to my knowledge, the wherewithal to be
22 able to send those faxes out, you know, albeit the
23 software or the computer or however it's done.
24 So...
25     Q   Well, you could have --

Page 83

1      A   -- had I come across them, I don't believe
2  I would have pursued any in-depth conversation, you
3  know, with them on that.
4      Q   Well, why not call a third-party vendor
5  that sold fax lists to purchase that list and then
6  use a fax marketing company to send the images to
7  those lists?
8          MR. POSTMAN: Object to the form.
9          I'm sorry.  Are you done?
10         Object to the form.
11         THE WITNESS: The important thing for us
12 was to contract with a company that had customers
13 that agreed to receive faxes from them.
14         With FaxQom -- and one of the requirements
15 I had in hiring them was for them to provide us an
16 indemnification of any potential issue, which was,
17 basically, them guaranteeing, as I understood, that
18 the fax numbers they had were all from people that
19 opted in.
20         So I received that in writing from him,
21 and then further in that same indemnification it
22 says specifically that Steve Simms -- that all the
23 faxes would be under his management, his personal
24 management, and he was a 17-year veteran of FaxQom.
25         So as I understood the general regulations

Page 84

1  for the DMA and the TCPA to go that was really the
2  requirement for hiring or using a legitimate fax
3  broadcast company.
4  BY MR. KELLY:
5      Q   Now, you used the term "opted in."  What do
6  you mean by a fax list where people had opted in?
7      A   Agreed to receive faxes.  Had an existing,
8  you know, relationship with -- you know, with FaxQom
9  or with the company.
10     Q   Was that --
11     A   Just like -- you know, just like the text
12 messages, you know, today.  You opt in to certain
13 things or whatever it is.
14     Q   Was that term of an opt-in fax list
15 first represented to you by Steve Simms, or is it
16 something that you had read in the TCPA?
17         MR. POSTMAN: Object to the form.
18         You can answer.
19         THE WITNESS: I have an e-mail dated
20 June 24 from Steve Simms that says, "100 percent of
21 our data is compiled opt in," in quotes.
22 BY MR. KELLY:
23     Q   Right.  So I guess --
24     A   So I believe "opt in" would be his term,
25 but a term I would have also been familiar with.

Page 85

1  BY MR. KELLY:
2      Q   Well, that's what I'm asking about.  So
3  were you familiar with the term "opt in" prior to
4  reaching out to FaxQom?
5          MR. POSTMAN: Form.
6          You can answer.
7          THE WITNESS: I'm sure I've heard the
8  phrase before or prior to --
9  BY MR. KELLY:
10     Q   Okay.  Now --
11     A   -- or understood it.  It could be possible
12 I came across that language in looking into the DMA
13 or TCPA.
14     Q   Okay.  Have you ever reviewed the FCC
15 regulations regarding junk faxing?
16         MR. POSTMAN: Prior to the existence of
17 this case?
18         MR. KELLY: Yes.  Well, this is -- we're
19 talking --
20         MR. POSTMAN: Yes.  I just --
21         MR. KELLY: -- late 2008, early 2009.
22         THE WITNESS: I --
23         MR. POSTMAN: Do you understand what he's
24 saying?  Before this lawsuit began and you got
25 correspondence from them is what he's asking you.

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 86**

1  THE WITNESS: I may have. You know, my
2  role of responsibility with the company, you know,
3  puts me in a lot of different directions. So it's
4  possible that I came across some FCC information
5  at some point or TCPA or at college. We could have
6  studied it or looked into it.
7  BY MR. KELLY:
8  Q  Does the TCPA use the term "opt in"?
9  MR. POSTMAN: Object to the form.
10  THE WITNESS: I'm not sure. I'd have to
11  look at the Website.
12  BY MR. KELLY:
13  Q  Does the FCC use the term "opt in"?
14  A  I'm not sure. I'd have to look at the
15  Website.
16  Q  Did you review any case law from various
17  courts around the country regarding junk faxing?
18  A  I may have. There may have been cases on
19  those Websites as reference. I don't recall.
20  And if I did, it, you know, would have been as a
21  reference. I'm not an attorney so I'm not really
22  well versed in case law.
23  Q  Okay. In late 2008, early 2009, what
24  was your understanding of how someone can send a
25  legal advertisement by fax?

**Page 87**

1  MR. POSTMAN: Object to the form.
2  You can answer.
3  THE WITNESS: I'm just kind of -- I guess
4  I'm trying to -- I don't know what my understanding
5  was at that time. You know, since this case has
6  been presented, clearly my memory of what I
7  understand to be right or wrong, you know, may
8  have -- you know, may have changed.
9  At that time what I understood would have
10  been, you know, based on -- you know, based on what
11  I was told, based on what was represented to me
12  by -- you know, by the company, FaxQom, that I
13  worked with, or whatever general understanding or
14  information that -- you know, that I received
15  from -- you know, from the side.
16  BY MR. KELLY:
17  Q  And that's what I'm trying to ask you.
18  What other information on the side did you have with
19  respect to the fax laws that were not represented to
20  you by FaxQom?
21  A  I'm not sure what other information I would
22  have.
23  Q  Can you think of any specific statute,
24  regulation, or any other statement that you had
25  an understanding that was not provided to you by

**Page 88**

1  FaxQom?
2  A  Are we talking about --
3  Q  Back in --
4  A  -- what was provided by FaxQom or prior
5  knowledge of or --
6  Q  Well, I was --
7  A  I'm just trying to understand what you're
8  asking.
9  Q  Yes. I'm trying to break it up because you
10  had said that you learned about the TCPA through
11  FaxQom through their representations.
12  A  No.
13  MR. POSTMAN: Object to form. Sorry.
14  THE WITNESS: I'm sorry. I don't know that
15  they're the ones that taught me about the TCPA. I
16  believe there was some research done prior to even
17  reaching out to FaxQom, just to be clear.
18  BY MR. KELLY:
19  Q  And that's my --
20  A  I don't recall specifically.
21  Q  Okay. So, as you sit here --
22  A  It's possible that I had gone and looked at
23  the TCPA or the DMA prior to contacting FaxQom. I'm
24  confident that's the way that it went because, when
25  I spoke with FaxQom, a lot of what they represented

**Page 89**

1  and stated in the conversations we had orally or,
2  you know, it was clear as these e-mails here, was
3  consistent with those practices.
4  Q  Okay. Can you think of any specific
5  instance, based upon your knowledge back in early
6  2009, regarding the fax laws that was inconsistent
7  with what FaxQom had told you?
8  A  I don't recall any, no; and not in 2009,
9  no.
10  THE VIDEOGRAPHER: Can I change the tape
11  now?
12  MR. KELLY: All right.
13  THE VIDEOGRAPHER: The time is 11:03 a.m.
14  This is the end of Tape 1. We're going off the
15  record.
16  (Whereupon, a recess was taken from
17  11:03 a.m. to 11:05 a.m.)
18  THE VIDEOGRAPHER: Back on the record. The
19  time is 11:05 a.m. This is the beginning of Tape 2.
20  BY MR. KELLY:
21  Q  All right. From what I understand now is
22  that you were having conversations with Steve Simms
23  in early 2009, and he made certain representations
24  to you; correct?
25  A  Correct.

Min-U-Script®
L.A. Reporters
(800) 675-9700   www.LAReporters.com
(22) Pages 86 - 89
CONFIDENTIAL
CinQ+MC000116

CIN-Q AUTOMOBILES, INC. vs.                                                                    MATTHEW KAISER
BUCCANEERS LIMITED PARTNERSHIP                                                                   March 25, 2014

Page 90

1  Q  All right. Now, did you have a discussion
2  with Steve Simms regarding FaxQom's opt-in list?
3    A  I don't remember specific conversations
4  regarding the numbers or the list itself, but I do
5  specifically remember discussing how he obtained the
6  list, you know, as far as the customers that he had,
7  people who had agreed to receive faxes, people who
8  had an existing -- I don't know if he said business
9  or just an existing relationship.
10  Q  Well, let me ask you this. What do you
11  mean that he had a business relationship with?
12    A  Let me go through. I believe I have an
13  e-mail where he represents that everyone who he
14  sends to -- it says:
15        "A hundred percent of our data compiled
16        is opt-in. That's how the company survived
17        18 years strong."
18    And then furthest:
19        "FaxQom is a legal compiler of fax
20        databases and has been using the same
21        compiling techniques since 1991, which
22        was the same year that the TCPA was in
23        force. Using legal techniques in compiling
24        fax data has enabled FaxQom to be 18 years
25        strong, with a solid reputation in

Page 91

1        broadcast marketing."
2    Further, that's not what you asked, but:
3        "Your account will be handled directly
4        by Steve Simms."
5    Q  Okay. But I guess my question to you is
6  you're using this, the term "existing business
7  relationship." In what context is that significant
8  in opt-in fax lists?
9    A  I understand it to be the same. If
10  somebody opted in or agreed to receive something,
11  then they have some type of a relationship. So,
12  as opposed to business, it would be personal. So,
13  like, I would call it a "business relationship."
14    Q  Was it your understanding that FaxQom had
15  called the entities, asking whether or not they
16  would agree to receive faxes?
17    A  I don't recall specifically what he told
18  me, how they had created their database, you know,
19  with regard to how they sourced it or how they
20  maintained it. I don't remember specifically what
21  he said except that they were all his clients or
22  customers or people who had agreed to receive the
23  faxes.
24    Q  Did you have an understanding in January of
25  2009 as to how many employees FaxQom had?

Page 92

1    A  I don't recall, no.
2    Q  Did you have an understanding that there
3  was anyone else other than Steve Simms that operated
4  FaxQom?
5    A  I believe there was a check that was sent
6  to a different name. So I assumed that it was, you
7  know, another employee under him or with him.
8    Q  Well, that --
9      MR. POSTMAN: Let him finish.
10      MR. KELLY: Okay.
11      THE WITNESS: I can answer, at the very end
12  of 2010, where we had received the complaint and I
13  told Steve to cease sending any faxes out until we
14  had investigated, you know, his company or our
15  understanding of the laws further, there was some
16  conversation where I think he referred to a "boss"
17  needing to okay the refund of the remaining check,
18  the balance I think was in the account.
19    So I guess that would be a total of three
20  people that I would have been aware of, you know,
21  perhaps at his company. But it was Steve who I
22  dealt with a hundred percent of the time.
23    Q  So back in January of 2009, you only spoke
24  with Steve Simms; correct?
25    A  Correct.

Page 93

1    Q  And at that point in time you were unaware
2  of any other employees that were working at FaxQom;
3  correct?
4    A  Correct.
5    Q  Did Steve Simms ever send you any documents
6  as to how he compiled what he claims was an opt-in
7  list?
8    A  I don't recall, other than the
9  indemnification agreement.
10    Q  Now, the Buccaneers wanted to market to
11  certain area codes near Tampa; is that right?
12    A  In the Tampa Bay area, correct.
13    Q  Actually, if you look at Exhibit 1, the
14  Buccaneers wanted to market, obviously, Tampa;
15  correct?
16    A  Correct.
17    Q  And that's Area Code 813?
18    A  That is correct.
19    Q  And then the Buccaneers wanted to market
20  Clearwater and St. Pete, and that's the 727 Area
21  Code?
22    A  That's correct.
23    Q  And then the Buccaneers want to market
24  Sarasota. That's the 941 Area Code?
25    A  It probably encompasses more than Sarasota,

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 94**

1  but, yes, that's correct.
2  Q   And then the Buccaneers wanted to market
3  Orlando, which is the 407 Area Code?
4  A   Yes. I'm not sure on Orlando because
5  this was the first e-mail that he provided me. So
6  we had requested a handful of different area codes.
7  To what extent the actual ones that we did market
8  to, I don't recall if Orlando was in there or not.
9  Q   Okay. And it also says Gainesville here
10  and surrounding area codes. Do you understand that
11  to be 352?
12  A   Yes. And I just know. I used to live in
13  the 352 Area Code in Spring Hill so that's, you
14  know, County, just 30 minutes north of, you know,
15  Raymond James Stadium and the Tampa Bay area. So it
16  goes as high as Gainesville, but it's much closer to
17  Tampa than the 352.
18  Q   All right. So was there an occasion where
19  you would ask Steve Simms how many opt-in fax
20  numbers he had available in those areas?
21  A   How many --
22  Q   How many fax numbers he had in those
23  different areas?
24  A   Yes. I would have requested that, I think,
25  to get a sense of, you know, the scope and the cost.

---

**Page 95**

1  Q   Now, according to Exhibit 1, Steve Simms
2  sent you an e-mail and stated that he had 305,489
3  fax numbers to those various areas. Do you see
4  that?
5  A   I do.
6  Q   Did you have an understanding that those
7  fax numbers were opt-in fax numbers?
8  A   At this time, on January 23, 2008 --
9  Q   Or 2009.
10  A   I'm sorry, 2009. I don't know. Again, I
11  don't recall specifically what oral conversations we
12  had when we first spoke. This e-mail seems to be a
13  response to -- you know, to a verbal conversation.
14  So I don't remember if that was something he, you
15  know, warranted and represented on the phone to me.
16  But, regardless, prior to anything going out, he
17  certainly put it in writing.
18  Q   All right. So, in January of 2009, as
19  you sit here today, you can't say that your
20  understanding was that the 305,000 fax numbers were
21  numbers that had opted in?
22      MR. POSTMAN: Object to the form.
23      THE WITNESS: I'm sorry. Would you mind
24  asking again.
25  ///

---

**Page 96**

1  BY MR. KELLY:
2  Q   Yes. In January of 2009, your
3  understanding as to the 305,489 fax numbers that
4  are identified in Exhibit 1 -- you're not sure if
5  those numbers are opted-in fax numbers or other fax
6  numbers?
7      MR. POSTMAN: Object to the form.
8      You can answer.
9      THE WITNESS: I have no way of confirming,
10  again, what was represented on the phone call that
11  we had which prompted this e-mail. I don't know
12  specifically -- I can't recall specifically what he
13  said.
14      So to answer your question, I had no way of
15  determining who's opted in or who's not. I trusted
16  him.
17  BY MR. KELLY:
18  Q   Did you ever have a conversation with Steve
19  Simms regarding whether or not the Buccaneers wanted
20  to send out faxes to people who had opted in, as
21  opposed to fax numbers that had not?
22  A   Conversations with Steve Simms?
23  Q   Yes.
24  A   I think the only conversation that I had
25  with Steve Simms was that we wanted to use best

---

**Page 97**

1  practices, you know, as outlined, I think, by the
2  DMA, and I think the only numbers we were interested
3  in FaxQom sending faxes to were numbers of contacts
4  that had agreed to receive from FaxQom.
5  Q   Were you surprised by the number -- the
6  quantities in the various area codes that are
7  identified in Exhibit 1?
8  A   No, not necessarily.
9  Q   Why not?
10  A   I had no way of -- in gauging how many
11  faxes, you know, that represents. I would imagine
12  there are probably many more telephone numbers than
13  what's shown as fax numbers.
14      And I don't know if this initial estimate
15  included all fax numbers or just business fax
16  numbers. I believe our campaign was targeted just
17  towards more business.
18  Q   Well, fax numbers are generally assigned
19  to businesses, as opposed to residential homes;
20  correct?
21      MR. POSTMAN: Object to the form.
22      THE WITNESS: I would say that's, yes, much
23  more likely. I know a lot of people, though, that
24  have or had at some point their own individual fax
25  number, though, just -- you know, a private business

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 98**

1 or small businesses.
2     MR. KELLY: Let's mark this.
3     THE REPORTER: Marked Exhibit 2.
4              * * *
5     (Whereupon, the document referred
6     to was marked for identification
7     as Plaintiffs' Exhibit No. 2.)
8              * * *
9 BY MR. KELLY:
10    Q   I'm going do show you what's been marked as
11 Exhibit 2. It's Bates labeled BLP 10. It's an
12 e-mail from Sales at FaxQom.com. You understand
13 that to be the e-mail address associated with Steve
14 Simms; correct?
15    A   I believe so, yes. He may have used info
16 with FaxQom.com as well.
17    Q   All right. At the top says it's an e-mail
18 from you to Jason Layton. Do you see that?
19    A   I do.
20    Q   That's an e-mail that was sent a few hours
21 after the 6:15 a.m. e-mail; correct?
22    A   Correct.
23    Q   All right. So you received the 6:15 a.m.
24 e-mail; correct?
25    A   Yes, because I forwarded this to Jason

**Page 99**

1 Layton. I am assuming so, yes.
2    Q   So it says:
3           "Advertising By Fax Services
4           14.8 Million U.S. Fax Database
5           8.2 Million Solicited (opt in)
6           Database."
7           Do you see that?
8    A   I do.
9    Q   So, in June of 2009, did you have an
10 understanding that FaxQom had an opt-in database of
11 8.2 million fax numbers?
12    A   That's what's shown in the e-mail. You
13 know, as far as my understanding, I didn't use this
14 e-mail as -- you know, as the basis of the dialogue
15 I had with FaxQom. I think this was a follow-up,
16 kind of a general marketing technique that they must
17 have sent out just for...
18    Q   Well, did you believe Steve Simms in his
19 statement that he had 8.2 million opted-in fax
20 numbers?
21    A   I didn't have any reason not to. He had
22 been in business for 18 years so, you know, it
23 seemed reasonable. It's 8.2, a big number. Is it a
24 small number compared to the number of faxes --
25 you know, that are there or that he could have

**Page 100**

1 collected? I have no way to tell.
2    Q   Did you ever ask him if he personally made
3 all 8.2 million calls?
4    A   I don't recall what we discussed, again,
5 orally the first time that we talked. So I may
6 have. Maybe not using those exact words, or there
7 may have been conversations on exactly how things
8 were opted in, but the subject of the conversation
9 was always, you know, people who have opted in.
10    Q   Well, did he ever tell you that he
11 personally made the 8.2 million calls?
12    MR. POSTMAN: Form.
13    You can answer.
14    THE WITNESS: I don't recall. Yes, I don't
15 recall. You know, I don't know. His company -- the
16 size of his company at this time -- I wouldn't think
17 to question because we had not agreed, I think,
18 really to do any business. So at this point FaxQom
19 could have been a company of 150 people or one
20 person at the time. So I don't know.
21 BY MR. KELLY:
22    Q   But when you were speaking to Steve Simms
23 in January of 2009, you didn't have an understanding
24 that it was any more than him individually working
25 FaxQom; correct?

**Page 101**

1    MR. POSTMAN: Object to the form of the
2 question.
3    THE WITNESS: My initial conversations
4 with Steve Simms, I don't remember specifically
5 discussing how many employees he had. I don't
6 really remember discussing specifically how many
7 employees FaxQom had, I think, at any point.
8    But the only authorization I ever gave
9 FaxQom or Steve Simms was for Steve Simms to
10 personally deal with, you know, our account.
11 BY MR. KELLY:
12    Q   When you would call Steve Simms -- I see a
13 508 number on Exhibit 1. Do you see that?
14    A   I do.
15    Q   Would he typically answer the phone?
16    A   I don't remember if I got voicemails or if
17 he answered the phone. I remember there being a
18 couple of different numbers. There was a FaxQom,
19 you know, more kind of headquarter office, their
20 general line. And then I remember using his
21 cell phone. I don't know the 508 -- I thought his
22 cell phone was a Houston number or a Texas number.
23 I recall. I grew up in Texas and that's why I would
24 know.
25    Q   Do you have the understanding that we did

                            CONFIDENTIAL                      CinQ+MC000119

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 102**

1 take Steve Simms' deposition about two weeks ago?
2    MR. POSTMAN: So — hold on.
3    I have no problem with that question, but
4 that does seek attorney-client information, but
5 you're just trying to get a series of other
6 questions. So as long as you agree that's not a
7 waiver of the attorney-client privilege, just to
8 get to the next predicate, I have no problem with
9 him answering; is that fair?
10    MR. KELLY: That's fair.
11    THE WITNESS: I will say I do, and I was
12 absolutely shocked, to be honest.
13 BY MR. KELLY:
14    Q   Did you read the transcript?
15    A   I did last night just kind of briefly.
16 Just kind of, you know, went through it.
17    Q   Well, let me ask you this.
18    A   I actually thought it was Barry asking
19 him the questions that you were asking him just —
20 you know, because of just how crazy some of the
21 responses and things were. I was just — I was kind
22 of surprised, to be honest.
23    Q   Well, let me ask you this. Steve Simms
24 is actually Michael Clement. Do you have that
25 understanding?

**Page 103**

1    A   I do now, yes.
2    Q   He was deposed about a year ago, maybe two
3 years ago by my office, in which the Buccaneers
4 weren't involved at that time. Did you read that
5 transcript?
6    A   I did not. No, I don't think I have that.
7    Q   All right. But you did read his transcript
8 that was taken a few weeks ago?
9    A   I just kind of perused it over the last —
10 that was a lot of stuff. I may have spent 30
11 minutes just kind of scanning through it.
12    Q   What were you shocked about?
13    A   Well, I wasn't in shock last night because
14 I had already been informed by our attorneys —
15    MR. POSTMAN: You agree it's not a waiver?
16    MR. KELLY: Well, I don't know what he's
17 going to say.
18    MR. POSTMAN: Well, he's just going to say
19 what I told him.
20    THE WITNESS: I was going to say they had
21 told me kind of the highlights of the deposition.
22    MR. POSTMAN: That's fine.
23    THE WITNESS: So, with that, I wasn't as
24 shocked last night in actually going through and
25 reading everything because the surprise element was

**Page 104**

1 kind of unveiled a couple of weeks ago after they
2 had met with him.
3 BY MR. KELLY:
4    Q   Well, what surprised you the most about his
5 testimony?
6    A   Wow. I'm shocked that, you know, he used
7 an alias. I think I'm shocked that he ended up
8 using other companies to send the faxes out. You
9 know, he only had the authority — limited authority
10 that I gave him to send things, so I was surprised
11 to see how — you know, the trail — how far the
12 trail went.
13    I was surprised by the inconsistency of a
14 lot of the answers he gave. I could go through — I
15 could probably find some more surprises now, too.
16    Q   Yes, there were surprises, but I don't want
17 to go through everything in that transcript. But I
18 guess my question is: Were those answers in the
19 transcript inconsistent with your understanding of
20 the way he operated his business?
21    MR. POSTMAN: Form.
22    You can answer.
23    THE WITNESS: In general — again, I just
24 kind of perused the transcript for 30 minutes and,
25 you know, it's the kind of document I could spend

**Page 105**

1 three hours on, you know, to kind of break down
2 specifically things he said that were inaccurate or
3 probably not true in the transcript. There's a few
4 things I remember seeing.
5    But, yes, I — yes, in large part, I was
6 very surprised by a lot of the — a lot of the facts
7 of what happened here.
8    MR. POSTMAN: F-a-c-t-s on that one.
9    THE WITNESS: Sorry.
10    MR. POSTMAN: No. Great. I just want to
11 make sure the court reporter gets it.
12 BY MR. KELLY:
13    Q   Did you ever have an opportunity to
14 question his statements in working with FaxQom?
15    A   I'm not sure what you mean by questioning
16 his statements.
17    Q   Well, did he ever make a statement to you
18 that you questioned as being untruthful?
19    A   I don't recall.
20    MR. POSTMAN: Form.
21    You can answer.
22    THE WITNESS: Yes, I don't recall
23 specifically an instance. General nature that I
24 have, if somebody tells me something that doesn't
25 sound believable, I typically question it.

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 106**

1  BY MR. KELLY:
2    Q   Did you question the quantity of 8.2
3  million solicited or opt-in fax lists?
4        MR. POSTMAN: Form.
5        THE WITNESS: I don't recall. I may have.
6  BY MR. KELLY:
7    Q   Did you ever question the 305,000 opt-in
8  fax lists for the various area codes?
9        MR. POSTMAN: Form.
10       THE WITNESS: I requested the counts so --
11  BY MR. KELLY:
12   Q   Did you ever question --
13       MR. POSTMAN: Wait. He said, "So." He may
14  be done --
15       THE WITNESS: So I'm just kind of -- trying
16  to -- I'm just trying to kind of think. It was five
17  years ago, so the reality is I'm trying to be as
18  forthright as I can and provide you with as much as
19  I can, but I just -- you know, just, again, trying
20  to jog my memory from five years ago.
21       Did I question the total number of 305-? I
22  don't recall, but it was a question in the first
23  place in order to get the 305- was "how many do you
24  have?" So...
25  ///

---

**Page 107**

1  BY MR. KELLY:
2    Q   Did you ever ask for any documents to
3  support the representation that there was an opt-in
4  fax list?
5    A   I don't recall.
6    Q   Did Steve Simms ever provide you with any
7  documents to support his representation that he had
8  an opt-in fax list?
9    A   He did, yes. He provided me with the
10  indemnity agreement. He provided to me. And in
11  addition to indemnifying us from any legal issues
12  that could arise, he confirmed that he was in
13  compliance with the TCPA. He's been using these
14  same legal compiling techniques since 1991 and that
15  they had a solid reputation. My account would be
16  handled directly by Steve Simms. They would all be
17  under his management and that he was a 17-year vet.
18  So...
19   Q   Well, did he ever -- when he represented to
20  you that he had an opt-in fax list, did you then
21  go back to statute or FCC regulations even to
22  determine if there's any significance to an opt-in
23  fax list?
24   A   I think we were -- I don't recall. I think
25  we were beyond that at that point. I had done my

---

**Page 108**

1  due diligence. Most of what I had learned to be the
2  best practice was confirmed or seemed confirmed
3  through Steve Simms. I was comfortable with
4  receiving an indemnification and even took that a
5  step further by attaching an Exhibit A that I put
6  there as well.
7    Q   We'll get into that.
8        MR. POSTMAN: Well, you didn't let him
9  finish, unless you want to withdraw the question.
10       THE WITNESS: Well, the Exhibit A answers
11  that question because it says -- I put this in here.
12  It says:
13        "FaxQom confirms that all faxes have
14        been collected according to the best
15        industry practices as outlined by the
16        DMA."
17        That was in addition to the TCPA language
18  he gave me. So I felt this really was a sense of
19  confirmation. I was comfortable with this. It also
20  said that FaxQom will agree to abide by all laws
21  associated with fax marketing, and I felt that was
22  sufficient.
23  BY MR. KELLY:
24   Q   Did you understand Steve Simms as being an
25  attorney?

---

**Page 109**

1    A   I don't recall him being an attorney, no.
2    Q   Did he ever represent to you that he was an
3  attorney?
4    A   I don't believe so, no.
5        MR. POSTMAN: And smilingly, because
6  whatever he represented to you -- he's a motorcycle
7  guy; right?
8  BY MR. KELLY:
9    Q   In 2009, the Buccaneers had general
10  counsel; is that right?
11   A   I believe so. There were some periods kind
12  of between, but, yes, I believe so.
13   Q   And the general counsel for the Buccaneers
14  in 2009 was Manny Alvare?
15   A   He would have -- yes, he would have been
16  the guy then.
17   Q   In 2000- -- let's say early 2009, before
18  contracting with FaxQom, did you ever have any
19  contact with Manny Alvare regarding the legality of
20  sending the advertisements by fax?
21       MR. POSTMAN: Objection. I'm going
22  to instruct you not to answer based on the
23  attorney-client privilege.
24       MR. KELLY: I'm not asking the actual
25  conversations, just whether or not there was

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 110**

1  contact.
2  　　MR. POSTMAN: The question that you phrased
3  was with regard to a certain subject matter, and
4  I've instructed him not to answer.
5  　　So if you're going to ask him if he ever
6  spoke to Manny Alvare, I'll let him answer that.
7  But if you say he spoke to Manny Alvare with regard
8  to X, Y, Z, then you're asking my client about a
9  conversation he had with counsel, and I'm going to
10  instruct him not to answer.
11  　　You can ask him if he ever spoke to Manny
12  Alvare.
13  　　MR. KELLY: Well, that's not my question.
14  　　MR. POSTMAN: I know.
15  　　MR. KELLY: Let me ask it again. You can
16  object, and I'll just certify the question. I
17  just want to make sure I get the question out, the
18  question I want to ask.
19  　　MR. POSTMAN: Okay. You don't have to
20  certify it in Florida, but you can do it if you want
21  to. I'll agree that it's certified. You don't need
22  that. But I'm happy to let you do it again.
23  　　MR. KELLY: All right.
24  　Q   Prior to contracting with FaxQom, did you
25  ever contact Manny Alvare for his input in whether

**Page 111**

1  or not the sending of those advertisements by fax
2  would be legal?
3  　　MR. POSTMAN: So let me just talk to him
4  for a second. It may be that I can waive the
5  objection, depending on what the answer is. So I
6  think I'm allowed to with a pending question, with
7  there being a privilege, to find out. It may be
8  that he doesn't know, or it may be that he knows.
9  　　Let me see if I can resolve the answer. I
10  do think that's an objectionable one, but if it's
11  something that we can avoid -- let me just talk to
12  him outside for a second.
13  　　THE VIDEOGRAPHER: The time is 11:31 a.m.
14  We are off the record.
15  　　(Whereupon, there was a pause in the
16  proceedings from 11:31 a.m. to 11:33 a.m.)
17  　　THE VIDEOGRAPHER: Back on the record. The
18  time is 11:33 a.m.
19  　　MR. POSTMAN: So I think it's inappropriate
20  for you to ask my client when he talked to his
21  lawyer about any specific subject matter.
22  　　But, in all fairness, I've asked him. He
23  doesn't recall. So there's no reason for us to
24  fight over something he doesn't remember. So I'll
25  have him say that on the record.

**Page 112**

1  　　But I do think it's inappropriate. It's
2  not worth fighting over, and I think I have an
3  obligation as an Officer of the Court to find out if
4  there's a reason for us to fight something.
5  　　And so having said all of that, if you want
6  to read back the question, he'll answer it, I
7  believe.
8  　　(Record read as follows:
9  　　"Q   Prior to contracting with FaxQom,
10  　　did you ever contact Manny Alvare for his
11  　　input in whether or not the sending of
12  　　those advertisements by fax would be
13  　　legal?")
14  　　THE WITNESS: I don't recall.
15  BY MR. KELLY:
16  　Q   Had you contacted any lawyer prior to
17  contracting with FaxQom to determine whether or not
18  the advertisements by fax were being sent legally?
19  　　MR. POSTMAN: Okay. I probably shouldn't
20  have let you answer the last question. I was trying
21  to be nice about it.
22  　　I'm going to object and instruct him not to
23  answer.
24  　　MR. KELLY: Do you understand the question?
25  　　MR. POSTMAN: Well, if --

**Page 113**

1  　　MR. KELLY: I want to make sure that the
2  witness understands the question.
3  　　THE WITNESS: I understand the question.
4  　　MR. KELLY: So I'll certify the question.
5  　　MR. POSTMAN: All right.
6  BY MR. KELLY:
7  　Q   Is your cell phone number (310) 980-4068?
8  　A   That's correct. Again, I'll contact him --
9  I think you wrote it down, "4068" --
10  　　MR. POSTMAN: Don't contact him without
11  going through my office. That includes you, Madam
12  Court Reporter. Although he's married, but don't
13  contact him.
14  　　THE WITNESS: Somebody had contacted me
15  years ago on this. My office had called.
16  　　MR. POSTMAN: These lawyers -- they won't
17  do that.
18  　　THE WITNESS: Not these gentlemen. I think
19  it was the attorney for CIN-Q called me directly.
20  BY MR. KELLY:
21  　Q   All right. Now, do you have an
22  understanding of what else was discussed -- well,
23  strike that.
24  　　What else was discussed regarding FaxQom's
25  representation that they had an opt-in fax list?

Min-U-Script®

L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL

(28) Pages 110 - 113

CinQ+MC000122

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 114**

1      MR. POSTMAN: Form.
2      THE WITNESS: Specific to the opt-in list,
3  I think it was -- again, what I would have stated
4  was that he had been in business for 18 years. He
5  had collected fax numbers lawfully with people who
6  had agreed to receive faxes; that he was aware of
7  all the best practices, as outlined in the DMA,
8  Direct Marketing Association; and that he was very
9  familiar with the laws of the TCPA, specifically
10  because his company was started or incorporated the
11  year that that Act came out. .
12  BY MR. KELLY:
13      Q   After Steve Simms represented that he had
14  an opt-in fax list, did you then go back to any of
15  the other fax broadcasters that you may have spoken
16  to and asked them about the existence of any opt-in
17  fax list?
18      MR. POSTMAN: Object to the form.
19      THE WITNESS: I don't recall. I think we
20  may have been beyond that at that point, but I don't
21  recall.
22  BY MR. KELLY:
23      Q   What do you mean you may have been beyond
24  that?
25      A   Well, you're asking as far as the language

---

**Page 115**

1  with Steve. We had -- again, to my knowledge, had
2  an oral conversation prior to the e-mail in January,
3  the first, I guess, written correspondence we had.
4  I don't recall how many subsequent conversations
5  he and I had, you know, discussing the lawfulness
6  of -- you know, of his practices and, you know, the
7  guidelines he followed. So I guess -- what was the
8  question now?
9      Q   Well, the question was, after he
10  represented to you that he had an opt-in fax list,
11  did you then go back to any other fax marketing
12  companies and ask them if they had any opt-in fax
13  list?
14      MR. POSTMAN: Form.
15      THE WITNESS: I don't recall. I think it
16  was -- I don't recall. I don't think it was a
17  situation where I would have gone back to ask the
18  question. I think that question was the primary
19  question that I had for any of these companies that
20  I had -- or would have contacted.
21  BY MR. KELLY:
22      Q   Is FaxQom the only fax marketing company
23  that represented to you that they had an opt-in fax
24  list?
25      A   I don't recall.

---

**Page 116**

1      Q   Was there ever a situation that you
2  seriously considered another fax marketing company?
3      A   I don't believe so.
4      Q   And just so I'm clear, you don't know how
5  you first came into contact with FaxQom?
6      A   I don't recall.
7      Q   Okay.
8      A   I really don't recall.
9      Q   Do you know that FaxQom was even on the
10  Internet in 2009?
11      A   I believe so. Either they had reached out
12  to me as some sort of, you know, e-mail advertising
13  of who they were, and I held onto it, or I had
14  Googled -- I think it was Google that was used --
15  Googled "fax marketing companies." At some point I
16  came across FaxQom. So I do recall them having a
17  Website, yes.
18      Q   Did you rely on anything on the Website in
19  contracting with FaxQom?
20      A   You know, I don't remember specifically
21  when this case came about. I remember trying to go
22  to the FaxQom Website and it not being there. So
23  that would have helped, I think, jog my memory a
24  little bit, but I don't recall. There could have
25  been testimonials.

---

**Page 117**

1      I can just speak for myself when looking
2  into different, you know, companies that we're
3  looking to do business with. You know, the Website,
4  the quality of the Website, the responsiveness --
5  you know, these are all things that we consider.
6      Q   Did FaxQom ever send you any references?
7      A   I don't recall.
8      Q   Did you have an understanding that Steve
9  Simms was operating near Houston, Texas?
10      A   I don't remember where or really having
11  given thought where he was himself operating out of.
12  I remember I recognized a 617 number as I remember
13  from Boston. I just -- I know area codes very well
14  as part of personal items.
15      So, generally, the company, at least being
16  incorporated or having an office or something there,
17  I think, to my recollection. Where he was, myself,
18  I don't think I gave it much concern. I get
19  questions a lot of times how I work for the Tampa
20  Bay Buccaneers in California. In this day and age,
21  you know, with these machines and the telephones
22  and videoconferences, it wouldn't be something
23  that I would have given a whole lot of concern to or
24  question to.
25      Q   Prior to contracting with FaxQom, do you

---

CONFIDENTIAL                                          CinQ+MC000123

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 118**

1  have an understanding of where their business was
2  operating out of?
3  A   I don't -- prior to contacting them?
4  Q   Contracting.
5  A   Oh, contract. I think -- I don't recall.
6  I probably would have assumed it was -- you know, it
7  was in Boston. I think it was -- again, it was a
8  617 number on the Website so --
9  Q   Did you ever search the Boston Secretary
10 of State to see if FaxQom was a legal incorporated
11 business?
12 A   Unlikely that I did.
13 Q   Did you ever check the Better Business
14 Bureau, you know, for any complaints related to
15 FaxQom?
16 A   I don't recall. No, I don't recall.
17 Q   Did you ever ask Steve Simms whether or not
18 he maintained liability insurance?
19 A   I don't recall.
20 Q   Did Steve Simms ever tell you that he
21 maintained liability insurance?
22 A   I don't recall. If he did, it would have
23 been on an oral -- a conversation over the phone,
24 because I don't have any representation from him
25 that's in writing that he did.

**Page 119**

1  Q   Prior to contracting with FaxQom did you
2  have an understanding of how much is awarded to a
3  recipient of an unsolicited advertisement by fax?
4      MR. POSTMAN: Object to form.
5      THE WITNESS: Prior to contacting him?
6  BY MR. KELLY:
7  Q   No -- well, yes.
8  A   Or contracting or contacting?
9  Q   Yes.
10 A   I don't believe so. I may have come across
11 it in my review of the TCPA or DMA. I could tell
12 you I think I know the answer to that now just based
13 on this case, but I can't speak for five years ago
14 what I knew regarding that.
15 Q   So you didn't know what the award is for
16 an unsolicited advertisement by fax prior to
17 contracting with FaxQom?
18     MR. POSTMAN: Form.
19     THE WITNESS: Again, it may have been
20 something that I came across and understanding parts
21 of it, TCPA and the outlines of the TCPA and the
22 DMA. I can't answer with certainty if I knew
23 exactly what that number was or what it was five
24 years ago. Again, I can tell you what it is today,
25 I think.

**Page 120**

1  BY MR. KELLY:
2  Q   What is the compensation for an unsolicited
3  advertisement by fax?
4      MR. POSTMAN: Is the only way you know that
5  based upon either communication or letters from me
6  and/or from your general counsel?
7      THE WITNESS: Perhaps.
8      MR. POSTMAN: If the only way you know the
9  answer to that question is because of what we've
10 told you, I'm going to instruct you not to answer.
11     THE WITNESS: Okay.
12     MR. POSTMAN: Whether it be told written or
13 orally, based upon communications that have been
14 written.
15     THE WITNESS: I think perhaps -- I'm not a
16 hundred percent. Perhaps. So if you don't want me
17 to answer because of that, then that's fine --
18     MR. POSTMAN: I don't want you to answer
19 because you're not allowed to talk about information
20 you learned from me or from Mr. Cohen or --
21     THE WITNESS: Right.
22     MR. POSTMAN: -- from any of your
23 predecessor firms.
24     THE WITNESS: I don't know. I'm sure I
25 could Google on my phone in two seconds so -- your

**Page 121**

1  question wasn't about whether I know it now. Your
2  question was whether that I knew it then, and I
3  can't recall if it was something that I was aware of
4  at that point.
5  BY MR. KELLY:
6  Q   Did Steve Simms ever tell you what could be
7  awarded for each violation?
8  A   Again, I don't recall because I don't
9  remember an amount. So if he told me what could
10 have been awarded -- if he did, I don't remember
11 being told a specific amount or figure or number.
12 Q   Well, you were aware prior to contracting
13 with FaxQom that there was a statute that prohibited
14 the sending of advertisements by fax --
15     MR. POSTMAN: Object to the form.
16 BY MR. KELLY:
17 Q   -- generally?
18     MR. POSTMAN: Object to the form.
19     THE WITNESS: No. My understanding was
20 that there was liability associated with the
21 unsolicited sending of faxes --
22 BY MR. KELLY:
23 Q   Okay.
24 A   -- potentially.
25 Q   Right. Did you have an understanding

CIN-Q AUTOMOBILES, INC. vs.                                                          MATTHEW KAISER
BUCCANEERS LIMITED PARTNERSHIP                                                        March 25, 2014

---

**Page 122**

1  that a recipient can go into court and seek money
2  damages?
3     A   It would have been an assumption that
4  I -- yes, I would assume by just definition of
5  "liability" and there being laws associated with
6  it and just the nature of the TCPA coming into
7  existence, I would assume that, yes, by going
8  against that, there would be legal repercussions.
9  I don't know specifically what they could be or how
10 large they could be or if it's jail time or if it's
11 court or what it is but...
12    Q   Did you know what a class action was prior
13 to contracting with FaxQom?
14    A   I'm sure I probably did, yes.
15    Q   And you do understand this case is being a
16 proposed class action?
17    A   It's my understanding, correct.
18    Q   Can you tell me what your understanding of
19 what a "class action" is.
20       MR. POSTMAN: So if it's only based upon
21 information you learned from lawyers --
22       THE WITNESS: I don't -- no, I don't think
23 so. My understanding -- I don't know specifically
24 how many members of the class there have to be.
25 I mean, I get things from the credit cards, you

---

**Page 123**

1  know, all the time in the mail. I usually just
2  throw them out. But my understanding of a class
3  action is -- are you asking my understanding of
4  other class actions or my understanding of how many
5  parties it takes?
6  BY MR. KELLY:
7     Q   Well, just generally what a class action
8  is.
9     A   It's usually a large -- my understanding, a
10 firm representing a certain number of people who --
11 you know, who all have a valid or a legal, you know,
12 complaint.
13    Q   Were you aware that lawyers had filed
14 class action complaints against entities who sent
15 unsolicited advertisements by fax prior to you
16 contracting with FaxQom?
17    A   Not specifically. If there were specific
18 cases -- I don't recall having any knowledge at all,
19 and if there was a knowledge, I don't recall any
20 specific knowledge, you know, of certain cases or
21 things that may have existed.
22    Q   Did you ever discuss with Steve Simms the
23 possibility that someone could file a class action
24 lawsuit?
25    A   That was -- I think to go back to the first

---

**Page 124**

1  e-mail that I brought, you know, I put -- well,
2  there's a quote. I have:
3        "Steve, after reading some literature
4     on legislation regarding to spam marketing
5     as it relates to faxes, I am concerned
6     with moving forward. Can you please
7     tell me if a hundred percent of your
8     numbers have opted in."
9        So I guess, to answer your question, it
10 was -- yes, I think it was a concern we had before
11 getting into this space or engaging anybody. It was
12 something that we were aware could have, you know,
13 some potential liability, and with that we wanted to
14 be as diligent as -- you know, as really we could be
15 to make sure that we had the correct company and
16 that they used the best practices.
17    Q   So you were aware that recipients could
18 file proposed class actions for violating the TCPA?
19       MR. POSTMAN: Object to the form.
20       THE WITNESS: I was -- my research into the
21 TCPA was more kind of a general understanding. So
22 I don't know where you're headed with this, but if
23 specifically what the amount or how it takes place
24 or exactly how, you know, liability is assessed,
25 again, not being an attorney, I, you know, relied

---

**Page 125**

1  upon, you know, FaxQom and their representations,
2  you know, on that.
3        I had a general understanding of kind of
4  what the best practices were, the right way to do
5  things, which is kind of what navigated my search
6  and pushed me towards, I think, FaxQom.
7        MR. POSTMAN: At the right time, I need to
8  take a break, but whenever you're ready.
9        MR. KELLY: You want to take -- go for
10 lunch?
11       MR. POSTMAN: I've got to go to the
12 Bathroom.
13       MR. KELLY: Okay. Let's just take a
14 break --
15       MR. POSTMAN: But I want to -- do you have
16 a couple of more questions?
17       MR. KELLY: No. I mean, I've got more
18 questions on that issue.
19       MR. POSTMAN: You want to finish it? It's
20 up to you.
21       MR. KELLY: No. I've got more questions
22 where I don't want you to feel uncomfortable during
23 that.
24       MR. POSTMAN: Okay, because I have to go.
25       MR. KELLY: But I think we should probably

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 126**

1   break for lunch if --
2        MR. POSTMAN: So you could not -- just tell
3   me, what's your time frame? I mean, do we want to
4   take a lunch break, or I'm happy to take my client
5   out to lunch and we can take an hour, or do you want
6   to -- if you're going to be all day, maybe the best
7   thing we do is bring food in, if you're intending on
8   being seven hours.
9        MR. KELLY: Well, we've got -- well, we've
10  got -- well, we don't need this on the record.
11       MR. POSTMAN: Okay.
12       THE VIDEOGRAPHER: Off the record or --
13  you said, "off the record"?
14       MR. KELLY: Off the record's fine, yes.
15       THE VIDEOGRAPHER: The time is 11:50 a.m.
16  We are off the record.
17       (Whereupon, a recess was taken from
18  11:50 a.m. to 12:13 p.m.)
19       THE VIDEOGRAPHER: Back on the record. The
20  time is 12:13 p.m.
21  BY MR. KELLY:
22  Q   Okay. We were talking about, prior to
23  contracting with FaxQom, your understanding of the
24  general fax laws.
25       My question to you is did you have

**Page 127**

1   an appreciation as to whether or not these
2   advertisements by fax were sent illegally, how much
3   the Buccaneers can be fined or have to pay out?
4        MR. POSTMAN: Form.
5        THE WITNESS: Well, I don't claim to -- you
6   know, to specifically understand all of the laws. I
7   would use the word, you know, "guidelines" perhaps
8   for the DMA and for the TCPA.
9        I understood there to be some liability
10  as, you know, there's liability for doing anything
11  illegal. Clearly, there was some sort of law or act
12  in place that kind of set the guidelines and imposed
13  liability. So that's, I think, what we were --
14  you know, really what we were aware of and concerned
15  with when choosing -- you know, when choosing a fax
16  marketer.
17  BY MR. KELLY:
18  Q   Prior to contracting with FaxQom, did you
19  have an understanding that the Buccaneers would have
20  to pay out hundreds of millions of dollars if the
21  faxes were sent illegally?
22       MR. POSTMAN: Object to the form.
23       THE WITNESS: No. Again, I wasn't aware of
24  what specifically that the liability is or could be
25  so I didn't -- I don't imagine I had assumed any

**Page 128**

1   calculations on what a total amount for liability
2   could be.
3   BY MR. KELLY:
4   Q   Well, prior to contracting with FaxQom, did
5   you have an understanding that a recipient could be
6   awarded $500 for each unsolicited advertisement
7   by fax?
8        MR. POSTMAN: Object to the form.
9        THE WITNESS: Again, I don't recall if I
10  was aware at the time what that amount is or was,
11  and it was my understanding that a company -- the
12  company that would be liable would be the company
13  that sent the faxes out.
14  BY MR. KELLY:
15  Q   And was that your understanding prior to
16  contracting with FaxQom?
17  A   Yes.
18  Q   Okay. Why did you believe that it would be
19  the company that would send out the faxes that would
20  be liable, as opposed to the Buccaneers?
21       MR. POSTMAN: Object to the form.
22       THE WITNESS: I don't know specifically
23  what perhaps I read. I think it's safe to say
24  that my assumption would be if a legitimate company
25  like the Buccaneers hired another legitimate company

**Page 129**

1   that followed the rules, followed the regulations,
2   indemnified us from any harm, had no problem
3   representing that what they were doing was legal,
4   was forthright, was with the compliance of the law,
5   I think it was a reasonable assumption at the time,
6   if that is what I made, that we would have no reason
7   to be liable for taking the measures that we took
8   and the assurances that we have in writing.
9   BY MR. KELLY:
10  Q   Are you drawing the distinction between the
11  representations that FaxQom made to you, as opposed
12  to the person hitting the "Send" button in the
13  context of who would be liable under the TCPA?
14       MR. POSTMAN: Form.
15       THE WITNESS: I'm not sure if I understand
16  the question. Let me try to answer it.
17       FaxQom was the person sending the "Send"
18  button, to my knowledge, and they were the only one
19  who had the limited authority to do so. I was only
20  made aware that there were other companies in the
21  past couple of weeks.
22  BY MR. KELLY:
23  Q   My question to you is did you feel that the
24  Buccaneers could be liable, regardless of who would
25  press the "Send" button?

CONFIDENTIAL                                    CinQ+MC000126

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 130**

1    MR. POSTMAN: Form.
2    THE WITNESS: I understood that there was
3  some liability associated with not following the
4  best practices. Now, exactly how that broke down,
5  who could be liable, you know, really where the road
6  ends -- you know, what kind of a -- you know, the
7  trail leads. Again, I'm not an attorney. I don't
8  know if at the time or even now I understand
9  specifically, you know, how that ends up.
10    It was our concern initially, understanding
11  that there could be some liability to somebody for
12  not following, which is why we -- again, we took the
13  measures to make sure that we were indemnified; we
14  were working with a legitimate company. As Steve
15  put it, "had been in business for 18 years." He
16  said a hundred percent of their data compiled is
17  opted in and a few other representations I know that
18  he made. Let me just -- I'll just touch base on the
19  ones that he put in writing.
20    "FaxQom will agree and abide by all
21  laws associated with fax marketing" --
22  facsimile marketing; right? Facsimile? I just sort
23  of used that term.
24  BY MR. KELLY:
25    Q   Did you do anything to verify that FaxQom

---

**Page 131**

1  had been in business for 18 years?
2    A   I don't recall specifically what I
3  did to confirm. I think we felt that with
4  the conversations we had -- that I had, the
5  representations that they made and the
6  indemnification that we received and whatever
7  research we did at the time and our due
8  diligence of going through the DMA and the TCPA
9  and -- I think I felt that was sufficient.
10    Q   Did you do anything to verify that the fax
11  lists that were going to be used were people who had
12  opted in?
13    MR. POSTMAN: Form.
14    THE WITNESS: Yes. I received in writing
15  from FaxQom or Steve Simms that:
16    "All faxes have been collected
17    according to the best industry practices
18    as outlined by the Direct Marketing
19    Association."
20  BY MR. KELLY:
21    Q   Other than Steve Simms' representations to
22  you, did you do anything else to verify that FaxQom
23  was using an opt-in list?
24    A   Not that I recall. I don't feel that at
25  that point it was necessary with what I was given

---

**Page 132**

1  and represented.
2    Q   Were you ever provided the names and
3  addresses to those fax numbers that were used for
4  the fax broadcasting?
5    A   No. I never even saw the fax numbers.
6    MR. KELLY: Let's mark this as the next
7  number. I think it's "3."
8    THE REPORTER: Yes, it's "3."
9                     * * *
10    (Whereupon, the document referred
11    to was marked for identification
12    as Plaintiffs' Exhibit No. 3.)
13                     * * *
14    MR. POSTMAN: On the record, I do want to
15  appreciate Counsel's professional courtesy having a
16  copy for me and for my client.
17  BY MR. KELLY:
18    Q   All right. I'm showing you what's been
19  marked as Exhibit 3. It's an e-mail from you to
20  FaxQom dated June 24, 2009. Do you see that?
21    A   I do.
22    Q   You state that "After reading some
23  literature on legislation regarding spam marketing
24  as it relates facsimile" -- do you see that?
25    A   I do.

---

**Page 133**

1    Q   And your concerns with moving forward with
2  the list. Do you see that?
3    A   I do.
4    Q   Do you know, specifically, what literature
5  you were reviewing?
6    A   I don't recall. Being five years ago, gee,
7  I could probably assume it was the TCPA or the DMA
8  or those items because it was, you know, those two
9  items that made it onto the indemnification, the
10  exhibit that -- the paperwork that we had executed
11  with him. I assume it was them. What other
12  literature -- there may have been some other
13  literature or Websites or things that perhaps
14  I researched and looked into.
15    Q   All right. Now, this e-mail is dated
16  June 24. Do you see that?
17    A   I do.
18    Q   The contact that you had with Steve Simms,
19  the initial e-mail contact was January 23, 2009. Do
20  you see that?
21    A   I do.
22    Q   So that's about a six-month gap in time.
23  Do you have an understanding as to what transpired
24  from January to June 24, 2009?
25    MR. POSTMAN: I'm sure you're doing this --

---

L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL

CinQ+MC000127

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 134**

1 there's an e-mail below it that appears.
2       MR. KELLY: There is, yes.
3       MR. POSTMAN: I'm sure that you did it
4 unintentionally, but there's an e-mail below it
5 that appears to be a response to, but I think that's
6 copied somewhere in here, too.
7       THE WITNESS: You know, I could speak in
8 generality. A lot of things that I work on, you
9 know, take some time to come to fruition. I think
10 we would agree that even though we perhaps set out
11 to begin looking forward to season ticket sales and
12 things, that January is probably not the best time
13 to have, you know, sent them.
14 BY MR. KELLY:
15    Q   All right. So was it your --
16        I thought you were going to object.
17    A   Well, I was actually just going to take it
18 a step further. I don't know if this is relevant or
19 not, but the e-mail in January showed 305,000 fax
20 numbers. And I only bring this up because you had
21 asked about it earlier. This e-mail here shows, as
22 a response on May 12, 2009, 306-.
23        So, again, it just helps to solidify that
24 it looks like they're continuing to add to this
25 list. And in six months' time, a thousand extra

**Page 135**

1 accounts seemed very reasonable to me, and I
2 remember specifically looking at that. It seemed
3 like they were continuing their practices of — you
4 know, of opting in. I know you were questioning the
5 8.2 before so...
6    Q   Well, yes, that was my question. That
7 didn't raise any red flags to you about the 8.2
8 million?
9       MR. POSTMAN: Form.
10       THE WITNESS: I don't recall, and I don't
11 remember specifically referring to the 8.2 in
12 Exhibit 2. I don't know how much attention I paid
13 to what was sent in here because it was not an
14 e-mail addressed directly to me.
15 BY MR. KELLY:
16    Q   All right. So in your June 24 e-mail
17 you go on to say:
18        "Also, would you be willing to
19        indemnify us from any complaints or
20        potential financial recourse as it
21        relates to the fines imposed for spam
22        mail?"
23        Do you see that?
24    A   I do.
25    Q   When you refer to "spam mail," you're

**Page 136**

1 actually referring to faxing; right?
2    A   Correct. You know, above it I said, "spam
3 marketing" — I'm sorry. I'm just going to turn my
4 phone off. I thought I had.
5       MR. POSTMAN: If you need to take a call —
6       THE WITNESS: No, I'm fine. I'm fine. I
7 just want to turn it off.
8 BY MR. KELLY:
9    Q   So spam mail --
10       MR. POSTMAN: Well, you've got to let him
11 finish.
12       THE WITNESS: Well, I would just say
13 I -- "spam mail" and "spam marketing" I use
14 interchangeably. I'm sitting in a roomful of
15 attorneys, so I'm sure there are differences between
16 the two. I think my intent was, yes, the spam --
17 the marketing or the spam mail or -- that is what I
18 was referring to is the faxes.
19 BY MR. KELLY:
20    Q   Why did you want FaxQom to indemnify the
21 Buccaneers from any complaints?
22    A   You know, I don't recall if it's perhaps
23 something that I gathered from the research with the
24 DMA or some of these other sites I may have gone on,
25 or it could very well have been some conversations

**Page 137**

1 that I had with some of the other fax companies
2 that, you know, I may have contacted. I don't
3 remember specifically, but I felt if FaxQom was so
4 confident with their practice that he would have no
5 problem, you know, putting -- you know, putting his
6 money where his -- you know, where his mouth was and
7 indemnifying and standing behind his representations
8 that everything was done lawfully.
9    Q   You never asked him whether or not he had
10 liability insurance, did you?
11       MR. POSTMAN: Object to the form.
12       THE WITNESS: I don't recall. It may have
13 been a conversation that was had. It may not have
14 been.
15 BY MR. KELLY:
16    Q   Did you ever request for him to provide
17 you with any insurance policies regarding liability
18 insurance?
19       MR. POSTMAN: Object to the form.
20       THE WITNESS: Again, I don't recall. If
21 I did, I don't recall receiving anything. So I'm
22 confident it would be — you know, it would have
23 been provided in these documents.
24 BY MR. KELLY:
25    Q   Did you ever ask FaxQom to put the

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 138**

1  Buccaneers as an additional insured on their policy?
2      MR. POSTMAN: Object to the form.
3      THE WITNESS: I don't recall.
4  BY MR. KELLY:
5    Q   Did you have an understanding of whether or
6  not FaxQom could even reimburse or pay for any of
7  the potential financial recourse as it relates to
8  the fax broadcasting?
9    A   I don't recall. You know, I -- I don't
10  recall. As I understood, it would be FaxQom that
11  would be liable if they were not following the
12  regulations they represented. So it would be their
13  issue as far as their insurance or how they wanted
14  to deal with that.
15    Q   Does the fact that FaxQom did or did not
16  have insurance or did or did not have the ability to
17  pay on a judgment -- did that have any relevance to
18  you?
19      MR. POSTMAN: Object to the form.
20      THE WITNESS: I don't know whether they did
21  or didn't or what their ability was or wasn't to
22  pay. You know, they seemed like a very legitimate
23  company, having -- you know, having understood the
24  TCPA, the DMA, having been in business for 18 years.
25  It would be a reasonable assumption for me to assume

**Page 139**

1  that, you know, a business would carry a policy.
2      But as far as any specific conversations I
3  had with them requesting it or not requesting it, I
4  don't specifically recall; or, to your point, their
5  ability to be able to pay. I don't recall.
6  BY MR. KELLY:
7    Q   All right. According to Exhibit 1, there
8  were 300,000 and change counts of fax lists. At
9  this point was there a discussion regarding that
10  these fax lists were opted-in fax lists?
11      MR. POSTMAN: Form.
12      THE WITNESS: I don't recall with regard
13  to this initial quote. However, just kind of
14  going back on memory, the direction we headed in
15  contacting and engaging fax marketing companies
16  was based off of our general -- I keep saying
17  "our" -- my general understanding of the TCPA and
18  the outlines set forth in the DMA.
19      So, as I recall, most conversations that
20  were had with any fax companies were kind of
21  based or predicated upon that knowledge or that
22  understanding or that qualification, where I could
23  confidently say I don't believe I would have
24  continued to speak to companies that couldn't offer
25  that or represent that or warrant that.

**Page 140**

1  BY MR. KELLY:
2    Q   In your June 24 e-mail you state that
3  you're concerned with moving forward with your list.
4  What was your concern at that time?
5    A   It may not have been the best words to
6  use. I think FaxQom and I were still having a
7  conversation. Nothing had been decided. I don't
8  recall any specific concern with his list. More
9  of just a concern in general. You know, "Gee, guys,
10  after really looking into this TCPA and this DMA, I
11  just want to be a hundred percent sure here." So I
12  think that was more the intent of what was written
13  there, as opposed to having a specific concern on
14  his list.
15      You can see his response immediately after
16  that confirms that a hundred percent of the data is
17  compiled, is opted in, and that's how they, again,
18  survived 18 years. He says he has no problem
19  indemnifying us in a broadcast relationship, and
20  then asked if we wanted to continue.
21    Q   Did Steve Simms ever represent to you that
22  he called all of the entities associated with the
23  fax numbers seeking permission for the Buccaneers to
24  send them an advertisement by fax?
25      MR. POSTMAN: Object to the form.

**Page 141**

1      THE WITNESS: Well, the Buccaneers never
2  sent anyone a fax. It was faxed on the CIN-Q faxes.
3  But did he represent that he had called and spoken
4  to each of the business -- I think we're referring
5  to businesses; I'm not sure of the total number of
6  faxes at that point -- did he represent that to me?
7  I don't recall, other than what he represented
8  already in writing, which was that everyone was
9  opted in and that he had, you know,
10  an existing relationship or -- let me get exactly
11  what he says here. Let me just go back.
12      And that they were using legal techniques
13  in compiling fax data, that Steve Simms would
14  directly handle our account, and that they were in
15  compliance with the TCPA Act from 1991.
16  BY MR. KELLY:
17    Q   Well, in January he gave you a quote of
18  300,000 fax numbers; correct?
19      MR. POSTMAN: Object to the form.
20      THE WITNESS: Correct.
21  BY MR. KELLY:
22    Q   All right. You didn't have the
23  understanding that he called these 305,000
24  businesses associated with the fax numbers,
25  specifically asking them if the Buccaneers can send

CONFIDENTIAL

CinQ+MC000129

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 142**

1  them a fax; correct?
2      MR. POSTMAN: Object to the form.
3      THE WITNESS: Well, again, the Buccaneers
4  didn't send the faxes out. This is the — some of
5  the first dialogue that I had with Steve Simms so --
6  I recall some subsequent oral conversations, and
7  then there's a whole trail of some further e-mails.
8  I can read each, if you'd like, to kind of go
9  through how we got to the point of requesting the
10  indemnification and him confirming that they were
11  using legal techniques and that everyone was "opted
12  in," I think as he put it.
13  BY MR. KELLY:
14      Q   You know, my question is a little bit more
15  specific. Whether or not he represented to you
16  that he picked up the phone and called the 300,000
17  businesses associated with the fax numbers, asking
18  each one of them whether or not they would agree to
19  a Tampa Bay Buccaneers fax.
20      MR. POSTMAN: I think he's answered that
21  question, I think, probably eight times. I'm only
22  allowed to object to the form at some point until it
23  gets to harassment. You've suggested this depo will
24  be seven hours. You have a right, in all fairness,
25  under the rules, taking seven hours, but if the way

**Page 143**

1  to get there is to ask the same question over and
2  over again, that might border on the line of
3  harassment.
4      I'll let him answer it because, in the
5  spirit of cooperation, we want to be agreeable and
6  we want the Court to know that we're agreeable. But
7  if the entire seven hours is going to be made up of
8  asking questions over and over and over again so you
9  can use your seven hours, at some point we're going
10  to terminate it.
11      Having said that, I apologize for the long
12  objection. Perhaps the court reporter can read it
13  back. I'll have him answer it again, and I'll
14  object to the form.
15      THE WITNESS: Well, I understand. Your
16  question is did he specifically state that he picked
17  up the phone and called -- and I guess maybe that's
18  where my confusion is or why I'm not answering
19  the question as direct as I could be. Are you
20  referring to the Exhibit 1, or are we referring to
21  the order form that was actually --
22  BY MR. KELLY:
23      Q   Yes. I --
24      A   In either case, I don't recall if he
25  specifically said or stated that he had personally

**Page 144**

1  talked to each of those people, other than just that
2  FaxQom had received permission to send.
3  BY MR. KELLY:
4      Q   Did he explain to you how FaxQom compiled
5  the list of fax numbers?
6      A   He did.
7      Q   Let me show you this document (indicating)
8  and ask you if it's consistent with your
9  understanding.
10      MR. POSTMAN: Wait. Do you want to
11  withdraw the question?
12      THE WITNESS: Just to answer your question,
13  the way he said he compiled it was that they used
14  legal techniques in compiling -- he used the word
15  "compiling" -- fax data and that has enabled FaxQom
16  to be 18 years strong, with a solid reputation in
17  broadcast marketing. He said, "legal techniques."
18  So that's how he used it.
19      MR. KELLY: Can we mark this as the next
20  number (indicating).
21      * * *
22      (Whereupon, the document referred
23      to was marked for identification
24      as Plaintiffs' Exhibit No. 4.)
25      * * *

**Page 145**

1      THE REPORTER: Exhibit 4.
2      MR. POSTMAN: I can't get mad at you for
3  not giving me a copy if you got it yesterday; right,
4  Ross?
5      MR. GOOD: You should see the bill for
6  printing this one.
7      MR. POSTMAN: I told you I was going to
8  give it to you.
9      MR. GOOD: I know, but I wanted to look at
10  them.
11      MR. POSTMAN: You're the computer guy. I
12  know you had them all in the computer.
13      Which one is it?
14      THE REPORTER: Exhibit 4.
15      MR. POSTMAN: Then I know.
16      MR. KELLY: It's a June 10 e-mail.
17      MR. POSTMAN: Okay. And we marked this as
18  "Exhibit 1," or whatever mine are, but I have it.
19      MR. KELLY: Well, I don't have another
20  copy so --
21      MR. POSTMAN: Do you want me to give this
22  to the witness?
23      MR. KELLY: Can I use it?
24      MR. COHEN: Do you want us to get them to
25  make a copy?

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 146**

1    MR. KELLY: No. It's going to be two
2  seconds.
3    Q   Now, I show you what's been --
4    MR. POSTMAN: Do you have that in here?
5  BY MR. KELLY:
6    Q   -- marked as Exhibit 4 --
7    A   You know, I might actually have a copy of
8  this. I believe that I do. But it doesn't matter.
9  But, okay. Exhibit 4 here. Oh, this was 2010. So,
10  yes.
11    MR. KELLY: Is that it?
12    THE WITNESS: Yes, right here (indicating).
13  BY MR. KELLY:
14    Q   In his June 10, 2010 e-mail to --
15    A   I'm sorry. Did -- this is the same stuff
16  that you have here. So I just thought if you had
17  any question with what I was looking at or anything,
18  it's the same thing.
19    Q   No. I know what you're looking at.
20    A   Okay.
21    Q   There's a paragraph that says:
22      "Our compiling center uses a 12 to
23      15-second script in compiling fax numbers
24      when calling companies and receiving the
25      fax numbers verbally from company owners/

**Page 147**

1      employees. This is the legal procedure
2      we use in receiving them."
3      Do you see that?
4    A   I do.
5    Q   Was that statement consistent with your
6  understanding as to how FaxQom compiled the fax
7  numbers before contracting with FaxQom?
8    A   No. I would like to point out, I believe,
9  that this e-mail was towards the end of our
10  relationship. This is one of the last e-mails or
11  correspondence I had with Steve Simms. So even if
12  this was something new or a new way he was referring
13  to, it was after what we had already discussed as
14  far as the legal ways.
15      I think he's confused. This 12- to
16  15-second script -- he was trying to sell us a
17  telephone -- kind of like a voice mail thing, you
18  know; whereas, we could use a player, a message for
19  tickets that he had telephone numbers as well, and
20  that if we wanted to, we could engage him into that.
21      So I don't know why he's using this.
22  Maybe he was confused, but this was a response to
23  an e-mail that I had sent him. So maybe he was
24  confused. But, nonetheless, this was, I think, one
25  of the last e-mails that I sent to Steve Simms.

**Page 148**

1    Q   My question to you, though, is did you have
2  any understanding prior to contracting with FaxQom
3  as to how he obtained the fax numbers?
4    MR. POSTMAN: That's number nine. Object
5  to the form.
6      You can answer.
7    THE WITNESS: Yes. I must have in the
8  conversations I had with him. I don't recall
9  specifically what he told me his method was, just
10  that it was -- it was -- you know, it was legal and
11  in compliance with the TCPA.
12  BY MR. KELLY:
13    Q   But the paragraph regarding "compiling the
14  fax numbers" in Exhibit 4, is that consistent or
15  inconsistent with your --
16    A   It's inconsistent, and if you'll notice --
17    MR. POSTMAN: I object to the form.
18      Keep going.
19    THE WITNESS: It's inconsistent, and it
20  only shows up at the very end of the dialogue that
21  he and I had; so it's inconsistent.
22      And, again, just to further note, I think,
23  as I look at this now, he may have been confused
24  with what I was actually asking for in my request
25  of him.

**Page 149**

1  BY MR. KELLY:
2    Q   All right. Did you ever ask Steve Simms
3  for any of the fax numbers?
4    MR. POSTMAN: I think you asked that.
5  Object to the form.
6    THE WITNESS: No, I don't believe so.
7  BY MR. KELLY:
8    Q   Did he ever provide you with any of the fax
9  numbers?
10    MR. POSTMAN: Object to the form.
11    THE WITNESS: No, I don't believe so.
12  BY MR. KELLY:
13    Q   Did the Buccaneers ever provide any fax
14  numbers to Steve Simms?
15    A   Well, when the campaign started I believe
16  there was a person that said that they received a
17  fax, did not want to receive it, and asked to be
18  taken off the list.
19      So I forwarded Steve that fax number that
20  was initially his. So I was just sending it back
21  to him for two reasons: Anything else that we
22  did, I wanted to make sure that that person
23  didn't receive another fax; and just for his own
24  information, other clients and things, that that
25  person didn't -- really didn't want to receive

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 150**

1  faxes.
2    Q   There's an e-mail that has the "Michael
3  Clement" on it. Have you seen that e-mail before?
4    A   I have not.
5    Q   Okay. You always believed that you were
6  speaking to Steve Simms?
7    A   Steve Simms, yes.
8    Q   When is the first time you heard of the
9  name Michael Clement?
10   A   A couple of weeks ago. I think -- it would
11 be after the deposition. I forget exactly, David,
12 when you and I spoke.
13       MR. POSTMAN: Oh.
14       THE WITNESS: Just that we spoke, but it
15 would have been after the deposition of Steve Simms
16 or Michael Clement, and I'm not sure what e-mail
17 you're referring to.
18       MR. POSTMAN: It's an e-mail where you sent
19 a check to him.
20       THE WITNESS: Not to Michael Clement.
21       MR. POSTMAN: Well, either way. It is what
22 it is.
23       MR. KELLY: Let me get the order forms.
24       (Whereupon, a discussion was held off
25       the record.)

**Page 151**

1        MR. KELLY: Mark this next in order
2  (indicating).
3            * * *
4        (Whereupon, the document referred
5        to was marked for identification
6        as Plaintiffs' Exhibit No. 5.)
7            * * *
8        THE REPORTER: Exhibit 5.
9  BY MR. KELLY:
10   Q   I'm showing you what's been marked as
11 Exhibit 5. This is an e-mail from you to Manny --
12 Alvare (pronunciation)? Is that how you pronounce
13 it?
14   A   Alvare (pronunciation), I think it was,
15 yes.
16   Q   Okay. And it's dated August 3, 2009. Do
17 you see that?
18   A   I do.
19   Q   Why did you send the agreement and
20 indemnification to Manny Alvare?
21   A   I don't recall specifically. He may
22 have --
23       MR. POSTMAN: I don't want you to talk
24 about any conversations you had with him. The
25 question he asked is permissible in terms of why you

**Page 152**

1  did it. If the answer requires you to say what
2  Manny and you talked about, I'm going to instruct
3  you not to answer.
4        THE WITNESS: Understood.
5        I don't recall specifically. He may
6  have requested a copy just for his documentation
7  purposes. As practiced currently today, any
8  contracts and things that I sign, I usually send a
9  copy to our accounting and/or our general counsel,
10 kind of depending on the...
11 BY MR. KELLY:
12   Q   Have you spoken to Manny Alvare after he
13 was ter- -- after he left?
14   A   No, I don't believe so. I don't recall
15 talking to him if I did.
16   Q   All right. The Buccaneers contracted with
17 FaxQom to send faxes; is that right?
18   A   Correct.
19   Q   And the images that were requested to be
20 sent identified Tampa Bay Buccaneers individual
21 ticket sales and season ticket sales; correct?
22   A   Are you referring to the -- what we
23 actually -- what was --
24   Q   What was sent.
25   A   What we understood to be being sent out?

**Page 153**

1    Q   Right.
2    A   I have a copy of them so I just want to
3  make sure that I'm answering your question in the
4  right way. I don't know what you're referring to.
5  Do you have a Bates stamp number or --
6    Q   You can identify them by Bates-labeled
7  numbers.
8    A   Okay.
9    Q   So the question is can you identify those
10 images that the Buccaneers contracted with FaxQom to
11 send by fax?
12   A   Going off memory, this -- yes, this looks
13 accurate as to --
14       MR. POSTMAN: That's the Bates stamp number
15 (indicating).
16       THE WITNESS: Bates stamp 75 looks accurate
17 to the campaign --
18       MR. POSTMAN: By the way, that -- there
19 may be multiple copies of Bates stamp 75, in all
20 fairness.
21       THE WITNESS: Right. And here's one for
22 103, so that would have gone after, but it looks
23 like the same document.
24       So, going back specifically, exactly what
25 we decided, what and when, as you're aware, there

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 154**

1  was 2009 and 2010. So 2009, this looks like was
2  what was sent out. I'm just trying to recall if
3  there were two different forms or if maybe, you
4  know, we changed something on a form. I don't
5  recall --
6  BY MR. KELLY:
7  Q   We can match up what was contracted to be
8  sent out by looking at the e-mails; correct?
9  A   Yes.
10  Q   And that's the best way to figure out what
11  image was contracted to be sent out?
12  A   Yes.
13  Q   So let's go to Exhibit 5. I'm just going
14  to ask you generally about this Fax Broadcast Order
15  Form. That's something that would be typically
16  filled out prior to any broadcast?
17  MR. POSTMAN: Object to the form.
18  THE WITNESS: This is what Steve Simms
19  required prior to, I guess, you know, saying that he
20  would send any faxes out.
21  BY MR. KELLY:
22  Q   All right. So this is a blank order form.
23  There's writing on it. Is that your writing?
24  A   It is.
25  Q   Okay.

**Page 155**

1  A   Are you referring to the top?
2  Q   Yes. That's your writing. And then
3  there's typed in quantities and area codes. Do you
4  see that?
5  A   I do, which I believe he typed in there
6  before sending it over.
7  Q   All right. And then it says:
8  "Total faxes ordered: 613,472."
9  Do you see that?
10  A   "613,472"; correct.
11  Q   All right. The total cost of that was
12  $15,336.80. Do you see that?
13  A   Correct.
14  Q   And then the schedule identifies when the
15  faxes would be sent out and to what area codes. Do
16  you see that?
17  A   It does.
18  Q   So July 14, July 15, and July 16 there, the
19  first three days in which the Buccaneers contracted
20  with FaxQom to send faxes; correct?
21  A   I believe that's accurate.
22  Q   And do you understand that the image that
23  was sent was to promote season ticket sales?
24  A   We're referring again to Bates stamp 75?
25  Q   Yes.

**Page 156**

1  A   Yes, that would be correct. Yes, the
2  upcoming season.
3  MR. POSTMAN: I'm sure it's unintentional,
4  but that's the first version. There's a different
5  version of it. You know that; right? I mean, you
6  have this (indicating)? Because I know I've seen
7  it, too. This is in the documents you brought.
8  THE WITNESS: Well, yes, because this
9  e-mail we're referring to went to --
10  MR. GOOD: Look at the bottom left-hand
11  corner.
12  MR. POSTMAN: This is 8/11/09.
13  MR. GOOD: This is July 9, '09.
14  THE WITNESS: Yes. I guess that was my --
15  well, okay.
16  MR. POSTMAN: In all fairness to you, I
17  should let you take your deposition. I'm just
18  trying to make sure there's no confusion about
19  anything.
20  MR. KELLY: All right.
21  Q   So the writing at the bottom, "Tampa Bay
22  Buccaneers," is that your writing?
23  A   I'm sorry. I just lost the page here.
24  Yes, that looks like my writing.
25  Q   All right. And there's a "page 1 of 3,"

**Page 157**

1  and then there's an initial. Do you see that?
2  A   Yes.
3  Q   Is that your writing?
4  A   That's my initial and my writing; correct.
5  Q   And there's the Indemnity Agreement.
6  That's page 2 of 3. Do you see that?
7  A   I do.
8  Q   Is this language that Steve Simms provided
9  in the Indemnity Agreement, or did you provide this
10  language?
11  A   I believe he provided it and for two
12  reasons: One, initially, he had First Allied
13  Corporation, not understanding kind of who was doing
14  the faxes or who this was for. So I had him change
15  that to "Buccaneers."
16  And then, two -- I have to go find the
17  e-mail, but I'm sure there's an e-mail where I
18  requested the indemnification, and he responded
19  saying he would send his standard form over
20  tomorrow, and I might have that e-mail here.
21  Yes, June 25, 2009:
22  "I will have an indemnity form
23  for you this evening for you to sign
24  and fax back to me."
25  Q   And what Bates label is that?

CONFIDENTIAL                                    CinQ+MC000133

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 158**

1  A   This was 15.
2  Q.   All right. Along with the Indemnity
3  Agreement, there was also an Exhibit A. Do you see
4  that?
5  A   Correct. And, I'm sorry, Bates stamp 16
6  is the attachment of his standard indemnification
7  agreement which, again, had "First Allied Corp." at
8  the top, which was changed.
9  MR. POSTMAN: And just so you don't get
10  confused -- I'm sorry for doing this -- the Bates
11  stamp numbers don't reflect the dates on anything.
12  It's a separate lawyer thing --
13  THE WITNESS: Oh, I understand. So I
14  understood.
15  MR. POSTMAN: Some may be Bates 1 --
16  THE WITNESS: These are kind of all over
17  the place.
18  MR. POSTMAN: -- and then Bates 15.
19  THE WITNESS: Right.
20  MR. POSTMAN: It doesn't mean "1" came
21  before "15." I just don't want you to get confused.
22  THE WITNESS: Right. And I've always kept
23  everything kind of in -- you know, in order of
24  conversation, you know, kind of first to the last.
25  So...

---

**Page 159**

1  BY MR. KELLY:
2  Q   All right. So let me ask you about
3  Exhibit A that's attached to Exhibit 5.
4  A   Okay.
5  Q   Is that a document that was created by you
6  or the Buccaneers?
7  A   I created it.
8  Q   And that Exhibit A is designed to be the
9  document that was typed in on the Fax Broadcast
10  Order Form; correct?
11  A   I'm sorry. I was looking at it when you
12  asked.
13  Q   So page 1 of 3 -- Exhibit 5 contains four
14  pages. The first page is just an e-mail cover
15  sheet?
16  A   The e-mail, right. The attachment was
17  these three pages.
18  Q   So if you look at the Fax Broadcast Order
19  Form, it says:
20      "The acceptance of this agreement
21      and payment is subject to the conditions
22      set forth in Exhibit A."
23      Is Exhibit A the fourth page of Exhibit 5?
24  A   Yes.
25  Q   Okay. And would you agree that the

---

**Page 160**

1  Buccaneers contracted with FaxQom to send 613,472
2  faxes promoting season ticket sales with FaxQom?
3  MR. POSTMAN: Object to the form.
4  THE WITNESS: Well, I wouldn't agree to
5  that. The 600,000 I think was in reference to the
6  total number of pages, not faxes. It may say,
7  "Total faxes ordered," but they were all, I believe,
8  two-page faxes.
9  BY MR. KELLY:
10  Q   Okay.
11  A   So the number would have been in half.
12  Q   All right. So about 300,000 faxes were
13  contracted?
14  A   I assumed; correct.
15  Q   Okay. And there was a total cost of
16  $15,336.80; correct?
17  A   Correct.
18  Q   And that was paid to FaxQom; correct?
19  A   Correct.
20  Q   And that was paid by check?
21  A   I believe so. I'd -- just to familiarize
22  myself, I'd want to kind of go through the stack
23  and -- I believe so.
24  MR. POSTMAN: There's a check somewhere in
25  here.

---

**Page 161**

1  THE WITNESS: I just want to make sure that
2  that check was consistent with his question on this
3  particular campaign.
4  MR. KELLY: Let's mark this (indicating).
5  * * *
6  (Whereupon, the document referred
7  to was marked for identification
8  as Plaintiffs' Exhibit No. 6.)
9  * * *
10  THE REPORTER: Exhibit 6.
11  MR. KELLY: Great. Let me get that back,
12  Barry.
13  MR. POSTMAN: Oh, you don't want me to look
14  at it?
15  MR. KELLY: No.
16  MR. POSTMAN: I didn't look at it.
17  (Whereupon, a discussion was held off
18  the record.)
19  BY MR. KELLY:
20  Q   All right. I'm showing you what has been
21  marked as Exhibit 6.
22  A   Okay.
23  Q   These are bank records from FaxQom's bank.
24  There's a copy of a check for $15,336.80. Do you
25  see that?

---

CONFIDENTIAL                    CinQ+MC000134

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 162**

1    A   Yes, yes.
2    Q   In looking at this would you agree that the
3  Buccaneers had paid $15,336.80 to FaxQom for sending
4  of faxes June 14, June 15 -- I'm sorry -- July 14,
5  July 15, and July 16 of 2009?
6        MR. POSTMAN: Form.
7        You can answer.
8        THE WITNESS: I would agree that that's
9  what was contemplated. I would say, though --
10  and, again, just going off of memory, there was a
11  campaign or two -- and I don't know if this was one
12  of those campaigns -- where not all faxes went
13  through or were assumed to have gone through. So I
14  don't know if -- let me take a step back.
15        I believe there was some credit remaining
16  from the campaign according to some e-mails. So I
17  don't know if that's what you're asking or not.
18  BY MR. KELLY:
19    Q   That credit occurred in 2010, as opposed to
20  2009; correct?
21    A   I think it was rolled over to 2010 from the
22  campaign in 2009, based on the total number of faxes
23  that we were told went out.
24    Q   Do you have any reason to dispute that
25  FaxQom did not send a Buccaneers fax to the area

**Page 163**

1  codes and to the quantity of fax numbers identified
2  on Exhibit 5 in the Fax Broadcast Order Form?
3    A   You know, to be honest, I didn't think
4  that's any reason to dispute. I would kind of word
5  it that, you know, I don't have any confirmation
6  really that anything went out. You know, as you
7  saw, I had requested that my fax number -- and we
8  talked about this earlier, whether it was a MyFax or
9  a digital fax was on the list. That's the only fax
10  that I received so it's the only one that I could
11  really say with certainty that we received.
12        I can assume other people received faxes
13  because, as we go through this, we'll see that, you
14  know, there was a person that called and complained,
15  and I don't think we'd be sitting here today if
16  maybe your clients didn't -- you know, didn't
17  receive a fax.
18        So -- but the only one I can say with
19  certainty that went out is the one that I received.
20    Q   The Buccaneers continued to use FaxQom
21  after July 14 through 16th of 2009; correct?
22    A   There was a campaign in 2010.
23    Q   Well, there was also a campaign in August
24  of 2009; correct?
25    A   I have to go through and take a look.

**Page 164**

1  Again, I'm just kind of going off of memory.
2        MR. POSTMAN: Make sure you have the
3  following number just to be sure. It's one e-mail.
4        THE WITNESS: Can I take a look at that,
5  just to --
6        MR. KELLY: Yes.
7        THE WITNESS: There's another one
8  underneath. Right here (indicating).
9        MR. POSTMAN: This is all of your notes,
10  yes.
11        THE WITNESS: I've got to do everything in
12  order. I can't go by -- so, I'm sorry. What was
13  the question? Was August?
14  BY MR. KELLY:
15    Q   So August of 2009.
16    A   Looking back on Exhibit 5 --
17    Q   It's August 13, 2009.
18    A   Do you have a copy of this? Do you want me
19  to save some time? I mean, it's up to you.
20        MR. KELLY: Well, we'll mark it as an
21  exhibit.
22              * * *
23        (Whereupon, the document referred
24        to was marked for identification
25        as Plaintiffs' Exhibit No. 7.)

**Page 165**

1        MR. POSTMAN: This is Exhibit 7?
2        MR. KELLY: Yes.
3        THE WITNESS: Are you saying that you know
4  that there were two separate '09 transmissions?
5  Okay. I'm sorry. Because tickets on sale, things
6  for e-mail --
7        MR. POSTMAN: You know, just ask him.
8        MR. KELLY: You don't have to put that on
9  the record.
10        MR. POSTMAN: For the record, what he
11  says -- if he's going to talk, I need it --
12        MR. KELLY: He's not really saying
13  anything. He's speaking --
14        THE WITNESS: I'm just trying to confirm --
15  yes, your question was how many campaigns did we do.
16  Was there another campaign in 2009? And, yes, it
17  appears there were. My numbers in my head were just
18  confused. I forgot how many we did in 2009.
19  BY MR. KELLY:
20    Q   All right. So let's take a look at
21  Exhibit 7.
22    A   Okay. That's 5, 3 -- I don't have a copy
23  of 7.
24    Q   I have it. There you go.
25    A   Thank you.

CONFIDENTIAL                    CinQ+MC000135

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 166**

1    Q   So if you take a look at the second page,
2  there's an e-mail from you to FaxQom, and Jason
3  Layton's cc'd.
4    A   Yes.
5    Q   All right. So, in August of 2009, did the
6  Buccaneers contract with FaxQom to send faxes to the
7  area codes that are on Exhibit 7?
8    A   Yes, it appears so.
9    Q   And those area codes are 727, 813, 352, and
10  941. Do you see that?
11   A   I do.
12   Q   And that's Bates labeled BLP 87; correct?
13   A   Correct.
14   Q   All right. The total numbers are
15  identified, the dates identified, including when the
16  broadcast would start; correct?
17   A   Correct.
18   Q   And then there was an agreement for payment
19  of $7,668.40. Do you see that?
20   A   I'd have to go through my notes to confirm
21  that a check was sent, but there's a note that a
22  payment was sent.
23   Q   Well, go to Exhibit 6. I'll show you the
24  check.
25   A   Okay. I didn't have that check.

---

**Page 167**

1        7,668, again to FaxQom.
2    Q   All right. So looking at the bank records
3  that are identified as Exhibit 6, would you agree
4  that the Buccaneers sent a check in the amount of
5  $7,668.40 to FaxQom?
6    A   Yes, I would agree.
7    Q   And would you agree that check was in
8  response to the August 2009 fax broadcast?
9    A   Yes. That was the purpose of the check.
10   Q   All right. And the area code numbers and
11  dates to which the faxes would be sent are included
12  in Exhibit 7, Bates labeled BLP 87; correct?
13   A   I'm sorry. The first part of your
14  question?
15   Q   My — the area codes —
16   A   The area codes are included. Yes, they are
17  included in Exhibit 7.
18   Q   And the total numbers and the dates are
19  identified in Exhibit 5 (sic) and Bates labeled BLP
20  87; correct?
21   A   Exhibit 5?
22   Q   Exhibit 7. I'm sorry.
23   A   Oh, 7. BLP 87, correct.
24   Q   Now, the image that was sent is identified
25  in BLP 88 and BLP 89; correct?

---

**Page 168**

1    A   That's an image — I would want to just go
2  through my information to confirm that that was,
3  indeed, the image that went out, but, yes. It
4· appears to be consistent with the order form.
5    Q   Okay. And this time the document to be
6  faxed dealt with individual ticket sales, as opposed
7  to season ticket sales; correct?
8    A   I would have to look at the — sorry.
9  I just want to look at the last campaign.
10       Yes, it says, "Individual game tickets on
11  sale now," which would make sense because, based on
12  the date, we're already into the season, I believe,
13  August — no, it's still the Florida season. I just
14  want to look at the old one that was sent out, what
15  was said. Sorry. Just a second here.
16       Correct.
17   Q   And do you have the image in front of you?
18·  A   This image you're referring to here
19  (indicating)?
20   Q   Yes. What Bates label is that?
21   A   90.
22   Q   So that was the image that was sent out
23  for individual game tickets for the August 2009
24  broadcast; correct?
25       MR. POSTMAN: Object to the form.

---

**Page 169**

1        THE WITNESS: Correct. Again, I just
2  wanted to — I'm sure it is the one. I just — I
3  have my things kind of organized a certain way, so
4  if — give me — I'm sorry. Give me just one more
5  second. I just want to confirm that this is exactly
6  what went out. I don't know if it matters or not to
7  where you're going, but I just don't want to give
8  you the wrong information here.
9        So August 10. "Thanks for the e-mail.
10  This is what's sent out. Individual" — yep, that
11  looks like that's correct. Sorry.
12       MR. KELLY: Okay. So let's change the
13  tape.
14       THE VIDEOGRAPHER: The time is 1:01 p.m.
15  This is the end of Tape 2. You're off the record.
16       (Whereupon, a recess was taken from
17       1:01 p.m. to 1:07 p.m.)
18       THE VIDEOGRAPHER: Back on the record. The
19  time is 1:07 p.m. This is the beginning of Tape 3.
20  BY MR. KELLY:
21   Q   Do you have any reason to believe that
22  FaxQom did not send out the faxes as instructed for
23  the August 2009 broadcast?
24       MR. POSTMAN: Object to the form.
25       THE WITNESS: I don't have any reason to

---

L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL

CinQ+MC000136

**Page 170**

1  believe that they didn't. I just don't have any
2  confirmation other than, again, the one fax that I
3  received that they actually did.
4  BY MR. KELLY:
5     Q   The Buccaneers did contract with FaxQom in
6  August of 2009 for a second time; correct?
7     A   Correct.
8     Q   In knowing that the Buccaneers contracted
9  a second time with FaxQom, would you agree that
10  they performed to your standards for the July 2009
11  broadcast?
12    A   I don't know what that means.
13    Q   Well, you used them again. So I assume
14  that you were happy with the work that they did?
15    A   Well, we didn't have any issues.
16    Q   All right. Do you have any evidence that
17  FaxQom acted outside of their authority in either
18  the July or August 2009 broadcast?
19       MR. POSTMAN: Object to the form. Now or
20  then?
21       THE WITNESS: Yes, that's what I was going
22  to ask.
23  BY MR. KELLY:
24    Q   Then.
25    A   Then, no.

**Page 171**

1     Q   Okay.
2        MR. KELLY: Let's look at -- let's mark
3  this as the next number (indicating).
4                   * * *
5        (Whereupon, the document referred
6        to was marked for identification
7        as Plaintiffs' Exhibit No. 8.)
8                   * * *
9  BY MR. KELLY:
10    Q   Now, I show you what's been marked as
11  Exhibit 8. This is the only copy I have. Take a
12  look at that.
13    A   May 18, 2010.
14       MR. POSTMAN: While he's looking at that,
15  we're going to fight whether you have the right to
16  keep the depo open. You've used the exhibits that
17  I gave you yesterday. Just so that it's clear,
18  Counsel, it's going to be my position -- and it cost
19  you $112, Ross; I'll pay the $112 -- but you can't
20  argue that you can keep it open based on that.
21       MR. KELLY: You're not keeping the
22  deposition open because we had to pay $112. We're
23  going to keep the deposition open because we didn't
24  have adequate time to review the documents.
25       MR. POSTMAN: Well, I think the use of

**Page 172**

1  them --
2        THE WITNESS: I happen to have those
3  documents here.
4        MR. POSTMAN: I think the use of them in
5  this case might suggest otherwise. But having said
6  that, we'll again play it out to the presence of
7  everybody.
8        THE WITNESS: Wouldn't the simplest thing
9  to do is just to take the stack and the other stack
10  and just cross, cross, cross, get one in the room
11  and nothing --
12       MR. POSTMAN: We lawyers like to do things
13  complicated.
14       THE WITNESS: -- three seconds which
15  documents may or may not have been?
16       MR. POSTMAN: It's what we do for a living.
17  We keep things more complicated if it was less
18  complicated.
19  BY MR. KELLY:
20    Q   All right. We're looking at a May 18, 2010
21  e-mail. Did the Buccaneers contract with FaxQom to
22  send faxes in May of 2010?
23    A   Yes, I believe so.
24    Q   According to the first page on Exhibit 8,
25  there was a request for a check in the amount of

**Page 173**

1  $14,766.92. Do you see that?
2     A   I do.
3     Q   And if you look at Exhibit 6, in the bank
4  records --
5     A   14,766.92.
6     Q   Do you see a check in the amount of
7  $14,766.92?
8     A   I do. I'm just trying to focus on our
9  check, which the writing's very small, but, yes, it
10  appears correct.
11    Q   All right. Did the Buccaneers contract or
12  pay FaxQom $14,766.92 for faxes to be sent in May of
13  2010?
14    A   I believe so. I would just like to confirm
15  with my own records and copies of the check. I'm
16  not sure if I have a copy of the check here.
17       (Whereupon, a discussion was held off
18       the record.)
19       THE WITNESS: I'll answer the question as
20  "yes." I just usually like to confirm, you know,
21  my own copy of the check. But, yes, that looks like
22  a Buccaneers check in the same amount of what we
23  contracted with them for.
24  BY MR. KELLY:
25    Q   And the content of the images that were to

Min-U-Script®
L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL
(43) Pages 170 - 173
CinQ+MC000137

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 174**

1  be sent, are they identified in Exhibit 8?
2    A  Show me what you have, and I'll just — I
3  don't have a copy of that.
4      MR. POSTMAN: That you do. That's in
5  there. I'm not saying that —
6      THE WITNESS: Well, this isn't the exhibit
7  he's referring to (indicating). So I just want to
8  make sure we're talking about the same thing.
9      MR. POSTMAN: Oh.
10      THE WITNESS: So you're talking about this
11  page (indicating) --
12  BY MR. KELLY:
13    Q  Yes.
14    A  — which we're both looking at the same
15  thing. So, yes, this appears to be the content.
16  BY MR. KELLY:
17    Q  And then there's also another one that
18  says, "Group Tickets On Sale Now." Was that a
19  different type of document that was faxed?
20    A  "Attached is an order form, cover sheet,
21  and both attachments." So it looks like, yes,
22  those were the — it looks like those were page 2 of
23  something that went out with page 1, the cover being
24  the same for both.
25    Q  And Exhibit 8 also contains the Fax

**Page 175**

1  Broadcast Order Form. Is this your writing on
2  there?
3    A  It is.
4    Q  All right.
5    A  It looks like we've moved over to the new
6  building, you had asked me earlier. I see a new
7  address, 10250 Constellation. So it looks like by
8  May of 2010 is when we must have moved in the new
9  building.
10    Q  All right. Does the Fax Broadcast Order
11  Form identify the dates, area codes, quantities to
12  which the faxes were sent in May of 2010?
13      MR. POSTMAN: Object to the form.
14      You can answer.
15      THE WITNESS: It appears so.
16  BY MR. KELLY:
17    Q  And is that your signature in the lower
18  right-hand corner?
19    A  Yes, it is.
20    Q  There's an indemnification language on the
21  next page. This one's a little bit different than
22  the others that we've looked at. Is this language
23  that was created by the Buccaneers?
24    A  Well, it looks like I — it looks like my
25  handwriting, and it reads:

**Page 176**

1      "FaxQom agrees to indemnify and
2  hold Tampa Bay Buccaneers or any of its
3  affiliates, agents, or employees harmless
4  from any claims, complaints, or FCC
5  violations as a result of this campaign
6  and hereby confirms that all numbers have
7  been collected lawfully and with cause."
8      If you'd give me just a second — "yes," to
9  answer your question — I just want to point an
10  e-mail out where Steve Simms — I think where you're
11  going is that their indemnification wasn't included
12  in this, and it may have been. I'd have to double
13  check. But I have an e-mail from Steve Simms
14  confirming that the indemnification that he provided
15  us before was still in effect.
16    Q  Okay.
17    A  Let me see if I can find that.
18      I do have that e-mail. I'm not sure
19  exactly if it was included in this stack or not,
20  Bates stamp 73. It says:
21      "Steve, with our existing contract
22  still in effect, with regard to the
23  language in the indemnification and
24  conditions set forth in Exhibit A, please
25  send the attached beginning tomorrow."

**Page 177**

1      So this was, I guess, our new dialogue
2  regarding the 2010 campaign.
3    Q  Why use different language for the 2010
4  broadcast, as opposed to the July and August 2009
5  broadcast?
6    A  You know, I — the — I would want to go
7  through my records and e-mail just to confirm that
8  the original indemnification wasn't included with
9  this, to be honest, and then I may have just written
10  in addition to that form. You know, I don't recall.
11  I mean, I really — I don't want to — I don't
12  recall. I just want to — I want to confirm that
13  the indemnification wasn't sent with that, and it
14  very well may have been.
15    Q  Okay. For all the broadcasts the
16  Buccaneers wrote checks and sent them to FaxQom;
17  correct?
18    A  I believe that's accurate.
19    Q  And I think I read in the e-mails that you
20  were asking whether or not FaxQom accepts American
21  Express; correct?
22    A  We had a particular schedule, and even with
23  the existing relationship we had with — in FaxQom,
24  referring to the 2010 campaign, they always required
25  payment up front, which I believe he told me he

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 178**

1 didn't accept American Express but would accept
2 credit cards. I only have an American Express
3 company card. So that's required.
4    Q   Is that card associated with the
5 Buccaneers?
6    A   It is. It's a company card, correct.
7    Q   All right. Did the fact that he wouldn't
8 accept American Express raise any red flags to you
9 in the form of payment?
10    A   No. I have my favorite Italian restaurant
11 down the street from where I live. They only accept
12 cash. They've been in business for 35 years so —
13 it doesn't cease to amaze me, but I'm — yes, in
14 this day and age, I'm surprised that, you know,
15 everyone doesn't accept every type of payment.
16    Q   Okay. Do you have an understanding that,
17 if you use a credit card and you're not happy with
18 the service or goods performed, you can always
19 dispute the charge?
20    A   Do I — I'm sorry. The first part of your
21 question?
22    Q   Do you have an understanding that if you
23 had charged something and dispute the service or
24 good that's been purchased that you possibly can get
25 a refund?

**Page 179**

1    A   I guess it would depend on the card. It's
2 not an understanding that I have, but I don't know
3 the rules and regulations of our company card. I
4 think American Express kind of has a reputation
5 for that, but it's nor here or there. I just
6 happened — American Express was the only company
7 cards I had so...
8    Q   Why did you not insist on FaxQom using
9 the American Express card, as opposed to drafting a
10 Buccaneers check?
11       MR. POSTMAN: Object to the form.
12       THE WITNESS: I don't recall. I'd have to
13 go back and look. It's possible that our policy at
14 the time was to pay by check, as opposed to credit
15 card, but it's a moot point because he didn't accept
16 the credit card anyhow. So...
17 BY MR. KELLY:
18    Q   All right. So we have looked at a
19 broadcast that took place in July of 2009, August of
20 2009, and then May of 2010; correct?
21    A   Correct.
22       MR. POSTMAN: Form.
23 BY MR. KELLY:
24    Q   Are you also aware of recipients who had
25 complained of receiving the faxes?

**Page 180**

1    A   I was in charge of the campaign. This
2 was — you know, this was — this was my campaign,
3 so I believe — just going off of memory, in 2009 —
4 I think there was one complaint. And I think the
5 practice would be whoever received the complaint in
6 Tampa — because I believe that's, you know, where
7 the complaint went through because of the number on
8 the fax — they would then contact me.
9       So whether it would be a Manny or, you
10 know, be a Jason Layton or a Ben Milsom or someone
11 would advise me that, "Hey, you know, we got a
12 call. This person, you know, has a complaint or
13 didn't want to receive the fax."
14    Q   At all times did the Buccaneers — or
15 strike that.
16       At all times you were working for the
17 Buccaneers; correct?
18    A   At all times —
19    Q   Yes, in 2009, 2010.
20    A   Correct.
21    Q   And you represented yourself as being an
22 employee of the Buccaneers in dealing with FaxQom;
23 is that right?
24    A   Of course.
25    Q   At any time in 2009 and 2010, were you

**Page 181**

1 aware of FaxQom acting outside of the scope of their
2 authority in the work that they performed for the
3 Buccaneers?
4    A   Not that I was aware of, no.
5    Q   Did you ever have any problems with the
6 way in which they sent the faxes as contracted in
7 2009-2010?
8    A   Any issues as far as —
9    Q   Any issues that the faxes didn't go
10 through, that they didn't send the proper quantity?
11       MR. POSTMAN: Object to the form.
12       You can answer.
13       THE WITNESS: Not that I'm aware of.
14 BY MR. KELLY:
15    Q   Okay. I mean, in other words, a break
16 between August of 2009 and May of 2010 would be,
17 like, an eight-month break; is that right?
18    A   Correct.
19    Q   You could have chosen another fax
20 broadcaster to send faxes; correct?
21    A   Yes, I suppose we could have.
22    Q   Did you consider using another fax
23 broadcaster in 2010?
24    A   I don't recall.
25    Q   Do you recall ever speaking to any fax

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 182**

1 broadcasters regarding sending faxes in 2010?
2    A   Other than FaxQom?
3    Q   Other than FaxQom.
4    A   I don't recall. It's possible. Just
5 sitting down and proposing different sales
6 strategies is really kind of an annual thing,
7 you know, in and around the time we begin to sell
8 tickets. So, you know, with that, it's possible we
9 have reached out to other companies, specifically
10 other fax companies. I don't recall.
11    Q   Is there a reason why the Season Ticket
12 Order Forms were sent in May of 2010, as opposed to
13 another month?
14    A   I don't recall. May seems a little early.
15 Just going -- you know, it's in and around when
16 schedules come out. It's in and around when the
17 draft is. So I think it's in and around the time
18 when, you know, initial interest for the upcoming
19 season really begins. That, I guess, would be my
20 guess, but I don't --
21    MR. POSTMAN: Don't guess.
22 BY MR. KELLY:
23    Q   The schedules come out mid-April usually
24 every year; right?
25    A   I believe so; correct.

**Page 183**

1    Q   So by the time May rolls around, the
2 Buccaneers would know who they're playing and where
3 they're playing; correct?
4    A   Correct.
5    Q   Did the Buccaneers benefit from the sending
6 of the faxes?
7    A   Benefit --
8    Q   Financially.
9    A   As far as sales?
10    Q   As far as sales, yes.
11    A   Not that I'm aware of.
12    Q   Who at the Buccaneers would have the best
13 information as to how many people responded to the
14 faxes?
15    A   It would either be probably Ben Milsom or
16 Jason Layton because they oversaw, you know, that
17 department.
18    Q   Okay. Did you have any knowledge or were
19 you provided any information as to whether or not
20 the faxes increased sales?
21    A   I wasn't provided anything. I don't recall
22 there being any sales or specific increases as a
23 result of, you know, this campaign.
24    Q   Then why go ahead and do it again in 2010?
25    A   You know, I think -- I think, given the

**Page 184**

1 cost -- you know, I carried a certain, you know,
2 marketing budget and, you know, it was a small cost,
3 I think, compared to some other things that we were
4 doing. And just because it didn't work in 2009
5 didn't necessarily mean it couldn't or wouldn't work
6 in 2010.
7        And, you know, with 2010 it was a new year.
8 I think it was the second year for Ricky Morris. So
9 I think there was some more excitement about a new
10 season, you know, as opposed to maybe the year
11 before. Maybe, you know, some...
12    Q   Is it your testimony that the 2009
13 broadcast didn't increase sales, or you just don't
14 know?
15        MR. POSTMAN: Object to the form.
16        THE WITNESS: "I don't know" I think would
17 be the fair answer, but I don't recall -- I really
18 don't recall having any discussions or any
19 revelations that this was -- you know, that this was
20 something that was -- you know, that was working
21 or...
22 BY MR. KELLY:
23    Q   Do you know whether or not the Buccaneers
24 can identify whether or not a person purchased
25 season tickets or individual tickets from receiving

**Page 185**

1 a fax?
2    A   I'm sorry. Will you ask the question
3 again.
4    Q   Yes. The question is: Can the Buccaneers
5 identify those individuals who responded to the fax
6 and actually purchased season tickets or individual
7 ticket sales?
8    A   You know, I'm not sure. You know, I think
9 in this day and age, even if you were to send a fax
10 to people, sometimes they'll respond, you know, via
11 e-mail or -- so I don't -- I don't know if there's a
12 way -- what are you saying, a way for us to kind of
13 track it or understand or --
14    Q   Well, yes. A lot of times, if you're
15 selling a product, somebody calls in, and one of the
16 first questions is, "Well, how did you" --
17    A   "How did you hear about it?"
18    Q   "How did you hear about me?"
19    A   I don't know -- you know, I don't know
20 that we had any internal processes in place where --
21 you know, where we checked a box when people were
22 calling in.
23        As you can imagine, we get a lot of calls,
24 you know, from a lot of people, and our sales is
25 really kind of a year-round business. So to the

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 186**

1  extent people identified that they were calling
2  because they received, you know, a certain
3  advertisement, I couldn't tell you.
4  Q   Who would be the person at the Buccaneers
5  that was in charge of sales in 2009 and 2010?
6  A   Well, as we discussed, Jason Layton, I
7  think, was the — you gave me his title before —
8  the vice president of Sales or the senior director
9  of Sales I think was his title, and then Ben Milsom
10  was the director of Ticketing I believe was his
11  title at that time.
12  Q   You had said that you are aware of one
13  person complaining from faxes sent in 2009. Do you
14  recall what that person's name was?
15  A   I'm not sure if I was ever given a name for
16  this person. Give me — I can go through my notes.
17  I know I had it listed here.
18      Okay. So it looks like — okay, 2009, I
19  have an e-mail. This is Bates stamp 56 to Steve at
20  FaxQom, where I state that:
21      "We received a call from a guy who
22      says he's on the National Do Not Call list
23      and received numerous faxes. He said he
24      has lawsuits against marketing companies
25      for using his info illegally and is going

**Page 187**

1      to contact the State Attorney's Office
2      today regarding this issue.
3      "He would like the call-back with the
4      name of the marketing company we use. How
5      do you recommend we respond to people like
6      this?
7      "His information is as follows:"
8      So I have his name, a telephone number, and
9  a fax number, which was given to me from Tampa, Mike
10  Paschke.
11  Q   P-a-s-c-h-k-e?
12  A   Correct.
13  Q   And have you ever spoken to him?
14  A   I never spoke with him.
15  Q   Is that the person that Steve Simms spoke
16  to?
17  A   It appears so. So I — there's a break in
18  the correspondence between my e-mail to Steve and it
19  looks like his e-mail — well, his e-mail back to me
20  says, "I already spoke to the guy." So maybe he
21  just took the liberty at that point to call.
22  He stated that the person has been opted out
23  permanently. If I get any of these in the future,
24  just to forward to him, and that was it.
25  Q   So July 15, 2009, that's the second day

**Page 188**

1  into the fax broadcasting; correct?
2  A   I believe that was correct.
3  Q   And you had received an e-mail or at
4  least a call from a guy threatening to contact the
5  State Attorney's Office regarding the sending of
6  unsolicited faxes. Do you see that?
7  A   I do.
8  Q   And you took that seriously; correct?
9  A   Yes. I, you know, immediately — I
10  immediately sent it over to Steve. You know, the
11  language was — the opt-out language was on the
12  bottom of the pages that we sent out, actually
13  prompting anyone to contact FaxQom directly. But,
14  as you can imagine, it looks like they've contacted
15  us instead.
16  Q   Well, the issue with respect to sending the
17  fax to Mr. Paschke wasn't the opt-out language. It
18  was the fact that he never opted into any list;
19  correct?
20      MR. POSTMAN: Form.
21      THE WITNESS: Well, that's what he stated.
22  That's what he stated so —
23  BY MR. KELLY:
24  Q   And did that cause —
25      MR. POSTMAN: Wait.

**Page 189**

1      Done or not done?
2      THE WITNESS: I think I'm done.
3      MR. POSTMAN: Okay.
4      THE WITNESS: I never spoke with him, so
5  the reality is this was forwarded to me. I don't
6  know if it was in an e-mail or by a conversation. I
7  don't have an e-mail string so it must have been by
8  conversation, I assume through Ben or Jason. They
9  said this individual called and said he was unhappy.
10  So it looks like I'm just kind of repeating what was
11  told to me via e-mail to Steve Simms.
12  BY MR. KELLY:
13  Q   All right. And he actually threatened a
14  lawsuit against the Buccaneers on July 15, 2009;
15  correct
16  A   It looks like — yes, it looks like that's
17  what I put in writing to Steve so —
18  Q   At that time did you call up Steve and
19  say, "Don't send out any more faxes" on July 16 or
20  July 17?
21  A   No, based on Steve's response, that he
22  spoke to the guy. Everything seems fine. And that
23  he would scrub that number — he used the word
24  "scrub" — or remove the number from his database.
25      It didn't seem one out of 307,000 supposed

**Page 190**

1 faxes that went out was -- you know, hardly, you
2 know, an inconsistency with, you know, what was
3 represented. You know, it's possible -- and I don't
4 know if this was something that Steve explained to
5 me at the time -- that sometimes people opt out
6 of things. They don't remember opting out.
7 Sometimes -- you know, I assume there could be a
8 miscalculation of the number in the software that's
9 being used. You know, these kind of things.
10     So one out of, again, 307,000, or whatever
11 the number was, didn't really cause any alarms.
12     Q   Have you seen the FTC complaints against
13 the Buccaneers, people complaining to the FTC that
14 they were receiving --
15     A   Federal Trade Commission?
16     Q   Yes, Federal Trade Commission.
17     A   No, I don't believe I've seen any of those.
18     Q   Are you aware of --
19     A   What were they complaining?
20     Q   Unsolicited faxes.
21         Were you provided with any of the
22 complaints from the people that complained to the
23 FTC?
24     A   I'm sorry. Did I receive --
25     Q   Did you have any understanding in 2009-2010

**Page 191**

1 that people were complaining to the FTC about
2 Buccaneer faxes?
3     A   Not to my knowledge, no.
4     Q   And me bringing up the FTC violations here
5 today is the first time you've heard of that?
6     A   Yes.
7     Q   Are you aware of whether the FTC sent a
8 letter to the Buccaneers telling them to stop
9 sending the faxes?
10     A   Well, let me -- there was an e-mail -- it
11 was at the very end of the campaign, and maybe this
12 is what you're referring to --
13         MR. KELLY: It's not.
14         THE WITNESS: -- so I might look for a
15 track on it.
16         MR. POSTMAN: Let him find it.
17         MR. KELLY: It's not so --
18         MR. POSTMAN: Well, you've got to let him
19 look. You can't --
20         MR. KELLY: Well, I know. I'm just going
21 to represent to him that that deals with the Florida
22 Attorney General.
23         THE WITNESS: I think you're correct.
24 BY MR. KELLY:
25     Q   So my question to you is the FTC. Do you

**Page 192**

1 recall any letters from the FTC to the Buccaneers?
2     A   I don't recall. You know, again, it was
3 five years ago. As diligent as -- you know, as I've
4 been keeping documents of everything, I'd be
5 surprised if I had -- or had received anything.
6     Q   Did the Florida Attorney General send a
7 letter to the Buccaneers regarding the sending of
8 faxes?
9     A   I remember a reference of a letter being
10 received by the Florida Attorney General. I can't
11 confirm or deny if we received it as -- let me just
12 go through. I'll look at the e-mail that I sent,
13 and I just kind of have to go off of what I -- you
14 know, what I said.
15     Q   I have it here. It's the June 16, 2010
16 e-mail.
17     A   Perfect.
18     Q   It says, "Hi, Steve."
19     A   Yes.
20     Q       "After receiving the letter from the
21         Attorney General regarding our faxing,
22         we do not feel comfortable moving forward
23         with more faxes."
24         Do you have a copy of the letter from the
25 Attorney General?

**Page 193**

1     A   I don't. You know, I have a copy of the
2 e-mail. I don't know if I referenced -- I don't
3 know if I meant to put "the" letter or "a" letter.
4         I said, "After receiving the letter." It
5 insinuates that there's just some sort of a letter
6 or something. I probably meant to put "a" letter,
7 not that that's here or there but --
8     Q   Well, I don't understand the distinction.
9 I guess my question is --
10     A   Well, I say "the" as if it was something
11 that was discussed or talked about, as opposed to
12 "a" letter. Nonetheless, I don't have a copy of
13 the letter. I thought, though -- I'm -- it's just
14 kind of confusing --
15         MR. POSTMAN: It looks like you did a
16 pretty good job of going through those e-mails last
17 night.
18         MR. KELLY: No. I wish we had more time to
19 go through the e-mails. We'd be better prepared for
20 this deposition.
21         THE WITNESS: Do you have June 9? It's --
22 yes, you just referred to it a second ago. That the
23 paragraph at the bottom, the "cease and desist" --
24 just so I'm clear, and then I can answer your
25 question, that's not the FTC?

CONFIDENTIAL                    CinQ+MC000142

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 194**

1 BY MR. KELLY:
2   Q   No.
3   A   Okay.  So, then, I don't have a copy of a
4 letter from the FTC.  Maybe in that e-mail I was
5 referring to this (indicating).  Maybe I got FTC or
6 the Florida statute or — oh, I'm sorry.  The e-mail
7 says, "Attorney General."  The e-mail doesn't say
8 "FTC" so — your question was did I get a letter
9 from the "FTC"?
10   Q   Well, I think we're past that, and I think
11 you said you don't recall receiving anything from
12 the FTC.  My question now is:
13       According to your e-mail, you've stated
14 that you've got a letter from the Attorney General.
15 My question is why haven't you a copy of the letter from
16 the Attorney General?
17   A   I think what I was referring to was, to go
18 back to this e-mail on June 9 — it says:
19       "Steve, we received a letter today
20       with the attached paragraph summarized
21       below."
22   I don't know if somebody cut that out and
23 attached it to a letter saying, "Don't fax me" or —
24 I have no idea.  He says:
25       "Can you please explain to me, just

**Page 195**

1       so I understand what this means and what
2       these specific reference chapters of the
3       Florida statutes mean.  I would like to
4       hold off on sending anything else out
5       until I understand this first."
6   So that was really my — to answer your
7 previous question, my first sense of any type of
8 alarm.
9   So when I send the e-mail out June 16 —
10 and I don't know what the Bates stamp was — and I
11 say, "After receiving the letter from the Attorney
12 General," I think what I was referring to is after
13 we — I never received anything directly — after we
14 received this letter, which referenced the Attorney
15 General, "we don't feel comfortable moving forward
16 anymore."  I think that was the intent of what I
17 meant because I never received a letter from the
18 Attorney General.
19       So that's a very long-winded answer to your
20 question.
21   Q   So it's your testimony that the Buccaneers
22 never received a letter from the Attorney General?
23   A   No, not that I recall.  And in looking at
24 the fax now, it looks like we received a letter with
25 a clippet that referenced the Attorney General.

**Page 196**

1 That looks to be — and that's — you're kind of
2 jogging a five-year-old memory here — that seems to
3 be the case, correct.
4       Well, it looks like it's the June 9,
5 2010 letter.  Actually, it looks like there's an
6 attachment.  It's 19 kilobytes.  That's awfully
7 small.  That could be that little sniplet —
8   Q   Yes.  Okay.
9   A   — initially, and I'd be happy to print out
10 the attachment on the e-mail when I get back to the
11 office just to confirm that it is this.
12   Q   Okay.  And I'll ask that, and I'll also ask
13 to see if you do have the letter that's referenced
14 in the June 9, 2010 e-mail.
15       MR. POSTMAN: So we'll cooperate.  Do you
16 have an FTC letter?  Because we don't have an FTC
17 letter.
18       MR. KELLY: We have, like, a dozen
19 complaints to the FTC.
20       MR. POSTMAN: I have seen those.  You've
21 produced those.  But that's not what you asked him.
22       Do you have a letter from the FTC to the
23 Bucs?  Because we don't have that.
24       MR. KELLY: Okay.
25       MR. POSTMAN: Do you have a letter that was

**Page 197**

1 sent?
2       MR. KELLY: I don't have a letter that was
3 sent to the Bucs, but —
4       MR. POSTMAN: Okay.  Because your question
5 suggests that you might.  But I'm happy to cooperate
6 with you in that regard.  So when you go back to the
7 office, just send me an e-mail —
8       THE WITNESS: I'll just forward this exact
9 e-mail to you.  And I assume — again, back to
10 MCmail, it just shows the attachment here, and that
11 is the actual attachment of the 19 kilobytes.
12       MR. POSTMAN: Send it to Dave, and then
13 Dave will send it to me.
14       THE WITNESS: But there's also —
15       THE REPORTER: I didn't hear you.
16       MR. POSTMAN: I'm just telling him to send
17 it to David or to me, and I'll send it over.
18       But I'm also yawning, though.  So I
19 apologize.
20       MR. KELLY: But I'm also requesting the
21 letter that's referenced, not only the attachment to
22 the June 9 e-mail.
23       MR. POSTMAN: I think — maybe I
24 misunderstood, but I think what he said is that is
25 what he understood the letter to be.

Case 8:16-cv-01622-AEP   Document 131-1   Filed 12/14/18   Page 146 of 332 PageID 2516

Case 8:13-cv-01592-AEP   Document 138-2   Filed 05/27/14   Page 52 of 99 PageID 3537
CIN-Q AUTOMOBILES, INC. vs.                                                    MATTHEW KAISER
BUCCANEERS LIMITED PARTNERSHIP                                                   March 25, 2014

**Page 198**

1 But having said that, if we have something
2 else I think would be responsive to a Discovery
3 request, then we'll produce it.
4 MR. KELLY: Okay.
5 MR. POSTMAN: So if you have the letter --
6 THE WITNESS: I don't -- it's -- I go back.
7 I don't think there was a letter. I think I just
8 probably could have worded my e-mail to Steve better
9 saying, "After I received the letter we talked
10 about the other day, which referenced the Attorney
11 General, we don't feel comfortable moving forward."
12 Because I don't have any copy of any other
13 kind of letter or knowledge of receiving anything
14 from them directly so...
15 MR. KELLY: Okay.
16 MR. POSTMAN: So about ten or 15 minutes,
17 we'll take this afternoon break.
18 So I tell you as a courtesy so you can...
19 BY MR. KELLY:
20 Q   Are you aware of a lawsuit that was filed
21 against the Tampa Bay Buccaneers on August 29, 2009?
22
23 A   I have been made aware of the lawsuit.
24 MR. POSTMAN: So you can't talk about what
25 I've told you.

**Page 199**

1 THE WITNESS: Okay.
2 MR. POSTMAN: Or what David has told you or
3 what any lawyer has told you.
4 THE WITNESS: Okay.
5 MR. POSTMAN: So --
6 BY MR. KELLY:
7 Q   When is the first time you knew that there
8 was a lawsuit filed against the Tampa Bay Buccaneers
9 regarding unsolicited faxes?
10 A   I don't recall. I believe it was just
11 recently, though.
12 Q   "Recently," that would be sometime in 2014?
13 A   Again, I think probably since -- maybe
14 a little earlier than that. I don't recall. I just
15 remember hearing something about it. If it was --
16 if it was kind of through all this Discovery process
17 or what it was.
18 Q   But you did not have notice of the lawsuit
19 that was filed in August of 2009 in 2009, 2010, or
20 2011; correct?
21 A   I don't believe so in 2009 or 2010. When
22 exactly I was made aware, I don't know. I wasn't
23 involved or questioned with anything or asked to
24 produce anything at that time, I don't believe. So
25 I can't recall exactly when I was made aware.

**Page 200**

1 Q   All right. But the best information that
2 you have was you were made aware of the lawsuit
3 against the Buccaneers that was filed in August of
4 2009 just recently; correct?
5 MR. POSTMAN: Object to the form.
6 THE WITNESS: I don't know how recent.
7 When you say, "recent," we're talking about between
8 2009 and 2014. So the second half of "recent," I
9 would say yes. The first half of "recent," I would
10 say probably no. But, again, I don't recall exactly
11 when I was made aware of it.
12 BY MR. KELLY:
13 Q   Well, who made you aware of the lawsuit
14 that was filed in August of 2009?
15 A   I really don't recall. I don't recall. It
16 wasn't anything that's come to my knowledge in -- I
17 don't believe in preparing, you know, for today
18 or anything, but I don't recall. I really don't
19 recall.
20 Q   Can you give me your best estimate of the
21 year in which you were first informed of the case
22 against the Buccaneers in August of 2009.
23 MR. POSTMAN: Form.
24 THE WITNESS: Again, I don't recall. If
25 I were to kind of draw a map, starting with -- you

**Page 201**

1 know, with this case or -- at some point I think
2 there was some dialogue. I don't remember who it
3 was with, if was Steve Johnston or David Cohen or
4 Jason Layton or somebody. I really -- I don't
5 recall.
6 But within the -- call it the "five-year
7 period," I'd say probably somewhere in that second
8 half. So with that, we could probably eliminate
9 certain people. I really don't recall. I can't
10 help you out here. I don't remember.
11 BY MR. KELLY:
12 Q   Your best estimate as to what year you were
13 first notified of the lawsuit that was filed in
14 August of 2009, you had said it's probably the
15 second half of the five-year time period. So would
16 it be somewhere in 2011? 2012?
17 MR. POSTMAN: Form.
18 THE WITNESS: Likely. It could also likely
19 be 2013. I just don't remember being made aware --
20 rather than saying what I do remember, what I don't
21 remember is having any knowledge in 2009 and 2010.
22 When that knowledge was gained or acquired, I
23 really -- I don't recall. I really don't recall.
24 BY MR. KELLY:
25 Q   Okay. And you don't recall who first

Case 8:13-cv-0159...AEP   Document 138-2   Filed 05/27/14   Page 53 of 99 PageID 3538

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 202**

1  notified you of the lawsuit that was filed in August
2  of 2009?
3  　　MR. POSTMAN: Form.
4  　　THE WITNESS: Again, I don't recall, but
5  when it was -- when it was discussed, I think it was
6  more of a "did you know?" or "this had happened" or
7  "this is resolved" or whatever it was, but I really
8  don't recall.
9  BY MR. KELLY:
10  　Q　Did you understand that --
11  　A　It was more in a passing, as opposed to,
12  "Okay. We need you to deal with this kind of
13  situation," if that makes sense.
14  　Q　Have you ever read the Complaint that was
15  filed in August of 2009 against the Buccaneers?
16  　A　I don't believe I have.
17  　Q　Do you know where that case was filed?
18  　　MR. POSTMAN: The only way you would be
19  able to answer that question if you do is if you
20  learned from somebody that's not a lawyer that
21  represents the Buccaneers. You haven't read the
22  Complaint, and you were told. So if you learned
23  from someone and you can recall.
24  　　THE WITNESS: I don't know. I don't
25  recall -- I guess my recollection is -- my

**Page 203**

1  recollection is the case we're discussing today was
2  initially -- if this is what we're talking about,
3  and this is the recollection I have of what was
4  initially filed, I think, in Tampa, before being
5  filed with the Federal Court. If -- are we
6  referring to the same case?
7  BY MR. KELLY:
8  　Q　Yes. The plaintiff in the case is CIN-Q --
9  　A　Right.
10  　Q　-- which was filed in State Court in August
11  of 2009.
12  　A　Okay. So I just wanted to confirm that
13  that's what you were referring to.
14  　Q　That's what I'm referring to.
15  　A　Okay.
16  　　MR. POSTMAN: So why don't we take our
17  break.
18  　　MR. KELLY: Okay.
19  　　THE VIDEOGRAPHER: The time is 1:47 p.m.
20  We're off the record.
21
22  　　(At the hour of 1:47 p.m., a
23  　　luncheon recess was taken.)
24  ///
25  ///

**Page 204**

1  　　(At the hour of 2:29 p.m., the
2  deposition of MATTHEW KAISER was resumed
3  at the same place, the same persons being
4  present.)
5
6  　　THE VIDEOGRAPHER: Back on the record. The
7  time is 2:29 p.m.
8  　　MR. POSTMAN: I was just going to say that
9  could be another fight in and of itself, but if it's
10  not going to be an issue, we won't deal with it.
11  　　　　* * *
12  　　　EXAMINATION
13  　　　(Resumed)
14  BY MR. KELLY:
15  　Q　All right. We were talking about
16  complaints made to the Buccaneers for the sending of
17  the faxes. We were talking about an August 2009
18  case that was filed against the Buccaneers. Do you
19  recall that?
20  　　MR. POSTMAN: Object.
21  　　THE WITNESS: I recall discussing it, yes.
22  BY MR. KELLY:
23  　Q　Okay. And we also talked about another
24  complaint that Mike Paschke made in reference to the
25  Attorney General. Do you recall that?

**Page 205**

1  　A　I don't think Paschke was in reference to
2  the Attorney General. I think Paschke was just the
3  first complaint or notification we had.
4  　Q　Well, I'm looking at the e-mail. It's,
5  again, that July 15, 2009 e-mail, where it says,
6  "and is going to contact State Attorney Office today
7  regarding this issue."
8  　A　I don't know if that came from Mike
9  Paschke. We talked about two things. We talked
10  about this, the letter, and then we talked about
11  Mike Paschke. Mike Paschke was just one out of
12  the -- one person out of the first round of faxes.
13  I think this is with regard to the 2010, if I'm not
14  mistaken.
15  　Q　No. This is in regard to 2009, that he was
16  going to complain to the State Attorney Office.
17  That's what the e-mail says.
18  　A　Okay. Okay. I remember. I thought we
19  were kind of merging the two things.
20  　Q　Well, that letter or notification from the
21  Attorney General isn't necessarily related to Mike
22  Paschke; correct?
23  　A　I guess, yes, that's the point that I was
24  trying to make is I thought you were trying to put
25  the two together, and I was just clarifying that, to

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 206**

1 my knowledge, it wasn't.
2 Q All right.
3 A I think it was just a snippet. A snippet.
4 Q I'll represent to you that the Complaint
5 that was filed in August of 2009, and the
6 Buccaneers were served with it September 7, 2009.
7 Do you know of any reason why you weren't
8 notified in 2009 about the lawsuit?
9 A I'm not sure. I'm not sure, no.
10 Good question.
11 Q Have you ever learned why you weren't
12 notified of the August 2009 lawsuit?
13 MR. POSTMAN: Object to the form.
14 THE WITNESS: No. I could assume that
15 perhaps at the time maybe it didn't require anything
16 directly of me, any of my direct involvement at that
17 time would be the assumption I would make.
18 BY MR. KELLY:
19 Q Were you aware --
20 MR. POSTMAN: Wait. Hold on. Are you
21 done?
22 THE WITNESS: Yes.
23 MR. POSTMAN: Okay.
24 BY MR. KELLY:
25 Q Were you aware that the August 2009 lawsuit

---

**Page 207**

1 was a class action complaint?
2 A I don't -- one way or the other, I don't
3 remember learning if it was class action versus not
4 class action or what it was.
5 Again, I just kind of remember some
6 discussion about it -- again, if it was with Steve
7 Johnston or Jason Layton or -- I use the phrase "in
8 passing" at some point, not remembering exactly when
9 I was made aware of it, learning that there was a
10 suit. So I don't recall whether or not it was, you
11 know, a class action versus a non.
12 Q In the State Court case, the August --
13 let's call it the August 2009 lawsuit. Okay?
14 A Okay.
15 Q That's the State Court case which CIN-Q
16 brought. You answered --
17 A Is that what this has kind of morphed into,
18 just so I'm understanding --
19 Q Yes. This is a different lawsuit. It also
20 has CIN-Q, but it's filed in Federal Court.
21 A Okay.
22 Q You know, the specifics don't really matter
23 for the purposes of these questions.
24 But in the State Court case you had signed
25 Answers to Interrogatories in 2011. Do you remember

---

**Page 208**

1 signing a Verification?
2 A I kind of vaguely recall. I don't recall
3 signing anything. It's not to say that I didn't. I
4 just specifically don't remember signing a specific
5 document with regard to a specific lawsuit.
6 But you said that was 2011?
7 Q 2011.
8 A That was probably the time that I was kind
9 of first made aware of it, then.
10 Q All right. And just so I'm clear, in May
11 or June of 2010, you were unaware of any lawsuit
12 brought against the Buccaneers for the sending of
13 faxes?
14 MR. POSTMAN: Object to the form.
15 THE WITNESS: Again, I don't remember the
16 specific date in which I was made aware of it. My
17 guess would be the second half of the last five
18 years. Clearly, if you're saying I signed something
19 on January of 2011, then I would say that that would
20 certainly be a date -- the earliest date that I can
21 confirm that I'm aware of it, or was aware of it.
22 BY MR. KELLY:
23 Q I didn't say "January 2011." I think I
24 just said "2011." I can get you the date, though.
25 A Okay.

---

**Page 209**

1 Q But I guess my question is, when you were
2 contracted with FaxQom in May-June of 2010, were you
3 aware of any pending lawsuits?
4 MR. POSTMAN: This is literally eight times
5 you've asked the exact same question. Object to the
6 form of the question.
7 THE WITNESS: I'm happy to answer it the
8 same way.
9 BY MR. KELLY:
10 Q Okay.
11 A I really -- at that point I don't recall
12 that I was aware of anything.
13 Q All right. Did you ever speak to Steve
14 Simms about the lawsuit?
15 A About the suit that you're referring to?
16 Q Yes.
17 A My answer would be, "no," for a couple of
18 different reasons: One, not knowing when I was
19 made aware of it. I think Steve Simms' and I's
20 conversation ended towards late 2010.
21 Two, it wouldn't be my nature to discuss
22 anything legal within our company with a third
23 party, even if it was a result of that third party.
24 That would be something I would have our attorneys
25 do if there was something to discuss. I wouldn't

---

L.A. Reporters
(800) 675-9700    www.LAReporters.com
CONFIDENTIAL

CinQ+MC000146

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 210**

1 even bring up that there was a suit or something to
2 somebody.
3     Q   Are you aware of Manny Alvare ever speaking
4 to Steve Simms?
5     MR. POSTMAN: So the only way you could
6 answer that is predicated upon conversations you
7 had with Manny Alvare. So at this point I'm going
8 to instruct you not to answer it, unless you
9 verbally -- unless you saw it -- well, even if you
10 saw it, if you remember.
11     MR. KELLY: No, because if somebody from
12 the Buccaneers told him that Manny Alvare spoke to
13 Steve Simms --
14     MR. POSTMAN: But that would all be covered
15 by privilege so —
16     MR. KELLY: No, it wouldn't be.
17     THE WITNESS: I -- well, I mean, listen.
18 It's up to you. I think Manny had requested Steve
19 Simms' contact information or vice versa. I don't
20 recall. It's in a document.
21 BY MR. KELLY:
22     Q   Yes. I --
23     MR. POSTMAN: Here's the thing. Any
24 conversations you have with Manny are privileged.
25     THE WITNESS: Right.

---

**Page 211**

1     MR. POSTMAN: And the law is -- just so --
2 and I'll tell you in front of him that, if you start
3 talking about it, then you waive privilege.
4     THE WITNESS: Gotcha.
5     MR. POSTMAN: And no disrespect to Ryan
6 or Ross, but they very well may say that even an
7 inadvertent disclosure could be a waiver of a
8 broader privilege that you and the Buccaneers have
9 a right to. He can suggest anything as your
10 non-lawyer about what it may or may not be.
11     As your lawyer, to the extent he's asking
12 about any conversations with Manny, I'm going to
13 instruct you not to answer.
14 BY MR. KELLY:
15     Q   And I'm not asking you about any
16 conversations that you had with Manny. My question
17 to you is do you have an understanding that Manny
18 spoke to Steve Simms?
19     MR. POSTMAN: And if the only understanding
20 that you have is predicated upon conversations or
21 communications you had with Manny and/or another
22 lawyer I'm going to instruct you not to answer.
23     THE WITNESS: I guess at the advice of my
24 lawyer, I don't want to answer the question, then.
25     MR. KELLY: All right. So I'll certify

---

**Page 212**

1 that question.
2     Let's mark this (indicating).
3               * * *
4     (Whereupon, the document referred
5     to was marked for identification
6     as Plaintiffs' Exhibit No. 9.)
7               * * *
8     THE REPORTER: Exhibit 9.
9 BY MR. KELLY:
10     Q   I'm showing you what has been marked as
11 Exhibit 9. It's an e-mail dated August 11, 2009,
12 where you wrote to FaxQom with the phone number
13 (813) 554-1353. Do you see that?
14     A   I do.
15     Q   And the preceding e-mail is an e-mail from
16 FaxQom to you requesting Manny's phone number. Do
17 you see that?
18     A   I do.
19     Q   Do you know what triggered these two
20 e-mails?
21     A   I don't recall. This was what I was
22 referring to a second ago.
23     MR. POSTMAN: But, in all fairness --
24     THE WITNESS: I'm sorry
25     MR. POSTMAN: -- if you know of it because

---

**Page 213**

1 of conversations with Steve, that's not privileged.
2 If you know of it from conversations with Manny, it
3 is privileged, so in all fairness.
4     THE WITNESS: Okay. Then I was confused on
5 the last question. This is what I was referring to.
6     I don't remember specifically. I think
7 Manny may have reached out to Steve, and then Steve
8 was looking to return his call. I don't remember.
9 BY MR. KELLY:
10     Q   Was the topic regarding indemnification, or
11 was it regarding a complaint that was made against
12 the Buccaneers?
13     MR. POSTMAN: Again, only if you know from
14 Steve.
15     THE WITNESS: I honestly couldn't tell you.
16 I don't remember. I remember this. My recollection
17 five years ago, I don't remember exactly why he
18 needed to call Manny back or if Manny had reached
19 out to him or what the conversation was.
20 BY MR. KELLY:
21     Q   Did Steve tell you what they spoke about?
22     A   Not to my knowledge, unless there's an
23 e-mail or something where Steve responds or says,
24 "I talked to Manny," or whatever it was. I don't
25 recall.

---

CinQ+MC000147

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 214**

1  Q   Did Manny require a signed Indemnity
2  Agreement every time a broadcast occurred?
3      MR. POSTMAN: So I'm going to instruct you
4  not to answer that question on the grounds of the
5  attorney-client privilege.
6      THE WITNESS: So at the advice of my
7  attorney I decline to answer the question.
8      MR. KELLY: I'll certify the question.
9      MR. POSTMAN: So what does that mean when
10 you certify the question? Because it's obviously an
11 Illinois thing. If I'm instructing him not to
12 answer, in all fairness to you, the record will
13 reflect -- and I could be wrong, although I think
14 I'm right -- that you can bring it to the Judge.
15 But I -- just since you've done it, what does that
16 mean?
17     MR. KELLY: That just means that question
18 is marked on the transcript as a question that the
19 witness --
20     MR. POSTMAN: So you put it in a separate
21 area?
22     THE REPORTER: I just put "Question
23 Instructed Not to Answer," and then I index it.
24     MR. POSTMAN: Oh, you index it somewhere.
25     THE REPORTER: Yes.

**Page 215**

1      MR. POSTMAN: Okay. So you can find it.
2      MR. KELLY: It has some legal significance
3  in other states.
4      MR. POSTMAN: Okay.
5      MR. KELLY: I'm not sure if it has any in
6  Federal Court.
7  Q   Have you ever spoken to Manny regarding the
8  requirement to have indemnification?
9      MR. POSTMAN: I'm going to object and
10 instruct the witness not to answer predicated upon
11 the attorney-client privilege.
12     THE WITNESS: Per the advice of my attorney
13 I decline to answer the question.
14     MR. KELLY: Certify the question.
15 Q   Did you rely on any representations Manny
16 made to you regarding contracting with FaxQom to
17 send faxes?
18     MR. POSTMAN: Well, there's probably a way
19 you can ask that question, although that's not the
20 way because that would reflect conversations you
21 had with Manny. But I think you can ask about his
22 actions after speaking with Manny. But the way
23 that question is asked, I'm going to instruct you
24 not to answer predicated upon the attorney-client
25 privilege.

**Page 216**

1      THE WITNESS: So per the advice of my
2  attorney I decline to answer the question.
3      MR. KELLY: Certify the question.
4  Q   Had you ever spoken to Manny regarding any
5  issues relating to FaxQom?
6      MR. POSTMAN: So I'm going to object and
7  instruct you not to answer the question predicated
8  upon the attorney-client privilege.
9      MR. KELLY: I'm not asking about the
10 conversations. I'm asking about whether or not
11 there were any discussions.
12     MR. POSTMAN: And that's what I'm trying to
13 work with you on this. I think that any -- whether
14 he speaks to a lawyer -- so let's assume I commit a
15 crime last night, and I call a lawyer. I think the
16 fact that I have a communication with the counsel in
17 and of itself is privileged.
18     So I guess if you're asking a
19 "Yes"-and-"No" question, I probably don't have a
20 problem because it doesn't disclose the contents of
21 the question. And if you agree that it's not a
22 waiver of any attorney-client privilege, I'll agree
23 to allow him to answer it. But if you're not
24 willing to do that, then I think I have to instruct
25 him not to answer.

**Page 217**

1      MR. KELLY: Okay. I'm not agreeing to that
2  at all so...
3      MR. POSTMAN: Okay. So any conversations
4  that you had with Manny about any subject matters
5  related to this case and whether or not those
6  conversations took place are privileged, at least
7  under Florida law they are, and I'm going to
8  instruct you not to answer.
9      THE WITNESS: Okay.
10 BY MR. KELLY:
11 Q   But my question to you is have you had any
12 contact with Manny relating -- or any communications
13 with Manny relating to any issues related to FaxQom?
14     MR. POSTMAN: And I think that's exactly
15 the same question that you just said, and again my
16 instruction to you would be the exact same, based
17 upon the attorney-client privilege and the benefit
18 that both you and the Buccaneers have, I'm going to
19 instruct you not to answer.
20     THE WITNESS: So as per the suggestion of
21 my attorney I decline to answer the question.
22     MR. KELLY: All right. Certify the
23 question.
24 Q   Was Manny general counsel for the
25 Buccaneers in 2009-2010?

CIN-Q AUTOMOBILES, INC. vs.                                                    MATTHEW KAISER
BUCCANEERS LIMITED PARTNERSHIP                                                 March 25, 2014

Page 218

1    A   I hesitate. I don't know if it was all of
2   2009-2010, but during that period, yes, he was.
3    Q   If there was a legal question that needed
4   to be addressed, would you go to Manny for that
5   issue?
6    A   It really depends on the issue.
7    Q   Had you contacted any private attorneys
8   regarding any FaxQom matters in 2009 and 2010?
9    MR. POSTMAN: So I would have to ask him
10  to see if I -- I need to ask him a question about
11  that before I let him answer it because it could
12  predicate on the privilege, and that's the reason
13  why I want to take a break. Otherwise, I'm going to
14  instruct him not to answer. I'm happy to go
15  outside and see if he does.
16   MR. KELLY: That's fine.
17   THE VIDEOGRAPHER: Off the record?
18   MR. COHEN: What time?
19   THE VIDEOGRAPHER: The time is 2:43 p.m.
20  We are off the record.
21   (Mr. Cohen, Mr. Postman, and the deponent
22   left the room at 2:43 p.m. and returned
23   at 2:45 p.m.)
24   THE WITNESS: I forgot the question. Could
25  I have it read back?

Page 219

1    MR. KELLY: We have to go back on the
2   record first.
3    THE VIDEOGRAPHER: Back on the record. The
4   time is 2:45 p.m.
5    (Record read as follows:
6    "Q   Had you contacted any private
7    attorneys regarding any FaxQom matters in
8    2009 and 2010?")
9    THE WITNESS: Not that I recall.
10  BY MR. KELLY:
11   Q   Did you ever speak to Ed Glazer regarding
12  the legality of sending faxes?
13   MR. POSTMAN: You can answer that.
14   THE WITNESS: Yes. Yes, I'm confident at
15  some point. I don't recall specifically, but I'm
16  confident we had a conversation at some point.
17  BY MR. KELLY:
18   Q   All right. Did you continue to contract
19  with FaxQom on the advice of Manny?
20   MR. POSTMAN: I'm sorry. What was the
21  question?
22   (Record read as follows:
23   "Q   Did you continue to contract
24   with FaxQom on the advice of Manny?")
25   MR. POSTMAN: I'm going to object and

Page 220

1   instruct you not to answer predicated upon the
2   attorney-client privilege.
3    THE WITNESS: At the suggestion of my
4   attorney I decline to answer the question.
5    MR. KELLY: Certify the question.
6    Q   What communications did you have with Ed
7   Glazer regarding the sending of faxes?
8    A   The initial sending of faxes or --
9    Q   Yes. Faxes were sent in July and August of
10  2009 and then May and June of 2010; correct?
11   A   Correct.
12   Q   So when was the first time you spoke to Ed
13  Glazer regarding the legality of sending out faxes?
14   A   Regarding the legality?
15   Q   Regarding the legality.
16   A   I don't know that we had specific questions
17  or conversations regarding the legality. I can
18  answer the first time I spoke with him about it,
19  you know, was probably in that sales meeting,
20  somewhere between January of 2009, in my first
21  correspondence with FaxQom, and September of 2009,
22  in which case I had proposed a number of different
23  ideas for sales. The legality, I don't remember
24  specific questions or conversations regarding that.
25   Q   At all times was Ed Glazer made aware of

Page 221

1   the work that you were doing with FaxQom?
2    A   No, I wouldn't say at all times. He was
3   aware that I was going to move forward with --
4   you know, with FaxQom, that I was working with
5   FaxQom. But to that extent he wasn't aware of all
6   communications and conversations, no.
7    Q   Were you authorized by the Buccaneers to
8   contract with FaxQom?
9    A   I'm -- yes, you know, as the director of
10  New Business Development, I'm authorized to make
11  those decisions.
12   Q   Do you have a certain budget that you can
13  freely spend?
14   A   There's not a set amount, but I have the
15  authority to request from our Accounting Department
16  certain amounts to be paid to certain vendors, yes.
17   Q   I think we have three checks. I'm not sure
18  if these are -- do you think there's only three
19  checks that were written or possibly a fourth?
20   A   You know, honestly, it would depend on the
21  number of campaigns that we went through. So we
22  talked. We said there were two in 2009. We have
23  those two checks. And then there was the 2010
24  campaign, and we have that check. So if there
25  were only the three occasions, then that would be

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 222**

1  accurate.
2  Q   So if you just add them up, one was --
3  A   Three "broadcasts" call them or
4  "campaigns."
5  Q   -- roughly 15,000, the other one was
6  roughly 8,000, and the other one was 15,000. So
7  that's about $38,000 or so. Is that within your
8  authority to expend for marketing?
9  A   Yes.
10  Q   And the Buccaneers used 1 Touch for text
11  messages; is that right?
12  A   It was a mobile marketing campaign that we
13  did.
14  Q   Do you know how much was spent with
15  1 Touch?
16  A   I don't recall. And you said, "text
17  messages." There were -- I would have to go by my
18  memory. 1 Touch was kind of in the mobile world.
19  So their campaign was a little different. It wasn't
20  necessarily text messages, but I would have to go
21  back and look exactly what we did with them. But
22  did I -- I'm not sure of your initial question.
23  Q   The question was how much was spent with
24  1 Touch.
25  A   I don't recall. I could figure it out, but

**Page 223**

1  I don't recall.
2  Q   Just a rough estimate is all --
3  A   No. I'd have to look at the contract and
4  stuff with them to figure it out, which I don't have
5  with me, but I don't recall.
6  Q   Would it be around the same amount as the
7  faxing?
8  MR. POSTMAN: Object to the form.
9  THE WITNESS: Again, I don't recall. If
10  you asked me the same question about FaxQom, the
11  only reason I would have an estimate because all
12  these documents are in front of me and, you know,
13  have been. So, with 1 Touch, I really don't recall.
14  BY MR. KELLY:
15  Q   In order to do marketing does the general
16  counsel for the Buccaneers need to sign off on the
17  marketing?
18  MR. POSTMAN: I think you can answer that.
19  It's a pattern or practice question, as opposed to a
20  specific conversation.
21  THE WITNESS: The answer would be no, but
22  that doesn't necessarily preclude them from being
23  involved.
24  BY MR. KELLY:
25  Q   Did you notify the Buccaneers' general

**Page 224**

1  counsel of the marketing efforts that you did with
2  faxing?
3  MR. POSTMAN: So that is a specific
4  conversation, and I am going to object and
5  instruct you not to answer predicated upon the
6  attorney-client client.
7  THE WITNESS: So per the suggestion of my
8  attorney I decline to answer the question.
9  MR. KELLY: Certify the question.
10  MR. POSTMAN: Just so that I can
11  understand, why do you think that's not privileged?
12  If Manny is the general counsel, don't you believe
13  that any conversations that my client has with his
14  general counsel and the sum and substance of what
15  those conversations are fall within the purview of
16  the attorney-client privilege --
17  MR. KELLY: Not --
18  MR. POSTMAN: -- particularly given the
19  fact that you've not agreed to waive that any
20  single conversation is not a waiver of the entire
21  privilege?
22  MR. KELLY: You can make that argument,
23  Barry.
24  MR. POSTMAN: Well, just so --
25  MR. KELLY: I don't have to explain my

**Page 225**

1  position --
2  MR. POSTMAN: No, you don't --
3  MR. KELLY: -- at a deposition so --
4  MR. POSTMAN: You don't but, in all
5  fairness, I will point out to the Court that I tried
6  to work it out at the deposition, and you didn't
7  want to talk about it. So you're right, you don't
8  have a responsibility to try to work it out. No one
9  is pointing a gun to your head to try to talk to me
10  about it, but I wanted you to at least have the
11  benefit of trying to convince me that I'm wrong, but
12  we're happy to keep plowing along.
13  BY MR. KELLY:
14  Q   Have you ever spoken to any Buccaneer
15  employees about the lawsuit that was filed in August
16  of 2009 or 2010?
17  MR. POSTMAN: Aside from counsel?
18  MR. KELLY: Aside from counsel.
19  THE WITNESS: Your question is specific
20  about discussing it in 2009 and 2010, and I had
21  established that the earliest I can confirm that I
22  was aware was 2011.
23  So, no. I guess the answer to your
24  question would be "no."
25  ///

Min-U-Script®

L.A. Reporters
(800) 675-9700    www.LAReporters.com
CONFIDENTIAL

(56) Pages 222 - 225

CinQ+MC000150

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 226**

1 BY MR. KELLY:
2   Q   Do the Buccaneers take complaints that have
3 lawsuits seriously?
4   A   Absolutely.
5   Q   And can you think of any reason why you
6 weren't notified of the lawsuit?
7       MR. POSTMAN: Object to the form. He's
8 already testified he was notified of it.
9       MR. KELLY: Well, and he also testified the
10 earliest he can think of is 2011.
11      THE WITNESS: Well, that's the earliest I
12 can confirm.
13 BY MR. KELLY:
14   Q   So the question is why do you think
15 you weren't notified of a class action lawsuit in
16 2009-2010?
17   A   I—
18      MR. POSTMAN: Object to the form. I'm
19 sorry. Continue.
20      THE WITNESS: I would go back to what
21 I said before is that if -- if -- if-- if -- if
22 the Buccaneers were notified in 2009, the only
23 assumption I can make of why I wasn't informed until
24 2011, or whenever the date was, was that perhaps it
25 didn't require my involvement. We have a general

**Page 227**

1 counsel for a reason, to address certain issues,
2 just like I'm the director of New Business
3 Development. You know, I'm here to conduct new
4 business.
5       So just because I was involved in one
6 project prior and there's something related to that
7 project that comes to fruition a number of years
8 later doesn't necessarily require my immediate
9 attention or, you know, hence, my involvement.
10 BY MR. KELLY:
11   Q   Had you been notified of the lawsuit in
12 2009, would you question your contracting with
13 FaxQom in 2010?
14      MR. POSTMAN: Form again.
15      THE WITNESS: If the lawsuit in 2009 was
16 specific and absolutely related to the FaxQom, I
17 think that would have given us some concern, yes.
18 So, you know, I can't say with any confidence that I
19 would have proceeded in 2010, having known in 2009
20 that there was a valid issue.
21      When I say, "valid issue," not to be
22 confused with one person out of 300,000 that said,
23 "I didn't want to receive a fax." We take both
24 seriously, but, you know, one clearly screams, you
25 know, "serious" and -- you know, so...

**Page 228**

1 BY MR. KELLY:
2   Q   Well, why would it cause you serious
3 concern had you been notified of the 2009 lawsuit in
4 2009?
5       MR. POSTMAN: You're misrepresenting
6 what he's saying. I'm sure you're doing it
7 unintentionally because you wouldn't do that, but
8 object to the form.
9       You can answer.
10      THE WITNESS: The question was why would it
11 cause me concern?
12 BY MR. KELLY:
13   Q   Right.
14      MR. POSTMAN: Form.
15      THE WITNESS: Because I had taken so many
16 steps. I had done so much due diligence to make
17 sure that the faxes that were being sent out by
18 FaxQom were legal. And I had required in writing
19 that everyone who was to receive a fax had opted
20 in and that all the best practices were being used,
21 and that FaxQom was operating lawfully and under the
22 guidelines of the TCPA. So to receive notice that
23 someone was bringing a suit would have been an eye
24 opener, yes.
25 ///

**Page 229**

1 BY MR. KELLY:
2   Q   Okay.
3   A   Just as -- if I may continue -- just as it
4 was an eye opener when we received this letter with
5 this snippet from -- a paraphrase from the Attorney
6 General, which is why at that point I immediately
7 ceased operations with FaxQom.
8   Q   Aside from counsel for the Buccaneers,
9 did you ever ask anyone why you weren't promptly
10 notified of the lawsuit in 2009?
11      MR. POSTMAN: Object to the form.
12      THE WITNESS: Well, I never specifically
13 asked counsel why I wasn't notified.
14 BY MR. KELLY:
15   Q   Well, I said aside from -- well, I'm not
16 suggesting --
17   A   You said, "aside." That's assuming that I
18 did so --
19   Q   Yes, I was trying to ask a question that
20 wouldn't invade the attorney-client privilege.
21   A   Gotcha. You're saying outside.
22   Q   Outside.
23   A   Gotcha. So outside of counsel, did I
24 discuss the lawsuit with anyone within the
25 Buccaneers?

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 230

1    Q   Well, specifically, the question why you
2   weren't notified promptly in 2009 about the lawsuit.
3         MR. POSTMAN: Form.
4         THE WITNESS: No, I don't believe I
5   discussed that. It's — I'm more interested in
6   moving forward with things, you know, as opposed to
7   asking questions why -- you know, why I may not have
8   been involved with something.
9   BY MR. KELLY:
10   Q   Had you been notified of the lawsuit in
11   2009, would you have gone ahead and contracted with
12   FaxQom in 2010?
13         MR. POSTMAN: Object to the form.
14         THE WITNESS: Absolutely not, no.
15   BY MR. KELLY:
16   Q   Do you feel as if the Buccaneers did not -- .
17   or do you know why the Buccaneers didn't provide you
18   with notice of the 2009 lawsuit in 2009?
19   A   Well, again, I can only speculate that at
20   the time it didn't require any immediate or direct
21   action from me and that our general counsel was
22   working on it. So for whatever reason that I wasn't
23   made aware, you know, at that point, I could only
24   speculate. I'm not sure.
25   Q   Why would you have not contracted with

Page 231

1   FaxQom in 2010 had you received notice of the
2   lawsuit in 2009?
3         MR. POSTMAN: Object to the form.
4         THE WITNESS: Well, for the same reasons
5   that I required that FaxQom put in writing that what
6   they were doing was lawful and followed the proper
7   guidelines that we've discussed.
8         So to receive a lawsuit, the most serious
9   offense, more serious than, you know, just an
10   individual complaint, again, would be a red flag to
11   me and -- just as it was when we received the letter
12   from the person threatening the lawsuit, which is
13   when I ceased -- or had FaxQom cease operations with
14   the faxes or cease, I guess, the broadcast, I should
15   say.
16   Q   To your knowledge, did Ed Glazer know of
17   the lawsuit in 2009?
18         MR. POSTMAN: Object to the form.
19         THE WITNESS: I couldn't confirm that or
20   deny that.
21   BY MR. KELLY:
22   Q   If he had notice of the lawsuit in 2009,
23   would you expect him to tell you about it?
24         MR. POSTMAN: Object to the form.
25         THE WITNESS: Not necessarily.

Page 232

1   BY MR. KELLY:
2   Q   And why not?
3   A   You know, I would just be speculating but,
4   you know, it would depend on when he was made aware
5   of it. If -- you know, if we had our regularly
6   scheduled meetings -- I go out of town during the
7   summer, and he takes vacations in the summer. So
8   it just would really kind of depend -- I wouldn't
9   necessarily expect him to say something to me,
10   especially if it was being handled by the proper
11   people within our organization to address it, if
12   it didn't require any action from me. So, not
13   necessarily, I guess is the answer.
14   Q   Had you received any preservation letters
15   from anyone at the Buccaneers to preserve all
16   e-mails and other evidence from the 2009 lawsuit?
17         MR. POSTMAN: I mean, I've got to ask him a
18   privileged question with regard to that before he
19   answers it.
20         MR. KELLY: Off the record.
21         THE VIDEOGRAPHER: The time is 3:00 o'clock
22   p.m. We are off the record.
23         (Mr. Cohen, Mr. Postman, and the deponent
24         left the room at 3:00 p.m. and returned
25         at 3:03 p.m.)

Page 233

1         MR. POSTMAN: Can you read back the
2   question for me.
3         (Record read as follows:
4         "Q   Had you received any preservation
5         letters from anyone at the Buccaneers to
6         preserve all e-mails and other evidence
7         from the 2009 lawsuit?")
8         MR. POSTMAN: Wait. Hold on.
9         MR. KELLY: Well, hold on.
10         THE VIDEOGRAPHER: Are we on the record?
11         MR. POSTMAN: No, we're off the record.
12         (Whereupon, a discussion was held off
13         the record.)
14         THE VIDEOGRAPHER: Ready to go on?
15         MR. POSTMAN: Yes.
16         THE VIDEOGRAPHER: Back on the record. The
17   time is 3:03 p.m.
18         MR. POSTMAN: Okay. I'm going to --
19   unfortunately -- and I'll be happy to explain this
20   to you -- there was a time period where there was a
21   letter that came through, but he got it through
22   counsel, so he can't answer it. I'm telling you so
23   you understand why he can't answer it.
24         MR. KELLY: Well, that's not --
25         MR. POSTMAN: I'm just telling you. So the

CONFIDENTIAL

CinQ+MC000152

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 234**

1  answer is, I'm going to object and instruct him not
2  to answer. I wanted to give you the courtesy of
3  learning from me why I'm doing it, because it would
4  have come through counsel.
5      Now, if you want to ask if he got it from
6  other sources, that's fine, but -- so the answer is
7  he's not -- I'm going to object and instruct you not
8  to answer, predicated upon what I now understand to
9  be a communication you had with your lawyer.
10     MR. KELLY: All right. I'll certify the
11 question.
12  Q   When did you receive the preservation
13 letter?
14     MR. POSTMAN: You can answer that.
15     I think -- well --
16     MR. KELLY: Well, he did --
17     MR. POSTMAN: No, he didn't see the letter.
18     MR. KELLY: Well, you just said he did.
19     MR. POSTMAN: No. I said he learned about
20 it is what I said, actually.
21     MR. KELLY: Is there a preservation letter
22 or not?
23     MR. POSTMAN: I actually -- I don't know
24 if --
25     THE WITNESS: What is a "preservation

---

**Page 235**

1  letter"?
2      MR. POSTMAN: So let me try to work this
3  out with you, and you can fight with me if you want.
4      At some point he had a conversation with
5  his counsel about the pending lawsuit. I'm guessing
6  it's 2011, predicated upon what he's already told
7  us, but I don't know. And during that time there
8  was an issue about getting the documents together,
9  which he ultimately did. I think that's what he
10 thinks you're asking him.
11     That all came from a conversation that he
12 had with general counsel at the time. All of that
13 is privileged, so that it's clear. The way you've
14 seeking conversations he had with his lawyer.
15 seeking conversations he had with his lawyer.
16     MR. KELLY: That's not true.
17     MR. POSTMAN: I'm not trying to hide
18 something.
19     MR. KELLY: Well, that's not what I'm
20 asking. All I'm asking is when did you receive the
21 preservation letter.
22     MR. POSTMAN: So I'm going to -- so why
23 don't you ask him, "did you get a" -- "did you
24 get" -- have you physically seen a letter from a
25 lawyer not represented by the Buccaneers asking you

---

**Page 236**

1  to preserve evidence?"
2      MR. KELLY: No, that's not my question.
3   Q   My question is when did you receive the
4  preservation letter from the attorneys for the
5  Buccaneers?
6      MR. POSTMAN: I don't --
7      MR. KELLY: You represented that he
8  received one.
9      MR. POSTMAN: No. I think what I
10 represented is he was told to preserve evidence.
11 Maybe you misunderstood me. Maybe I said it wrong.
12 Maybe I don't understand.
13     THE WITNESS: I could add some
14 clarification I think would clear this up.
15     I don't remember or recall ever receiving
16 specifically a preservation letter. To your point,
17 I -- I guess that's it. I don't know if that clears
18 it up or -- sorry. I'm not trying to --
19 BY MR. KELLY:
20  Q   Do you know what a "preservation letter"
21 is?
22  A   No, I don't.
23  Q   It's a letter that states a lawsuit's been
24 filed and not to destroy evidence. Do you recall
25 ever receiving a letter like that?

---

**Page 237**

1  A   I don't recall. I may have. I don't
2  recall.
3   Q   All right.
4      MR. POSTMAN: Now, it's just getting cranky
5  towards the end of the day. We're just going to
6  fight over everything.
7  BY MR. KELLY:
8   Q   All right. So we've talked about the Mike
9  Paschke complaint that was July 15, 2009; correct?
10  A   If the 15th was the date, correct.
11  Q   Okay. And then there was a lawsuit that
12 was filed in August of 2009; correct?
13     MR. POSTMAN: Object to the form.
14     THE WITNESS: Correct.
15 BY MR. KELLY:
16  Q   I'll represent to you it's August 2009.
17  A   Okay.
18  Q   Any other complaints that you were made
19 aware of in 2009 or in 2010, other than the Attorney
20 General in June or July of 2010?
21  A   You know, I'd have to go through and scour.
22 I'm happy to do it and see if there was another
23 number or two. The Mike Paschke -- I remember
24 talking to Steve Simms that he talked to the guy.
25 He was a nice guy. Took the number out.

---

L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL

CinQ+MC000153

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 238

1    I'd have to go through my e-mails. I
2 remember at some point there was a number, too, that
3 I sent to Steve Simms, asking him to be sure those
4 were not included in our latest broadcast, you know,
5 because of the Complaint that we had.
6    So if there was another number, I'd have to
7 go through to confirm it. Or if you know the
8 number, you could save me the time to --
9    Q   Well, we can look at the e-mails. But my
10 question to you is do you have any recollection
11 outside of the e-mails.
12    A   Outside of the Mike Paschke and you said
13 the person with the Florida --
14    Q   Yes, whatever's not in the e-mails.
15    A   Yes. I think I sent, on recollection,
16 Steve in 2010, before doing what I would call kind
17 of a second round of broadcast, a couple of fax
18 numbers. Whether the number's two or three, I
19 really don't recall.
20    Q   Do you know who the complaining people were
21 for those two or three?
22    A   I didn't speak to them directly so I
23 wouldn't know. You asked me earlier about the name
24 associated with Mike Paschke's telephone number, and
25 I wasn't aware until I just re-looked it. There was

Page 239

1 a name and telephone number associated with it.
2    So, no. I think I was just given fax
3 numbers from somebody in the Tampa office.
4    Q   All right. So you don't recall ever
5 talking to anybody complaining of receiving any fax?
6    A   I didn't do it --
7    MR. POSTMAN: Aside from counsel.
8 BY MR. KELLY:
9    Q   Are you aware of anyone else at the
10 Buccaneers, aside from counsel, that had spoken to
11 anyone that complained of faxing?
12    MR. POSTMAN: Form.
13    THE WITNESS: I'd have to go through. If
14 perhaps Ben received a phone call -- I believe he
15 did because I think he sent me one of the telephone
16 numbers. You said except for counsel so...
17 BY MR. KELLY:
18    Q   Are you aware of any letters from anyone
19 claiming a violation of the TCPA that came either by
20 Fed-Ex or by mail to the Buccaneers?
21    A   I don't recall. I would never receive
22 those, nothing with regard to the TCPA that I can
23 recall.
24    Q   Would you expect those complaint letters
25 claiming a violation of the TCPA to be sent to you?

Page 240

1    A   Not directly, no.
2    Q   Why not?
3    A   From the person --
4    Q   From the complainant.
5    A   From the complainant? No. Not many
6 people are aware of my office location or, you know,
7 my direct responsibility, you know, with the
8 organization so...
9    Q   Did you ever ask the Buccaneer employees to
10 forward all complaints to you so you can handle it
11 directly?
12    A   I may have. I'll even say I believe so
13 because I was the one working with FaxQom directly,
14 and I would have wanted to be sure that they
15 scrubbed those numbers or removed those numbers
16 from certainly anything else we were doing, but
17 as a courtesy to have them remove the numbers from
18 anything else they did for any other clients because
19 clearly those people made it clear they didn't want
20 to receive a fax.
21    Q   There was "opt-out" language at the bottom
22 of the faxes; correct?
23    A   Correct.
24    Q   And the "opt-out" language didn't identify
25 Buccaneers' contact; correct?

Page 241

1    A   Correct, to my knowledge, but I've got a
2 copy right here. It was language that Steve Simms
3 sent to me and I used verbatim at the bottom. I
4 assumed it was all in an effort to continue to
5 comply with the TCPA and the DMA guidelines.
6    Q   So the toll free number "(877) 272-7614,"
7 that's --
8    A   Which one are you looking at here?
9    Q   I just pulled one out randomly.
10    A   Yes, I've got one here.
11    Q   All right. So that would be a number that
12 would be owned and maintained by FaxQom; correct?
13    A   I assume so, correct.
14    Q   And then "Removaltech@FaxQom.com," that's a
15 FaxQom address?
16    A   I would assume so.
17    Q   Did you have any access to those recipients
18 that wanted to be removed off the fax list?
19    A   To have access -- I'm not sure if I
20 understand.
21    Q   Did you have access to those people that
22 were complaining about the Tampa Bay Buccaneers'
23 faxes in calling that toll free number or in
24 e-mailing that e-mail address?
25    MR. POSTMAN: Form.

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 242**

1  THE WITNESS: I just want to make sure
2  that I understand. Do I have access to the
3  people? Because in the case of Mike Paschke
4  (pronunciation) —
5  BY MR. KELLY:
6  Q  Paschke (pronunciation).
7  A  Sorry, Paschke (pronunciation).
8  In the case of Mike Paschke, the fax number
9  and his name was accompanied by a telephone number.
10  So I had access to his telephone number. But are
11  you asking — you're asking about the removal of
12  FaxQom? Did I have access to that?
13  Q  Yes. I think my question is were you
14  made aware of or did you have access to those
15  individuals that were complaining about receiving
16  the Buccaneers' faxes?
17  MR. POSTMAN: Form.
18  THE WITNESS: I believe, other than Mike,
19  I was just giving the fax numbers that needed to be
20  removed.
21  BY MR. KELLY:
22  Q  Well, how were you obtaining those fax
23  numbers?
24  A  It would have been — whatever fax numbers
25  that I forwarded to Steve Simms I believe would have

**Page 243**

1  come from either Ben Milsom or perhaps counsel,
2  maybe even Jason Layton. So that, again, in an
3  effort — if we were to continue the broadcast or as
4  a courtesy to FaxQom, advise them that clearly these
5  people don't recall removing their numbers or
6  deciding that at some point they didn't want to be
7  on their list any longer.
8  Q  The Sales Department would receive the
9  phone calls for people who were interested, as well
10  as people that were complaining; correct?
11  MR. POSTMAN: Form.
12  THE WITNESS: Not necessarily. I think
13  it's safe to assume that, in most cases, people
14  would just call probably the largest telephone
15  number on what they received.
16  But, again, in this day and age, people
17  have a complaint, it's likely they could have just
18  gone online and called the main line, asked for the
19  person in charge of sales or asked for the general
20  counsel. We get people that call and ask to speak
21  with Coach. You know,
22  BY MR. KELLY:
23  Q  Well, what were the instructions for the
24  Sales Department for those people who didn't want to
25  receive any more faxes?

**Page 244**

1  A  I don't remember any specific instructions
2  that I gave to the Sales Department. I think
3  the Sales Department, in general, has, you know,
4  procedures in place for people that call that have a
5  complaint. You know, I think we try to hire some
6  smart people, some good people, you know, people
7  with a sense of ownership. And if someone's calling
8  your business that you work for or represent with an
9  issue, I'm confident that the people we've had
10  working or have working would take that seriously
11  and pass it along to the person in charge of their
12  department.
13  Q  So for the Sales Department who would
14  complaints be forwarded to?
15  A  Tickets specifically, Ben Milsom, and I
16  think at the time he reported to Jason Layton, but I
17  could be mistaken on that. But it was Jason that
18  was kind of overseeing the entire Sales Department,
19  but Ben more on the kind of individual ticket level.
20  Q  Now, you said that Jason or Ben may have
21  forwarded you people complaining about receiving
22  faxes. I didn't see any of those e-mails in the
23  production. Do you know if you have any of those
24  e-mails?
25  A  The — and it may have been done over a

**Page 245**

1  conversation. Perhaps they called me and said,
2  "Hey, you know, we got a call from this person" and,
3  you know, "they've respectfully requested to be
4  removed" or something; so I may have written the
5  number down.
6  But there is an e-mail, I believe, that I
7  sent to Steve Simms before — it was either after —
8  just after a campaign or just before starting a new
9  campaign — I think there are a couple of different
10  e-mails, actually, confirming or reminding him that,
11  hey, these are the two or three out of the, again,
12  600,000 at that time, or whatever, that — you know,
13  I guess, orders that, you know, that he had
14  supposedly to put together to make sure that they
15  weren't included again in anything else we did and
16  certainly anything else that he did.
17  I can probably find that e-mail for you,
18  too.
19  (Whereupon, a discussion was held off
20  the record.)
21  BY MR. KELLY:
22  Q  Okay. Yes, I've got the e-mail.
23  A  You've got it?
24  Q  I don't know if it's the e-mail that you —
25  A  What date do you have on there?

Min-U-Script®

L.A. Reporters
(800) 675-9700   www.LAReporters.com
CONFIDENTIAL

(61) Pages 242 - 245

CinQ+MC000155

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 246**

1   Q   It's September 1, 2009.
2   A   September 1, 2009.  Okay.
3       MR. KELLY: Let's mark this as the next
4   number (indicating).
5                     * * *
6       (Whereupon, the document referred
7        to was marked for identification
8        as Plaintiffs' Exhibit No. 10.)
9                     * * *
10      THE REPORTER: Exhibit 10.
11      (Whereupon, a discussion was held off
12       the record.)
13      MR. GOOD: I don't have an explanation for
14  this one.
15      MR. POSTMAN: I don't see it.
16      MR. KELLY: Well, it's Bates numbered 95.
17  It's just -- I think this portion was redacted
18  (indicating).
19      THE WITNESS: I have the e-mail here.
20      MR. POSTMAN: Explain to him why that
21  comes now in terms of you putting it off yesterday.
22  Explain that to him. He needs to understand that,
23  the bottom of it.
24      THE WITNESS: What is the question?
25  ///

---

**Page 247**

1   BY MR. KELLY:
2   Q   So the question is --
3   A   Why the e-mail we gave them from
4   yesterday --
5       MR. POSTMAN: Yes.
6       THE WITNESS: The logo mark lives on our
7   server. So we just had a new logo a month ago. So
8   I could forward an e-mail that was sent as early as
9   I'd ever had -- anyone at the Buccaneers could send
10  an e-mail from as early as they ever had in one of
11  these, and it would show up as the new logo that
12  lives on a server somewhere.
13      MR. POSTMAN: That's what it was.
14      MR. GOOD: That's not what we're talking
15  about.
16      MR. KELLY: Yes, I don't understand. I
17  think this portion (indicating) of it was redacted
18  for some reason. It's not a big deal. We've got it
19  now so...
20  Q   Take a look at Exhibit 10. There's an
21  e-mail from Manny to you dated September 1, 2009.
22      MR. POSTMAN: That's probably why it's
23  redacted.
24  BY MR. KELLY:
25  Q   Do you see that?

---

**Page 248**

1   A   "Need to get this number taken out of the
2   blast ASAP..."
3       MR. POSTMAN: The reason why it's not
4   redacted is because, in all fairness to you, it
5   was forwarded to a third party. So I can't claim
6   privilege if it was forwarded to a third party.
7   BY MR. KELLY:
8   Q   All right. So the e-mail says:
9           "Need to get this number taken
10      out of the blast ASAP...727-892-9925."
11      Do you see that?
12  A   I do.
13      MR. POSTMAN: He's talking about he
14  forwarded it to a third party.  That's why it is not
15  privileged.
16      MR. KELLY: That's fine.
17      THE WITNESS: I do see that.
18  BY MR. KELLY:
19  Q   Okay.
20  A   And that number again was?
21  Q   727-892-9925.
22  A   Okay.
23  Q   And then you forwarded that number to
24  FaxQom the same day; correct?
25  A   September 1st and September 1st; correct.

---

**Page 249**

1   Q   Do you know who the owner of that number
2   was?
3   A   I don't. Again, I think only in the case
4   of Mike -- I'm sorry, it's been a long day.
5   Q   Paschke.
6   A   Paschke. I think only in the case of Mike
7   Paschke was I given a name or anything more than
8   just the fax number.
9       MR. KELLY: All right. Let's mark this.
10      (Whereupon, the document referred
11       to was marked for identification
12       as Plaintiffs' Exhibit No. 11.)
13  BY MR. KELLY:
14  Q   All right. I'm showing you what's been
15  marked as Exhibit 11.
16  A   Okay.
17  Q   The number that's on Exhibit 10 is
18  "727-892-9925." Do you see that?
19  A   I do.
20  Q   And then on Exhibit 11, the Law Offices
21  of Phyllis J. Towzey is that same fax number,
22  727-892-9925.
23      MR. POSTMAN: Do you have a signed copy of
24  this?
25      MR. KELLY: Well, considering I got the

---

CONFIDENTIAL

CinQ+MC000156

CIN-Q AUTOMOBILES, INC.: vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 250

1 e-mail last night --
2       MR. POSTMAN: Oh, this is from us?
3       MR. KELLY: No, it's not from you.
4       MR. POSTMAN: Oh. But considering we just
5 got the information off of Exhibit 10 last night, we
6 were able to retrieve this letter, which should have
7 been produced by the Buccaneers a long time ago.
8       MR. POSTMAN: Well, that's assuming it was
9 received. I see an unsigned copy. I have no proof
10 that it was actually sent in or received. Can you
11 get a signed copy?
12 BY MR. KELLY:
13   Q   All right. Take a look at Exhibit 11.
14 It's a letter from an attorney to Brian Ford from
15 the Tampa Bay Buccaneers. Do you see that?
16   A   I do.
17   Q   All right. Who is Brian Ford?
18   A   Again, he's our C.O.O.
19   Q   Have you ever seen this letter before?
20   A   I have not.
21   Q   Would you characterize this as a letter --
22   A   Not that I recall, I should say.
23   Q   Take a moment and just review it. It says:
24       "On July 14, 2009, and again on
25       August 17, 2009, Tampa Football Corporation

Page 251

1       on behalf of the Tampa Bay Buccaneers sent
2       a facsimile to my facsimile machine that
3       is connected to the telephone number
4       727-892-9925..."
5       Do you see that?
6   A   I do.
7   Q   And the letter goes on to state the statute
8 and that there's a claim that the Buccaneers sent at
9 least two unsolicited faxes; correct?
10       MR. POSTMAN: Objection to the form.
11       THE WITNESS: Well, you say, "unsolicited."
12 I -- I -- I --
13 BY MR. KELLY:
14   Q   Or just faxes.
15   A   Faxes?
16   Q   Okay. Were you notified by Brian Ford that
17 there was a claim for violating the TCPA that was
18 sent to the Buccaneers on August 20, 2009?
19   A   Well, I'm not sure if -- I don't recall
20 being notified directly by Brian Ford. What appears
21 to have happened is that he gave this letter to our
22 general counsel, who then advised me to have this
23 number removed from anything further that we did.
24 I think by August 20th, the 2009 broadcast was
25 completed.

Page 252

1   Q   Had you known about the Exhibit 11 would
2 you have gone ahead and contracted with FaxQom in
3 May and June of 2010?
4   A   Perhaps. I don't know. You know, this
5 is the first time I've seen this letter, but this
6 person claims to have received a fax unlawfully.
7 Perhaps this individual doesn't remember having
8 opted into the FaxQom language.
9       And after I clearly forwarded to Steve
10 Simms that that number should be removed from
11 anything further that we did, it wouldn't seem like
12 it would, you know, continue to be an issue.
13       So, you know, I can't say definitively
14 "Yes" or "No." Just that I really don't have enough
15 facts.
16   Q   Have you spoken to anyone at the
17 Buccaneers, outside the Buccaneers' counsel,
18 regarding Exhibit 11?
19   A   No, not that I recall.
20   Q   Would you expect Exhibit 11 to be a concern
21 for you in deciding whether or not to use FaxQom
22 again?
23       MR. POSTMAN: Object to the form.
24       Is it your testimony that you have -- not
25 your testimony -- you have this and didn't produce

Page 253

1 it to us, out of curiosity?
2       MR. KELLY: Barry, we got it this morning.
3       MR. GOOD: You didn't give us the fax
4 number until last night.
5       MR. KELLY: Yes. So --
6       MR. POSTMAN: This is a letter -- listen,
7 this is a letter that you had.
8       MR. GOOD: Since this morning.
9       MR. KELLY: Yes.
10       MR. POSTMAN: You've had this letter since
11 this morning?
12       MR. GOOD: I can give you the exact time,
13 but you redacted this fax number.
14       MR. KELLY: And I'm surprised this wasn't
15 produced by you guys.
16       MR. POSTMAN: We don't have it. I've never
17 seen it.
18       MR. KELLY: All right. Sure.
19   Q   All right. Are you aware of any other
20 demand letters made by recipients of faxes similar
21 to Exhibit 11?
22       MR. POSTMAN: Form.
23       THE WITNESS: I'm sorry. I didn't
24 understand the question. Am I aware of what other
25 type of letters?

L.A. Reporters
(800) 675-9700   www.LAReporters.com

CONFIDENTIAL

CinQ+MC000157

CIN-Q AUTOMOBILES, INC. vs.                                                    MATTHEW KAISER
BUCCANEERS LIMITED PARTNERSHIP                                                 March 25, 2014

**Page 254**

1 BY MR. KELLY:
2   Q   Any other demand letters.
3   A   Demand?
4   Q   Demand. This letter is demanding payment.
5 Are you aware of --
6   A   Oh, I'm sorry. I didn't finish it.
7   Q   Okay.
8   A   So, "...liable to pay to me...currently...
9 a total 3,000" -- I'm -- not to my knowledge am I
10 aware of any other letters at all that are demanding
11 payment. The only other letter that I was aware of
12 that I was advised that was received was the one
13 with the Attorney General snippet enclosed.
14   Q   Do you specifically know what Brian Ford
15 did with Exhibit 11?
16       MR. POSTMAN: Object to the form.
17       THE WITNESS: I can't confirm, but if this
18 letter was received on August 20th and -- where's
19 Exhibit 10?
20 BY MR. KELLY:
21   Q   Right here (indicating).
22   A   And then I received from Manny Alvare
23 on September 1st that I should remove the number,
24 I would assume -- maybe I shouldn't make
25 assumptions -- but I would assume that it went from

**Page 255**

1 Brian Ford's desk to our general counsel, who then
2 advised me to make sure that the number was removed
3 from anything else that we were doing.
4   Q   All right. The letter goes on to state on
5 the second page:
6       "In that case, Hooters hired a fax
7       service that sent six unsolicited junk
8       faxes to each of 1,321 fax numbers. In
9       April 2001, the court ordered Hooters to
10      pay treble damages of $11,889,000."
11      Do you see that?
12   A   I do.
13   Q   All right. Had you seen Exhibit 11, would
14 that cause you concern and not contract with FaxQom
15 in May and June of 2010?
16       MR. POSTMAN: Form.
17       THE WITNESS: Well, you know, again, not
18 necessarily because this is -- of the number of
19 faxes that we understood went out, I believe this is
20 based on the date and everything we've discussed --
21 the second such complaint that we would have
22 received. So, no, not necessarily.
23       I think it's likely out of 300,000 fax
24 broadcasts that may have gone out that one or two
25 people don't remember signing up and/or deciding

**Page 256**

1 that they no longer wanted to receive faxes; or,
2 to take it a step further, it's possible that this
3 number got somehow in the system on accident.
4       MR. KELLY: Change the tape.
5       You can finish your answer.
6       MR. POSTMAN: Are you finished?
7       THE VIDEOGRAPHER: The time is --
8       THE WITNESS: Oh, I would just --
9       MR. KELLY: Hold on. We've got to change
10 the tape, and then you can finish your answer.
11      THE WITNESS: Okay.
12      THE VIDEOGRAPHER: The time is 3:27 p.m.
13      (Whereupon, a recess was taken from
14      3:27 p.m. to 3:37 p.m.)
15      THE VIDEOGRAPHER: Back on the record. The
16 time is 3:37 p.m. This is the beginning of Tape 4.
17      MR. POSTMAN: Would you read back the last
18 question and answer, ma'am.
19      (Record read as follows:
20      "Q   Had you seen Exhibit 11
21      would that cause you concern and not
22      contract with FaxQom in May and June
23      of 2010?")
24      THE REPORTER: Objection. "Form."
25 ///

**Page 257**

1      (Record read further as follows:
2      "A   Well, you know, again, not
3      necessarily because this is -- of the
4      number of faxes that we understood went
5      out, I believe this is based on the date
6      and everything we've discussed -- the
7      second such complaint that we would have
8      received. So, no, not necessarily.
9      "I think it's likely out of 300,000
10     fax broadcasts that may have gone out
11     that one or two people don't remember
12     signing up and/or deciding that they no
13     longer wanted to receive faxes; or,
14     to take it a step further, it's possible
15     that this number got somehow in the system
16     on accident.")
17     THE WITNESS: I'm finished with that.
18     MR. POSTMAN: You are finished?
19     THE WITNESS: Yes.
20 BY MR. KELLY:
21   Q   Okay. The fax number that's on Exhibit 11,
22 727-892-9925, that number eventually made it to you;
23 correct?
24   A   It's the same number.
25   Q   Okay. Do you know why the demand letter

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 258**

1  was not sent to you?
2      MR. POSTMAN: Object to the form.
3      THE WITNESS: No. I could speculate again
4  that it looks like it was sent to Brian Ford. My
5  assumption would be that Ford gave it to our general
6  counsel, who then advised me that this number
7  needs to be removed ASAP as indicated in his e-mail
8  on September 1st.
9          "Need to get this number taken
10         out of the blast ASAP."
11  My immediate forward to Steve Simms:
12         "You need to remove this number from
13         your broadcast. Definitely remove it from
14         anything else we might do in the future."
15  BY MR. KELLY:
16   Q   Do you know if Brian Ford responded to
17  Exhibit 11?
18   A   I can't speak on behalf of Brian Ford. I'm
19  not sure. I couldn't say.
20   Q   Do you know if Manny responded to
21  Exhibit 11?
22      MR. POSTMAN: So you would only know -- do
23  you know?
24      THE WITNESS: Not to my knowledge.
25      MR. POSTMAN: Okay.

**Page 259**

1      THE WITNESS: I wasn't aware that
2  Exhibit 11 existed until today.
3      MR. KELLY: Let's mark this (indicating).
4          * * *
5      (Whereupon, the document referred
6      to was marked for identification
7      as Plaintiffs' Exhibit No. 12.)
8          * * *
9      THE REPORTER: Exhibit 12.
10  BY MR. KELLY:
11   Q   All right. Was it the custom and practice
12  for letters that -- or complaint letters to be
13  forwarded to general counsel?
14   A   It would depend on the subject and the
15  severity. As far as the company's policy on that,
16  I'd probably have to get a better description from
17  our Human Resource office or our current general
18  counsel with regard to what our policy is or what
19  the policies were for the general counsel that were
20  in place at that time.
21      So I don't know if the policy has been
22  consistent. I don't know if the policy has changed.
23  I'm not sure exactly what the policy is, other than
24  to say any complaint or issue that seems severe
25  by -- at the confidence of any employee would take

**Page 260**

1  it to their department director, and then from there
2  that individual would likely decide if it needs to
3  go further to general counsel, for example.
4   Q   All right. Take a look at Exhibit 12.
5   A   I haven't seen it yet.
6   Q   It's dated December 16, 2009. So about a
7  month later. This is a letter to Manny from the
8  person complaining of receiving the faxes. She
9  states:
10         "I'm following up on our conversation
11  several weeks ago regarding the unsolicited
12  advertisements..."
13      Do you see that?
14   A   I do.
15   Q   Do you know or have any knowledge as to
16  what was spoken about between Manny and Ms. Towzey?
17      MR. POSTMAN: So I'm going to tell you if
18  you only -- think you don't -- just answer --
19      THE WITNESS: The answer's "No."
20      MR. POSTMAN: Okay. I was going to say, if
21  the answer's "no," then I don't need to object. If
22  you answer...
23  BY MR. KELLY:
24   Q   Then the next paragraph or the third
25  paragraph says:

**Page 261**

1         "As you know, I received a letter
2         from a Steven Simms at FaxQom in which
3         he vehemently denied that it was his
4         company that sent the faxes. Mr. Simms
5         declined to provide a mailing address or
6         a physical address for FaxQom, and his
7         company's website (www.faxquom.com.)
8         likewise furnishes no contact information."
9      Do you see that?
10   A   I do.
11   Q   Have you ever reviewed that letter from
12  Steve Simms to Ms. Towzey?
13   A   No. I wasn't even aware there was a
14  conversation.
15   Q   And I think I know the answer to this, but
16  did you ever speak with Steven Simms regarding his
17  letter to Ms. Towzey?
18   A   No.
19      MR. POSTMAN: That's probably why Manny
20  needed the phone number. I don't know.
21  BY MR. KELLY:
22   Q   And you've never seen Exhibit 12; is that
23  right?
24   A   That's correct.
25   Q   Had you seen Exhibit 12, would you have

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 262**

1  contracted with FaxQom in May and June of 2010?
2    A   Perhaps, I think, and perhaps not. I think
3  it would have really depended on the conversations
4  I had with Steve Simms, first and foremost. I
5  would want to know why he declined providing any
6  additional details, including his denial that it
7  was his company that sent the faxes.
8    Q   Anything else?
9    A   No.
10   Q   She says that:
11        "The company's website furnishes
12        no contact information."
13        Is that your recollection of FaxQom.com?
14        MR. POSTMAN: That's the wrong spelling.
15        THE WITNESS: It's not because at some
16  point I had gotten ahold of FaxQom. So between
17  January of 2009, when it looks like our first
18  conversation was, and September, it's possible they
19  have changed the Website.
20        But there was some sort of number, you
21  know, in which, you know, I called FaxQom. I don't
22  know if it was on their Website. I really -- I
23  don't recall five years ago, and I cannot recall who
24  contacted who first. I don't remember.
25        MR. KELLY: You know what? Let me just

**Page 263**

1  take a short break, and I'm almost done. At least
2  under the -- a good ending.
3        THE VIDEOGRAPHER: The time is 3:46 p.m.
4  We're off the record.
5        (Whereupon, a recess was taken from
6        3:46 p.m. to 3:53 p.m.)
7        MR. KELLY: Let's mark this (indicating).
8              * * *
9        (Whereupon, the document referred
10       to was marked for identification
11       as Plaintiffs' Exhibit No. 13.)
12             * * *
13       THE REPORTER: Exhibit 13.
14       THE VIDEOGRAPHER: Back on the record. The
15  time is 3:53 p.m.
16  BY MR. KELLY:
17   Q   All right. I'm going to show you what's
18  been marked as Exhibit 13. This is a letter from
19  Ms. Towzey to Steve Simms. There's a fax number
20  here, "617-674-2147." Do you see that?
21   A   I do.
22   Q   And if you look at Exhibit 2, do you see
23  the number "617-674-2147"?
24   A   I do.
25   Q   And that's the same number?

**Page 264**

1    A   I'm sorry. You're waiting for me to --
2    Q   Yes.
3    A   Yes. Yes, it's the same telephone number.
4    Q   All right. So this is a letter from
5  Ms. Towzey to Steve Simms; correct?
6    A   It appears to be.
7    Q   She writes:
8        "In 22 years of business litigation,
9        I have learned to be skeptical of
10       individuals who do not identify their
11       position with a company and also who do
12       not provide the business operating address
13       of the company."
14       Do you see that?
15   A   I do.
16   Q   "Your fax to me had no date, no
17       business address of the company, and
18       you did not provide your identification
19       with the company. The website
20       www.faxquom.com shows no business address.
21       Are you empowered to act on behalf of
22       FaxQom?"
23       Do you see that?
24   A   I do. Faxquom wouldn't have an address
25  because that's not the correct site.

**Page 265**

1    Q   It's not the correct Website address?
2    A   It doesn't -- yes. It has
3  "f-a-x-q-u-o-m.com." So if she used that, she
4  probably went to the wrong place.
5    Q   All right. Have you ever seen Exhibit 13?
6    A   I have not, no.
7    Q   So Steve Simms never forwarded to you
8  Exhibit 13?
9    A   Whichever -- sorry.
10       MR. POSTMAN: You can answer.
11       THE WITNESS: I -- no, I never -- never
12  received anything from him on this.
13  BY MR. KELLY:
14   Q   All right. There's a "cc" on this letter.
15  Do you see that?
16   A   At the bottom?
17   Q   Yes.
18   A   I do.
19   Q   And the person who was cc'd is Manny
20  Alvare. Do you see that?
21   A   Yes.
22   Q   He's the general counsel for Tampa Bay; is
23  that right?
24   A   At the time, correct.
25   Q   Did Manny ever forward to you Exhibit 13?

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

Page 266

1    MR. POSTMAN: Well, I think you know -- I'm
2 not going to object on that. I think he's told us
3 the answer.
4    THE WITNESS: I don't recall receiving it,
5 no.
6 BY MR. KELLY:
7    Q   Had you received Exhibit 13 would you still
8 have contracted with FaxQom in May and June of 2010?
9    MR. POSTMAN: Form.
10    You can answer.
11    THE WITNESS: Well, I think the answer
12 would be the same is, had I received Exhibit 12,
13 which is perhaps, perhaps not, the reason being
14 this is the same letter from the same individual.
15 So this letter wouldn't sway anything more than --
16 this initial letter -- oh, I'm sorry. This
17 letter -- Exhibit 13, I don't think would sway any
18 more than Exhibit 12, than it would Exhibit 11,
19 because it's all from the same one individual.
20    So to go back, I guess, to the answer
21 I gave before is that, out of the volume of fax
22 broadcasting that we contracted for, it's possible
23 that somebody had opted out and for whatever the
24 reason the number wasn't removed.
25    I don't want to make excuses for FaxQom and

---

Page 267

1 their database and their maintenance of records, but
2 perhaps someone wanted to be removed and it wasn't,
3 or perhaps the computer made an error and, you know,
4 it's sent to a number that -- you know, that wasn't
5 opted in.
6 BY MR. KELLY:
7    Q   Okay. The images that were sent out by
8 FaxQom, those images were created by the Buccaneers;
9 is that right?
10    MR. POSTMAN: Object to the form.
11    THE WITNESS: When you say, "images," are
12 you talking about the fax broadcast?
13    MR. POSTMAN: Object to the form.
14    You can answer.
15    THE WITNESS: 95 percent of the content,
16 yes.
17 BY MR. KELLY:
18    Q   What about the other five percent?
19    A   The other five percent would be the
20 "opt-out" language that we were advised to put at
21 the bottom of the fax.
22    Q   So there was discussion in the e-mails
23 regarding the language of the "opt-out" language?
24    A   I don't know if it was discussion. He sent
25 it, and we used it verbatim or exactly -- exactly

---

Page 268

1 what he asked us to put at the bottom.
2    Q   And when you say, "he," you're referring to
3 Steve Simms?
4    A   To Steve Simms, yes, correct.
5    Q   Did you do any research, or did you have an
6 understanding of whether the opt-out language that
7 Steve Simms suggested was legally compliant?
8    A   You know, I think the initial research I
9 did in and around the TCPA and the DMA I felt was
10 sufficient. I was relying on Steve, really, from
11 the start to kind of guide us on exactly what was
12 compliant and what wasn't. And prior to any faxes
13 going out, that's exactly what he did. So he, I
14 guess -- he really gave the final approval of what
15 was sent out by adding that language.
16    Q   Are you aware that the TCPA provides
17 that, even if a recipient gives permission or has a
18 business relationship, the "opt-out" language isn't
19 sufficient; that it's still a violation?
20    MR. POSTMAN: Object to the form.
21    THE WITNESS: I'm not aware specifically
22 to that. I don't know how the TCPA's evolved or
23 changed over the years either. But above and beyond
24 that, I felt that everything else we had gotten in
25 writing from FaxQom was sufficient.

---

Page 269

1 BY MR. KELLY:
2    Q   Did you ever have any negotiation into the
3 language of the "opt-out" language with Steve Simms?
4    A   "Negotiation's" a broad term. Going back,
5 I think he told us exactly how he wanted the
6 language at the bottom, and we followed. Just going
7 off memory, we may have increased or decreased the
8 font size to be more consistent with the rest of the
9 message.
10    And I think, in 2010, he gave us some
11 separate "opt-out" language to use at the bottom
12 and then confirmed that we would be okay using the
13 initial language from 2009 that seemed, at least to
14 my knowledge, to have served us just fine.
15    Q   All right. But you didn't go to the FCC
16 regulations or the statute to confirm or verify that
17 the language at the bottom of the faxes were legally
18 sufficient?
19    A   You know, I don't recall -- you know,
20 from the day, I think, we began considering fax
21 marketing, I know we did research and we paid a lot
22 of attention to, really, the -- you know, the entire
23 campaign and, really, what the message was and who
24 we were using; again, just to reiterate, the
25 indemnification that we received, the guarantees

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

---

**Page 270**

1  that everything was lawful.
2      So I guess to answer your question, I may
3  or may not have gone back to their Website just to
4  confirm that what we already had seemed to be in
5  line or, you know, with what their recommendations
6  are.
7  Q   Did you feel as if Steve Simms had
8  working knowledge of the TCPA statute and the FCC
9  regulation?
10  A   I did, yes.
11  Q   And you believed that the language at the
12  bottom of the faxes that he suggested established a
13  working knowledge of the TCPA and FCC regulations?
14  A   I — you know, I would have to say, "yes."
15  Again, just to back up, I researched the TCPA, you
16  know, for their recommendations and the DMA,
17  and based on what I learned, he seemed to confirm,
18  really, every step of the process.
19      So with regard to the specific language
20  at the bottom, he seemed to be the — you know, the
21  expert, having done this for 18 years. So I trusted
22  him that that was sufficient.
23  Q   What are the different elements to have a
24  legally compliant "opt-out" language?
25      MR. POSTMAN: Form.

---

**Page 271**

1      THE WITNESS: The elements?
2  BY MR. KELLY:
3  Q   The elements.
4  A   I'm not an attorney. I don't know
5  specifically what is required. Based on my memory,
6  to have some type of "opt-out" language I think was
7  a necessity, but specifically what it needs to say,
8  I don't recall.
9  Q   Did you ever speak to Ed Glazer regarding
10  the requirement for "opt-out" language?
11  A   I don't recall. I'm in the office with
12  him, so I may have at some point.
13  Q   To your knowledge, did Ed Glazer ever speak
14  to Steve Simms?
15  A   Not to my knowledge, no.
16  Q   Did you ever speak to anyone other than
17  Steve Simms at FaxQom?
18  A   Not to my knowledge, no. I don't recall,
19  no.
20  Q   Do you know what Hudson is, H-u-d-s-o-n?
21  It's the Medadata on the PDFs that were produced.
22  A   The — what do — it's the Medadata?
23  Q   Just the way the PDFs are created. It
24  says, "Hudson," H-u-d-s-o-n?
25  A   Do you have a copy I can look at?

---

**Page 272**

1  Q   Well, it's the creator of the fax images.
2  A   Creator of the fax images. The images we
3  sent out?
4  Q   Yes.
5  A   Or that FaxQom sent out, but the images
6  that we put together?
7  Q   Yes. There was a designer that helped with
8  the creating of the images; correct?
9  A   Our internal graphic artist.
10  Q   What was that person's name?
11  A   Darren Morgan, I believe.
12  Q   All right. You worked with Darren Morgan
13  to create the content, and then Steve Simms put in
14  the "opt-out" language on the faxes; correct?
15      MR. POSTMAN: Form.
16      THE WITNESS: Steve Simms gave us the
17  language that needed to be put in there to make the
18  fax compliant is my understanding.
19  BY MR. KELLY:
20  Q   All right. Who would put the "opt-out"
21  language at the bottom of the faxes? Would it be
22  you, or would it be Darren Morgan?
23      MR. POSTMAN: Form.
24      THE WITNESS: I believe I asked Darren
25  Morgan to do that and then sent it to Steve for his

---

**Page 273**

1  final approval.
2  BY MR. KELLY:
3  Q   Are you aware of Steve Simms ever changing,
4  modifying, or altering any of the content of any of
5  the images that were sent out by fax?
6      MR. POSTMAN: Form.
7      THE WITNESS: Not that I'm aware of, nor
8  would I have authorized him to do so without making
9  me aware.
10      MR. KELLY: Okay. That's it. I just know
11  that there's a letter, according to Exhibit 12,
12  that Steve Simms sent Manny Alvare. I request that
13  letter.
14      And I also have a few other documents that
15  we first learned of that may be relevant to the
16  litigation based upon the records that were produced
17  last night.
18      MR. POSTMAN: So, in all fairness, I will
19  look to see if those exist. We've looked and don't
20  have them. I can represent to you that I talked to
21  my client and --
22      THE WITNESS: See that one there
23  (indicating)?
24      You asked for the attachment to this
25  (indicating).

---

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

**Page 274**

1   MR. POSTMAN: So I'm going to mark this as
2   an exhibit.
3       THE WITNESS: Okay.
4       MR. POSTMAN: That's why I need to take
5   that. I'll remember this.
6       THE WITNESS: Okay.
7       MR. POSTMAN: We don't have them, but we'll
8   double check and make sure and see what we have. So
9   I can -- I don't know what else to say, aside from
10  saying we'll look and see if we have it and, if we
11  do, we'll give it to you.
12      MR. GOOD: Just a suggestion. It says it
13  was faxed to him. You might want to check that.
14      MR. POSTMAN: Okay. So we're going to mark
15  as Defendants' Exhibit A -- you guys are using
16  numbers; we'll call this letters -- "A," the
17  documents that were sent to you all last night that
18  apparently you've done a pretty good job of going
19  through. I just want the record to be clear that
20  these are the documents, and there's no dispute
21  about what the documents are. So I'll want these
22  attached as Exhibit A. And, with that, I'm done.
23      (Whereupon, the documents referred
24       to were marked for identification
25       as Defendants' Exhibit A.)

**Page 275**

1       MR. KELLY: Well, okay. What are those
2   documents?
3       MR. POSTMAN: These are exactly what you
4   got last night by e-mail. It's a full set of all of
5   the documents.
6       MR. KELLY: All right. Let's mark it as
7   Exhibit A, and I'll just ask the witness what they
8   are.
9       MR. POSTMAN: I just represented to you
10  what they are. He doesn't -- I mean, he may or may
11  not know, but that's fine. I mean --
12      MR. COHEN: Just introduce the Bates
13  numbers.
14      MR. POSTMAN: Yes. I literally just gave
15  you a Bates number, a copy of all of them.
16      MR. KELLY: There's no need to question --
17  I mean --
18      MR. POSTMAN: Whatever you want. My point
19  to you is I wanted it on record that you had them
20  and what it is that you had so there's no dispute as
21  to what you had.
22      MR. KELLY: Let me just ask a question --
23      MR. POSTMAN: Sure.
24  BY MR. KELLY:
25      Q   I'm going to show you what's been marked as

**Page 276**

1   Exhibit A. Your attorney represented that these are
2   all of the documents that have been produced. I
3   know there was a supplemental production that --
4       MR. POSTMAN: They don't include -- maybe I
5   wasn't clear. Those aren't in this. These are the
6   documents that were produced to you all last night
7   from him.
8       MR. KELLY: Okay. I actually have a couple
9   of questions about those e-mails, but let me ask you
10  this.
11      Q   The documents that are marked as Exhibit A,
12  are these all of the e-mails that were retrieved by
13  you?
14      A   That's correct.
15      Q   Okay. And you retrieved those for
16  preparation -- for -- by the instruction of your
17  attorneys; correct?
18      MR. POSTMAN: Well, so you can't answer
19  that question but --
20      MR. KELLY: Let me ask a different
21  question.
22      MR. POSTMAN: Yes.
23  BY MR. KELLY:
24      Q   The e-mails that are marked as Exhibit A
25  were produced for this litigation; correct?

**Page 277**

1       A   Yes. Yes, that would be -- yes, that would
2   be correct.
3       Q   You didn't change, modify, or alter any of
4   the e-mails before production; correct?
5       A   No.
6       MR. POSTMAN: The only thing is, it has his
7   logo on the bottom. Okay?
8       THE WITNESS: Yes. I guess we could --
9       MR. POSTMAN: I don't know if you call that
10  a modification -- I don't want him to slip up -- so
11  you understand.
12  BY MR. KELLY:
13      Q   And Exhibit A truly and accurately depicts
14  the e-mails that were created in 2009 and 2010
15  related to your activities relating to FaxQom?
16      A   Yes. And I would take that a step further
17  to say that this was 98 percent of the conversations
18  I had with Steve Simms directly.
19      MR. POSTMAN: That's all of the requests.
20      MR. KELLY: You don't have a separate set?
21      MR. POSTMAN: No.
22      MR. KELLY: Do you have a set of the Glazer
23  e-mails that exist?
24      MR. POSTMAN: I don't believe so.
25      MR. GOOD: They're in a different place.

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 278

1     MR. KELLY: Do you know if they're Bates
2 stamped?
3     MR. POSTMAN: They're all Bates stamped.
4     MR. KELLY: I mean, since these are the
5 30(B)(6), I want some testimony regarding those
6 e-mails, where they came from. You can --
7     MR. POSTMAN: I'll stipulate that they came
8 from us and that they're authentic and they're true
9 and accurate representations as it relates to those
10 e-mails.
11     MR. KELLY: And where did they come from?
12     MR. POSTMAN: They came from Buccaneers'
13 equipment, computers, et cetera.
14     MR. KELLY: Okay. In Tampa?
15     MR. POSTMAN: I don't know that, but I
16 don't know if it makes a difference. I don't know
17 if it came from Tampa or L.A. or wherever. But I'll
18 stipulate -- if you give me the numbers -- or I'll
19 represent to you that those are Buccaneers' e-mails,
20 and I won't fight the admissibility of those
21 documents.
22     MR. KELLY: What's the Bates label on the
23 supplemental production?
24     MR. POSTMAN: I won't fight the
25 admissibility of those documents, Exhibit A, as

Page 279

1 well as the documents that were kept in the
2 ordinary course of business that were produced as a
3 supplement a couple weeks ago. Give me the Bates
4 stamp numbers, and I'll confirm them.
5     MR. GOOD: Give me one second.
6     It's 136 to 187.
7     MR. KELLY: All right. So the documents
8 are Bates labeled BLP 136 --
9     MR. GOOD: To 187.
10     MR. KELLY: -- to 187. Those are e-mails,
11 I believe, generally involved at Glazer.
12     MR. POSTMAN: So whatever e-mails I gave
13 you -- and I'll say this as an officer of the Court,
14 as well as a professional; I just can't verify the
15 numbers -- whatever e-mails I gave you two weeks
16 ago, I will agree that they are e-mails from the
17 Buccaneers that were kept in the ordinary course
18 of business, and I'm not going to fight the
19 admissibility of those documents.
20     And I will also tell you, as an officer
21 of the Court, that I won't fight Exhibit A either
22 because they did come to us.
23     MR. KELLY: Okay. That's it.
24     MR. POSTMAN: Okay. We're done.
25     He'll read and coordinate it through my

Page 280

1 office.
2     MR. KELLY: Okay.
3     THE VIDEOGRAPHER: Are we off the record?
4     The time is 4:11 p.m. This is the end of
5 the videotaped deposition of Matthew Kaiser, Volume
6 I, dated March 25, 2014, and we are off the record.
7     (Whereupon, a discussion was held off
8     the record.)
9     THE REPORTER: Mr. Kelly, do I send the
10 original to you?
11     MR. KELLY: Yes, we'll get the original.
12     THE REPORTER: All right.
13     (Whereupon, a discussion was held off
14     the record.)
15     MR. POSTMAN: I'm assuming that that depo
16 was ordered. Did I miss it? So I'd like a copy of
17 it.
18     MR. COHEN: I got the video.
19     MR. POSTMAN: I need like in the same
20 manner and fashion that --
21     THE REPORTER: Do you want an E-Tran as
22 well?
23     MR. POSTMAN: Yes.
24     THE REPORTER: And do you want a condensed?
25     MR. POSTMAN: Yes, yes. If they want it

Page 281

1 tomorrow -- I don't think they do -- but if they do,
2 I'll want it tomorrow. If they want it regular,
3 I'll take it regular. I just don't want it any
4 different way that they don't get it, if that makes
5 sense.
6     THE REPORTER: Same day.
7     Is two weeks all right? That's our normal
8 turnaround.
9     MR. KELLY: Yes, two weeks is fine.
10     THE REPORTER: Thank you.
11     (The deposition was concluded at
12     4:13 p.m.)
13     ---oOo---
14
15
16
17
18
19
20
21
22
23
24
25

Min-U-Script®
L.A. Reporters
.(800) 675-9700   www.LAReporters.com
CONFIDENTIAL
(70) Pages 278 - 281
CinQ+MC000164

CIN-Q AUTOMOBILES, INC. vs.
BUCCANEERS LIMITED PARTNERSHIP

MATTHEW KAISER
March 25, 2014

Page 282

1  STATE OF CALIFORNIA        )
2                             )  ss.
3  COUNTY OF LOS ANGELES  )
4
5
6          I, the witness herein, hereby certify under
7  penalty of perjury under the laws of the State of
8  California that the foregoing is true and correct.
9
10         Executed this_____day of
11  _____, 2014, at_____,
12  California.
13
14
15  _____
16         MATTHEW KAISER
17
18
19
20
21
22
23
24
25

Page 283

1  STATE OF CALIFORNIA      )
2  COUNTY OF LOS ANGELES  )  ss.
3
4          I, Sylvia Pollick, a Certified
5  Shorthand Reporter, do hereby certify:
6          That prior to being examined, the
7  witness named in the foregoing proceedings was by me
8  duly sworn to testify to the truth, the whole truth,
9  and nothing but the truth;
10         That said proceedings were taken before
11  me at the time and place therein set forth and were
12  taken down by me in shorthand and thereafter
13  transcribed into typewriting under my direction and
14  supervision;
15         I further certify that I am neither
16  counsel for, nor related to, any party to said
17  proceedings, nor in anywise interested in the
18  outcome thereof.
19         In witness thereof, I have hereunto
20  subscribed by me.
21
22  Dated: _____  _____
23                     Sylvia Pollick
24                     CSR #1826, RMR, CRR
25

CONFIDENTIAL                    CinQ+MC000165

Date : 8/25/2015 5:13:45 PM
From : "Tina Natali"
To : "wra1991@aol.com" , "bbuczkowski@jamsadr.com"
Cc : "David Oppenheim" , "Ross Good" , "m@mcalaw.net" , "mark.mester@lw.com"
Subject : Cin-Q Automobiles v. Buccaneers - JAMS Reference No. 1340012173
Attachment : Ex. C - rsp to 1st RFA.pdf;Ex. D.- Kaiser to FaxQom email.pdf;Ex. E - FaxQom to Kaiser email.pdf;Ex. F - draft ad.pdf;Ex. G - fax agmt.pdf;Ex. H - copy of check.pdf;Ex. I - Kaiser to FaxQom email.pdf;Ex. J - emails re Mike Paschke.pdf;Ex. K - Kaiser to Glazer email.pdf;

Email 2 of 3
Attached are Exhibits C through K to Plaintiffs' Pre-Mediation Statement.

*Tina Natali*
*Assistant to David M. Oppenheim*
*Anderson + Wanca*
*3701 Algonquin Road, Suite 500*
*Rolling Meadows, IL 60008*
*Telephone: 847-368-1500*
*Fax: 847-368-1501*

CONFIDENTIAL

CinQ+MC000166

UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.  8:13-cv-1592-17 AEP

CIN-Q AUTOMOBILES, INC., a
Florida corporation, individually and as
the representative of a class of similarly-
situated persons,

      Plaintiff,

      v.

BUCCANEERS LIMITED PARTNERSHIP
and JOHN DOES 1-10,

      Defendants.

_____/

### DEFENDANT, BUCANEERS LIMITED PARTNERSHIP'S RESPONSES TO PLAINTIFF, CIN-Q AUTOMOBILES INC.'S FIRST REQUESTS FOR ADMISSION

Defendant, Buccaneers Limited Partnership ("Defendant"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 36, hereby files its Responses to Plaintiff, Cin-Q Automobiles, Inc.'s First Requests for Admission, and in support thereof, states as follows:

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Denied.  The e-mail was a draft and was never sent to the recipient.

8. Denied.

COLE, SCOTT & KISSANE, P.A.
1645 PALM BEACH LAKES BOULEVARD  - 2ND FLOOR  - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

CONFIDENTIAL

CinQ+BC000187

**EXHIBIT**
**C**

9.  Admit.

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit.

17. Admit.

18. Admit.

19. Admit.

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Admit.

25. Admit.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Admit.

31. Admit.

- 2 -

**COLE, SCOTT & KISSANE, P.A.**
1645 PALM BEACH LAKES BOULEVARD - 2ND FLOOR - WEST PALM BEACH, FLORIDA 33401 (561) 383-0200 - (561) 683-8977 FAX

CONFIDENTIAL

CinQ+MC000168

32. Admit.

33. Admit.

34. Admit.

35. Admit.

36. Admit.

37. Denied.

38. The Defendant is without knowledge as to the truth of the averments contained in Request for Admission No. 38. The Defendant asserts that it has made a reasonable inquiry and the information readily obtainable is insufficient to admit or deny Request for Admission No. 38.

39. Admit that the check attached as Exhibit 30 was written on Buccaneers Limited Partnership's account in the amount of $15,336.80 payable to FaxQom. The Defendant is without knowledge as to the date on which FaxQom deposited the check.

40. Admit.

41. Admit.

42. Denied as phrased.

43. Denied.

44. The Defendant is without knowledge as to the truth of the averments contained in Request for Admission No. 44 because the documents to be faxed were faxed by FaxQom not Matt Kaiser. The Defendant asserts that it has made a reasonable inquiry and the information readily obtainable is insufficient to admit or deny Request for Admission No. 44.

45. Admit.

46. Admit.

47. Denied. The document entitled "Fax Cover" dated July 14, 2009 is from "Human Resources" submitted to "Group Seating Department."

48. Denied.

49. Admit.

- 3 -
**COLE, SCOTT & KISSANE, P.A.**
1645 PALM BEACH LAKES BOULEVARD - 2ND FLOOR - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

CONFIDENTIAL                    CinQ+MC000169

50. Denied. The document entitled "Fax Cover" dated July 15, 2009 is from "Human Resources" submitted to "Group Seating Department."

51. Admit.

52. Denied as phrased.

53. Denied.

54. Admit that an email dated July 15, 2009 1:31 p.m. PDT was issued from Matt Kaiser to Steve Simms concerning Mike Paschke, denied as to the remaining allegations in Request for Admission No. 54.

55. Admit.

56. Admit that an email attached as Exhibit 41 forwarded an email from Steve Simms, denied as to the remaining allegations in Request for Admission No. 56.

57. Denied. The email dated July 15, 2009 1:33 p.m. PDT was issued from Matt Kaiser to "Eglazer."

58. Denied.

59. Denied.

60. Admit.

61. Admit.

62. Denied.

63. Denied. The document entitled "Fax Cover" dated July 16, 2009 is sent from "Human Resources" to "Group Seating Department."

64. The Defendant is without knowledge as to the truth of the averments contained in Request for Admission No. 64 because the document(s) faxed were faxed by FaxQom not the Tampa Bay Buccaneers or on behalf of the Tampa Bay Buccaneers. The Defendant asserts that it has made a reasonable inquiry and the information readily obtainable is insufficient to admit or deny Request for Admission No. 64.

65. Denied.

66. Admit.

67. Admit.

- 4 -

COLE, SCOTT & KISSANE, P.A.
1645 PALM BEACH LAKES BOULEVARD - 2ND FLOOR - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

CONFIDENTIAL

CinQ+MC000170

68. Admit.

69. Admit.

70. Admit.

71. Admit that the check attached as Exhibit 54 was written on Buccaneers Limited Partnership's account in the amount of $7,668.40 dated July 30, 2009 was made payable to FaxQom. The Defendant is without knowledge as to the date on which FaxQom deposited the check.

72. Admit.

73. Admit.

74. Denied.

75. Admit.

76. Admit.

77. Admit.

78. Admit.

79. Admit.

80. Admit.

81. Admit.

82. Admit.

83. Admit.

84. Admit.

85. Admit.

86. Admit.

87. Admit.

88. Admit

89. Denied.

- 5 -

COLE, SCOTT & KISSANE, P.A.
1645 PALM BEACH LAKES BOULEVARD · 2ND FLOOR · WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 · (561) 683-8977 FAX

CONFIDENTIAL                    CinQ+MC000171

90. Denied.

91. Denied.

92. Admit.

93. Admit.

94. Denied.

95. Admit

96. Admit.

97. Denied.

98. Admit.

99. Admit.

100. Denied.

101. Admit.

102. Admit.

103. Denied.

104. Denied.

105. Denied.

106. Denied. The document entitled "Fax Cover" dated July 16, 2009 is sent from "Human Resources" to "Group Seating Department."

107. Denied.

108. The Defendant is without knowledge as to the truth of the averments contained in Request for Admission No. 108 because the document faxed was faxed by FaxQom not the Tampa Bay Buccaneers or on behalf of the Tampa Bay Buccaneers. The Defendant asserts that it has made a reasonable inquiry and the information readily obtainable is insufficient to admit or deny Request for Admission No. 108.

109. Denied.

- 6 -

CONFIDENTIAL                    CinQ+MC000172

110. The Defendant is without knowledge as to the truth of the averments contained in Request for Admission No. 110 because the document faxed was faxed by FaxQom not the Tampa Bay Buccaneers or on behalf of the Tampa Bay Buccaneers. The Defendant asserts that it has made a reasonable inquiry and the information readily obtainable is insufficient to admit or deny Request for Admission No. 110.

111. Admit.

112. Admit.

113. Denied.

114. Denied.

115. Admit.

116. Admit.

117. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles, denied that FaxQom sent facsimiles on behalf of Buccaneers Limited Partnership.

118. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles, denied that FaxQom sent facsimiles on behalf of the Tampa Bay Buccaneers.

119. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles in July 2009, denied that FaxQom sent facsimiles on behalf of Buccaneers Limited Partnership.

120. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles in July 2009, denied that FaxQom sent facsimiles on behalf of the Tampa Bay Buccaneers.

121. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles in August 2009, denied that FaxQom sent facsimiles on behalf of Buccaneers Limited Partnership.

122. Admit that Matt Kaiser was authorized to enter into an agreement with FaxQom to send facsimiles, denied that FaxQom sent facsimiles on behalf of the Tampa Bay Buccaneers.

123. Admit.

124. Admit.

- 7 -

CONFIDENTIAL                    CinQ+MC000173

125. Admit.

126. Admit.

127. Admit.

128. Admit.

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of October 2013, a true and correct copy of the foregoing has been furnished via email and U.S. Mail to: **Michael Addison, Esquire**, Addison & Howard, 400 N. Tampa St., #1100, Tampa, FL, and **Ryan M. Kelly, Esquire/Brian J. Wanca, Esquire**, Anderson & Wanca, 3701 Algonquin Rd., Suite 760, Rolling Meadows, IL, 60008.

COLE, SCOTT & KISSANE, P.A.
Attorneys for Defendant
1645 Palm Beach Lakes Blvd., 2nd Floor
West Palm Beach, Florida 33401
Telephone: (561) 383-9200
Facsimile: (561) 683-8977

By: _____
BARRY A. POSTMAN
FBN: 991856
barry.postman@csklegal.com
JUSTIN C. SOREL
FBN: 0016256
justin.sorel@csklegal.com

- 8 -
COLE, SCOTT & KISSANE, P.A.
1645 PALM BEACH LAKES BOULEVARD · 2ND FLOOR · WEST PALM BEACH, FLORIDA 33401 (561) 383-0200 · (561) 683-0977 FAX

CONFIDENTIAL                    CinQ+MC000174

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIN-Q AUTOMOBILES, INC.,
a Florida corporation, individually and
as the representative of a class of
similarly-situated persons,

     Plaintiff,

v.                             Case No. 8:13-cv-1592-17AEP

BUCCANEERS LIMITED
PARTNERSHIP and JOHN DOES 1-10,

     Defendants.                   /

### CIN-Q AUTOMOBILES, INC.'S,
### FIRST REQUEST FOR ADMISSIONS DIRECTED TO
### DEFENDANT, BUCCANEERS LIMITED PARTNERSHIP

     Cin-Q Automobiles, Inc. ("Cin-Q"), pursuant to Federal Rule of Civil Procedure

36, serves upon Buccaneers Limited Partnership ("Buccaneers"), the following Requests

for Admissions, to be answered by Buccaneers within the time period allowed by the

Federal Rules of Civil Procedure. The answers shall admit or specifically deny the

matter, or set forth in detail the reasons why the answering party cannot truthfully admit

or deny the matter. A denial shall fairly meet the substance of the requested admission,

and when good faith requires that a party qualify its answer or deny only a part of the

matter of which an admission is requested, the party shall specify so much of it as is true

and qualify or deny the remainder. An answering party may not give lack of information

or knowledge as a reason for failure to admit or deny unless the party states that it has

CONFIDENTIAL          CinQ+MC000175

made reasonable inquiry and that the information known or readily obtainable by it, or its agent, is insufficient to enable the party to admit or deny.

1.      Please admit that the email dated January 23, 2009, 10:38 AM PST, from Steve Simms to Matt Kaiser attached as **Exhibit 1** (BLP 000001) is a true and correct copy of the email received by Matt Kaiser.

2.      Please admit that the email dated January 23, 2009, 10:59 AM PST, from Steve Simms to Matt Kaiser attached as **Exhibit 2** (BLP 000002) is a true and correct copy of the email received by Matt Kaiser.

3.      Please admit that the email dated January 23, 2009, 11:01 AM PST, from Steve Simms attached as **Exhibit 3** (BLP 000003) is a true and correct copy of the email received by Matt Kaiser.

4.      Please admit that the email dated May 12, 2009, 4:15 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 4** (BLP 000006) is a true and correct copy of the email sent by Matt Kaiser.

5.      Please admit that the email dated May 12, 2009, 5:06 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 5** (BLP 000007) is a true and correct copy of the email sent by Matt Kaiser.

6.      Please admit that the email dated May 12, 2009, 5:08 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 6** (BLP 000008) is a true and correct copy of the email received by Matt Kaiser.

7.     Please admit that the email dated May 27, 2009, 9:36 AM PDT, from Matt Kaiser to Justin Latorre attached as **Exhibit 7** (BLP 000009) is a true and correct copy of the email sent by Matt Kaiser.

8.     Please admit that the email dated June 16, 2009, 9:22 AM PDT, from Matt Kaiser to Justin Latorre attached as **Exhibit 8** (BLP 000010) is a true and correct copy of the email sent by Matt Kaiser.

9.     Please admit that the email dated June 24, 2009, 9:31 AM PDT from Matt Kaiser to Steve Simms attached as **Exhibit 9** (BLP 000011) is a true and correct copy of the email sent by Matt Kaiser.

10.     Please admit that the email dated June 24, 2009, 10:06 AM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 10** (BLP 000012) is a true and correct copy of the email received by Matt Kaiser.

11.     Please admit that the email dated June 24, 2009, 1:34 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 11** (BLP 000013) is a true and correct copy of the email sent by Matt Kaiser.

12.     Please admit that the email dated June 25, 2009, 12:16 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 12** (BLP 000014) is a true and correct copy of the email sent by Matt Kaiser.

13.     Please admit that the email dated June 25, 2009, 12:39 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 13** (BLP 000015) is a true and correct copy of the email received by Matt Kaiser.

CONFIDENTIAL                    CinQ+MC000177

14.    Please admit that the email dated June 25, 2009, 4:56 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 14** (BLP 000016) is a true and correct copy of the email, with two attachments (BLP 000017 and BLP 000018) received by Matt Kaiser.

15.    Please admit that the email dated June 26, 2009, 9:27 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 15** (BLP 000019) is a true and correct copy of the email sent by Matt Kaiser.

16.    Please admit that the email dated June 26, 2009, 9:27 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 16** (BLP 000020-21) is a true and correct copy of the email, with one attachment (BLP 000022), sent by Matt Kaiser.

17.    Please admit that the email dated June 26, 2009, 10:16 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 17** (BLP 000023-24) is a true and correct copy of the email sent by Matt Kaiser.

18.    Please admit that the email dated June 26, 2009, 10:40 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 18** (BLP 000025) is a true and correct copy of the email sent by Matt Kaiser.

19.    Please admit that the email dated June 26, 2009, 10:48 AM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 19** (BLP 000026) is a true and correct copy of the email received by Matt Kaiser.

20.    Please admit that the email dated June 26, 2009, 11:47 AM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 20** (BLP 000027) is a true and correct copy of the email received by Matt Kaiser.

CONFIDENTIAL                    CinQ+MC000178

21.     Please admit that the email dated June 26, 2009, 11:48 AM PDT, from Matt Kaiser to Darren Morgan attached as **Exhibit 21** (BLP 000028) is a true and correct copy of the email sent by Matt Kaiser.

22.     Please admit that the email dated June 26, 2009, 12:16 PM PDT, from Matt Kaiser to Darren Morgan attached as **Exhibit 22** (BLP 000029) is a true and correct copy of the email sent by Matt Kaiser.

23.     Please admit that the email dated July 1, 2009, 11:12 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 23** (BLP 000030) is a true and correct copy of the email sent by Matt Kaiser.

24.     Please admit that the 3-page Fax Broadcast Order Form signed by Matt Kaiser on July 9, 2009, attached as **Exhibit 24** (BLP 000067-69) is a true and correct copy of the Fax Broadcast Order Form sent to FaxQom by Matt Kaiser.

25.     Please admit that the Fax Broadcast Order Form attached as Exhibit 24 (BLP 000067) was signed by Matt Kaiser on July 9, 2009 on behalf of the Tampa Bay Buccaneers as its Director of New Business Development.

26.     Please admit that the Fax Indemnity Agreement attached as Exhibit 24 (BLP 00068) was requested by Matt Kaiser from FaxQom.com based on his concerns for legal liability from conducting a facsimile broadcast advertising campaign as the agent for Buccaneers Limited Partnership.

27.     Please admit that the Fax Broadcast Order Form (BLP 000067) attached as Exhibit 24 contemplated the broadcast of 613,472 pages of facsimile transmissions for a total cost of $15,336.80.

CONFIDENTIAL                    CinQ+MC000179

28.     Please admit that the Fax Broadcast Order Form (BLP 000067-69) attached as Exhibit 24, is a business record of Buccaneers Limited Partnership.

29.     Please admit that the Fax Broadcast Order Form (BLP 000067-69), attached as Exhibit 24, is a business record of Buccaneers Limited Partnership that was maintained in the ordinary course of business by the Buccaneers Limited Partnership.

30.     Please admit that the email dated July 9, 2009, 1:34 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 25** (BLP 000031) is a true and correct copy of the email received by Matt Kaiser.

31.     Please admit that the email dated July 12, 2009, 5:00 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 26** (BLP 000032) is a true and correct copy of the email, with attachment (BLP 000033), received by Matt Kaiser.

32.     Please admit that the email dated July 13, 2009, 9:16 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 27** (BLP 000034) is a true and correct copy of the email sent by Matt Kaiser.

33.     Please admit that the email dated July 13, 2009, 9:47 AM PDT, from Matt Kaiser to Ryan Abelman attached as **Exhibit 28** (BLP 000035) is a true and correct copy of the email sent by Matt Kaiser.

34.     Please admit that the email dated July 13, 2009, 12:08 PM PDT, from Matt Kaiser to Anne Ansley attached as **Exhibit 29** (BLP 000036-37) is a true and correct copy of the email, with attachment (BLP 000038), sent by Matt Kaiser.

35.     Please admit that the check attached to Exhibit 29 (BLP 000038) is a true and correct copy of a check drawn on the account of the Buccaneers Limited Partnership.

6

CONFIDENTIAL                                    CinQ+MC000180

36.   Please admit that the check attached to Exhibit 29 (BLP 000038) is a true and correct copy of a check that was made payable to FaxQom.

37.   Please admit that the check attached to Exhibit 29 (BLP 000038) was submitted as payment for the facsimile advertising program identified as "SeasonTix Faxes" entered into on behalf of the Buccaneers Limited Partnership through its agent, Matt Kaiser, in July and August of 2009.

38.   Please admit that the check attached to Exhibit 29 (BLP 000038) was sent by Federal Express on or about July 13, 2009, to FaxQom, to the attention of Michael Clement, at 2257 North Loop 336 West, Suite 140-394, Conroe, Texas 77304.

39.   Please admit that the check attached as **Exhibit 30** was written on an account for the Buccaneers Limited Partnership in the amount of $15,336.80, payable to FaxQom and was deposited on July 14, 2009.

40.   Please admit that the email dated July 13, 2009, 1:45 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 31** (BLP 000039) is a true and correct copy of the email sent by Matt Kaiser.

41.   Please admit that the email dated July 13, 2009, 2:57 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 32** (BLP 000040) is a true and correct copy of the email, with attachment (BLP 000041-42), sent by Matt Kaiser.

42.   Please admit that the instruction to FaxQom on Exhibit 32 (BLP 000040) was to send a copy of any facsimile advertisement sent out on behalf of the Buccaneers to the following additional fax numbers:  (813) 872-0046; (813) 554-1351; (310) 275-8995; (866) 613-5112; and (813) 387-6310.

CONFIDENTIAL                    CinQ+MC000181

43.   Please admit that the instruction to include a transmission to the five additional fax numbers set out in Exhibit 32 (BLP 000040) for any facsimile advertisement sent out on behalf of the Buccaneers was to allow the Buccaneers representatives to monitor the actual transmission of the facsimile advertisement at the time it was being sent to the other facsimile machine telephone numbers from the telephone area codes selected by the Buccaneers for the broadcast transmission.

44.   Please admit that the facsimile advertisement on Exhibit 32 (BLP 000041-42) sent on the instructions of Matt Kaiser was received by fax numbers:  (813) 872-0046; (813) 554-1351; (310) 275-8995; (866) 613-5112; and (813) 387-6310.

45.   Please admit that the email dated July 14, 2009, 9:18 AM PDT, from Matt Kaiser to Steve Simms attached as Exhibit 33 (BLP 000043) is a true and correct copy of the email sent by Matt Kaiser.

46.   Please admit that the email dated July 14, 2009, 10:39 AM PDT, from Matt Kaiser to Steve Simms attached as Exhibit 34 (BLP 000044) is a true and correct copy of the email, with two attachments (BLP 000045-48), sent by Matt Kaiser.

47.   Please admit that the document entitled "Fax Cover" dated July 14, 2009, from the Tampa Bay Buccaneers attached as Exhibit 35 (BLP 000097-98) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

48.   Please admit that the document dated July 14, 2009, entitled "FaxQom Broadcast Confirmation 146770" shows 61,207 facsimiles sent by FaxQom on July 14,

2009, to Customer Number: 146110 TampaBay Bucc/Matt Kaiser, attached as **Exhibit 36** (BLP 000128), is a true and correct copy of the receipt received by Matt Kaiser.

49.     Please admit that the email dated July 15, 2009, 9:34 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 37** (BLP 000049) is a true and correct copy of the email, with attachment (BLP 000050-51), sent by Matt Kaiser.

50.     Please admit that the document entitled "Fax Cover" dated July 15, 2009, from the Tampa Bay Buccaneers attached as **Exhibit 38** (BLP 000099-100) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

51.     Please admit that the email dated July 15, 2009, 12:30 PM PDT, from Matt Kaiser to "EGlazer" attached as **Exhibit 39** (BLP 000052-55) is a true and correct copy of the email sent by Matt Kaiser.

52.     Please admit that on July 15, 2009, the Buccaneers received complaints from Mr. Mike Paschke and Mr. Mike Stember about their receipt of the facsimile advertisement broadcast by the Buccaneers to their respective fax numbers (BLP 000053). See Exhibit 39.

53.     Please admit that on July 15, 2009, Matt Kaiser sent an email to Mr. E. Glazer of the Buccaneers Limited Partnership concerning the complaints received from Mr. Paschke and Mr. Stember, and provided him copies of the indemnifications requested from FaxQom and provided by FaxQom to the Buccaneers Limited Partnership (BLP 000054-55). See Exhibit 39.

54.   Please admit that the email dated July 15, 2009, 12:34 PM PDT, from Matt Kaiser to sales@faxqom.com directed to Steve Simms attached as **Exhibit 40 (BLP 000056)** is a true and correct copy of the email sent by Matt Kaiser concerning the complaint of Mr. Mike Paschke.

55.   Please admit that the email dated July 15, 2009, 1:31 PM PDT, from Matt Kaiser to Ben Milsom attached as **Exhibit 41 (BLP 000057)** is a true and correct copy of the email sent by Matt Kaiser.

56.   Please admit that the email attached as Exhibit 41 (BLP 000057) forwarded the response from "Steve" with FaxQom.com concerning the complaint from Mr. Ben Milsom.

57.   Please admit that the email dated July 15, 2009, 1:33 PM PDT, from Matt Kaiser to E. Glazer attached as **Exhibit 42 (BLP 000058)** is a true and correct copy of the email sent by Matt Kaiser.

58.   Please admit that the July 15, 2009, email (BLP 000058) from Matt Kaiser to "Eglazer" addressed the complaint of Mr. Ben Milsom and the threat of a lawsuit made by Mr. Milsom.  See Exhibit 42.

59.   Please admit that Matt Kaiser notified Steve with FaxQom.com to remove Mr. Milsom's facsimile telephone number from the next broadcast of facsimile advertisements on behalf of the Buccaneers Limited Partnership and advised Mr. E. Glazer that "all is well" as a result (BLP 000058).  See Exhibit 42.

CONFIDENTIAL                    CinQ+MC000184

60.   Please admit that the email dated July 15, 2009, 1:39 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 43** (BLP 000059) is a true and correct copy of the email received by Matt Kaiser.

61.   Please admit that the email dated July 15, 2009, 1:43 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 44** (BLP 000060) is a true and correct copy of the email sent by Matt Kaiser.

62.   Please admit that the document dated July 15, 2009, entitled "FaxQom Broadcast Confirmation 146880" shows 165,814 facsimiles sent by FaxQom on July 15, 2009, to Customer Number: 146110 TampaBay Bucc/Matt Kaiser, attached as **Exhibit 45** (BLP 000129), is a true and correct copy of the receipt received by Matt Kaiser.

63.   Please admit that the document entitled "Fax Cover" dated July 16, 2009, from the Tampa Bay Buccaneers attached as **Exhibit 46** (BLP 000101-102) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

64.   Please admit that the document entitled "Individual Game Tickets On Sale Now" from the Tampa Bay Buccaneers attached as **Exhibit 47** (BLP 000103) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

65.   Please admit that the document dated July 16, 2009, entitled "FaxQom Broadcast Confirmation 146882" shows 366,409 facsimiles sent by FaxQom on July 16, 2009, to Customer Number: 146110 TampaBay Bucc/Matt Kaiser, attached as **Exhibit 48** (BLP 000130), is a true and correct copy of the receipt received by Matt Kaiser.

CONFIDENTIAL                    CinQ+MC000185

66.     Please admit that the email dated July 16, 2009, 10:18 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 49** (BLP 000061) is a true and correct copy of the email sent by Matt Kaiser.

67.     Please admit that the email dated July 16, 2009, 10:47 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 50** (BLP 000062) is a true and correct copy of the email sent by Matt Kaiser.

68.     Please admit that the email dated July 17, 2009, 11:43 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 51** (BLP 000063) is a true and correct copy of the email sent by Matt Kaiser.

69.     Please admit that the email dated July 17, 2009, 11:49 AM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 52** (BLP 000064) is a true and correct copy of the email received by Matt Kaiser.

70.     Please admit that the email dated July 20, 2009, 9:35 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 53** (BLP 000065-66) is a true and correct copy of the email sent by Matt Kaiser.

71.     Please admit that the check dated July 30, 2009, attached as **Exhibit 54** was written on an account for the Buccaneers Limited Partnership in the amount of $7,668.40, payable to FaxQom and was deposited on August 17, 2009.

72.     Please admit that the check attached as Exhibit 54 is a true and correct copy of a check drawn on the account of the Buccaneers Limited Partnership.

73.     Please admit that the check attached as Exhibit 54 is a true and correct copy of a check that was made payable to FaxQom.

12

CONFIDENTIAL

74.     Please admit that the check attached as Exhibit 54 was submitted as payment for the facsimile advertising program identified as "SeasonTix Faxes" entered into on behalf of the Buccaneers Limited Partnership through its agent, Matt Kaiser, in August 2009.

75.     Please admit that the email dated August 5, 2009, 1:27 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 55** (BLP 000070) is a true and correct copy of the email sent by Matt Kaiser.

76.     Please admit that the email dated August 5, 2009, 2:14 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 56** (BLP 000071) is a true and correct copy of the email received by Matt Kaiser.

77.     Please admit that the email dated August 6, 2009, 10:30 AM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 57** (BLP 000072) is a true and correct copy of the email received by Matt Kaiser.

78.     Please admit that the email dated August 10, 2009, 1:38 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 58** (BLP 000073-74) is a true and correct copy of the email, with attachment (BLP 000075), sent by Matt Kaiser.

79.     Please admit that the email dated August 10, 2009, 3:02 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 59** (BLP 000076-77) is a true and correct copy of the email, with attachment (BLP 000078), sent by Matt Kaiser.

80.     Please admit that the email dated August 10, 2009, 3:08 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 60** (BLP 000079) is a true and correct copy of the email received by Matt Kaiser.

CONFIDENTIAL                              CinQ+MC000187

81.    Please admit that the email dated August 10, 2009, 3:21 PM PDT, from Matt Kaiser to Ryan Abelman attached as **Exhibit 61** (BLP 000080) is a true and correct copy of the email sent by Matt Kaiser.

82.    Please admit that the email dated August 10, 2009, 3:24 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 62** (BLP 000081) is a true and correct copy of the email received by Matt Kaiser.

83.    Please admit that the email dated August 11, 2009, 9:26 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 63** (BLP 000082) is a true and correct copy of the email sent by Matt Kaiser.

84.    Please admit that the email dated August 11, 2009, 12:17 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 64** (BLP 000083) is a true and correct copy of the email sent by Matt Kaiser.

85.    Please admit that the email dated August 11, 2009, 1:39 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 65** (BLP 000084) is a true and correct copy of the email, with attachment (BLP 000085), received by Matt Kaiser.

86.    Please admit that the email dated August 13, 2009, 9:22 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 66** (BLP 000086) is a true and correct copy of the email sent by Matt Kaiser.

87.    Please admit that the email dated August 13, 2009, 9:22 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 67** (BLP 000087-89) is a true and correct copy of the email, with two attachments (BLP 000090-91), sent by Matt Kaiser.

CONFIDENTIAL                    CinQ+MC000188

88.   Please admit that the Fax Broadcast Order Form (BLP 000091) was signed by Matt Kaiser on August 11, 2009 as Director of New Business Development for the Tampa Bay Buccaneers, and ordered 306,736 pages of facsimile transmissions for a price of $7,668.40. See Exhibit 67.

89.   Please admit that the Tampa Bay Buccaneers sent a check dated July 30, 2009, in the amount of $7,668.40 to FaxQom.com for the facsimile transmissions ordered by the Fax Broadcast Order Form (BLP 000091). See Exhibit 64.

90.   Please admit that the Fax Broadcast Order Form (BLP 000091), attached as Exhibit 67, is a business record of Buccaneers Limited Partnership.

91.   Please admit that the Fax Broadcast Order Form (BLP 000091), attached as Exhibit 67, is a business record of Buccaneers Limited Partnership that was maintained in the ordinary course of business by the Buccaneers Limited Partnership.

92.   Please admit that the email dated August 17, 2009, 10:55 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 68** (BLP 000092) is a true and correct copy of the email sent by Matt Kaiser.

93.   Please admit that the email dated August 17, 2009, 11:31 AM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 69** (BLP 000093) is a true and correct copy of the email sent by Matt Kaiser.

94.   Please admit that Matt Kaiser advised Steve of FaxQom.com that the schedule for the sending of the broadcast facsimile advertisements was of concern to him because the sales department needed to be available to respond to telephone calls when

the people received the facsimile advertisements and wanted to place orders for game tickets (BLP 000093). See Exhibit 69.

95.    Please admit that the email dated August 17, 2009, 1:33 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 70** (BLP 000094) is a true and correct copy of the email sent by Matt Kaiser.

96.    Please admit that the email dated September 1, 2009, 1:45 PM PDT, from Matt Kaiser to Steve Simms attached as **Exhibit 71** (BLP 000095) is a true and correct copy of the email sent by Matt Kaiser.

97.    Please admit that the email from Matt Kaiser to sales@faxqom.com dated September 1, 2009, attached as Exhibit 71 (BLP 000095) asked for the removal of another facsimile number from future facsimile advertisements sent by the Buccaneers Limited Partnership.

98.    Please admit that the email dated September 1, 2009, 6:32 PM PDT, from Steve Simms to Matt Kaiser attached as **Exhibit 72** (BLP 000096) is a true and correct copy of the email received by Matt Kaiser.

99.    Please admit that the Buccaneers Limited Partnership was served with the Summons and Complaint in the civil action styled *Cinque v. Buccaneers Limited Partnership*, Case No. 09-CA-021839, on September 10, 2009, in the Circuit Court of Hillsborough County, Florida.

100.    Please admit that the civil action styled *Cinque v. Buccaneers Limited Partnership*, Case No. 09-CA-021839, sought damages for the facsimile advertisements

CONFIDENTIAL

CinQ+MC000190

broadcast pursuant to the request of the Buccaneers Limited Partnership during the months of July and August 2009.

101.   Please admit that Buccaneers Limited Partnership produced documents with Bates Nos. BLP 000001 through BLP 000135 to Craig Cinque in the case styled, *Craig Cinque v. Buccaneers Limited Partnership*, Case No. 09-CA-021839, Division C, Circuit Court, Hillsborough County, Florida.

102.   Please admit that the document dated May 18, 2010, and signed by Matt Kaiser, as Director of New Business Development for the Tampa Football Corporation submitted an order attached as **Exhibit 73** in the Fax Broadcast Order Form for the broadcast of an additional 626,454 pages of facsimile advertisements for a cost of $14,766.92 (BLP 000107).

103.   Please admit that the document entitled "REVISED Fax Broadcast Order Form" dated May 18, 2010, directed to Matt Kaiser from FaxQom (BLP 000107) is a true and correct copy of the REVISED Fax Broadcast Order Form received by the Tampa Bay Buccaneers from FaxQom.  See Exhibit 73.

104.   Please admit that the facsimile advertisement ordered in the REVISED Fax Broadcast Order Form (BLP 000107) was requested to advertise the availability of tickets for the Tampa Bay Buccaneers football games in 2010.  See Exhibit 73.

105.   Please admit that the REVISED Fax Broadcast Order From (BLP 000107) requested the transmission of approximately 626,454 pages of facsimile advertisements for the Buccaneers Limited Partnership.  See Exhibit 73.

106.   Please admit that the document entitled "Fax Cover" dated May 24, 2010, from the Tampa Bay Buccaneers attached as **Exhibit 74** (BLP 000104-106) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

107.   Please admit that the documents entitled "Fax Cover and Fax Broadcast Order Form" dated May 24, 2010, from the Tampa Bay Buccaneers to FaxQom attached as **Exhibit 75** (BLP 000108-109) is a true and correct copy of the Fax Cover and Fax Broadcast Order Form sent by the Tampa Bay Buccaneers to FaxQom.

108.   Please admit that the document entitled "Group Tickets On Sale Now" attached as **Exhibit 76** (BLP 000110) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

109.   Please admit that the document dated June 3, 2010, entitled "Credit Card Authorization Form" attached as **Exhibit 77** (BLP 000111) is a true and correct copy of the authorization to charge $700 to a credit card on behalf of the Tampa Bay Buccaneers.

110.   Please admit that the document entitled "2010 Group Ticket Order Form" attached as **Exhibit 78** (BLP 000112) is a true and correct copy of a document sent by facsimile to numerous facsimile numbers on behalf of the Tampa Bay Buccaneers.

111.   Please admit that the email dated January 19, 2011, 4:18 PM, from Matt Kaiser to Steve Johnston attached as **Exhibit 79** (BLP 000113) is a true and correct copy of the email sent by Matt Kaiser.

112.   Please admit that the email dated January 19, 2011, 4:18 PM from Matt Kaiser to Steve Johnston attached as **Exhibit 80** (BLP 000114-115) is a true and correct copy of the email sent by Matt Kaiser.

113.   Please admit that Matt Kaiser was an authorized agent of the Buccaneers Limited Partnership in July and August 2009 for the purpose of arranging for marketing efforts.

114.   Please admit that Matt Kaiser was an authorized agent of the Tampa Bay Buccaneers in July and August 2009 for the purpose of arranging for marketing efforts.

115.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of Buccaneers Limited Partnership in July and August 2009.

116.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of the Tampa Bay Buccaneers in July and August 2009.

117.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of Buccaneers Limited Partnership.

118.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of the Tampa Bay Buccaneers.

119.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of Buccaneers Limited Partnership in July 2009.

120.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of the Tampa Bay Buccaneers in July 2009.

121.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of Buccaneers Limited Partnership in August 2009.

122.   Please admit that Matt Kaiser was authorized to enter into an agreement with the person doing business as FaxQom to send facsimiles on behalf of the Tampa Bay Buccaneers in August 2009.

123.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of Buccaneers Limited Partnership in July 2009.

124.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of the Tampa Bay Buccaneers in July 2009.

125.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of Buccaneers Limited Partnership in August 2009.

126.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of the Tampa Bay Buccaneers in August 2009.

127.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of Buccaneers Limited Partnership in May 2010.

128.   Please admit that Matt Kaiser was authorized to enter into agreements for marketing activities on behalf of the Tampa Bay Buccaneers in May 2010.

CinQ+MC000194

ADDISON & HOWARD, P.A.
400 N. Tampa St., Suite 1100
Tampa, FL 33602-4714
Tel: (813) 223-2000
Fax: (813) 228-6000
Attorneys for CIN-Q AUTOMOBILES, INC.

/s/Michael C. Addison
Michael C. Addison
Florida Bar No. 0145579
m@mcalaw.net

and

Ryan M. Kelly
Florida Bar No. 90110
Email: rkelly@andersonwanca.com
Brian J. Wanca
Anderson + Wanca
3701 Algonquin Rd., Suite 760
Rolling Meadows, IL 60008
(847) 368-1500   FAX (847) 368-1501

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2013, I electronically served the foregoing First Request for Admissions by email to the persons listed below.

/s/Michael C. Addison
Michael C. Addison

Mark J. Criser, Esq.
Matthew F. Hall, Esq.
Hill, Ward & Henderson, P. A.
P. O. Box 2231
Tampa, FL 33601-2231
(813) 221-3900  FAX (813) 221-2900
Attorneys for Buccaneers Limited Partnership
Email: mcriser@hwhlaw.com;
tmcdonald@hwhlaw.com;
mhall@hwhlaw.com

Justin C. Sorel, Esq.
Barry A. Postman, Esq.
Cole, Scott & Kissane, P.A.
1645 Palm Beach Lakes Blvd., 2nd Floor
West Palm Beach, FL 33401
(561) 383-9229  FAX (561) 683-8977
Email: justin.sorel@csklegal.com;
patricia.nuccilli@csklegal.com;
barry.postman@csklegal.com

\\mcasbs03\docs\clients open\cin-q auto.buccaneers\drnf\req to admit1 72063.docx

CONFIDENTIAL                          CinQ+MC000195

**From:** Matt Kaiser <mkaiser@firstalliedcorp.com>
**Subject:** RE: Tampa Faxes
**Date:** June 24, 2009 9:31:35 AM PDT
**To:** 'sales@faxqom.com'

Steve,

After reading some literature on legislation regarding spam marketing as it relates to the facsimile, I am concerned with moving forward with your list. Can you please tell me if 100% of the numbers you gather have Œopted in, to receive your faxes? Also, would you be willing to indemnify us from any complaints or potential financial recourse as it relates to the fines imposed for spam mail?

**Matt Kaiser**
Acquisitions Manager

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com

---

From: sales@faxqom.com [mailto:sales@faxqom.com]
Sent: Tuesday, May 12, 2009 5:09 PM
To: Matt Kaiser
Subject: Re: Tampa Faxes

Matt,

Here is the current counts as of today for the area codes listed.   All Businesses !

Rate is 3 cents per fax thru 100,000 faxes, 2.5 cents per fax 200,000 and up

352=123,617 ct
941=62,013 ct
813=88,199 ct
727=32,907 ct

total count= 306,736

Steve
FaxQom



EXHIBIT
D

CONFIDENTIAL

CinQ+MC00196

BLP 000011

**From:** sales@faxqom.com <sales@faxqom.com>
**Subject:** Re: Tampa Faxes
**Date:** June 24, 2009 10:06:35 AM PDT
**To:** Matt Kaiser

Matt,

100% of our data is compiled "opt-in"................thats how this company has survived 18 years strong.  I have no problem to indemfify you in a broadcast relationship.

What would you like to fax?  Do you have a document ready to go?

Please advise.

Steve Simms
FaxQom

CONFIDENTIAL 

EXHIBIT
E
CinQ+MC000197

BLP 000012

# BUCCANEERS TICKETS ON SALE NOW

Group, season and half season packages available now. Starting at $32.50 per ticket!
Call 866-582-BUCS (2827) today for the best seat locations

- Youth ticket prices now available
- New four and five game season half season packages
- Lower level seating
- Stadium Club Seating

- Easy payment plan for season tickets
- Upper level seating options without any seat deposit
- Long term contracts are no longer required

| SECTION | SEASON PER GAME PRICE | GROUP PER GAME PRICE | INDIVIDUAL GAME PRICE |
|---|---|---|---|
| Corners | $99.00 | $99.00 | $115.00 |
| Endzones | $89.00 | $89.00 | $105.00 |
| Upper Sideline | $85.00 | $85.00 | $99.00 |
| Upper Sideline | $75.00 | $75.00 | $89.00 |
| Upper Corner-Adult | $65.00 | $65.00 | $79.00 |
| Upper Corner-Youth | $32.50 | N/A | N/A |

Group tickets are available in packages of 20 or more  •  Youth tickets are available for ages 16 and under



Call 866-582-BUCS (2827) or visit www.buccaneers.com

EXHIBIT
F CinQ+MC0 0198

BLP 000022

CONFIDENTIAL

BLP 000067

## *FaxQom*

*Worldwide IP Fax Broadcast*
617-674-2147
www.Faxqom.com

# Fax Broadcast Order Form

**Name:** *Matt Kaiser*                      **Co Name:**

**Address:** *9601 Wilshire Blvd, Suite 744*

**City:** *Beverly Hills*   **State:** *CA*   **Zip:** *90210*

**Phone:** *(310) 275-8944*  **Fax:** *(310) 275-8995*  **Email:** *mkaiser@firstalliedcorp.com*

**What area codes do you want to fax to?   What Quantities per area code?**
**Please list area codes and quantities below and any other broadcast details needed !**

| |
|---|
| 352 area code 123,617 fax numbers / 2 page fax |
| 941 area code 62,013 fax numbers / 2 page fax |
| 813 area code  88,199 fax numbers / 2 page fax          ( per Matt Kaiser ) |
| 727 area code 32,907 fax numbers / 2 page |

Standard fax costs are **2.5** cents per fax for <u>bulk</u> by city, state, area code only

**Total faxes ordered:**      613,472      **Total Cost: $15,336.80**

**Schedule:**

Tuesday, July 14th 2009 @ 9:15AM – All 727 area codes
Wednesday, July 15th @ 9:15AM – All 813 area codes
Thursday, July 16th @ 9:15AM – All 352 & 941 area codes

The acceptance of this agreement and payment is subject to the conditions set forth in
Exhibit A (attached). *(MK)*

## To place immediate Order,  fax to  888-705-2307

*Tampa Bay Buccaneers*
*By: Matt Kai*
*Its: Director of New Business Development*
*Date: 7/9/09*

EXHIBIT

G

*page 1 of 3*
*(MK)*

CONFIDENTIAL                      CinQ+MC000199

BLP 000068



**FaxQom**

*Worldwide IP Fax Broadcast*
*5500 University, Boston. Ma 02134*
Ph 617-674-2147
*Faxqom.com*

*Fax Indemnity Agreement*

*In consideration of these presents and the mutual promises herein, the adequacy of
which hereby acknowledged, FaxQom agrees to indemnify defend, and hold harmless
Buccaneers Limited Partnership from any and all legal issues
that may arise from fax broadcasting through FaxQom.*

*FaxQom is a legal compiler of fax databases and has been using the same compiling
techniques since 1991 which was the same year the TCPA of 1991 (Telephone
Consumer Protection Act) was in force.*

*Using legal techniques in compiling fax data has enabled FaxQom to be 18 years strong
with a solid reputation in broadcast marketing.*

*Your account will be handled directly by Steven Simms, Exec VP of Marketing. All
broadcast orders, changes or questions will be under his management. You have a 17
year veteran of FaxQom at your service.*

*Happy Faxing !*

---

*Steven Simms, Exec VP of Marketing*
*FaxQom Atlantic*

---

Buccaneers Limited Partnership
By: *Tim Lan*
Its: Director of New Business Development
Date: 7/9/09

page 2 of 3
(TL)

CONFIDENTIAL                    CinQ+MC000200

BLP 000069

## Exhibit A

- FaxQom agrees to stop the campaign and refund all monies paid immediately at anytime with the written request from the Tampa Bay Buccaneers.

- FaxQom has acknowledged the Indemnity Form signed by Buccaneers Limited Partnership, which indemnifies the Tampa Bay Buccaneers from any and all complaints or litigation that may arise as a result of this campaign.

- The Tampa Bay Buccaneers will receive a detailed report showing the total number of successfully delivered faxes and will only be charged for each successful delivery of each. Such reports will be to the satisfaction of the Tampa Bay Buccaneers to the extent these reports can be generated by FaxQom.

- FaxQom agrees to send all faxes at the times and dates outlined in the Sales Agreement.

- FaxQom confirms that all faxes have been collected according to the best industry practices as outlined by the Direct Marketing Association (DMA).

- FaxQom will agree to and abide by all laws associated with facimile marketing.

*page 3 of 3*
*(MC)*

CONFIDENTIAL       CinQ+MC000201

**From:** Matt Kaiser <mkaiser@firstalliedcorp.com>
**Subject:** Copy of FaxQom Check
**Date:** July 13, 2009 12:08:42 PM PDT
**To:** 'Ansley, Anne'
▸ 1 Attachment, 672 KB

Thanks, Anne.

Matt Kaiser
Acquisitions Manager

First Allied Corporation
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com







CONFIDENTIAL

BLP 000036
CinQ+MC000202

*Buccaneers Limited Partnership*

73525

| Vendor | FAXQOK | Check Date | 7/9/2009 | Check Number | 073525 | | |
|--------|--------|-----------|----------|--------------|--------|---|---|
| Ref Nbr | Invc Nbr | Invc Date | Invoice Amount | Amount Paid | Disc Taken | | Net Check Amt |
| 117926 | SeasonTix Faxes | 7/9/2009 | 15336.80 | 15336.80 | 0.00 | | 15336.80 |

CONFIDENTIAL

**Buccaneers Limited Partnership**

73525

| OUR REF. NUMBER | YOUR INVOICE NUMBER | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 117928 | SeasonTix Taxes | 7/9/2009 | 15336.80 | 15336.80 | 0.00 | 15336.80 |



BBG
073525

| | CHECK DATE | CONTROL NUMBER | AMOUNT |
|---|---|---|---|
| | 7/9/2009 | 073525 | $***15336.80 |

PAY  Fifteen Thousand Three Hundred Thirty-Six and 80/100 -------------------------------- US Dollars

VOID AFTER 180 DAYS

TO THE  FaxQom
ORDER OF  5500 University
Boston, MA  02134

AUTHORIZED SIGNATURE

⑈073525⑈  ⑈263191387⑈:014106170⑈

**Buccaneers Limited Partnership**

73525



| Vendor | FAXQOM | Check Date | 7/9/2009 | Check Number | 073525 | |
|---|---|---|---|---|---|---|
| Ref Nbr | Invc Nbr | Invc Date | Invoice Amount | Amount Paid | Disc Taken | Net Check Amt |
| 117928 | SeasonTix Taxes | 7/9/2009 | 15336.80 | 15336.80 | 0.00 | 15336.80 |

SAFEGUARD
BLP 000038

CONFIDENTIAL

CinQ+MC000204

**From:** Matt Kaiser <mkaiser@firstalliedcorp.com>
**Subject:** **1st Day Fax**
**Date:** July 13, 2009 2:57:49 PM PDT
**To:** 'sales@faxqom.com'
▸ 1 Attachment, 296 KB



Steve,

Here is the fax sheet for tomorrow only. I will send you the ones for Wednesday and Thursday after this one goes out.

Please add the following to the list anytime a fax goes out.

(813) 872-0046
(813) 554-1351
(310) 275-8995
(866) 613-5112
(813) 387-6310

Please confirm your receipt of the attached. I look forward to the report for the 1st day.

If you have any questions or issues, please contact me on my mobile in the morning (310) 980-4068.

Thank you,

**Matt Kaiser**
Acquisitions Manager

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com



FaxSheetgro....pdf (296 KB)



EXHIBIT

I

CONFIDENTIAL

BLP 000040
CinQ+MC000205

# TAMPA BAY BUCCANEERS | FAX COVER

**F A C S I M I L E**



ONE BUCCANEER PLACE   TAMPA, FL 33607

TEL: (813) 870-2700      BUCCANEERS.COM

DATE: __7/14/09__     # of Pages (including cover): __2__

TO: __Human Resources__

FROM: __Group Seating Department__

SUBJECT: __Buccaneers Group Tickets__

ADDITIONAL COMMENTS:

Attached is the information on group seating. Tickets are available for groups of 20 or more people. When buying group seating, you save up to $16 per ticket versus the individual game ticket cost. Group seating also gives you access to large blocks of seating that are not available any other way.

Many companies use group seating as a retreat and/or reward to build team unity.

If you have any questions, please don't hesitate to call us at (877) 649-BUCS (2827).

## 2009 SCHEDULE

**DALLAS**
September 13 | 1:00pm

**AT BUFFALO**
September 20 | 4:05pm

**N.Y. GIANTS**
September 27 | 1:00pm

**AT WASHINGTON**
October 4 | 1:00pm

**AT PHILADELPHIA**
October 11 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**NEW ENGLAND**
October 25 | 1:00pm | LONDON

**GREEN BAY**
November 8 | 1:00pm

**AT MIAMI**
November 15 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**AT ATLANTA**
November 29 | 1:00pm

**AT CAROLINA**
December 6 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**AT SEATTLE**
December 20 | 4:15pm

**AT NEW ORLEANS**
December 27 | 1:00pm

**ATLANTA**
January 3 | 1:00pm

*ALL TIMES EASTERN / SUBJECT TO CHANGE

## 2002 WORLD CHAMPIONS



# GROUP TICKETS ON SALE NOW!
## 877-649-BUCS (2827)

| SECTION | A | B | C | D | E |
|---|---|---|---|---|---|
| GROUP PER GAME PRICE | $99.00 | $89.00 | $85.00 | $75.00 | $65.00 |

Group tickets are available in packages of 20 or more and reflect a discount of up to $16 per ticket

### 2009 SEASON

**DALLAS**
September 13 | 1:00pm

**NEW ORLEANS**
November 22 | 1:00pm

**N.Y. GIANTS**
September 27 | 1:00pm

**N.Y. JETS**
December 13 | 1:00pm

**CAROLINA**
October 18 | 1:00pm

**ATLANTA**
January 3 | 1:00pm

**GREEN BAY**
November 8 | 1:00pm



## Call 877-649-BUCS (2827) or visit www.buccaneers.com today for seat locations

To immediately and permanently remove your fax number from our opt-in compiled database, please call 877-272-7614. Removaltech@FaxQom.com

CONFIDENTIAL

BLP 000042
CinQ+MC000207

**From:** Matt Kaiser <mkaiser@firstalliedcorp.com>
**Subject:** RE: Fax Blast
**Date:** July 15, 2009 12:30:50 PM PDT
**To:** 'Eglazer'
▸ 2 Attachments, 843 KB

Got it. I let Ben know that for everyone else to just tell them that the opt out info is located either on Page 2 of the fax, at the bottom of the email, or they need to reply „OUT‰ to the text.

Both indemnifications are attached.

**Matt Kaiser**
Acquisitions Manager

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com

**From:** Eglazer [mailto:eglazer@mac.com]
**Sent:** Wednesday, July 15, 2009 12:36 PM
**To:** Matt Kaiser
**Subject:** Re: Fax Blast

I wouldn't worry about it. Let's see if they call back email me our signed indemnification we have

Note: please update your address book with my new email address - eglazer@mac.com which replaces any other email address you may have for me.

Sent from my iPhone

On Jul 15, 2009, at 2:49 PM, Matt Kaiser <mkaiser@firstalliedcorp.com> wrote:

Ed,

Would you like me to call this guy back and give him the information? I,d be happy to put a quarter in the mail for him as well∑

**Matt Kaiser**
Acquisitions Manager

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com



EXHIBIT
**J**

CONFIDENTIAL

CinQ+MC 000208

BLP 000052



**From:** Milsom, Ben [mailto:bmilsom@buccaneers.nfl.com]
**Sent:** Wednesday, July 15, 2009 11:54 AM
**To:** Matt Kaiser
**Subject:** FW: Fax Blast

Matt:

Any response to this?

Ben

<bucsflag.jpg> Ben Milsom
        *Director of Sales*
        Tampa Bay Buccaneers
        One Buccaneer Place
        Tampa FL 33607
        813-554-1305
        www.buccaneers.com

**From:** Sheiness, Alissa
**Sent:** Wednesday, July 15, 2009 2:41 PM
**To:** Milsom, Ben
**Subject:** Fax Blast

Mike Paschke
813-910-1515
Fax is 813-910-1717

*said he is on the national do not call list and has received numerous faxes. Said has law suits against marketing companies for using his info illegally. Is going to contact State Attorney office today regarding this issue. Would like a call back with the name of the marketing company we used.

Mike Stember
727-687-8222

*wants a call back " got a txt and got charged 25 cents. Wants his money back.

07/08/2008 16.49 FAX   5516822619                                          ⓘ001/001

# 1m

CAN - Spam Warranty

Email Marketing & Text Messaging

Notwithstanding the provisions in the Terms & Conditions, and in consideration of these
presents and the mutual promises herein contained, the adequacy of which hereby
acknowledged, 1 Touch Marketing is (1TM) 100% CAN – Spam compliant, and shall
indemnify, defend, and hold harmless BUCCANEERS LIMITED PARTNERSHIP
(Advertiser) from and against any and all third-party claims, suits, or liabilities arising
from or in connection with 1 Touch Marketing fulfillment of email-based advertisement
to the 1 Touch Marketing database, provided that such, suits, or liabilities are specifically

CONFIDENTIAL

BLP 000053

CinQ+MC000209

related to claims of spamming. I Touch Marketing hereby specifically warrants and represents that the above mentioned database is an "opt-in" database and therefore indemnifies and holds Advertiser harmless from any third party claim of spamming and any costs and/or penalties related thereto.

Advertiser shall promptly notify I Touch Marketing in writing of all such claims, provide cooperation, and information reasonably requested by I Touch Marketing and shall agree to give I Touch Marketing sole control over the defense and any settlement of such claims.

ITM follows all MMA guidelines and best practices set from the inception of the MMA. All records are verified via the aggregator and must be true opt-in before broadcast. All messages have to be approved by major carriers before broadcast on to any network. ITM uses our short code which hold us responsible for the message not the advertiser, the advertiser is held harmless.

| I Touch Marketing LLC. | Buccaneers Limited Partnership |
|---|---|
| By: _____ | By: _____ |
| Print Name: _Brad Ross_ | Print Name: Man Kaise |
| Title: _VP_ | Title: _Director of New Business Development_ |
| Date: _7/9/09_ | Date: _'/'/00_ |

**FaxQom**

*Worldwide IP Fax Broadcast*
*5500 University, Bedford MA 03734*
*Ph 617-874-2147*
*FaxQom.com*

Fax Indemnity Agreement

*In consideration of these promises and the mutual promises herein, the adequacy of which hereby acknowledged, FaxQom agrees to indemnify defend, and hold harmless Buccaneers Limited Partnership from any and all legal issues that may arise from fax broadcasting through FaxQom.*

*FaxQom is a legal compiler of fax databases and has been using the same compiling techniques since 1991 which are the same year the TCPA of 1991 (Telephone Consumer Protection Act) was in force.*

*Using legal techniques in compiling fax data has enabled FaxQom to be 18 years strong with a solid reputation in broadcast marketing.*

*Your account will be handled directly by Steven Sloane, Exec VP of Marketing. All broadcast orders, changes or questions will be tender his management. You have a 17 year veteran of FaxQom at your service.*

CONFIDENTIAL

*Happy Faxing !*

Steven Simms, Exec VP of Marketing
FaxQom Atlantic

1/9/01

Buccaneers Limited Partnership
By: John Kai
Its: Director of New Business Development
Date: 1/9/01

pge 2/8
(mg)

CONFIDENTIAL

CinQ+MC000211

BLP 000055

From: Matt Kaiser <mkaiser@firstalliedcorp.com>
Subject: FW: Complaint
Date: July 15, 2009 1:33:20 PM PDT
To: 'Eglazer'

FYI - The fax broadcast company took the liberty of contacting the guy threatening the lawsuit. I had forwarded his name and number to be sure he was not on our next go around. All is well.

**Matt Kaiser**
Acquisitions Manager

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com

---

**From:** sales@faxqom.com [mailto:sales@faxqom.com]
**Sent:** Wednesday, July 15, 2009 1:39 PM
**To:** Matt Kaiser
**Subject:** Re: Complaint

Matt,

I already spoke with this guy..........................I handled this already no problems. He is a pretty nice guy actually. I explained to him about the fax compiling and data.

He has been opt-out of our database permanantly.

If you get these in the future just forward to me at 617-674-2147 ext 1.......................I handle all of these throughout our company because Ive been here 17 years and know the data and proceedures very well.

Steve


EXHIBIT
K

BLP 000058
CinQ+MC00212

CONFIDENTIAL

Date : 8/25/2015 5:14:03 PM
From : "Tina Natali"
To : "wra1991@aol.com" , "bbuczkowski@jamsadr.com"
Cc : "David Oppenheim" , "Ross Good" , "m@mcalaw.net" , "mark.mester@lw.com"
Subject : Cin-Q Automobiles v. Buccaneers – JAMS Reference No. 1340012173
Attachment : Ex. L - email re Nick Coblio.pdf;Ex. M - Kaiser-FaxQom emails.pdf;Ex. N - Towzey aff.pdf;Ex. O - Alvare dep.pdf;Ex. P - Cinque cmplt.pdf;Ex. Q - fax broadcast order form.pdf;Ex. R - FL atty gen ltr.pdf;Ex. S - term sheet.pdf;

Email 3 of 3
Attached are Exhibits L through S to Plaintiffs' Pre-Mediation Statement.

*Tina Natali*
*Assistant to David M. Oppenheim*
*Anderson + Wanca*
*3701 Algonquin Road, Suite 500*
*Rolling Meadows, IL 60008*
*Telephone: 847-368-1500*
*Fax: 847-368-1501*

CONFIDENTIAL

From: **Matt Kaiser** mkaiser@firstalliedcorp.com
Subject: RE: Message
Date: July 22, 2009 at 10.46 AM
To: 'Milsom, Ben'
Cc: 'Layton, Jason'

Let's just add both his fax and mobile to the list, so I can send this to the companies if we decide to go for round 2 (which we will likely do).  Please also try to track down whatever hospital received all the faxes and add those numbers as well.

If these people didn't sign up for every free offer they see, then their names probably wouldn't end up in 2 separately complied marketing databases of 'opted-in' recipients.  I wish there was a nice way to explain that to them.

**Matt Kaiser**
**Acquisitions Manager**

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995
www.firstalliedcorp.com

---

**From:** Milsom, Ben [mailto:bmilsom@buccaneers.nfl.com]
**Sent:** Wednesday, July 22, 2009 10:18 AM
**To:** Matt Kaiser
**Cc:** Layton, Jason
**Subject:** FW: Message

Matt:

I talked with this guy earlier last week and he received a fax and requested to be removed from our lists. Today he received a text message from us.  He let me know he was going to file a compliant with the FCC.

Ben

**From:** Martin, Rachel
**Sent:** Wednesday, July 22, 2009 12:58 PM
**To:** Milsom, Ben
**Subject:** Message

Nick Coblio called in regards to the fax and text blasts. He has gotten a fax and a text and would like to be removed from the list. I put him on our "to be removed list" but he would like to speak with you. The number where you can return his call is 813-978-5804.

**EXHIBIT**

**L**

CONFIDENTIAL

CinQ+MC0002 4BLP00677



Ben Milsom
*Director of Sales*
Tampa Bay Buccaneers
One Buccaneer Place
Tampa FL 33607
813-554-1305
www.buccaneers.com



**From:** Matt Kaiser <mkaiser@firstalliedcorp.com>
**Subject:** **Buccaneers Fax**
**Date:** August 13, 2009 9:22:31 AM PDT
**To:** 'sales@faxqom.com'
**Cc:** 'Layton, Jason'
  2 Attachments, 5.4 MB



Steve,

Attached is the fax sheet (one page this time) and a copy of the agreement which shows the area codes to send to (same as before) with dates and times to send. I have also summarized the schedule below:

(727) Area Code = 32,907 total #s ˮ To be sent on 8/17/09 @ 9:30AM EST
(813) Area Code = 88,197 total #s ˮ To be sent on 8/18/09 @ 9:30AM EST
(352) Area Code = 123,617 total #s ˮ To be sent on 8/19/09 @ 9:30AM EST
(941) Area Code = 62,013 total #s ˮ To be sent on 8/20/09 @ 9:30AM EST

You will receive a check in the amount of $7,668.40 tomorrow.

Please remove the 2 numbers we discussed from the last round (813-783-7790 & 813-333-1049) and add any new numbers you may have gained since our last campaign to make up for our balance of credits.

As a reminder, put my faxes on each day,s list (310) 275-8995, (866) 613-5112, and (813) 872-0046.

Thank you,

Matt Kaiser

**Tampa Bay Buccaneers**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944
Fax: (310) 275-8995

**From:** Matt Kaiser [mailto:mkaiser@firstalliedcorp.com]
**Sent:** Monday, August 10, 2009 3:03 PM
**To:** 'sales@faxqom.com'
**Subject:** RE: Buccaneers Fax

To whose attention and what number?

Attached is the correct fax to send.

Let,s keep the same time each day (9:15AM).

Matt Kaiser

**First Allied Corporation**
9601 Wilshire Blvd., Suite 744
Beverly Hills, CA 90210
Tel: (310) 275-8944

EXHIBIT
M

CONFIDENTIAL

BLP 000087
CinQ-FMC-00216

Fax: (310) 275-8995

From: sales@faxqom.com [mailto:sales@faxqom.com]
Sent: Monday, August 10, 2009 3:08 PM
To: Matt Kaiser
Subject: Re: Buccaneers Fax

Matt,

Thanks for the email.

Please send the check to the same address as before:

2257 N Loop 336 w
Ste 140-394
Conroe, Texas 77304

Steve



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | MIAMI | August 27 | 8:00pm |
| | HOUSTON | September 4 | 7:00pm |
| | DALLAS | September 13 | 1:00pm |
| | N.Y. GIANTS | September 27 | 1:00pm |
| | CAROLINA | October 18 | 1:00pm |
| | GREEN BAY | November 8 | 1:00pm |
| | NEW ORLEANS | November 22 | 1:00pm |

CONFIDENTIAL

BLP 000088
CinQ+MC000217



**N.Y. JETS**   **December 13**   **1:00pm**



**ATLANTA**   **January 3**   **1:00pm**

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database,
please call 877-272-7614. Removeitech@FaxQom.com

## FaxQom
**Worldwide IP Fax Broadcast**
617-674-2147
www.Faxqom.com

## Fax Broadcast Order Form

**Name:** Matt Kaiser   **Co Name:** Tampa Bay Buccaneers

**Address:** 9601 Wilshire Blvd. Suite 744

**City:** Beverly Hills   **State:** CA   **Zip:** 90210

**Phone:** (310) 275-8944   **Fax:** (310) 275-8995   **Email:** mkaiser@fastallied corp.com

**Where do you want faxes sent ?   Please list area codes and quantities to each area code below.**

| 727 | area code : 32,967 fax numbers - to be sent 8/17/09 |
| 813 | area code : 88,199 fax numbers - to be sent 8/18/09 |
| 352 | area code : 123,617 fax numbers - to be sent 8/19/09 |
| 941 | area code : 62,013 fax numbers - to be sent 8/20/09 |
| | all faxes to be sent at 9:30AM EST |

**Rates are 2.5 cents per fax** × 306,736 total faxes = Total is: $7,668.40

<u>Faxqom does not guarantee any certain response rates from your broadcast.</u>

**Credit Card Info for Payment:** Mastercard / Visa / Discover only
**The charge on your credit card statement will read:** Net Fax

**Card Number:**_____ **Exp Date:**_____

**3 digit sec code:**_____ **Your Signature:**_____

**Credit Card Billing**
**Address:**_____ PAYMENT BY CHECK

**Signature:**_____

CONFIDENTIAL

CinQ+MC000218

BLP 000089



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | **MIAMI** | **August 27** | **8:00pm** |
| | **HOUSTON** | **September 4** | **7:00pm** |
| | **DALLAS** | **September 13** | **1:00pm** |
| | **N.Y. GIANTS** | **September 27** | **1:00pm** |
| | **CAROLINA** | **October 18** | **1:00pm** |
| | **GREEN BAY** | **November 8** | **1:00pm** |
| | **NEW ORLEANS** | **November 22** | **1:00pm** |
| | **N.Y. JETS** | **December 13** | **1:00pm** |
| | **ATLANTA** | **January 3** | **1:00pm** |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database,
please call 877-272-7614. Removaltech@FaxQom.com

CONFIDENTIAL

BLP 000090
CinQ+MC000219

# FaxQom
**Worldwide IP Fax Broadcast**
617-674-2147
www.Faxqom.com

# Fax Broadcast Order Form

**Name:** Matt Kaiser        **Co Name:** Tampa Bay Buccaneers

**Address:** 9601 Wilshire Blvd, Suite 744

**City:** Beverly Hills   **State:** CA   **Zip:** 90210

**Phone:** (310) 275-8944   **Fax:** (310) 275-8995   **Email:** mkaiser@ firstallied corp.com

**Where do you want faxes sent?   Please list area codes and quantities to each area code below.**

727 area code = 32,907 fax numbers - to be sent 8/17/09
813 area code = 88,199 fax numbers - to be sent 8/18/09
352 area code = 123,617 fax numbers - to be sent 8/19/09
941 area code = 62,013 fax numbers - to be sent 8/20/09
all faxes to be sent at 9:30 AM EST

**Rates are 2.5 cents per fax ×** 306,736 **total faxes = Total is:** $7,668.40

**Faxqom does not guarantee any certain response rates from your broadcast.**

**Credit Card Info for Payment:   Mastercard / Visa / Discover   only**
**The charge on your credit card statement will read:   Net Fax**

**Card Number:**_____   **Exp Date:**_____

**3 digit sec code:**_____   **Your Signature:**_____

**Credit Card Billing Address:**___ PAYMENT BY CHECK

**Signature:**_____

## To place immediate Order,  fax to 888-705-2307

Tampa Bay Buccaneers        Date: 8/11/09
By: Matt Kai
Ttl: Director of New Business Development

CONFIDENTIAL

BLP 000091

CinQ+MC000220

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIN-Q AUTOMOBILES, INC., and
MEDICAL & CHIROPRACTIC CLINIC,
INC., Florida corporations, individually
and as the representatives of a class of
similarly-situated persons,

       Plaintiffs,

v.                                          Case No. 8:13-cv-1592-17AEP

BUCCANEERS LIMITED
PARTNERSHIP and JOHN DOES 1-10,

       Defendants.          /

## AFFIDAVIT OF PHYLLIS J. TOWZEY

COUNTY OF PINELLAS )
STATE OF FLORIDA   )

    1.    I am over the age of 18, I have personal knowledge of the facts set forth in this affidavit and I am competent to testify with respect to the facts alleged herein. If called to testify in court, my testimony would be as follows:

    2.    I am the owner of the Law Offices of Phyllis J. Towzey, P.A., located at 475 Central Avenue, St. Petersburg, FL 336701.

    3.    I have been licensed to practice law in the State of Florida since 1987.

    4.    During July and August of 2009, my law firm maintained a facsimile machine for the sending and receiving of correspondence and court pleadings in connection with my law practice. The telephone number assigned to my law firm's



EXHIBIT
2

CONFIDENTIAL

CinQ007071
CinQ-MC000221

Affidavit of Phyllis J. Towzey
April 2, 2014

facsimile machine was (727) 892-9925, the service was registered in the name of my law firm and the billing for that service was paid for by my law firm. That telephone service was provided by Verizon.

5.      On two separate occasions—July 14, 2009, and again on August 17, 2009—someone on behalf of the Buccaneers Limited Partnership, d/b/a the Tampa Bay Buccaneers ("Tampa Bay Buccaneers"), sent a facsimile ("the Fax") to my law firm's facsimile machine that is connected to the telephone number (727) 892-9925.

6.      The Fax my law firm received was an advertisement attempting to sell football tickets.

7.      Buccaneers Limited Partnership, d/b/a the Tampa Bay Buccaneers, had the Fax sent to my law firm's facsimile machine without my prior express invitation or permission.

8.      Buccaneers Limited Partnership, d/b/a the Tampa Bay Buccaneers, has never had an established business relationship my law firm.

9.      I was tired of receiving unsolicited faxes that used up my firm's ink cartridge, interrupted my day by forcing me to review unwanted and unasked for advertisements, and delayed our receipt of fax communications that *were* invited.

10.     On August 20, 2009, I authored a letter (hereafter "August 20 Letter") to Brian A. Ford, Registered Agent, Tampa Football Corporation, One Buccaneer Square, Tampa, FL 33615 and sent it to his attention *via* Federal Express. A true and correct copy of the August 20 Letter is attached as **Exhibit A.**

2

CONFIDENTIAL

CinQ007072
CinQ+MC000222

Affidavit of Phylis J. Towzey
April 2, 2014

11.    In the August 20 Letter I warned Mr. Ford as follows:

"A federal law enacted in 1991, the Telephone Consumer Protection Act ("the Act"), provides as follows:

'It shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine' 47 U.S.C. § 227(b)(1).

"The Act also provides that '[a] person or entity may . . . bring in an appropriate court . . . an action . . . to receive $500 in damages for each such violation.'   If the court finds that the defendant 'willfully or knowingly violated this subsection' of the regulations, the court may triple the damage award. See 47 U.S.C. § 227(b)(3)."

12.    I further advised Mr. Ford of the consequences of sending the unsolicited advertisement to me by using my firm's facsimile machine in the following words:

"By sending the Fax to me, Tampa Bay Buccaneers violated 47 U.S.C. § 227(b)(1) and is now liable to pay damages to me of not less than $500 for each of the two occurrences under 47 U.S.C. § 227(b)(3). I believe Tampa Bay Buccaneers willfully or knowingly violated the Act (which has been widely publicized), and is therefore liable to pay me $1,500 for each of the two occurrences – a total of $3,000."

13.    On behalf of my law firm in the August 20 Letter I proposed a settlement of the claim, but warned as follows:

"If this matter is not resolved by payment of $1,000 by the deadline set forth above, it is my intention to file an action in federal court in the Middle District of Florida  for violations of the Act, seeking treble damages ($1,500 for each of the two occurrences), attorney's fees and the costs of the action."

14.    I know my August 20 Letter was received by the Tampa Bay Buccaneers because I confirmed through Federal Express tracking that it had been received, and it was not returned to me.

3

CONFIDENTIAL

CinQ007073
CinQ+MC000223

Affidavit of Phyllis J. Towzey
April 2, 2014

15.    In addition, I received a telephone call from Manuel Alvare, who identified

himself as the General Counsel for the Tampa Bay Buccaneers, and wished to discuss the

subject matter of my letter. He told me that my letter to Mr. Ford had been forwarded to

him for his attention, and that he was contacting me in response to that letter.

16.    Mr. Alvare told me in that conversation that the Fax had been sent by an

entity he identified as FaxQom and that he was looking into how that had occurred. He

apologized to me for any inconvenience or annoyance I had suffered as a result of the

unsolicited faxes sent to my office, and said he would take steps to ensure that it did not

happen again.

17.    When I raised the issue of monetary damages, Mr. Alvare told me he

believed FaxQom was responsible for any damages because FaxQom had sent the Fax.

18.    Following the receipt of my August 20 Letter by Mr. Alvare and our

subsequent telephone conversation, I received a facsimile from an individual who

identified himself as Steve Simms representing that he was associated with an entity

known as FaxQom. Mr. Simms denied being involved in the sending of the Fax to my

law firm's facsimile machine. I responded to the letter from Mr. Simms with my letter

dated September 11, 2009 (hereafter "September 11 Letter"), which I had to send by

facsimile because the letter from Mr. Simms did not include a physical address, nor was

any business address mentioned anywhere on FaxQom's website. A true and correct

copy of the September 11 Letter is attached as **Exhibit B.**

4

CONFIDENTIAL

CInQ007074
CinQ+MC000224

Affidavit of Phyllis J. Towzey
April 2, 2014

19.   I also sent a copy of the September 11 Letter by facsimile to Manuel A. Alvaré, III, Esq., Tampa Bay Buccaneers Headquarters, One Buccaneer Place, Tampa, Florida 33607, Phone: 813.870-2700, Fax: 813.554-1351.

20.   On September 16, 2009, I wrote a letter (hereafter "September 16 Letter") to Mr. Alvare following up on my telephone conversation with him, as well as my August 20 Letter and my September 11 Letter to Mr. Simms.  The September 16 Letter was again sent *via* Federal Express.  A true and correct copy of the September 16 Letter is attached as **Exhibit C.**

21.   In my September 16 Letter I informed Mr. Alvare of the following:

> "As you know, I received a letter from a Steven Simms at FaxQuom in which he vehemently denied that it was his company that sent the faxes. Mr. Simms declined to provide a mailing address or a physical address for FaxQuom, and his company's website (www.faxquom.com) likewise furnishes no contact information."

22.   I received a telephone call from Mr. Alvare following his receipt my September 16 Letter requesting that I not follow through with my threat to file a lawsuit against the Tampa Bay Buccaneers.  Mr. Alvare assured me that he would further investigate this matter with FaxQom, take all appropriate steps to ensure that I did not receive any further unsolicited faxes asking me to purchase Bucs tickets or anything else, and see what he could do to make FaxQom take responsibility for its actions if I agreed to refrain from filing that action.

CONFIDENTIAL

CinQ007075
CinQ+MC000225

Affidavit of Phyllis J. Towzey
April 2, 2014

23.    I have never received any compensation from the Buccaneers Limited

Partnership, or anyone else on its behalf, for the two Fax transmissions to my law firm

facsimile machine.

24.    I have not had any involvement with the subject matter addressed in this

Affidavit until the morning of Tuesday, March 25, 2014, when I received a telephone call

from Attorney Michael Addison inquiring as to my possible complaint to the Tampa Bay

Buccaneers about receiving facsimile advertisements for home games for the 2009

season.

25.    In response to Mr. Addison's request, I located the copies of my

correspondence that had been saved and stored on my computer hard drive, and provided

electronic copies of the three letters to him.  Those letters are attached as Exhibits A, B

and C to this Affidavit.

Phyllis J. Towzey

6

CinQ007076
CinQ+MC000226

Affidavit of Phyllis J. Towzey
April 2, 2014

STATE OF FLORIDA      )
COUNTY OF PINELLAS )

    Sworn to and subscribed before me on ___April 10___, 2014, by

Phyllis J. Towzey, who is personally known to me or who produced her

_____ as identification.

                                                                             NOTARY PUBLIC, State of Florida
Print, Type or Stamp Name of Notary
(Seal)

                               Steven C. Harnois
                         Commission #EE861305
                         Expires:  Mar. 30, 2017
                         BONDED THRU
                         AAA NOTARY & SURETY BONDS
                  ADDISON & HOWARD, P.A.
                  400 N. Tampa St., Suite 1100
                  Tampa, FL  33602-4714
                  Tel:  (813) 223-2000
                  Fax:  (813) 228-6000
                  Attorneys for Plaintiffs

                  /s/ Michael C. Addison
                  Michael C. Addison
                  Florida Bar No. 0145579
                  m@mcalaw.net

                  and

                  Ryan M. Kelly
                  Florida Bar No. 90110
                  ANDERSON + WANCA
                  3701 Algonquin Road, Suite 760
                  Rolling Meadows, IL  60008
                  Tel:  (847) 368-1500
                  Fax:  (847) 368-1501
                  rkelly@andersonwanca.com

CONFIDENTIAL

CinQ007077
CinQ+MC000227

# EXHIBIT A

CONFIDENTIAL

CinQ007078

CinQ+MC000228

Law Offices
# PHYLLIS J. TOWZEY, P.A.
### Board Certified Labor & Employment Law

(727) 895-1200
(727) 892-9925 (Fax)

phyllis@towzey.com
www.towzey.com

475 Central Ave
St. Petersburg, FL 33701

August 20, 2009

*Via Federal Express*

Brian A. Ford
Registered Agent
Tampa Football Corporation
One Buccaneer Square
Tampa, FL 33615

Re:   Tampa Football Corporation, Violation of Telephone Consumer Protection Act

Dear Mr. Ford:

On July 14, 2009, and again on August 17, 2009, Tampa Football Corporation on behalf of the Tampa Bay Buccaneers ("Tampa Bay Buccaneers") sent a facsimile ("the Fax") to my facsimile machine that is connected to the telephone number 727-892-9925, which is registered in my name. A copy of the Fax is enclosed. The Fax is an advertisement attempting to sell me football tickets. Tampa Bay Buccaneers sent the Fax to me without my prior express invitation or permission. Tampa Bay Buccaneers and I have never had an established business relationship. Frankly, I am tired of receiving unsolicited faxes that use up my ink cartridge, interrupt my day, and delay my receipt of fax communications that *are* invited.

A federal law enacted in 1991, the Telephone Consumer Protection Act ("the Act"), provides as follows:

It shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1).

The Act also provides that "[a] person or entity may . . . bring in an appropriate court . . . an action . . . to receive $500 in damages for each such violation." If the court finds that the defendant "willfully or knowingly violated this subsection" of the regulations, the court may triple the damage award. See 47 U.S.C. § 227(b)(3).

By sending the Fax to me, Tampa Bay Buccaneers violated 47 U.S.C. § 227(b)(1) and is now liable to pay damages to me of not less than $500 for each of the two occurrences under 47 U.S.C. § 227(b)(3). I believe Tampa Bay Buccaneers willfully or knowingly violated the Act (which has been widely publicized), and is therefore liable to pay me $1,500 for each of the two occurrences – a total of $3,000.

CinQ007079

CONFIDENTIAL                    CinQ+MC000229

Brian A. Ford
August 20, 2009
Page 2 of 2

For information about the Act, see the federal regulations interpreting the Act, and also see the 2001 class action lawsuit, *Nicholson v. Hooters of Augusta, Inc.*, (Richmond County, Georgia, Superior Court case number 95-RCCV-616). In that case, Hooters hired a fax service that sent six unsolicited junk faxes to each of 1,321 fax numbers. In April of 2001, the court ordered Hooters to pay treble damages of $11,889,000. In another case filed in 2002, Dallas Basketball Limited (the Dallas Mavericks) paid $650,000 to settle a junk fax class action lawsuit

To resolve this matter and avoid unnecessary litigation, I am willing to waive my right to seek damages totaling $3,000 for the two occurrences and will agree not to file a 47 U.S.C. § 227(b)(1) lawsuit against Tampa Bay Buccaneers in exchange for payment of $500 for each of the two occurrences (a total payment of $1,000) on or before September 15, 2009.

If this matter is not resolved by payment of $1,000 by the deadline set forth above, it is my intention to file an action in federal court in the Middle District of Florida for violations of the Act, seeking treble damages ($1,500 for each of the two occurrences), attorney's fees and the costs of the action.

Demand is hereby made that Tampa Bay Buccaneers immediately cease and desist from sending any facsimiles to me in the future.

Thank you in advance for your attention to this matter.

Sincerely,

Phyllis J. Towzey

CinQ007080

CONFIDENTIAL                              CinQ+MC000230

# EXHIBIT B

CONFIDENTIAL

CinQ007081
CinQ+MC000231

Law Offices
# PHYLLIS J. TOWZEY, P.A.
Board Certified Labor & Employment Law

(727) 895-1200
(727) 892-9925 (Fax)

phyllis@towzey.com
www.towzey.com

475 Central Ave
St. Petersburg, FL 33701

September 11, 2009

Sent by Fax to number 617-674-2147

Steven Simms
FaxQom

RE: Your fax to my phone fax number of 727 892 9925

Dear Mr. Simms:

In 22 years of business litigation, I have learned to be skeptical of individuals who do not identify their position with a company and also do who not provide the business operating address of the company. Your fax to me had no date, no business address of the company, and you did not provide your identification with the company. The website www.faxquom.com, shows no business address. Are you empowered to act on behalf of FaxQom?

Would you kindly provide me with your position with FaxQom? Is FaxQom a Florida Corporation? What is your business operating address? What is the name of your attorney?

Demand is hereby made pursuant to 47 U.S.C. § 227(b)(1). for FaxQom to remove my fax phone number – 727-892-9925—from all lists you maintain and from all lists you have sold, shared, or distributed to other companies in the past six months. Should my fax number be inundated by junk faxes in the near future I will consider your company responsible.

Sincerely,

Phyllis J. Towzey

Cc: by fax to
Manuel A Alvaré, III, Esq.
Tampa Bay Buccaneers Headquarters
One Buccaneer Place
Tampa, Florida 33607
Phone: 813.870-2700
Fax: 813.554-1351

CinQ007082
CinQ+MC000232

CONFIDENTIAL

# EXHIBIT C

CONFIDENTIAL

CinQ007083
CinQ+MC000233

Law Offices
# PHYLLIS J. TOWZEY, P.A.
**Board Certified Labor & Employment Law**

(727) 895-1200
(727) 892-9925 (Fax)

phyllis@towzey.com
www.towzey.com

475 Central Ave
St. Petersburg, FL 33701

September 16, 2009

*Via Federal Express*

Manny Alvare, Esq.
Tampa Bay Buccaneers Headquarters
One Buccaneer Place
Tampa, FL 33607

Re:   Violation of Telephone Consumer Protection Act

Dear Mr. Alvare:

I'm following up on our conversation several weeks ago regarding the unsolicited advertisements for the Tampa Bay Buccaneers sent to my fax machine in violation of the federal Telephone Consumer Protection Act.

You advised me that fax advertisements for the Bucs are sent by an outside vendor, "FaxQuom," and told me you were looking into how this occurred.

As you know, I received a letter from a Steven Simms at FaxQuom in which he vehemently denied that it was his company that sent the faxes. Mr. Simms declined to provide a mailing address or a physical address for FaxQuom, and his company's website (www.faxquom.com) likewise furnishes no contact information.

If I can provide any additional information that would assist you in obtaining indemnification from FaxQuom, please let me know. In the meantime, however, realize that it is irrelevant to me whether FaxQuom or another vendor actually sent the fax; the fax was clearly sent on behalf of the Tampa Bay Buccaneers, and expressly solicits the purchase of tickets for Bucs games. Accordingly, the law holds your company responsible for the actions of its agent.

Ironically, I learned of this law when one of my own clients, a small business located in Pinellas County, was sued by another party for sending unsolicited faxes advertising the company's services. After researching the matter, I determined that if a fax was indeed sent, there is simply no defense; my client was liable for treble damages and attorney's fees.

I have contacted you directly (rather than using the attorney who sued my own client) to provide an opportunity for you to resolve this matter by paying only the statutory amount of $500 per violation, rather than treble damages of $1,500 per occurrence, and attorney's fees.

CinQ007084

CONFIDENTIAL                 CinQ+MC000234

Manny Alvare, Esq.
September 16, 2009
Page 2 of 2


If I receive payment of $1,000 within the next ten (10) days, I will waive my right to seek damages totaling $3,000 for the two occurrences and will agree not to file a 47 U.S.C. § 227(b)(1) lawsuit against Tampa Bay Buccaneers. If it is necessary for me to file suit, however, I will turn the matter over to the attorney who sued my client, and your company will then be liable for his attorney's fees as well.

Thank you in advance for your attention to this matter.

Sincerely,


Phyllis J. Towzey

CinQ007085

CONFIDENTIAL          CinQ+MC000235

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
1–4

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
 2                TAMPA DIVISION

 3         CASE NO. 8:13-cv-1592-EAK-AEP

 4   CIN-Q AUTOMOBILES, INC. And
 5   MEDICAL & CHIROPRACTIC CLINIC,
     INC., Florida corporations,
 6   individually and as the
     representative of a class of
 7   similarly-situated persons,

 8          Plaintiff,

 9          vs.

10   BUCCANEERS LIMITED PARTNERSHIP and
     JOHN DOES 1-10,
11
            Defendants.
12                              /

13

14

15          DEPOSITION OF MANUAL ALVARE
                    PAGE 1 - 94
16
               Friday, May 2, 2014
17             8:57 a.m. - 11:00 a.m.

18              Cole Scott & Kissane
            4301 West Boy Scout Boulevard, Suite 400
19                 Tampa, Florida 33607

20   ------------------------------------------

21

22   REPORTED BY:
     Evelyn M. Adrean, RPR, FPR
23   Notary Public
     State of Florida at Large
24   Esquire Deposition Services - Tampa, Florida
     813-221-2535 (800-038-2014)
25   Job No.: 125362
```

**Page 2**

```
 1   APPEARANCES:

 2
         WALLACE C. SOLBERG, ESQUIRE
 3       ROSS M. GOOD, ESQUIRE
         Anderson & Wanca
 4       3701 Algonquin Road, Suite 760
         Rolling Meadows, Illinois  60008
 5       847-368-1500

 6       MICHAEL C. ADDISON, ESQUIRE
         Addison & Howard, P.A.
 7       400 North Tampa Street, Suite 100
         Tampa, Florida 33602
 8       813-419-1810
              (Appeared via telephone conference
 9       call)

10          Attorneys for CIN-Q AUTOMOBILES, INC. And
     MEDICAL & CHIROPRACTIC CLINIC, INC., Florida
11   corporations, individually and as the representative of
     a class of similarly-situated persons
12

13
         BARRY A. POSTMAN, ESQUIRE
14       Cole, Scott & Kissane
         1645 Palm Beach Lakes Boulevard, 2nd Floor
15       West Palm Beach, Florida  33401
         561-383-9234
16
         DAVID C. BORUCKE, ESQUIRE
17       Cole, Scott & Kissane
         4301 West Boy Scout Boulevard, Suite 400
18       Tampa, Florida 33607
         813-289-9300
19
         DAVID S. COHEN, ESQUIRE
20       CASSIE SADOWITZ, ESQUIRE
         Buccaneers Limited Partnership
21       One Buccaneer Place
         Tampa, Florida 33607
22       813-870-2700

23          Attorneys for BUCCANEERS LIMITED PARTNERSHIP
     and JOHN DOES 1-10
24

25
```

**Page 3**

```
 1              I N D E X

 2   DEPOSITION OF MANUEL ALVARE           PAGE

 3   Direct Examination by Mr. Solberg      5

 4   Cross-Examination by Mr. Postman       75

 5   Redirect Examination by Mr. Solberg    80

 6   Re-Cross Examination by Mr. Postman    86

 7   Redirect Examination by Mr. Solberg    87

 8   Re-Cross Examination by Mr. Postman    88

 9   Redirect Examination by Mr. Solberg    88

10   Certificate of Reporter                90

11   Deposition Errata Sheet                92

12   Certificate of Oath                    91

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1              PLAINTIFF'S EXHIBITS

 2   NO.   DESCRIPTION                      PAGE

 3    1    August 3, 2009 E-mail to Manny Alvaro
          from Matt Kaiser                    24
 4
      2    July 9, 2009 E-mail to Edward Glazer
 5         from Matt Kaiser                    34

 6    3    August 20, 2009 Letter to Brian Ford
          from Phyllis Towzey                 35
 7
      4    September 11, 2005 Letter to Steve
 8         Simms from Phyllis Towzey          41

 9    5    September 16, 2009 Letter to Manny
          Alvare from Phyllis Towzey          50
10
      6    September 1, 2009 Fax String Between
11         Manny Alvare and Matt Kaiser        52

12    8    Complaint for Case No. 09 22039     59

13    9    Amended Class Action Complaint      61

14   10    Verified Return of Service          62

15   11    June 3, 2010 Letter to Tampa Bay
          Buccaneers from June Clarkson        67
16
     12    October 2, 2009 Letter to Steve
17         Simms from Tim Hunt                 64

18   16    String of E-mails Between Manny
          Alvare and Ross Good                71
19

20

21

22

23

24

25
```



EXHIBIT O

CONFIDENTIAL

800.211.DEPO (3376)
EsquireSolutions.com

CinQ+MC000236



MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
5–8

800.211.DEPO (3376)
EsquireSolutions.com

CONFIDENTIAL

CinQ+MC000237

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
9–12

CONFIDENTIAL

CinQ+MC000238

MANUAL ALVARE                                            May 02, 2014
CIN-Q AUTOMOBILES vs. BUCCANEERS                              13–16

CONFIDENTIAL                              CinQ+MC000239

CONFIDENTIAL

CinQ+MC000240

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
21–24

CONFIDENTIAL

CinQ+MC000241

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
25–28

CONFIDENTIAL

CinQ+MC000242

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
29–32

CONFIDENTIAL

CinQ+MC000243

MANUAL ALVARE                                                   May 02, 2014
CIN-Q AUTOMOBILES vs. BUCCANEERS                                      33–36

CONFIDENTIAL                          CinQ+MC000244

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
37–40

CONFIDENTIAL

CinQ+MC000245

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
41—44

CONFIDENTIAL

CinQ+MC000246

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
45–48

CONFIDENTIAL                CinQ+MC000247

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
49–52

CONFIDENTIAL

CinQ+MC000248

Case 8:16-cv-01622-AEP   Document 131-1   Filed 12/14/18   Page 251 of 332 PageID 2621

Case 8:13-cv-01592-AEP   Document 138-8   Filed 05/27/14   Page 15 of 25 PageID 4254

CONFIDENTIAL

CinQ+MC000249

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
57–60

CONFIDENTIAL                    CinQ+MC000250

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
61–64

CONFIDENTIAL

CinQ+MC000251

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
65—68

CONFIDENTIAL

CinQ+MC000252

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
69–72

CONFIDENTIAL                    CinQ+MC000253

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
73–76

CONFIDENTIAL

CinQ+MC000254

Case 8:16-cv-01622-AEP   Document 131-1   Filed 12/14/18   Page 257 of 332 PageID 2627
Case 8:13-cv-01592-AEP   Document 138-8   Filed 05/27/14   Page 21 of 25 PageID 4260

CONFIDENTIAL

CinQ+MC000255

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
81–84

CONFIDENTIAL

CinQ+MC000256

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
85–88

CONFIDENTIAL

CinQ+MC000257

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
89–92

CONFIDENTIAL

CinQ+MC000258

MANUAL ALVARE
CIN-Q AUTOMOBILES vs. BUCCANEERS

May 02, 2014
93–94

CONFIDENTIAL

CinQ+MC000259

# VERIFIED RETURN OF SERVICE

**State of Florida**                    **County of Hillsborough**                    **Circuit-Civil Court**

Case Number: 09-21839 / C

Plaintiff(s):
CRAIG CINQUE, INDIVIDUALLY AND AS THE REPRSENTATIVE OF A
CLASS OF SIMILARLY SITUTATED PERSONS,

vs.

Defendant(s):
BUCCANEERS LIMITED PATERNERSHIP,

For:
Michael C. Addison
ADDISON & HOWARD, P.A.
400 N. Tampa Street
Park Tower, Suite 1100
Tampa, FL 33601

Received by Irvine Investigations & Services on the 7th day of September, 2009 at 11:47 am to be served on
BUCCANEERS LIMITED PARTNERSHIP, A FLORIDA LIMITED PARTNERSHIP, THROUGH ITS REGISTERED
AGENT BRIAN A. FORD ONE BUCCANEER PLACE TAMPA, FL 33607.

I, Judith Clark, do hereby affirm that on the 10th day of September, 2009 at 9:58 am, I:

SERVED the within named CORPORATION by delivering a true copy of the SUMMONS, COMPLAINT, AMENDED
COMPLAINT, with the date and hour of service endorsed thereon by me to MANNY LVARE as GENERAL
COUNSEL of the within named corporation, in compliance with state statutes.

I am over the age of 18 and have no interest in the above action.

"Under penalties of perjury, I declare that I have read the foregoing Verified Return of Service and that the facts
stated in it are true."

COPY

Judith Clark
03-73-7521

Irvine Investigations & Services
4514 N. Nebraska Avenue
Suite A
Tampa, FL 33603
(813) 541-7508
Our Job Serial Number: 2009001896

Copyright © 1992-2005 Database Services, Inc. - Process Server's Toolbox V5.5q



EXHIBIT
P

CONFIDENTIAL                    CinQ+MC000260

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT IN AND
FOR HILLSBOROUGH COUNTY, FLORIDA

GENERAL CIVIL DIVISION

CRAIG CINQUE, individually and as the
representative of a class of similarly-situated
persons,

      Plaintiff,

vs.

BUCCANEERS LIMITED
PARTNERSHIP,

      Defendant.

Case No.:

**09  21839**

**DIVISION C**

CLASS ACTION

## CLASS ACTION COMPLAINT

Plaintiff, CRAIG CINQUE ("Plaintiff") brings this action on behalf of itself and all other

persons similarly situated, through its attorneys, and except as to those allegations pertaining to

Plaintiff or its attorneys, which allegations are based upon personal knowledge, alleges the

following upon information and belief against Defendant, BUCCANEERS LIMITED

PARTNERSHIP ("Defendant").

## PRELIMINARY STATEMENT

1.    This case challenges Defendant's practice of faxing unsolicited advertisements in

violation of the federal Telephone Consumer Protection Act, 47 USC § 227 (the "TCPA").

2.    The TCPA prohibits a person or entity from faxing, whether directly or through

an agent, commercial advertisements without the recipient's prior express invitation or

permission ("junk faxes" or "unsolicited faxes"). The TCPA provides a private right of action

and provides statutory damages of $500 per violation.

CONFIDENTIAL

3.      Unsolicited faxes damage their recipients.  A junk fax recipient loses the use of its fax machine, paper, and ink toner.  An unsolicited fax wastes the recipient's valuable time that would have been spent on something else.  A junk fax interrupts the recipient's privacy. Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

4.      On behalf of itself and all others similarly situated, Plaintiff brings this case as a class action asserting claims against Defendant under the TCPA and the common law of conversion.

5.      Plaintiff seeks an award of statutory damages for each violation of the TCPA and reimbursement of the costs of bringing suit, including its reasonable attorneys' fees, among other relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 47 U.S.C. § 227 and Florida Statutes § 26.012, in that this class action seeks recovery of damages in excess of $15,000, exclusive of interests and costs, and Defendant has transacted business in Florida and committed tortious acts related to the matters complained of herein.

7.      Venue is proper in Hillsborough County pursuant to Florida Statutes § 47.051 in that the cause of action accrued in this county.

8.      Federal jurisdiction does not exist because no federal question or claim is asserted and Plaintiffs' individual claims are worth less than $75,000.00, inclusive of all forms of damages and fees.  Plaintiff expressly disclaims any individual recovery in excess of $75,000.00, inclusive of all forms of damages and fees.

2

CONFIDENTIAL                    CinQ+MC000262

## PARTIES

9.    Plaintiff is an individual who is a citizen of the State of Florida and a resident of Alachua County, Florida.

10.    On information and belief, Defendant, BUCCANEERS LIMITED PARTNERSHIP is a Florida limited partnership corporation with its principal place of business in Tampa, Florida.

## FACTUAL ALLEGATIONS

11.    On or about August 19, 2009, Defendant faxed a commercial advertisement to Plaintiff.  A copy of the facsimile is attached hereto as Exhibit A.

12.    Plaintiff had not invited or given permission to Defendant to send fax advertisements to it.

13.    On information and belief, Defendant faxed the same and similar advertisements to Plaintiff and more than 50 other recipients without first receiving the recipients' express permission or invitation.

14.    There is no reasonable means for Plaintiff (or any other class member) to avoid receiving illegal faxes.  Fax machines are left on and ready to receive the urgent communications their owners desire to receive.

15.    Defendant's unsolicited fax advertisements used the paper, toner and fax machine of Plaintiff and class members, and which they had not authorized Defendant to use, thereby causing damages to Plaintiff and class members.

3

CONFIDENTIAL                    CinQ+MC000263

## CLASS REPRESENTATION ALLEGATIONS

16.     In accordance with Fla. R. Civ. P. 1.220, Plaintiff brings this action as a class

action on behalf of the following Class of persons:

> All persons who (1) on or after four years prior to the filing of this
> action, (2) were sent telephone facsimile messages of material
> advertising the commercial availability of any property, goods, or
> services by or on behalf of Defendant, (3) with respect to whom
> Defendant did not have prior express permission or invitation for
> the sending of such faxes, and (4) with whom Defendant did not
> have an established business relationship.

Plaintiff asserts claims on behalf of the Class under the TCPA and the common law cause of

action of conversion.

### Numerosity and Impracticability of Joinder – Rule 1.220(a)(1)

17.     Plaintiff is informed and believes in good faith that the class includes fifty or

more persons and as such, the members of the Class are so numerous that joinder of all members

is impracticable.

### Commonality - Rule 1.220(a)(2)

18.     There are questions of fact or law common to the class, which predominate over

questions affecting only individual class members, including without limitation:

(i)     Whether Defendant sent unsolicited fax advertisements;

(ii)     Whether Defendant's facsimiles advertised the commercial

availability of property, goods, or services;

(iii)     The manner and method Defendant used to compile or obtain the

list of fax numbers to which it sent Exhibit A and other unsolicited faxed

advertisements;

CONFIDENTIAL     CinQ+MC000264

(iv)    Whether Defendant faxed advertisements without first obtaining

the recipients' express permission or invitation;

(v)    Whether Defendant violated the provisions of 47 USC § 227;

(vi)    Whether Plaintiff and the other class members are entitled to

statutory damages;

(vii)    Whether Defendant committed the common law tort of conversion;

(viii)    Whether Defendant should be enjoined from faxing advertisements

in the future; and

(ix)    Whether the Court should award trebled damages.

19.    Plaintiff's claims are typical of those of the members of the class.  Plaintiff's

claims, and those of the other class members arise out of the same actions and course of conduct

of Defendant in sending advertisements without prior express permission or invitation.

### Adequacy of Representation – Rule 1.220(a)(4)

20.    Plaintiff will fairly and adequately protect the interests of the other class

members.  Plaintiff's counsel is experienced in handling class actions and claims involving

unsolicited advertising faxes.  Neither Plaintiff nor Plaintiff's counsel has any interests adverse

or in conflict with the absent class members.  Plaintiff has interests in common with the proposed

class members and Plaintiff and Plaintiff's counsel will prosecute the case.  Plaintiff has the

same claim for damages as the other class members, Plaintiff and the other class members can

recover the same statutory liquidated damages.

### Superiority – Rule 1.220 (b)(3)

21.    A class action is superior and appropriate to other potential methods for fair and

efficient adjudications.

5

CONFIDENTIAL                    CinQ+MC000265

22.    The interest of each individual class member in controlling the prosecution of separate claims is small and individual actions are not economically feasible and inconsistent adjudications could result.

23.    This action is manageable as a class action.

### COUNT I
### VIOLATIONS OF TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

24.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

25.    The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227(b)(1).

26.    The TCPA defines "unsolicited advertisement," as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227(a)(4).

27.    The TCPA provides:

> 3.    Private right of action.  A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:
>
> > (A)    An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
> >
> > (B)    An action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
> >
> > (C)    Both such actions.

28.    The Court, in its discretion, can treble the statutory damages if the violation was knowing.  47 U.S.C. § 227.

6

CONFIDENTIAL

CinQ+MC000266

29.    Defendant violated the 47 U.S.C. § 227 et seq. by sending advertising faxes (such as Exhibit A) to Plaintiff and the other members of the class without first obtaining their prior express invitation or permission.

30.    The TCPA is a strict liability statute and Defendant is liable to Plaintiff and the other class members even if its actions were only negligent.

31.    Defendant knew or should have known that (A) Plaintiff and the other class members had not given express invitation or permission for Defendant or anybody else to fax advertisements about Defendant's goods or services, (B) that Defendant did not have an established business relationship with Plaintiff and the other class members, and (C) that Exhibit A was an advertisement.

32.    Defendant's actions caused damages to Plaintiff and the other class members. Receiving Defendant's junk faxes caused the recipients to lose paper and toner consumed in the printing of Defendant's faxes. Moreover, Defendant's faxes used Plaintiff's fax machine. Defendant's faxes cost Plaintiff time, as Plaintiff and its employees wasted their time receiving, reviewing and routing Defendant's illegal faxes. That time otherwise would have been spent on Plaintiff's business activities. Finally, Defendant's faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone.

33.    Even if Defendant did not intend to cause damage to Plaintiff and the other class members, did not intend to violate their privacy, and did not intend to waste the recipients' valuable time with Defendant's advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

## COUNT II
### CONVERSION

34.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

CONFIDENTIAL                    CinQ+MC000267

35.     By sending Plaintiff and the other class members unsolicited faxes, Defendant improperly and unlawfully converted their fax machines, toner and paper to its own use. Defendant also converted Plaintiff's employees' time to Defendant's own use.

36.     Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other class members owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

37.     By sending the unsolicited faxes, Defendant permanently misappropriated the class members' fax machines, toner, paper, and employee time to Defendant's own use. Such misappropriation was wrongful and without authorization.

38.     Defendant knew or should have known that its misappropriation of paper, toner, and employee time was wrongful and without authorization.

39.     Plaintiff and the other class members were deprived of the use of the fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each class member thereby suffered damages as a result of their receipt of unsolicited fax advertisements from Defendant.

40.     Each of Defendant's unsolicited fax advertisements effectively stole Plaintiff's employees' time because multiple persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendant's illegal faxes. Defendant knew or should have known employees' time is valuable to Plaintiff.

41.     Defendant's actions caused damages to Plaintiff and the other members of the class because their receipt of Defendant's unsolicited fax advertisements caused them to lose paper and toner as a result. Defendant's actions prevented Plaintiff's fax machines from being used for Plaintiff's business purposes during the time Defendant was using Plaintiff's fax

8

machines for Defendant's illegal purpose. Defendant's actions also cost Plaintiff employee time, as Plaintiff's employees used their time receiving, routing, and reviewing Defendant's illegal faxes, and that time otherwise would have been spent on Plaintiff's business activities.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, CRAIG CINQUE, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendant, BUCCANEERS LIMITED PARTNERSHIP, as follows:

A.     That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.     That the Court enter judgment finding Defendant has violated the TCPA and is liable to Plaintiff and the members of the class for violating the TCPA;

C.     That the Court enter judgment finding Defendant unlawfully converted the fax machines of Plaintiff and the members of the class and is liable to Plaintiff and the members of the class for damages arising from its conversion;

D.     That the Court award $500.00 in damages for each violation of the TCPA;

E.     That the Court enter an injunction prohibiting Defendant from engaging in the statutory violations at issue in this action; and

F.     That the Court award costs, including reasonable attorneys' fees, and such further relief as the Court may deem just and proper, but in any event, not more than $75,000.00 per individual, inclusive of all damages and fees.

CONFIDENTIAL                              CinQ+MC000269

ADDISON & HOWARD, P.A.
Attorneys for Plaintiff
P.O. Box 172535
Tampa, FL  33672-0535
Telephone:  (813) 223-2000
Facsimile:  (813) 228-6000


Michael C. Addison,
Florida Bar No. 145579
m@mcalaw.net

s:\clients open\florida first.spivey\pld\complaint 42818.doc

10

CONFIDENTIAL

CinQ+MC000270



# INDIVIDUAL GAME TICKETS ON SALE NOW!

| | | | |
|---|---|---|---|
| | **MIAMI** | **August 27** | **8:00pm** |
| | **HOUSTON** | **September 4** | **7:00pm** |
| | **DALLAS** | **September 13** | **1:00pm** |
| | **N.Y. GIANTS** | **September 27** | **1:00pm** |
| | **CAROLINA** | **October 18** | **1:00pm** |
| | **GREEN BAY** | **November 8** | **1:00pm** |
| | **NEW ORLEANS** | **November 22** | **1:00pm** |
| | **N.Y. JETS** | **December 13** | **1:00pm** |
| | **ATLANTA** | **January 3** | **1:00pm** |

All game dates and times are subject to NFL flexible scheduling.

# TO PURCHASE TICKETS CALL 800-745-3000
# OR VISIT BUCCANEERS.COM

To immediately and permanently remove your fax number from our opt-in compiled database, please call 888-703-9205, Removaltech@FaxQom.com

**EXHIBIT A**

CONFIDENTIAL

CinQ+MC000271

REVISED

## FaxQom
**Worldwide IP Fax Broadcast**
617-674-2147
www.Faxqom.com

## Fax Broadcast Order Form

Name: Matt Kaiser                    Co Name: Tampa Bay Buccaneers

Address: 10250 Constellation Blvd , Suite 2850

City: Los Angeles      State: CA      Zip: 90067

Phone: (310) 275-8944   Fax: (310) 275-8995  Email: MKaiser @ firstalliedcorp.com

**What area codes do you want to fax to?   What Quantities per area code?**
**Please list area codes and quantities below and any other broadcast details needed !**

9:45AM EST 5/24 - All  813 Area Codes = 90,060 - 2 page split 50/50
4:45AM EST 5/25 - All  727 Area Codes = 33,464 - 2 page split 50/50
9:45AM EST 5/26 - All  352 & 941 Area Codes = 189,703 - 2 page split 50/50

**\* Note -  50/50 split is using a different page #2 for half the numbers**
**2.5 cents per fax rate**

                        626,454
Total faxes ordered: less credit of 35,777 Total Cost: $ 14,766.92
                        590,677 total

Credit Card Info for Payment:  Mastercard / Visa only
**The charge on your credit card statement will read:** **NetFax or Fax Sports**

Card Number:_____       Exp Date:_____

3 digit sec code:_____  Your Signature: Tampa Football Corporation
                                          By: Matt Thai
                                          Its: Director of New Business Developmen.
                                          Date: 5/18/10
By: _____
    Steven Simms   VP Sales Engineer

Faxqom agrees to indemnify and hold Tampa Bay Buccaneers or
any of its affiliates, agents, or employees harmless from
any claims, complaints, or FCC violations as a result of this campaign and
hereby confirms that all numbers have been collected lawfully and with consen

**EXHIBIT**

Q CinQ+MC 00272

BLP 000107

CONFIDENTIAL



# FAX COVER

ONE BUCCANEER PLACE  TAMPA, FL 33607      TEL: (877) 649-2827   WWW.BUCCANEERS.COM

| DATE: | 5/24/10 | # OF PAGES (INCLUDING COVER): | 2 | **2010 HOME SCHEDULE** |
|---|---|---|---|---|

| TO: | **Human Resources** | **KANSAS CITY**<br>August 21 | 7:30pm |
|---|---|---|

| FROM: | **Group Sales Department** | **JACKSONVILLE**<br>August 28 | 7:30pm |
|---|---|---|

| SUBJECT: | **Your Group Ticket Order** | **CLEVELAND**<br>September 12 | 1:00pm |
|---|---|---|

ADDITIONAL COMMENTS

**Enclosed is the information you requested.**

**PITTSBURGH**
September 26 | 1:00pm

**NEW ORLEANS**
October 17 | 1:00pm

**ST. LOUIS**
October 24 | 1:00pm

**CAROLINA**
November 14 | 1:00pm

**ATLANTA**
December 5 | 1:00pm

**DETROIT**
December 19 | 1:00pm

**SEATTLE**
December 26 | 1:00pm



CONFIDENTIAL

BLP 000108
CinQ+MC000273

BLP 000109

# FaxQom

**Worldwide IP Fax Broadcast**
617-674-2147
www.Faxqom.com

## Fax Broadcast Order Form

**Name:** Matt Kaiser          **Co Name:** Tampa Bay Buccaneers

**Address:** 10250 Constellation Blvd , Suite 2850

**City:** Los Angeles     **State:** CA     **Zip:** 90067

**Phone:** (310) 275-8944  **Fax:** (310) 275-8995 **Email:** mkaiser@firstalliedcorp.com

**What area codes do you want to fax to?   What Quantities per area code?**
**Please list area codes and quantities below and any other broadcast details needed !**

| | |
|---|---|
| 5/19 - All 813 Area Codes = 90,060 - 2 page split 50/50 | |
| 5/20 - All 727 Area Codes = 33,464 - 2 page split 50/50 | |
| 5/21 - All 352 & 941 Area Codes = 189,703 - 2 page split 50/50 | |

✱ Note - 50/50 split is using a different page #2 for half the numbers

**2.5 cents per fax rate**

**Total faxes ordered:** 626,454 *less credit of 35,777* **Total Cost:** $14,766.92
590,677 total

**Credit Card Info for Payment:   Mastercard / Visa only**

**The charge on your credit card statement will read:** **NetFax  or  Fax Sports**

**Card Number:**_____     **Exp Date:**_____

**3 digit sec code:**_____     **Your Signature:** Tampa Football Corporation
By: Matt Mann
Its: Director of New Business Developm.
Date: 5/18/10

Faxqom agrees to Indemnify and hold Tampa Bay Buccaneers or any of its affiliates, agents, or employees harmless from any claims, complaints, or FCC violations as a result of this campaign and hereby confirms that all numbers have been collected lawfully and with conse.

CONFIDENTIAL          CinQ4MC000274



**BILL McCOLLUM**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

**OFFICE OF THE ATTORNEY GENERAL**
*Economic Crimes Division*

June M. Clarkson
Assistant Attorney General
110 SE 6ᵗʰ Street, 9ᵗʰ floor
Fort Lauderdale, FL 33301
Telephone (954) 712-4600
Fax (954) 712-4658

June 3, 2010

Tampa Bay Buccaneers
One Buccaneer Place
Tampa, FL 33607

Re: Transmission of Unsolicited Facsimiles

Dear Sir/Madam:

This office has received complaints indicating that your company may be engaged in the sending of unsolicited facsimiles advertising the sale of goods, services or real property. According to the complaints, the facsimiles were transmitted without any prior authorization from the recipients.

Pursuant to F.S. Chapter 365.1657, Florida Statutes, it is unlawful to transmit an unsolicited facsimile advertising the sale of any real property, goods or services within the State of Florida. The Attorney General is empowered by law to enforce the provisions of this statute. Moreover, 47 U.S.C. §227(b)(1)(C) and the Junk Fax Protection Act of 2005 set forth a similar prohibition under federal law. Based upon the information received by this office, your company is in violation of either the state or federal laws (or both) referenced herein. Violation of the foregoing statutes carry civil penalties of $500.00 per transmission.

Accordingly, you are hereby advised to immediately CEASE AND DESIST from transmitting any further unsolicited facsimiles to avoid penalties. Failure to comply may result in legal action against you.

Sincerely,

June M. Clarkson
Assistant Attorney General

JMC/ck

**EXHIBIT**
**B**

CONFIDENTIAL

CinO+MC000 75BLP00758

**Cin-Q Automobiles, Inc., et al. v. Buccaneers Limited Partnership, Case No. 13-cv-1592**
**Principal Terms of Class Settlement**

1. The parties will seek court approval of the following settlement to resolve all claims regarding the 357,888 unsolicited facsimile advertisements successfully sent by or on behalf of Defendant from July 14, 2009 to June 9, 2010 (the "Class Period").

2. Defendant will make available a total of $99,000,000.00 (the "Settlement Fund") to pay class member claims, to pay a *cy pres* award if necessary, to pay an incentive payment to each of the class representatives, and to pay attorney's fees and expenses to Class Counsel. Defendant need not segregate funds or otherwise create special accounts to hold the Settlement Fund. Defendant will not relinquish control of any money until payments are due. As described below, if the class member claims total less than an agreed percentage of the Settlement Fund, then that difference will be awarded to charity as a *cy pres* award. Otherwise, Defendant will keep all unclaimed funds.

3. The Settlement Class will be defined as: "All persons from July 14, 2009 to June 9, 2010 who were sent facsimile advertisements offering group tickets or individual game tickets for the Tampa Bay Buccaneers games and which did not display the opt-out language required by 47 C.F.R. §64.1200."

4. The Settlement Fund will be distributed on a "claims-made" basis as follows:

    (a) <u>Payments to claiming class members</u>. Defendant agrees to pay timely claims submitted by members of the Settlement Class. A settlement notice and claim form will be sent to the class members by facsimile. The per-fax, pro rata share of the Settlement Fund before subtracting the payments in Paragraphs (b) and (c) below is $500.00.

    (b) <u>Incentive award to the class representative</u>. Defendant agrees to pay and will not oppose or appeal a request for an incentive award of $15,000.00 from the Settlement Fund to the named plaintiffs for serving as the Class Representatives.

    (c) <u>Fees and expenses to Class Counsel</u>. Defendant agrees to pay and will not oppose a request by Class Counsel (Brian J. Wanca of Anderson + Wanca and Michael C. Addison of Addison & Howard, PA) for attorney's fees in an amount equal to 25% of the Settlement Fund ($24,750,000.00), plus reasonable out-of-pocket expenses from the Settlement Fund.

    (d) <u>*Cy pres* award from a percentage of unclaimed funds</u>. If the payments to Claimants total less than 20% of the Settlement Fund ($19,800,000.00), then that difference (between the total payments to Claimants and 20% of the Settlement Fund) shall be paid as a *cy pres* award to charities recommended by Class Counsel and approved by the Court.

    (e) <u>Reversion to Defendant</u>. After making all required payments pursuant to this Paragraph 4, Defendant shall keep all unclaimed money in the Settlement Fund.

5.  Defendant will agree to a permanent injunction enjoining violations of the TCPA with language to be agreed upon.

6.  The Settlement Class will broadly release Defendant from claims arising out of or relating to Defendant's advertising faxes during the Class Period (*see* class definition above). The Settlement Class will not release claims regarding advertising faxes sent after the Class Period.

7.  In addition to the Settlement Fund, Defendant shall pay the cost to retain a third party claims administrator who will issue the class notice by facsimile and publication, receive the claim forms, assist class members in completing and submitting forms, and provide a list of accepted and rejected claims to counsel for the parties. The decision of the claims administrator regarding whether a claim is valid is final and binding on the parties. Upon request, the third party claims administrator will provide copies of all claim forms to counsel for the parties.

8.  This term sheet constitutes a binding agreement if accepted. The parties will submit a formal written settlement agreement and other papers necessary to obtain the Court's preliminary and final approval of this settlement. Within 14 days after this term sheet is signed, Plaintiffs' counsel will draft and provide such documents for Defendant's review, revisions, and approval. The parties anticipate seeking preliminary approval from the Court within 28 days of signing this term sheet.

**BUCCANEERS LIMITED**
**PARTNERSHIP**

By: _____

Its: _____

Dated: _____

**PLAINTIFFS AND THE**
**SETTLEMENT CLASS**

By: _____
        Michael C. Addison
        Brian J. Wanca
        Their Attorneys

Dated: _____

**PROOF OF CLAIM – Cin-Q Automobiles, Inc. v. Buccaneers Limited Partnership. Case No. 13-cv-1592**

*You Must Complete All THREE Steps to Claim a Share of the Settlement Fund:*

1. **You Must Provide Your Contact Information.**

   Name: _____

   Company: _____

   Address: _____

   City/State/Zip Code: _____

   Fax Number(s): _____
           [List all numbers.  You may attach a separate sheet.]

2. **You Must Verify Ownership of the Fax Number(s) Listed in #1 above:**

   (a)    "The fax number(s) identified above or attached to this Proof of Claim was/were mine or my company's from July 14, 2009 to June 9, 2010."

                           _____
                           (Sign your name here)

   *OR*

   (b)    The fax number(s) identified in No. 1 above or attached to this Proof of Claim was **not**/were **not** mine or my company's throughout the period from July 14, 2009 to June 9, 2010.  Explain when you obtained the fax number(s) identified in No. 1 above or attached to this Proof of Claim:

           _____
           _____

                           _____
                           (Sign your name here)

3. **You Must Return this Claim Form by [90 days]_____, 2015:**

   a.    Fax this Claim Form to:  <fax number for claims >

       *OR*

   b.    Mail this Claim Form to:  [CLAIMS ADMINISTRATOR]

       *OR*

   c.    Submit this claim form electronically at **[website]**

# EXHIBIT 4
### (under seal)

CinQ+MC000399

Date : 9/20/2015 9:47:53 PM
From : "Brian Wanca"
To : "Wayne Andersen" , "David Oppenheim"
Cc : "Michael Addison"
Subject : RE: Con-q v Tampa Bay Bucs

This is nothing more than the offer they made at end of our day. So we waited close to 3 weeks for nothing .they started the mediation at $200 per fax number and ended with an ambiguous $300 offer which I assumed was $300 per fax number. Judge please ask them how many unique numbers they believe they are offering. Let's see if we agree on something so we can evaluate the fund amount they are offering.

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Wayne Andersen <wra1991@aol.com>
Date:09/20/2015 8:47 PM (GMT-06:00)
To: David Oppenheim <doppenheim@andersonwanca.com>
Cc: Michael Addison <m@mcalaw.net>, Brian Wanca <bwanca@andersonwanca.com>
Subject: Re: Con-q v Tampa Bay Bucs

I can't remember but I'm guessing that they just formally offered 200 and perhaps insisted on an in kind portion. Mark thinks it's worth meeting again and he's in this to settle it. Let's talk, maybe Tuesday or Wednesday. How many fax machines were used?

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com


> On Sep 20, 2015, at 8:42 PM, David Oppenheim <doppenheim@andersonwanca.com> wrote:
>
> I think that's where they were when we broke up on 8/31, no?
>
> ——Original Message——
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Sunday, September 20, 2015 5:50 PM
> To: Michael Addison; David Oppenheim
> Subject: Con-q v Tampa Bay Bucs
>
> Gentlemen,
>
> I have a new offer from the defendant which ups its proposal from $200 to $300 per unique fax number in cash, or at claimants' option, $300 worth of Bucs tickets, parking passes or vendors coupons. May we discuss this Tuesday? I'd copy Brian on this email but don't have his email address.
>
> Please advise.  Thanks.
>
> Judge Wayne Andersen (ret.)
> Mediator & Arbitrator
> 847.650.6844  mobile
>
> JAMS Chicago
> 312.655.9191  Brooke Buczkowski
> Bbuczkowski@jamsadr.com
>
>
>

CONFIDENTIAL                    CinQ+MC000399

# EXHIBIT 5
(under seal)

CinQ+MC000396

Date : 9/20/2015 5:50:05 PM
From : "Wayne Andersen"
To : "Michael Addison" , "David Oppenheim"
Subject : Con-q v Tampa Bay Bucs

Gentlemen,

I have a new offer from the defendant which ups its proposal from $200 to $300 per unique fax number in cash, or at claimants' option, $300 worth of Bucs tickets, parking passes or vendors coupons. May we discuss this Tuesday? I'd copy Brian on this email but don't have his email address.

Please advise. Thanks.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com

CONFIDENTIAL

# EXHIBIT 6

(under seal)

CinQ
+MC000403

Date : 9/21/2015 11:46:03 AM
From : "David Oppenheim"
To : "Wayne Andersen" , "Brian Wanca"
Cc : "Michael Addison"
Subject : RE: Con-q v Tampa Bay Bucs

So, they are proposing a fund of 131,011 x $300=$39,303,300?

With respect to another session, we think at least one of the Glazers needs to be there for it to work.

From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Monday, September 21, 2015 8:56 AM
To: Brian Wanca
Cc: David Oppenheim; Michael Addison
Subject: Re: Con-q v Tampa Bay Bucs

There are about 130,000 unique fax numbers.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

On Sep 20, 2015, at 9:47 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

> This is nothing more than the offer they made at end of our day. So we waited close to 3 weeks for nothing .they started the
> mediation at $200 for fax number and ended with an ambiguous $300 offer which I assumed was $300 per fax number. Judge
> please ask them how many unique numbers they believe they are offering. Let's see if we agree on something so we can evaluate the
> fund amount they are offering.

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Wayne Andersen <wra1991@aol.com>
Date:09/20/2015 8:47 PM (GMT-06:00)
To: David Oppenheim <doppenheim@andersonwanca.com>
Cc: Michael Addison <m@mcalaw.net>, Brian Wanca <bwanca@andersonwanca.com>
Subject: Re: Con-q v Tampa Bay Bucs

I can't remember but I'm guessing that they just formally offered 200 and perhaps insisted on an in kind portion. Mark thinks it's worth meeting again
and he's in this to settle it. Let's talk, maybe Tuesday or Wednesday. How many fax machines were used?

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

> On Sep 20, 2015, at 8:42 PM, David Oppenheim<doppenheim@andersonwanca.com> wrote:
>
> I think that's where they were when we broke up on 8/31, no?
>
> -----Original Message-----
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Sunday, September 20, 2015 5:50 PM
> To: Michael Addison; David Oppenheim
> Subject: Con-q v Tampa Bay Bucs
>
> Gentlemen,

CONFIDENTIAL                          CinQ+MC000403

# EXHIBIT 7

(under seal)

CinQ+MC000418-CinQ
+MC000419

Date : 9/21/2015 2:54:23 PM
From : "Wayne Andersen"
To : "Brian Wanca"
Cc : "David Oppenheim" , "Michael Addison"
Subject : Re: Con-q v Tampa Bay Bucs

His offer is without caps or a guaranteed common fund. It's a simple offer to pay any valid claimant $300. I don't think his client wants to concede a sure 8 digit payout in an email. We probably need to talk but my recollection is the same as Mr Addison's. I'm guessing we will not be able to get them at a common fund above 20. What do you all think?
Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

On Sep 21, 2015, at 12:13 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

    I thought they offered $15m.


    **Brian J. Wanca**
    **ANDERSON+WANCA**
    **3701 Algonquin Road, Suite 500**
    **Rolling Meadows, IL 60008**
    **Ph: 847-368-1500**
    **Fax: 847-368-1501**

    From: Wayne Andersen [mailto:wra1991@aol.com]
    Sent: Monday, September 21, 2015 12:13 PM
    To: David.Oppenheim
    Cc: Brian Wanca; Michael Addison
    Subject: Re: Con-q v Tampa Bay Bucs

    My guess is that they are maintaining the claims made approach but that they'll guarantee payment of more than $10 million, which they offered last time, correct?

    I agree re Galzers.

    I'll ask re fund size and let you know their response, ok?


    Judge Wayne Andersen (ret.)
    Mediator & Arbitrator
    847.650.6844   mobile

    JAMS Chicago
    312.655.9191   Brooke Buczkowski
    Bbuczkowski@jamsadr.com



On Sep 21, 2015, at 11:46 AM, David Oppenheim <doppenheim@andersonwanca.com> wrote:

    So, they are proposing a fund of 131,011 x $300=$39,303,300?

    With respect to another session, we think at least one of the Glazers needs to be there for it to work.

    From: Wayne Andersen [mailto:wra1991@aol.com]
    Sent: Monday, September 21, 2015 8:56 AM
    To: Brian Wanca
    Cc: David Oppenheim; Michael Addison
    Subject: Re: Con-q v Tampa Bay Bucs

    There are about 130,000 unique fax numbers.

    Judge Wayne Andersen (ret.)

CONFIDENTIAL                    CinQ+MC000418

Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

On Sep 20, 2015, at 9:47 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

This is nothing more than the offer they made at end of our day. So we waited close to 3 weeks for
nothing .they started the mediation at $200 per fax number and ended with an ambiguous $300 offer which
I assumed was $300 per fax number. Judge please ask them how many unique numbers they believe they
are offering. Let's see if we agree on something so we can evaluate the final amount they are offering.

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: Wayne Andersen <wra1991@aol.com>
Date:09/20/2015 8:47 PM (GMT-06:00)
To: David Oppenheim <doppenheim@andersonwanca.com>
Cc: Michael Addison <m@mccalaw.net>, Brian Wanca <bwanca@andersonwanca.com>
Subject: Re: Con-q v Tampa Bay Bucs

I can't remember but I'm guessing that they just formally offered 200 and perhaps insisted on an in kind portion.  Mark
thinks it's worth meeting again and he's in this to settle it.  Let's talk, maybe Tuesday or Wednesday.  How many fax
machines were used?

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com


> On Sep 20, 2015, at 8:42 PM, David Oppenheim <doppenheim@andersonwanca.com> wrote:
>
> I think that's where they were when we broke up on 8/31, no?
>
> ----Original Message----
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Sunday, September 20, 2015 5:50 PM
> To: Michael Addison; David Oppenheim
> Subject: Con-q v Tampa Bay Bucs
>
> Gentlemen,
>
> I have a new offer from the defendant which ups its proposal from $200 to $300 per unique fax number in cash, or at
claimants' option, $300 worth of Bucs tickets, parking passes or vendors coupons. May we discuss this Tuesday?  I'd
copy Brian on this email but don't have his email address.
>
> Please advise.  Thanks.
>
> Judge Wayne Andersen (ret.)
> Mediator & Arbitrator
> 847.650.6844  mobile
>
> JAMS Chicago
> 312.655.9191  Brooke Buczkowski
> Bbuczkowski@jamsadr.com
>
>
>

CONFIDENTIAL                    CinQ+MC000419

# EXHIBIT 8

(under seal)

CinQ
+MC000432

Date : 10/5/2015 12:05:36 PM
From : "David Oppenheim"
To : "Wayne Andersen" , "mark.mester@hw.com"
Cc : "Brian Wanca" , "Michael Addison (M@mcalaw.net)" , "Ross Good"
Subject : Bucs settlement term sheet theirs
Attachment : Bucs settlement term sheet theirs.docx;

CONFIDENTIAL SETTLEMENT COMMUNICATION

Judge Andersen passed on the Bucs latest counter. I apologize that I am just now getting back to this but I was out last week. Plugging your numbers into our term sheet yields the attached. Is this what you propose? If not, what is different? It makes sense to us to make sure we are comparing apples to apples and work out structural issues so that we can move forward. Please let us know. I am available to discuss if you want. Thanks.

David M. Oppenheim
Attorney at Law
Anderson + Wanca
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
p-(847) 368-1500
f-((847) 368-1501

# EXHIBIT 9
(under seal)

Cin-Q
+MC000433-CinQ
+MC000435

**Cin-Q Autos, Inc. v. Buccaneers Limited Partnership, Case No. 13-cv-1592**
**Principal Terms of Class Settlement**

1.    The parties will seek court approval of the following settlement to resolve all claims regarding the unsolicited facsimile advertisements successfully sent to 131,011 persons by or on behalf of Defendant from July 14, 2009 to June 9, 2010 (the "Class Period").

2.    Defendant will make available a total of $39,303,300.00 (the "Settlement Fund") to pay class member claims, to pay a *cy pres* award if necessary, to pay an incentive payment to each of the class representatives, and to pay attorney's fees and expenses to Class Counsel. Defendant need not segregate funds or otherwise create special accounts to hold the Settlement Fund. Defendant will not relinquish control of any money until payments are due. As described below, if the class member claims total less than an agreed percentage of the Settlement Fund, then that difference will be awarded to charity as a *cy pres* award. Otherwise, Defendant will keep all unclaimed funds.

3.    The Settlement Class will be defined as: "All persons from July 14, 2009 to June 9, 2010 who were sent facsimile advertisements offering group tickets or individual game tickets for the Tampa Bay Buccaneers games and which did not display the opt-out language required by 47 C.F.R. §64.1200."

4.    The Settlement Fund will be distributed on a "claims-made" basis as follows:

    (a)    <u>Payments to claiming class members.</u> Defendant agrees to pay timely claims submitted by members of the Settlement Class. A settlement notice and claim form will be sent to the class members by facsimile. The pro rata share of the Settlement Fund before subtracting the payments in Paragraphs (b) and (c) below is $300.00.

    (b)    <u>Incentive award to the class representative.</u> Defendant agrees to pay and will not oppose or appeal a request for an incentive award of $15,000.00 from the Settlement Fund to each of the named plaintiffs for serving as the Class Representatives.

    (c)    <u>Fees and expenses to Class Counsel.</u> Defendant agrees to pay and will not oppose a request by Class Counsel (Brian J. Wanca of Anderson + Wanca and Michael C. Addison of Addison & Howard, PA) for attorney's fees in an amount equal to 30% of the Settlement Fund ($11,790,990.00), plus reasonable out-of-pocket expenses from the Settlement Fund.

    (d)    <u>Reversion to Defendant.</u> After making all required payments pursuant to this Paragraph 4, Defendant shall keep all unclaimed money in the Settlement Fund.

5.    Defendant will agree to a permanent injunction enjoining violations of the TCPA with language to be agreed upon.

6.    The Settlement Class will broadly release Defendant from claims arising out of or relating to Defendant's advertising faxes during the Class Period (*see* class definition above). The

CinQ+MC000433

Settlement Class will not release claims regarding advertising faxes sent after the Class Period.

7.      In addition to the Settlement Fund, Defendant shall pay the cost to retain a third party claims administrator who will issue the class notice by facsimile and publication, receive the claim forms, assist class members in completing and submitting forms, and provide a list of accepted and rejected claims to counsel for the parties. The decision of the claims administrator regarding whether a claim is valid is final and binding on the parties. Upon request, the third party claims administrator will provide copies of all claim forms to counsel for the parties.

8.      This term sheet constitutes a binding agreement if accepted. The parties will submit a formal written settlement agreement and other papers necessary to obtain the Court's preliminary and final approval of this settlement. Within 14 days after this term sheet is signed, Plaintiff's counsel will draft and provide such documents for Defendant' review, revisions, and approval. The parties anticipate seeking preliminary approval from the Court within 28 days of signing this term sheet.

**BUCCANEERS LIMITED PARTNERSHIP**

By: _____

Its: _____

Dated: _____

**PLAINTIFF AND THE SETTLEMENT CLASS**

By: _____
      Michael C. Addison
      Brian J. Wanca
      Their Attorneys

Dated: _____

Term Sheet – page 2
CONFIDENTIAL

CinQ+MC000434

**PROOF OF CLAIM – Cin-Q Autos, Inc. v. Buccaneers Limited Partnership, Case No. 13-cv-1592**

*You Must Complete All THREE Steps to Claim a Share of the Settlement Fund:*

**1.    You Must Provide Your Contact Information.**

Name: _____

Company: _____

Address: _____

City/State/Zip Code: _____

Fax Number(s): _____
          [List all numbers.  You may attach a separate sheet.]

**2.    You Must Verify Ownership of the Fax Number(s) Listed in #1 above:**

(a)    "The fax number(s) identified above or attached to this Proof of Claim was/were mine or my company's from July 14, 2009 to June 9, 2010."

                        _____
                        (Sign your name here)

     **OR**

(b)    The fax number(s) identified in No. 1 above or attached to this Proof of Claim was **not**/were **not** mine or my company's throughout the period from July 14, 2009 to June 9, 2010.  Explain when you obtained the fax number(s) identified in No. 1 above or attached to this Proof of Claim:

     _____
     _____

                        _____
                        (Sign your name here)

**3.    You Must Return this Claim Form by [90 days]_____, 2015:**

a.    Fax this Claim Form to:  &lt;fax number for claims &gt;

     **OR**

b.    Mail this Claim Form to:  [CLAIMS ADMINISTRATOR]

     **OR**

c.    Submit this claim form electronically at **[website]**

# EXHIBIT 10
### (under seal)

CinQ
+MC000436

Date : 10/23/2015 2:06:16 PM
From : "David Oppenheim"
To : "wra1991@aol.com" , "mark.mester@lw.com"
Subject : Bucs settlement term sheet theirs
Attachment : Bucs settlement term sheet theirs.docx;

This is meant to be Defendant's last offer placed into our structure, not where we are.  We want to confirm that this is where you are and if so, will respond with revised numbers.  If not, we need to discuss.

CONFIDENTIAL

CinQ+MC000436

# EXHIBIT 11
(under seal)

CinQ+MC000445

Date : 11/14/2015 8:36:19 AM
From : "Wayne Andersen"
To : "Mark Mester"
Cc : "David Oppenheim"
Subject : Fwd: Bucs settlement term sheet theirs
Attachment : Bucs settlement term sheet theirs.docx;ATT00001.htm;

Mark,

Please forgive my delays in responding. I've been happily entangled in arbitration hearings which were subject to rigid time deadlines, so my energies were diverted.

I've talked with Dave about the term sheet he sent to you on Oct 5 which is attached hereto. While he plugged numbers into it, he meant those as illustrative, not as numbers he agrees to. His thought was to agree to a structure, such as the one in the term sheet, and then commence the debate over exactly how much should get paid. I believe they will insist on a common fund, but the possible point of convergence is uncertain. I have my own ideas.

In any event, if you agree with the structure in the proposed term sheet, we can begin the money battle. If you advocate changes, Dave's suggestion is that we work them out now before moving to the financial tug of war. While he's amenable to getting together, as am I, he thinks we can perhaps work this out by phone and email.

I've copied Dave on this, so he can chime in with any thoughts or corrections in my understanding.

Wayne

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com


Begin forwarded message:

> From: David Oppenheim <doppenheim@andersonwanca.com>
> Date: October 5, 2015 at 12:05:34 PM CDT
> To: Wayne Andersen <wra1991@aol.com>, "mark.mester@lw.com" <mark.mester@lw.com>
> Cc: Brian Wanca <bwanca@andersonwanca.com>, "Michael Addison (M@mcalaw.net)" <M@mcalaw.net>, Ross Good <rgood@andersonwanca.com>
> Subject: Bucs settlement term sheet theirs

CONFIDENTIAL SETTLEMENT COMMUNICATION

Judge Andersen passed on the Bucs latest counter. I apologize that I am just now getting back to this but I was out last week. Plugging your numbers into our term sheet yields the attached. Is this what you propose? If not, what is different? It makes sense to us to make sure we are comparing apples to apples and work out structural issues so that we can move forward. Please let us know. I am available to discuss if you want. Thanks.

David M. Oppenheim
Attorney at Law
Anderson + Wanca
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
p-(847) 368-1500
f-[(847) 368-1501

CONFIDENTIAL

CinQ+MC000445

# EXHIBIT 12
### (under seal)

CinQ
+MC000449

Date : 12/7/2015 3:50:21 PM
From : "Wayne Andersen"
To : "David Oppenheim"
Subject : Fwd: Cin-Q v. Bucs – Settlement Discussions / Fees

Let's discuss.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bburzkowski@jamsadr.com


Begin forwarded message:

From: <MARK.MESTER@lw.com>
Date: December 2, 2015 at 3:30:55 PM CST
To: <wra1991@aol.com>
Cc: <Kathleen.Lally@lw.com>
Subject: Cin-Q v. Bucs – Settlement Discussions / Fees
Reply-To: <MARK.MESTER@lw.com>


Dear Judge Andersen – Thank you again for taking the time to talk to Kate and me on November 18, 2015 regarding
the above-captioned matter. We very much appreciate your continuing efforts to help the parties and their counsel
reach an amicable resolution of this matter. Since our discussions on November 18th, we have had a chance to
discuss this matter with our clients and are now prepared to make an offer.

Like you, we are encouraged by the fact that there is apparently agreement in principle as to what the relief should be
for members of the proposed class, and given that agreement, we are of the view (and we understand you share our
view) that it would now be appropriate to discuss fees for class counsel.

As you know, we requested back in August the current lodestar figure for class counsel in this case, and we have not
yet received that information. Accordingly, we are somewhat hampered in our ability to address fees or make a
proposal. Nevertheless, we know what the Buccaneers have spent to date on this case, and I think we have some
sense of what the lodestar figure of Plaintiffs' counsel likely is or should be. Accordingly, what we are trying to
accomplish with this email is to make an offer that represents a reasonable estimate of the lodestar of class counsel
times a reasonable multiplier. Obviously, both of those numbers are negotiable, particularly if we receive
information as to what the lodestar of class counsel actually is, and by no means do we mean to suggest in the
making of this offer that it is a take it or leave it proposition. To the contrary, it is simply a good faith effort by our
clients and us to address the issue of fees, notwithstanding the fact that we do not currently know what the lodestar of
class counsel is in this case and likewise do not know what fee arrangement they have with their clients.  (That
information was requested in discovery but has not yet been provided.)

With that background in mind, the Buccaneers are prepared to offer and agree to a fee to class counsel of $2.1
million subject to a clear-sailing provision.   We are also willing to address the issue of costs separately, but since we
don't know what costs have been incurred by class counsel, we obviously are not in a position to make a proposal
with respect to costs at this time.  This offer contemplates a claim-in structure and terms otherwise consistent with
the offer we last conveyed to you on September 17, 2015.

If you could convey our offer to class counsel, we would be most appreciative. And if you or they have any questions,
we will certainly do our best to answer them as quickly as possible. There is, however, a fair amount of activity
scheduled to occur in this case in the next several weeks and month, so we would really like to reach a resolution
soon if at all possible, lest both sides spend a lot of time and money that they could otherwise devote to more
worthwhile pursuits.

Best regards,

Mark S. Mester

**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800                CONFIDENTIAL                     CinQ+MC000449

# EXHIBIT 13
(under seal)

CinQ
+MC000451

Date : 12/7/2015 4:21:22 PM
From : "David Oppenheim"
To : "Wayne Andersen"
Cc : "Brian Wanca"
Subject : RE: Cin-Q v. Bucs -- Settlement Discussions / Fees

There appears to have been a miscommunication somewhere along the line. We have not agreed on a claims-made settlement. We have indicated that we would agree to a common fund settlement under which defendant would be allowed a reversion of unclaimed funds. We have most recently attempted to plug the dribs and drabs of partial offers we had gotten from them to date into that structure seeking confirmation that that was, in fact, what they were contemplating. The below e-mail confirms that it apparently is not.

Let me be clear: we are proposing a common fund settlement. This is the type of settlement recently discussed in *Poertner v. Gillette Co.*, 618 Fed.Appx. 624, 628 (11ᵗʰ Cir. 2015) (discussing *Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 770, 774, 775 (11th Cir. 1991)*). That is the one and only circumstance in which we would consider a claims structure and process.

In such a settlement, the fees are a percentage of the fund. *Id.* Typically 25%. *Id.* That is what was in our proposal and we do not expect to deviate from that given that it is the "benchmark" for the jurisdiction. *Id.*

As such, "lodestar" is entirely irrelevant. An offer of a $2.1 million fee would correspond to a settlement fund of $8.4 million, which is not even in the galaxy of what would be reasonable in this case—and far below what we believed to be their last offer. If they expect any further interest from us on the settlement front, we need to get beyond the shell games and get a meaningful complete, common fund offer to which we can respond.

David M. Oppenheim
Attorney at Law
Anderson + Wanca
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
p-(847) 368-1500
f-((847) 368-1501

---

From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Monday, December 7, 2015 3:50 PM
To: David Oppenheim
Subject: Fwd: Cin-Q v. Bucs -- Settlement Discussions / Fees

Let's discuss.

Judge Wayne Andersen (ret.)

Mediator & Arbitrator

847.650.6844   mobile

JAMS Chicago

312.655.9191   Brooke Buczkowski

Bbuczkowski@jamsadr.com

Begin forwarded message:

> From: <MARK.MESTER@lw.com>
> Date: December 2, 2015 at 3:30:55 PM CST
> To: <wra1991@aol.com>
> Cc: <Kathleen.Leily@lw.com>
> Subject: Cin-Q v. Bucs -- Settlement Discussions / Fees
> Reply-To: <MARK.MESTER@lw.com>
>
> Dear Judge Andersen — Thank you again for taking the time to talk to Kate and me on November 18, 2015 regarding
> the above-captioned matter. We very much appreciate your continuing efforts to help the parties and their counsel

# EXHIBIT 14
(under seal)

CinQ
+MC000465

Date : 1/15/2016 11:16:05 AM
From : "David Oppenheim"
To : "Wayne Andersen"
Cc : "Brian Wanca" , "Michael Addison (M@mcalaw.net)"
Subject : RE: Bucs

Yes.

——Original Message——
From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Friday, January 15, 2016 11:15 AM
To: David Oppenheim
Subject: Bucs

Ok. Here's your proposal:

You propose a settlement at $500 per claimant on a claims made basis. Assuming 350,000 faxes, that creates a potential fund of $175,000,000 which you agree to cap at $92 million, so we will call the potential fund a "virtual" fund. Assuming a 5% claim rate, defendant will pay about $8.75 in claims. Assuming the court awards a fee of 25% of the virtual fund, you get a fee of $23 million, thus the estimate payout by defendant of $32 million. Correct?

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bouczkowski@jamsadr.com

# EXHIBIT 15
(under seal)

CinQ

+MC000468

Date : 1/28/2016 11:25:45 AM
From : "Brian Wanca"
To : "Wayne Andersen" , "David Oppenheim"
Cc : "Michael Addison (M@mcalaw.net)"
Subject : RE: Bucs

we need them to put their offer in the form of the termsheet we gave them

Brian J. Wanca
ANDERSON+WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Ph: 847-368-1500
Fax: 847-368-1501

——Original Message——
From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Thursday, January 28, 2016 11:00 AM
To: David Oppenheim <doppenheim@andersonwanca.com>
Cc: Brian Wanca <bwanca@andersonwanca.com>; Michael Addison (M@mcalaw.net) <M@mcalaw.net>
Subject: Re: Bucs

Brian and Dave,

I believe that the Bucs may be willing to spend up to $20 million to settle this. Mark will discuss with them this afternoon.  Is it worth mediating?

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

> On Jan 15, 2016, at 12:16 PM, David Oppenheim <doppenheim@andersonwanca.com> wrote:
> >.
> Yes.
>
> ——Original Message——
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Friday, January 15, 2016 11:15 AM
> To: David Oppenheim
> Subject: Bucs
>
> Ok. Here's your proposal:
>
> You propose a settlement at $500 per claimant on a claims made basis. Assuming 350,000 faxes, that creates a potential fund of $175,000,000 which you agree to cap
> at $92 million, so we will call the potential fund a "virtual" fund.  Assuming a 5% claim rate, defendant will pay about $8.75 in claims. Assuming the court awards a fee
> of 25% of the virtual fund, you get a fee of $23 million, thus the estimate payout by defendant of $32 million. Correct?
>
> Judge Wayne Andersen (ret.)
> Mediator & Arbitrator
> 847.650.6844  mobile
>
> JAMS Chicago
> 312.655.9191  Brooke Buczkowski
> Bbuczkowski@jamsadr.com
>
>
>

# EXHIBIT 16
(under seal)

CinQ
+MC000474-CinQ
+MC000475

**Term Sheet For Settlement**

**Cin-Q Automobiles, Inc., et al. v. Buccaneers Limited Partnership,**
**Case No. 8:13-cv-01592 (M.D. Fla.)**

1.      Plaintiffs Cin-Q Automobiles, Inc. and Medical & Chiropractic, Inc. (collectively, "Plaintiffs") and Buccaneers Limited Partnership ("Defendant," and collectively with Plaintiffs, the "Parties") have reached a settlement in principle (subject to the execution and approval of a formal settlement agreement) of the above-captioned case on the terms set forth herein.

2.      The Settlement Class will be defined to address faxes allegedly sent on behalf of the Buccaneers on July 14, 2009 and June 9, 2010 that purportedly did not display the opt-out language required by 47 C.F.R. § 64.1200.  Plaintiffs contend that the Settlement Class consists of approximately 131,000 persons.

3.      Defendant will make available a total of $16,000,000 ("Settlement Fund") to pay (a) claims of members of the Settlement Class, (b) an incentive payment to each of the Plaintiffs, (c) attorneys' fees and expenses to Anderson + Wanca, Addison & Howard, PA and Siprut P.C. (collectively, "Class Counsel") and (d) notice and administration costs. Defendant need not segregate funds or otherwise create special accounts to hold the Settlement Fund.  Defendant will not relinquish control of any money until payments are due.  As described below, if the total amount of claims paid to class members, incentive payments, fees and costs to Class Counsel and notice and administration costs all total less than the amount of the Settlement Fund, any and all remaining monies will revert to Defendant.

4.      The Settlement Fund will be distributed on a "claims-made" basis as follows:

(a)      <u>Payments to claiming class members.</u>  Defendant agrees to pay timely claims submitted by members of the Settlement Class.  Members of the Settlement Class who submit claims will receive the lesser of (i) $300 each or (ii) in the event that the amounts identified in Paragraph 3 are greater than the Settlement Fund, the pro rata share of members of the Settlement Class in the Settlement Fund after subtracting the payments in Paragraphs (b) through (d).

(b)      <u>Incentive award to the class representative.</u>  Defendant agrees to pay and will not oppose or appeal a request for an incentive award of $20,000.00 from the Settlement Fund to each of the Plaintiffs for serving as the Class Representatives. The payment of an incentive award does not prohibit Plaintiffs from also filing a claim under the settlement.

(c)      <u>Fees and expenses to Class Counsel.</u>  Defendant agrees to pay and will not oppose or appeal a request by Class Counsel for attorneys' fees in an amount equal to 25% of the Settlement Fund, plus reasonable out-of-pocket costs, all to be paid out of the Settlement Fund.

<div align="center">Term Sheet – Page 1</div>

(d)   <u>Notice and Administration Costs</u>.  Costs for notice and administration will be paid from the Settlement Fund.  The Parties will agree to a notice/class administrator and work with that administrator to establish a reasonable notice plan.  The notice/class administrator will also receive the claim forms, assist class members in completing and submitting forms and provide a list of accepted and rejected claims to counsel for the parties.  Upon request, the administrator will provide copies of all claim forms to counsel for the parties.

5.   Defendant will agree to a permanent injunction enjoining violations of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, <u>et seq</u>. ("TCPA") with respect to advertising faxes with language to be agreed upon.

6.   Plaintiffs and the Settlement Class will broadly release Defendant from claims arising out of or relating to Defendant's advertising faxes during the class period and applicable limitations period.  The Settlement Class will not release claims regarding advertising faxes sent after the Class Period.

7.   This term sheet is contingent upon the entry of a mutually-agreeable Settlement Agreement as well as preliminary and final approval of the Court.

**BUCCANEERS LIMITED PARTNERSHIP**

By: _____

Its: _____

Dated: _____

**PLAINTIFF AND THE SETTLEMENT CLASS**

By: _____
     Michael C. Addison
     Brian J. Wanca
     Their Attorneys

Dated: _____

# EXHIBIT 17
(under seal)

CinQ
+MC000472

Date : 3/11/2016 9:00:27 PM
From : "Wayne Andersen"
To : "Brian Wanca"
Subject : Re: Bucs

Brian,

Come on, $16 million is serious in any league. And, as a practical matter, we are just starting. The AG warning is certainly worth millions to your clients. I assume they will propose more, maybe lots more in light of their apparent acceptance of your claims made structure.

What would they actually pay under their proposal?  $4 million in fees + $1.2 million in claims (at 3% claim rate and $300 per claim) + costs of administration?  I have to believe they're willing to spend a multiple of that.

Please give a counter and let's see where they go.

See you Monday.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com


On Mar 11, 2016, at 8:42 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

    Offering less than 10% of their exposure before trebling is not a serious offer.

    Sent from Outlook Mobile


    On Fri, Mar 11, 2016 at 5:37 PM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

    Brian and Dave,

    Mark just sent this offer in the term sheet form I believe you've requested. I haven't read it yet. It's taken this long because Mark's schedule has been especially hectic—a city per day. His client would really like to resolve the case. Please let me know your response.


          CinQ+MC000472

# EXHIBIT 18
(under seal)

CinQ
+MC000482

Date : 3/12/2016 9:21:04 AM
From : "Brian Wanca"
To : "wra1991@aol.com"
Cc : "David Oppenheim"
Subject : Re: Bucs

Until they put up Capital One money there's nothing to talk about

Sent from Outlook Mobile

On Sat, Mar 12, 2016 at 7:13 AM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

Ah. Let's get this going. We know Mark has more authority but has to follow client instructions. Drop to anything you'd like and let's get going. You've dragged him into your format and his opening offer is not bad. He wasn't going to leap into the eight digits right away.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

On Mar 11, 2016, at 11:59 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

Someone is out of touch.

Sent from Outlook Mobile

On Fri, Mar 11, 2016 at 8:13 PM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

I agree with the $ estimate.  Please counter. Sleep well, gentlemen!

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

On Mar 11, 2016, at 9:41 PM, David Oppenheim <doppenheim@andersonwanca.com> wrote:

This is actually only about a $6.5 payout, so about 4%.

Sent from my iPhone

On Mar 11, 2016, at 8:42 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

Offering less than 10% of their exposure before trebling is not a serious offer.

Sent from Outlook Mobile

CONFIDENTIAL                    CinQ+MC000482

# EXHIBIT 19
## (under seal)

CinQ
+MC000486

Date : 3/12/2016 9:46:46 AM
From : "Brian Wanca"
To : "wra1991@aol.com"
Subject : Re: Bucs

$75m

Sent from Outlook Mobile

On Sat, Mar 12, 2016 at 7:30 AM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

Where did Capitol One end up?

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

On Mar 12, 2016, at 9:21 AM, Brian Wanca <bwanca@andersonwanca.com> wrote:

Until they put up Capital One money there's nothing to talk about

Sent from Outlook Mobile

On Sat, Mar 12, 2016 at 7:13 AM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

Ah. Let's get this going. We know Mark has more authority but has to follow client instructions. Drop to anything you'd like and let's get going. You've dragged him into your format and his opening offer is not bad. He wasn't going to leap into the eight digits right away.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

On Mar 11, 2016, at 11:59 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:

Someone is out of touch.

Sent from Outlook Mobile

On Fri, Mar 11, 2016 at 8:13 PM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

I agree with the $ estimate.  Please counter. Sleep well, gentlemen!

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

CONFIDENTIAL

CinQ+MC000486

# EXHIBIT 20
(under seal)

CinQ
+MC000494

Date : 3/14/2016 9:54:30 AM
From : "Brian Wanca"
To : "Wayne Andersen"
Cc : "David Oppenheim" , "m@mcalaw.net"
Subject : RE: Bucs

There was no reversion on capital one, we are offering reversion thru class cert . once a class is certified reversion is off the table.


**Brian J. Wanca**
ANDERSON+WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Ph: 847-368-1500
Fax: 847-368-1501


From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Saturday, March 12, 2016 9:48 AM
To: Brian Wanca <bwanca@andersonwanca.com>
Subject: Re: Bucs

With reversion correct?

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

On Mar 12, 2016, at 9:46 AM, Brian Wanca <bwanca@andersonwanca.com> wrote:

> $75m
>
> Sent from Outlook Mobile


On Sat, Mar 12, 2016 at 7:30 AM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

Where did Capitol One end up?

Hon. Wayne Andersen
Mediator & Arbitrator
847.650.6844

On Mar 12, 2016, at 9:21 AM, Brian Wanca <bwanca@andersonwanca.com> wrote:

> Until they put up Capital One money there's nothing to talk about
>
> Sent from Outlook Mobile


On Sat, Mar 12, 2016 at 7:13 AM -0800, "Wayne Andersen" <wra1991@aol.com> wrote:

Ah. Let's get this going. We know Mark has more authority but has to follow client instructions.  Drop to anything you'd like and let's get going. You've dragged him into your format and his opening offer is not bad. He wasn't going to leap into the eight digits right away.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com

CONFIDENTIAL                CinQ+MC000494

# EXHIBIT 21
(under seal)

CinQ
+MC000497-CinQ
+MC000499

<u>Cin-Q Autos, Inc. v. Buccaneers Limited Partnership, Case No. 13-cv-1592</u>
<u>Principal Terms of Class Settlement</u>

1.    The parties will seek court approval of the following settlement to resolve all claims regarding the 343,122 unsolicited facsimile advertisements successfully sent by or on behalf of Defendant from July 14, 2009 to June 9, 2010 (the "Class Period").

2.    Defendant will make available a total of $92,000,000.00 (the "Settlement Fund") to pay class member claims, to pay an incentive payment to each of the class representatives, and to pay attorney's fees and expenses to Class Counsel. Defendant need not segregate funds or otherwise create special accounts to hold the Settlement Fund. Defendant will not relinquish control of any money until payments are due. Defendant will keep all unclaimed funds. If any payments owed are not paid by the date due, Defendant will pay daily interest at Florida's statutory interest rate (4.75% per annum).

3.    The Settlement Class will be defined as: "All persons from July 14, 2009 to June 9, 2010 who were sent facsimile advertisements offering group tickets or individual game tickets for the Tampa Bay Buccaneers games and which did not display the opt-out language required by 47 C.F.R. §64.1200."

4.    The Settlement Fund will be distributed on a "claims-made" basis as follows:

    (a)    <u>Payments to claiming class members.</u>  Defendant agrees to pay timely claims submitted by members of the Settlement Class. A settlement notice and claim form will be sent to the class members by facsimile. The per-fax, pro rata share of the Settlement Fund before subtracting the payments in Paragraphs (a) and (b) above is $500.00.

    (b)    <u>Incentive award to the class representative.</u>  Defendant agrees to pay and will not oppose or appeal a request for an incentive award of $20,000.00 from the Settlement Fund to each of the named plaintiffs for serving as the Class Representatives.

    (c)    <u>Fees and expenses to Class Counsel.</u>  Defendant agrees to pay and will not oppose a request by Class Counsel (Brian J. Wanca of Anderson + Wanca and Michael C. Addison of Addison & Howard, PA) for attorney's fees in an amount equal to 25% of the Settlement Fund ($23,000,000.00), plus reasonable out-of-pocket expenses from the Settlement Fund.

    (d)    <u>Reversion to Defendant.</u>  After making all required payments pursuant to this Paragraph 4, Defendant shall keep all unclaimed money in the Settlement Fund.

5.    Defendant will agree to a permanent injunction enjoining violations of the TCPA with language to be agreed upon.

6.    The Settlement Class will broadly release Defendant from claims arising out of or relating to Defendant's advertising faxes during the Class Period (*see* class definition above). The

Settlement Class will not release claims regarding advertising faxes sent after the Class Period.

7.   In addition to the Settlement Fund, Defendant shall pay the cost to retain a third party claims administrator who will issue the class notice by facsimile and postcard mailing to all class members to whom fax notice failed after three attempts to the extent an address can be ascertained by a reverse lookup process, receive the claim forms, assist class members in completing and submitting forms, and provide a list of accepted and rejected claims to counsel for the parties.  The decision of the claims administrator regarding whether a claim is valid is final and binding on the parties.  Upon request, the third party claims administrator will provide copies of all claim forms to counsel for the parties.

8.   This term sheet constitutes a binding agreement if accepted.  The parties will submit a formal written settlement agreement and other papers necessary to obtain the Court's preliminary and final approval of this settlement.  Within 14 days after this term sheet is signed, Plaintiff's counsel will draft and provide such documents for Defendant' review, revisions, and approval.  The parties anticipate seeking preliminary approval from the Court within 28 days of signing this term sheet.

**BUCCANEERS LIMITED PARTNERSHIP**

By: _____

Its: _____

Dated: _____

**PLAINTIFF AND THE SETTLEMENT CLASS**

By: _____
       Michael C. Addison
       Brian J. Wanca
       Their Attorneys

Dated: _____

Term Sheet – page 2
CONFIDENTIAL

CinQ+MC000498

## PROOF OF CLAIM – Cin-Q Autos, Inc. v. Buccaneers Limited Partnership, Case No. 13-cv-1592

*You Must Complete All THREE Steps to Claim a Share of the Settlement Fund:*

**1.**    **You Must Provide Your Contact Information.**

Name: _____

Company: _____

Address: _____

City/State/Zip Code: _____

Fax Number(s): _____
         [List all numbers.  You may attach a separate sheet.]

**2.**    **You Must Verify Ownership of the Fax Number(s) Listed in #1 above:**

(a)    "The fax number(s) identified above or attached to this Proof of Claim was/were mine or my company's from July 14, 2009 to June 9, 2010."

             _____
                    (Sign your name here)

*OR*

(b)    The fax number(s) identified in No. 1 above or attached to this Proof of Claim was **not**/were **not** mine or my company's throughout the period from July 14, 2009 to June 9, 2010.  Explain when you obtained the fax number(s) identified in No. 1 above or attached to this Proof of Claim:

       _____
       _____
       _____

             _____
                    (Sign your name here)

**3.**    **You Must Return this Claim Form by [90 days] _____ , 2016:**

a.    Fax this Claim Form to:  <fax number for claims >

     *OR*

b.    Mail this Claim Form to:  [CLAIMS ADMINISTRATOR]

     *OR*

c.    Submit this claim form electronically at **[website]**

Term Sheet – page 3
CONFIDENTIAL

# EXHIBIT 22

(under seal)

CinQ
+MC000519-CinQ
+MC000520

Date : 4/24/2016 11:49:21 AM
From : "Ross Good"
To : "Brian Wanca" , "Wayne Andersen"
Cc : "m@mcalaw.net"
Subject : Re: Bucs- Confidential Settlement Communication FRE 408
Attachment : USDC-MDFL-LocalRules 12-2009.pdf;BLP Mtn.pdf;

Judge Andersen,

Would you please prepare a report that can be provided to the Court that an impasse has been reached in this case in compliance with Rule 9.01(a) of the Local Rules of the Middle District of Florida?

I am attaching BLP's Motion for A Settlement Conference which they have filed with the Court and the Local Rules of the Middle District of Florida.

Please let me know if you have any questions.

Thanks

--
Ross Good
Anderson + Wanca
3701 Algonquin Rd., Suite 500
Rolling Meadows, IL 60008
rgood@andersonwanca.com - EMail
(847) 350-9861 - Direct Line
(847) 350-9861 - Direct Fax
(847) 368-1500 - Office Phone
(847) 368-1501 - Office Fax

On Tue, Apr 12, 2016 at 2:23 PM Brian Wanca <bwanca@andersonwanca.com> wrote:
We will deal with fees after class wide relief has been agreed on.

Brian J. Wanca
ANDERSON+WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Ph: 847-368-1500
Fax: 847-368-1501

-----Original Message-----
From: Wayne Andersen [mailto:wra1991@aol.com]
Sent: Tuesday, April 12, 2016 2:17 PM
To: Brian Wanca <bwanca@andersonwanca.com>
Cc: m@mcalaw.net; Ross Good <rgood@andersonwanca.com>
Subject: Re:Bucs- Confidential Settlement Communication FRE 408

First, why give them an excuse not to raise the fee ante to $10 million--a hefty amount in absolute terms and more than double won't envelope offered. That said what about brackets with a virtual find of between $40 million and $80 million. Would you agree to that? At would entail a giant move by them and a relatively small move by you.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com

CONFIDENTIAL                    CinQ+MC000519

> On Apr 12, 2016, at 2:02 PM, ... an Wanca <bwanca@andersonwanca.com> wrote:
>
> I am not interested in brackets., the distance between the parties position is so substantial that it makes no sense for us to discuss anything as everything has been already said. As discussed the claim form structure will not be offered after the class is certified as we will require that checks be sent to every member of the class. The underlying facts of this case support a trebling of a substantial portion of the faxes that were sent with liability exceeding $150 M. so I am at a loss to understand the basis of the offer when we were lead to believe the def was offering $20M all in which would still be well short of what would be needed. While I have heard repeatedly def really wants to settle this I have seen no movement or an offer based on a true understanding of the liability facing the def. I must only conclude that it is another cry wolf which deserves to be ignored as actions speak louder than words. I don't wish to negotiate fees when the fund has not been agreed on and is not close to being agreed on.
>
>
> Brian J. Wanca
> ANDERSON+WANCA
> 3701 Algonquin Road, Suite 500
> Rolling Meadows, IL 60008
> Ph: 847-368-1500
> Fax: 847-368-1501
>
>
> -----Original Message-----
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Tuesday, April 12, 2016 1:14 PM
> To: Brian Wanca <bwanca@andersonwanca.com>
> Cc: Wayne Andersen <Wra1991@aol.com>
> Subject: Bucs
>
> Brian,
>
> Although we haven't talked or even emailed in a while, I've been struggling with Mark Mester who has been struggling with his client who still can't believe the huge financial consequence that has tumbled into its life as a result of the communications.  I did call Dave Sunday to discuss my plan, but, as you know, he told me he was leaving the firm and that he no longer had any standing to negotiate.  Hence this email.  My plan is to fire out proposed brackets on the fee.  My primary goal is to move the defendant into a range more than double its current offer of $4 million.
>
> If you have trouble with the bracket, please email so that we can set up a time to talk.
> For that matter, please feel free to call, text or email whenever you'd like.  My cell is 847-650-6844.  Thanks.  I'm in mediations all day today and tomorrow but can break free from time to time.  Friday I have a relatively unstructured day if you'd like to have a more prolonged discussion. I believe that Mark is at a point where his client will make a real effort to settle this.
>
> Thanks.
>
> Judge Wayne Andersen (ret.)
> Mediator & Arbitrator
> 847.650.6844   mobile
>
> JAMS Chicago
> 312.655.9191   Brooke Buczkowski
> Bbuczkowski@jamsadr.com
>
>
>
>

CONFIDENTIAL

# EXHIBIT 23
(under seal)

CinQ
+MC000510

Date : 4/13/2016 4:34:45 PM
From : "Wayne Andersen"
To : "Brian Wanca"
Cc : "Ross Good" , "m@mcalaw.net"
Subject : Re: More Bucs

Brian,

I've missed you at the office.  You've asked for an offer and I'll ask Mark to make one.  He believes he might do better with his clients if we started this with brackets of 40-80, but I'm going to ask him to just make an offer unless you advise me you'd like to go the bracket route.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844  mobile

JAMS Chicago
312.655.9191  Brooke Buczkowski
Bbuczkowski@jamsadr.com

> On Apr 13, 2016, at 12:01 PM, Brian Wanca <bwanca@andersonwanca.com> wrote:
>
> thanks
>
>
> Brian J. Wanca
> ANDERSON+WANCA
> 3701 Algonquin Road, Suite 500
> Rolling Meadows, IL 60008
> Ph: 847-368-1500
> Fax 847-368-1501
>
>
> ——Original Message——
> From: Wayne Andersen [mailto:wra1991@aol.com]
> Sent: Wednesday, April 13, 2016 11:59 AM
> To: Brian Wanca <bwanca@andersonwanca.com>
> Cc: Ross Good <rgood@andersonwanca.com>, m@mcalaw.net
> Subject: Re: More Bucs
>
> Ok. I just emailed him.
>
> Judge Wayne Andersen (ret.)
> Mediator & Arbitrator
> 847.650.6844  mobile
>
> JAMS Chicago
> 312.655.9191  Brooke Buczkowski
> Bbuczkowski@jamsadr.com
>
>
>
>> On Apr 13, 2016, at 11:25 AM, Brian Wanca <bwanca@andersonwanca.com> wrote:
>>
>> Mester can send us a termsheet with his " new offer."
>> Brian J. Wanca
>> ANDERSON+WANCA
>> 3701 Algonquin Road, Suite 500
>> Rolling Meadows, IL 60008
>> Ph: 847-368-1500
>> Fax 847-368-1501
>>
>>
>> ——Original Message——
>> From: Wayne Andersen [mailto:wra1991@aol.com]
>> Sent: Wednesday, April 13, 2016 11:18 AM
>> To: Brian Wanca <bwanca@andersonwanca.com>
>> Subject: More Bucs
>>
>> Brian,
>>
>> May I call you today to discuss this?  I'm in a mediation and not sure when I will get a break, but we shouldn't need to talk long.  I think Mester agreed to your structure in the back and forth with Dave earlier.  We also tentatively agreed upon a $300 per claim amount which would set the virtual fund at about $40 million. This is a hefty increase from any past offer.  Its the form you want and a substantial amount of money.  I'm sure they'll offer that—indeed they move up meaningfully if you give them any encouragement.  May we talk today?

CONFIDENTIAL                    CinQ+MC000510

# EXHIBIT 24

(under seal)

CinQ
+MC000721-22

Date : 5/2/2016 4:03:48 PM
From : "Wayne Andersen"
To : "Brian Wanca" , "Mark Mester" , "Michael Addison" , "Ross Good"
Subject : Form
Attachment : Notice of impasse 92221.docx;ATT00001.txt;

I've authorized counsel to file this form because I believe it comports with the local practice.

CONFIDENTIAL

CinQ+MC000722

Date : 5/2/2016 4:03:37 PM
From : "Wayne Andersen"
To : "Michael Addison" , "Mark Mester" , "Wayne Andersen"
Cc : "Wayne Andersen" , "Wayne Andersen" , "Ross Good" , "Brian Wanca"
Subject : Re: Form of Declaration of Impasse

Gentlemen,

After consulting my colleagues at Jams in Florida, I agree that the form provided by Mr. Addison comports with local practice.  Even though I might prefer it were different, I authorize counsel to submit on my behalf the form provided by Mr. Addison simply declaring an impasse.

Thanks for your patience.


Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com



On May 2, 2016, at 3:35 PM, Michael Addison <m@mcalaw.net> wrote:


Mike
Michael C. Addison
Addison & Howard, P.A.
400 N. Tampa St., Suite 1100
Tampa, FL 33602-4714
Tel: 813-223-2000 Fax: 813-228-6000
m@mcalaw.net


<Notice of impasse 92221.docx>

CONFIDENTIAL                    CinQ+MC000721

# EXHIBIT 25

(under seal)

CinQ
+MC000760

Date : 5/2/2016 5:18:41 PM
From : "Wayne Andersen"
To : "Brooke Buczkowski"
Cc : "rgood@andersonwanca.com" , "m@mcalaw.net" , "mark.mester@lw.com" , "bwanca@andersonwanca.com"
Subject : Re: Cin-Q Automobiles vs. Buccaneers Ltd Partnership - REF# 1340012173

All,

I went all the way to the top of Jams, our general counsel, for advice. This is what he authorized.
This communication supersedes my prior authorization. Thanks.

Judge Wayne Andersen (ret.)
Mediator & Arbitrator
847.650.6844   mobile

JAMS Chicago
312.655.9191   Brooke Buczkowski
Bbuczkowski@jamsadr.com

On May 2, 2016, at 5:01 PM, Brooke Buczkowski <bbuczkowski@jamsadr.com> wrote:

Dear Counsel:

Please see the attached declaration from Judge Andersen.

Brooke

<image001.jpg>      **Brooke Buczkowski**
                    Senior Case Manager

<image002.jpg>      JAMS
<image003.jpg> <image004.jpg>   71 S. Wacker Drive
                    Suite 3090
                    Chicago, IL 60606
                    bbuczkowski@jamsadr.com
                    Ph 312-655-9191
                    Fax 312-655-0644

                    Global resolutions—*close to home.* Find a
                    global leader at JAMS.

<Signed Mediator Declaration.pdf>

CONFIDENTIAL            CinQ+MC000760